

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 3 0 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICK REEVES,                          )
                                      )
        Plaintiff,                    )
                                      )     Civil Action File No.:
v.                                    )     1-00-CV-1720-CC
                                      )
UNIVERSAL WRESTLING,                  )
CORPORATION f/k/a                     )
WORLD CHAMPIONSHIP WRESTLING,         )
INC., TURNER SPORTS, INC.,            )
TURNER ENTERTAINMENT GROUP,           )
INC. and TURNER BROADCASTING          )
SYSTEM, INC.,                         )
                                      )
        Defendants.                   )
_____)

## PLAINTIFF REEVES' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Cary Ichter
Charles J. Gernazian
Michelle M. Rothenberg-Williams
**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center
Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
(404) 261-6020

110

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Reeves has established <u>overwhelming</u> evidence demonstrating that Defendants discriminated against him and other African-Americans, including the following:

- Defendants' principal decision-makers routinely used racial slurs such as "nigger" and made many racially offensive remarks, revealing a blatant racial bias against African-American wrestlers;
- WCW has been historically a racist enterprise in which Caucasian decision-makers routinely mistreated African-Americans without any guidelines or established criteria regarding non-discriminatory treatment of wrestlers and without any Turner Defendant to protect African-American wrestlers from systemic discrimination;
- WCW's principal decision-maker as to Reeves' wrestling career, Terry Taylor, routinely referred to African-American wrestlers as "niggers," stated that "black people wouldn't make it in the business as long as he had something to do with it" (Snakovsky Deposition[1] at 78), and routinely expressed his opinion that black wrestlers could not "draw" (i.e., attract a large crowd) (Bayens at 19, 62-63);
- Compelling Statistical evidence that demonstrates that WCW's practices were racially discriminatory; and
- Additional evidence of race-based decision-making, racial stereotyping, and adverse treatment of African-American wrestlers.

Because Reeves has established overwhelming direct, statistical, and circumstantial evidence that WCW had a pattern and practice of discriminating against African-American wrestlers, a <u>jury</u> must decide: (1) whether Defendants maintained a "pattern and practice" of race discrimination; and (2) whether or not Defendants can show that each of its adverse decisions

---

[1] Unless indicated otherwise, all references to a witness and corresponding page numbers will refer to the <u>deposition</u> on file.

regarding Reeves was not made in furtherance of its racially discriminatory practices.

Even if this Court does not find sufficient evidence of a "pattern and practice" of discrimination against all African-American wrestlers, Reeves has individually established overwhelming direct, statistical, and circumstantial evidence showing that he was a victim of intentional racial discrimination (as well as illegal race-based decision-making).

And although not required to do so, Reeves can further demonstrate that summary judgment is inappropriate under the "McDonnell Douglas" method of proof because, notwithstanding Defendants' contentions, Reeves can establish a prima facie case of discrimination. Moreover, because Defendants have not proffered any purported non-discriminatory reason for failing to give Reeves employment/contractual opportunities to wrestle for WCW, Reeves is entitled to allow a jury determine whether he has established a prima facie case of discrimination, by a preponderance of the evidence. If so, Reeves is entitled to a judgment against Defendants.

**STATEMENT OF FACTS**

**A. WCW'S DECISION-MAKING PROCESS WAS RACIALLY BIASED**

Throughout its entire history, WCW's executives and upper management were exclusively Caucasian. (Goodly at 32-33;

- 3 -

Bischoff at 103).  In addition to its top executives (Eric
Bischoff and Vince Russo), WCW had a committee ("Booking
Committee") of decision-makers ("Bookers") who selected
wrestlers for WCW events and developed storylines for the
wrestlers.  (Schiavone at 13-14; Bischoff at 47-49; Smith at 13-
14, 129; Disclosures of Expert Testimony of J. Steve Hicks
("Hicks Report") at 1, Tab S).  When the Bookers selected a
wrestler they wanted to promote, by providing opportunities in
main events, they providing a wrestler with a **"push."**  (Juster
at 127-128; Bruce at 12-13; Hicks Report at 2-3, Tab S).

The Booking Committee was exclusively Caucasian; WCW never
had an African-American, Asian-American, or Hispanic work on the
Booking Committee.  (Schiavone at 18-19; Williams at 116; Russo
at 67; Anderson at 189).  WCW never posted an available
"booking" position, and WCW employees joked that the Committee
was a "good old boys network."  (Bayens at 25-26).  Indeed,
having an African-American on the Booking Committee "never
seemed to be something that was a possibility."  (Bayens at 25-
26; see also Boulware at 119, Tab AA (WCW officials "picked
their buddies and their White counterparts and didn't hire
anyone that was Black").

Several qualified African-Americans, including Plaintiff
Patterson, tried to become members of the Booking Committee, but

- 4 -

the Caucasian decision-makers denied them the opportunity.

(Williams at 233-234; Anderson at 134-138; Morrison at 206-209;

Smith at 95-97).  Also, even though Pez Whatley, Kazuo Onoo, and

Lash Huffman, who also have filed claims against WCW, each

complained to Turner Human Resources Manager Timothy Goodly that

WCW did not have any African-American Bookers, WCW never

responded to their complaints by allowing a minority to work on

the Booking Committee.  (Whatley at 74, Tab BB; Onoo at 70-71;

Goodly at 89).

In addition to the Bookers, WCW also had "agents," who

executed the mechanics of the match and went over the scripts

with the wrestlers.  (Russo at 62, 67; Morrison at 24).  WCW

never had an African-American work as an agent.  (Boulware at

77, Tab AA).

Selection of Wrestlers From The Power Plant:

Although many wrestlers trained at WCW's training facility,

the Power Plant, WCW did not maintain any policy or guidelines

regarding the manner in which wrestlers from the Power Plant

would receive contracts, television exposure, or wrestling

opportunities:

> There was no formal process . . . could have been any
> number of ways that that might have happened . . . One way
> might have been that there was a student who caught the eye
> of booking people or the director of the power plant or
> whatever whom they thought was ready to take that next
> step.

(Juster at 126-127; see also Bruce at 82-83; Ferrara at 55).

Brenda Smith, the administrative assistant to Power Plant manager Jody Hamilton, testified that Hamilton distinguished between Black and White wrestlers by using what she termed "racial slurs within the wrestling lingo." (Smith at 19-20). Smith further concluded that Hamilton was participating in race-based decision-making when he spoke on the phone to the Bookers, using code words "jiggerboggie" and "lackey" to designate African-American wrestlers.  (Smith at 19, 21-22, 122).  Smith testified that "when the booking committee came over to look at different wrestlers," they "specifically watched the Caucasians that Mr. Hamilton suggested."  (Smith at 132, 136).

Selection of WCW Wrestlers From Outside The Power Plant:

In addition to promoting and selecting wrestlers from the Power Plant, WCW also provided wrestling opportunities and wrestling contracts to male wrestlers from a variety of places. According to Gary Juster, who was the Director of Business Affairs, in addition to the Power Plant, WCW recruited wrestlers from various sources, but there was "no formal system."  (Juster at 34).  According to Juster, some wrestlers would get an opportunity if they "would just hang around the industry and get to know people in the industry . . ."  Id.  In addition, many wrestlers who had wrestled in independent territories ended up

wrestling at WCW.  Id. at 33-34.  According to production worker
Moses Williams, many of the wrestlers would arrive at WCW "off
the street" because the wrestler was a "friend of some wrestler
or a friend of somebody on the booking committee. . ."
(Williams at 47).  Indeed, Williams recalls that WCW would "pick
a guy straight off the beach in Daytona."  (Williams at 50).

In addition, WCW also invited wrestlers to send in their
wrestling tapes.  (Juster at 33-34).  Terry Taylor conducted
several tryouts for individuals who had submitted their tapes to
WCW.  For example, in December, 2000, J.J. Dillon informed Paul
Orndorff that Terry Taylor would conduct a tryout for
individuals that had submitted tapes.  (Tab M).  Brenda Smith,
who was Orndorff's assistant, and copied on the same e-mail,
testified that all of the individuals that were scheduled for
that particular tryout were Caucasian.  (Smith at 93-94, Tab N).

**B.   REEVES' RELATIONSHIP WITH DEFENDANTS AND REEVES' CLAIMS**

Rick Reeves initiated his wrestling career in 1992 when he
began training to wrestle professionally with wrestling legend
Claude "Thunderbolt" Patterson.  (Reeves at 29).  Mr. Patterson
attempted to introduce him to the world of professional
wrestling through the WCW.  (Reeves at 30).  In order to give
him an extra edge, Mr. Patterson introduced Reeves to Booker Ole
Anderson as his "son."  (Reeves at 31).  This practice of

bringing in "new blood" into wrestling by way of introducing
them as the "son of" another famous wrestler was common in the
world of professional wrestling.  (Reeves at 31).  Anderson
seemed receptive to this introduction and asked Reeves to begin
coming to the tapings.  (Reeves at 32).  He stated that they
would "get him worked in."  (Reeves at 32).

However, despite Reeves' persistence and attendance at more
than twenty tapings in 1993 and 1994, he was never asked to
wrestle at any of these venues.  (Reeves at 34-35).  He
continued to show up time after time because Anderson kept
asking him to return.  (Reeves at 35).  Reeves soon came to
understand that his race was the reason he was not permitted to
wrestle at the tapings because he saw White wrestler after White
wrestler, such as Kevin Nash and Scott Hall, getting
opportunities to wrestle.  (Reeves at 37).  Nevertheless,
Anderson, who was the one who had given the White wrestlers the
chance to perform, kept telling Reeves to "hang in there."
(Reeves at 39).

Despite WCW's discrimination and refusal to provide him an
opportunity, Reeves continued to hone his wrestling skills by
wrestling professionally in 1994 for the Mid-South Wrestling
Organization.  (Reeves at 41-43).  Reeves wrestled in a
championship match for Mid-South wrestling in 1997.  (Reeves at

- 8 -

165).   He also wrestled for Boulware Wrestling Association (BWA)
in the late 90's and won the heavyweight championship belt in
that wrestling organization in 2000.   (Reeves at 163-164).

As he continued to improve his wrestling skills in other
organizations, he continued to attempt to wrestle for WCW.   In
1995, Reeves began sending tapes of his wrestling performances
to WCW.   (Reeves at 45-46).   Mr. Reeves sent about seven or
eight tapes, with two or three matches on each tape, to WCW in
about 1995-1996.   (Reeves at 45-47).   In addition, Mr. Reeves
sent tapes to J.J. Dillon, WCW's talent manager, and called him
about six or seven times a month for more than four years.
(Reeves at 48-50).

In addition to calling Dillon, Reeves also contacted Terry
Taylor, WCW's "head" or "top booker" many times by telephone and
in person several times at the Ramada Hotel where many of the
wrestlers stayed.   (Reeves at 54-55).   Reeves also gave Taylor
his wrestling tapes.   (Reeves at 56).   When Reeves asked Taylor
about getting a job, Taylor's response was, **"we got enough of
y'all boys already."**   (Reeves at 55-56).   Taylor clearly meant
that WCW did not wish to employ any more African-Americans.
(Reeves at 56).   Reeves also heard Taylor use "the 'n' word" in
conversations with other people.   (Reeves at 85).

- 9 -

Significantly, Reeves made attempts to wrestle regularly throughout the 90's and made many attempts to wrestle for WCW in 1998 and 1999, and perhaps even in 2000. (Reeves Aff. at ¶ 18, Tab A). Reeves not only attempted to get Taylor to give him an opportunity before Taylor left WCW (from January, 1999, until approximately October, 1999), but also applied for a wrestling job with Taylor after October, 1999. (Taylor at 29, 37) (testifying that he left WCW for about "ten months" and returned in November, 1999); Reeves at 55)). Similarly, Reeves made attempts to get a wrestling job through Dillon through 1999. (Reeves at 65).

In addition to approaching Mr. Anderson, Dillon, and Taylor, Reeves also spoke to Power Plant manager Jody Hamilton, about getting a wrestling job with WCW. Hamilton responded by saying, **"We got enough of your kind down here."** (Reeves at 59). And although Hamilton called Reeves "kid," he certainly knew who Reeves was. (Reeves Aff. at ¶ 17, Tab A).

Finally in 1999 or perhaps 2000, Reeves stopped contacting WCW officials. Dillon and Taylor because he was not given any opportunity or a wrestling contract. (Reeves at 65; Reeves Aff. at ¶ 18, Tab A). Reeves did not complain about discrimination because he understandably did not wish to file a complaint with the company for whom he was applying. (Reeves at 89, 103).

- 10 -

Despite his many unsuccessful attempts to become a WCW professional wrestler (Reeves at 36, 53, 72, 84, 90, 92), Reeves had to watch White wrestlers who were similarly situated – Kevin Nash, Chuck Palumbo, Stan Stasiak, Dallas Page, Tank Abbott and Billy Kidman, to name a few – receive opportunities to train and wrestle while he was passed over.  (Reeves at 73). He also saw other Caucasian wrestlers obtain opportunities even if he cannot recall their names.  (Reeves at 75; Reeves Aff. at ¶¶ 4-5, Tab A).

As a result of WCW's discrimination, Reeves lost wages and "productive years" that he should have been gainfully employed with WCW as a professional wrestler.  Also, he could have possibly have used his experience there as a jumping off point for a career with the WWF after WCW ceased operating.  (Reeves at 103-04, 145).  In addition, Mr. Reeves suffered emotional distress because of the repeated rejection and outright discrimination he suffered at the hands of WCW officials. (Reeves at 116-118).

<b><u>ARGUMENT AND CITATION OF AUTHORITY</u></b>

Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact," <u>Cornelius v. Town of Highland Lake</u>, 880 F.2d 348, 351 (11th Cir. 1989), or

- 11 -

if reasonable minds could differ on the inferences arising from
undisputed facts.  See Miranda v. B&B Cash Grocery Store, Inc.,
975 F.2d 1518, 1534 (11th Cir. 1992).  In assessing the record,
the Court may not weigh evidence or make credibility
determinations.  See Lipphardt v. Durango Steakhouse of Brandon,
Inc., 267 F.3d 181 (11th Cir. 2001).  In sum, Rule 56 merely
requires Reeves to present "sufficient evidence" in order to
require a fact-finder to resolve the "parties' different
versions of the truth at trial."  First Nat'l Bank v. City Serv.
Co., 391 U.S. 253, 288-289 (1968).

I.   **PLAINTIFF IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS
     PRODUCED OVERWHELMING EVIDENCE OF INTENTIONAL
     DISCRIMINATION.[2]**

    Defendants imply that Reeves is restricted to proving
discrimination under the methodology set forth in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).  Defendants'
position is misplaced because a plaintiff is not restricted to
one method of proving discrimination.  As stated by the Supreme
Court, the McDonnell Douglas framework is "merely a sensible,
orderly way to evaluate the evidence in light of common
experience as it bears on the critical question of
discrimination."  United States Postal Service Bd. of Governors

---

[2] Reeves is presently seeking relief under Title VII of the Civil Rights Act
of 1964, as amended and 42 U.S.C. § 1981.  And for all the reasons set forth
in Plaintiff Norris' Response, Reeves can proceed under both of these
statutes.  In any event, the analysis regarding Reeves' evidence of
discrimination is the same under each statute.

v. Aikens, 460 U.S. 711, 715 (1983); see also, Costa v. Desert
Place, Inc., 299 F.3d 838, 855 (9th Cir. 2002) ("nothing compels
the parties to invoke McDonnell Douglas").

As set forth infra, the Eleventh Circuit has recognized
that a plaintiff can rely on pattern and practice, direct,
and/or McDonnell Douglas evidence to prove discrimination.
Reeves has established each of these types of evidence, and thus
shows that he can easily persuade a trier of fact that
Defendants discriminated against Reeves. See Aikens, supra at
716 (stating that trial courts should not treat discrimination
"differently from other ultimate questions of fact").

A.    REEVES HAS ESTABLISHED PATTERN AND PRACTICE EVIDENCE.

Because Reeves can demonstrate a "pattern and practice" of
discrimination, "a rebuttable presumption that each plaintiff
was a victim of discrimination obtains, and the burden shifts to
the employer to prove that each individual employment decision
was not made in furtherance of its illegal policy." Hipp v.
Liberty National Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir.
2001).

Although "pattern and practice cases" are ordinarily raised
by the Equal Employment Opportunity Commission ("EEOC"), or by
class action plaintiffs, the courts have also allowed plaintiffs
in individual cases to prove discrimination through "pattern and

- 13 -

practice evidence."  Cox v. American Cast Iron Pipe Co., 784

F.2d 1546, 1559 (11th Cir. 1986)(noting that although pattern and

practice cases usually involve class actions, the individual

plaintiffs showed pattern and practice where sex discrimination

was "the company's standard operating procedure"); see also Tye

v. Houston County Bd. of Educ., 681 F. Supp. 740, 745 (M.D. Ala.

1987) (stating that individual plaintiff was entitled to

presumption of discrimination where she established a pattern

and practice of sex discrimination).

A plaintiff is allowed to prove pattern and practice

evidence of discrimination through (1) direct evidence; (2)

statistical evidence, and/or (3) anecdotal evidence that reveals

the employer's "intent" to treat a protected class unequally.

See EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286-1287

(11th Cir. 2000).  Reeves has established compelling evidence in

each category as shown below.

## 1.  Direct evidence

Reeves can establish a pattern and practice of

discrimination through direct evidence because the principal

decision-makers, Terry Taylor, Eric Bischoff, and Vince Russo,

as well as the Bookers, made numerous remarks and statements

that constitute direct evidence of their racial discrimination

against all African-American wrestlers, including Reeves.

As to Taylor, arguably the most influential decision-maker as to Reeves (and each African-American Plaintiff),[3] the record is replete with Taylor's most blatant remarks "whose intent could be nothing other than to discriminate on the basis of [race]." Bass v. Bd. of County Comm., 256 F.3d 1095, 1105 (11th Cir. 2001). Examples of the testimony revealing Taylor's offensively racial bias include:

- Stating to Reeves, "we got enough of y'all boys already." (Reeves at 55-56).
- Stating to Plaintiff Walker that "you're a nigger and you have no talent." (Snakovsky at 76).
- When informed that Walker had complained of his racial bias, stating that "I don't know if I'm a racist but I know that . . .[h]e's a nigger with no talent." (Bayens at 19).
- Stating that neither Walker nor Plaintiff Norris would make it in the wrestling profession because they were "black." (Snakovsky Aff. at ¶ 7, Tab D).
- When Walker was jumping off the ropes, stating "that nigger, he's not good for jumping, so he should go play basketball too." (Snakovsky at 83-84).
- Repeatedly telling African-American Ernest Miller that even though Miller was a good athlete, "the only reason you got a job is because you're black" and that "this company don't market toward blacks; we only have white fans, and [they're only going to] look at you as a nigger." (Miller at 66, 101).
- Stating that, in his opinion, black wrestlers "weren't much of a draw." (Bayens at 19, 62-63).
- Stating that black persons had great physiques because they were genetically inclined or predisposed, but that he questioned their ability to wrestle. (Bayens at 21-22, 64-65).
- Stating that Ernest Miller was "another nigger with no talent." (Bayens at 20).

---

[3] Taylor was known as the "top" or "head" booker as the other bookers were subordinate to him. (Miller at 197-198). Also, Reeves applied for a position to Taylor directly.

- Stating that black wrestlers "shouldn't be in our sport, they should be in basketball." (Snakovsky at 78).
- Stating that "a lot of black people wouldn't make it in the business because they are black as long as he had something to do with it." (Snakovsky at 78).
- When renowned wrestler Hulk Hogan was scheduled to begin at WCW, stating that he did not want any black wrestlers on the show; "there won't be any brothers on the show." (Williams Aff. ¶ 40, Tab E; Williams at 54-57).
- In reference to Harrison Norris, stating "that damn Hardbody is a no good nigger." (Snakovsky at 108, 140; Snakovsky Aff. ¶ 18, Tab D).
- Taylor used the "nigger" word quite a bit. (Anderson at 107).
- When watching a match involving Ernest Miller and Sonny Onoo, stating "there's a nigger and a Jap. Who's going to want to watch that?" (Bayens at 67; Miller at 148-149).
- When referring to African-American wrestlers, saying "that stupid nigger" and often used the word "nigger" when he was talking to other WCW officials while traveling on WCW business. (Anderson at 85, 172-173).
- When a Caucasian was scheduled to replace an African-American, stating "don't worry about the niggers, I'll take care of that." (Williams at 110).
- Stating his opinion that wrestling fans are "white" and that blacks don't buy wrestling tickets." (Williams at 111, 114-116; Williams Aff. ¶ 14, Tab E).
- On a very cold winter day, stating that "you better turn on the air conditioner because you know those niggers can't take the cold." (Carr at 92-93,Tab Z).
- When African-American wrestler Tony Carr was going to participate in a WCW event in Montana, stating that "no one would believe there were niggers in Montana." (Carr at 139,Tab Z).
- Apparently referencing to a demographic survey that was done by a Turner Defendant, informing African-American Rocky Boulware that "Turner told us we don't need to use you all niggers." (Boulware at 71, 124-125, Tab AA).

WCW President Eric Bischoff also made many statements

unequivocally revealing his intent to discriminate, as follows:

- Stating that wrestling was a "white man's sport" and that is why WCW did not have many black wrestlers. (Williams Aff. ¶ 12, Tab E).
- Stating that blacks were not paying to watch WCW events live and that they would rather watch it on TV. (Anderson at 177; Reeves at 178).
- When observing Plaintiff Norris, he stated that "that's too niggerish for my television." (Anderson at 90, 177-178).
- When observing another African-American wrestler, he stated that "we need to get that crack nigger off the TV." (Anderson at 76-77, 202).
- Using the word "nigger" in relation to wrestlers on more than one occasion. (Kearce at 42).
- On one occasion, while removing African-American wrestlers from the schedule, indicating that it was "white night." (Whatley at 132-134, Tab BB; Smith at 57; Reeves at 177-178).
- When Plaintiff Patterson tried to get a job at WCW, telling him that "we don't need no niggers." (Patterson at 76, 93).
- Instructing Bookers not to worry about "pushing a black or a nigger." (Anderson at 177).
- Asking why WCW was "pushing some of the blacks and some of the niggers on our television show?" (Anderson at 74-75).

Similarly, <u>Vince Russo</u>,[4] Bischoff's successor, made

blatantly racist remarks, demonstrating his intent to also

discriminate against African-Americans:

- Agreeing that African-American wrestlers were not as good workers as the white wrestlers. (Snakovsky at 82).

---

[4] To the extent Reeves attempted to obtain opportunities after October, 1999, Russo was also a decision-maker as to Reeves. (Ferrara at 18) (testifying that Russo was ultimately responsible for WCW's main events). At the very least, as the ultimate decision-maker, Russo participated in the selection process. <u>See</u> <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1542 n.13 (11th Cir. 1989) ("disparate treatment analysis requires that none of the decision-making process be influenced by racial bias").

- Often using racial slurs, including "nigger" when referring to wrestlers.  (Sullivan at 55-56).
- Calling African-Americans "Moolions," referring to a tribe from Africa.  (Sullivan at 56).
- Indicating his racial bias by specifically referring to "blacks" or "the brothers."  (Williams at 94-96).
- Stating that "whites rule wrestling."  (Williams Aff. ¶ 12, Tab E).
- Stating that "black folks don't buy wrestling tickets anyway, wrestling fans are white."  (Williams at 94-96).
- Indicating that WCW was going to have a "white champion" because that was the way he wanted it.  (Williams Aff. ¶ 12, Tab E).
- Using the word "nigger" on more than one occasion.  (Kearce at 38).

Thus, Taylor's, Bischoff's and Russo's statements are direct evidence of discrimination; the statements reveal racial discrimination against African-American wrestlers, without any inference or further inquiry. See Price Waterhouse v. Hopkins, 490 U.S. 220 (1989) (finding direct evidence where a decision-maker believed that women were not capable of functioning as senior managers); Haynes v. WC Kaye and Co., 52 F.3d 928, 930-31 (11th Cir. 1995) (finding direct evidence where decision-maker stated that "women were simply not tough enough" and that "it would require a man to do the job"); Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (finding discrimination where decision-makers stated that the program "needed a black director").

Lastly, the Bookers' constant and frequent use of racial slurs, including "nigger" (see Sullivan at 13-14; Yother at 13-

16; Smith at 131; Anderson at 83-84, 109-111, 174-175; Boulware
at 49-50, Tab AA; Juster at 116-117; Williams at 252; Schiavone
at 16-24; Walker at 210-211; Kearce at 29, 31-33, 41), also
constitutes direct evidence of discrimination.  See Miles v. MNC
Corp., 750 F. 2d 867, 873-76 (11th Cir. 1985) (characterizing
evidence of racially derogatory remarks as direct evidence).

Accordingly, Reeves has established ample direct evidence
of a pattern and practice of racial discrimination against
African-American wrestlers.

### 2.   Statistical evidence

Mr. Reeves has produced convincing statistical evidence,
through the expert testimony of Dr. David W. Rasmussen, who is
the James H. Gapinski Professor of Economics at Florida State
University, which conclusively demonstrates that WCW's practices
were discriminatory. Using appropriate benchmarks regarding the
available applicant pool, Dr. Rasmussen concluded that WCW's
practices demonstrated standard deviations which are "far beyond
the standard" that "indicates that chance accounts for the
under-representation of African-Americans at WCW."
(Supplemental Expert Report at 5, Tab F).

Dr. Rasmussen also performed an analysis of the statistical
breakdown regarding WCW wrestlers who received the highest
salaries, and found a "less than one chance in 100 that this

outcome" could occur by chance alone. (Disclosures of Expert
Testimony of Dr. Rasmussen at 18, Tab T). Reeves' statistical
evidence, therefore, further establishes a pattern and practice
of discrimination. See EEOC v. Joe's Stone Crab, Inc., supra,
at 1287.

> 3. Anecdotal evidence

In addition to the compelling direct and statistical
evidence, Reeves has also established ample anecdotal evidence
of discrimination:

>> a. WCW's decision-making process was racially
>> biased.

WCW's practice of allowing exclusively Caucasian decision-
makers to use informal methods of selecting its wrestlers
further demonstrates a pattern and practice of race
discrimination. Rowe v. General Motors Corp., 457 F.2d 348, 359
(5th Cir. 1972); see also, Robert's v. Gadsden Memorial Hospital,
1988 U.S. App. LEXIS 19507 at *14-15 (11th Cir. 1988)
(defendant's informal methods of selection "necessarily and
intentionally favored those who moved within his social circles
- i.e., white people").

In Rowe, the Court held that the defendant's exclusively
Caucasian, and completely subjective decision-making process,
was a "ready mechanism for discrimination against blacks, much
of which can be covertly concealed, and for that matter, not

really known to management." Rowe at 359. The Court further
noted that "we and others have expressed a skepticism that black
persons dependent directly on the decisive recommendations from
whites can expect non-discriminatory actions." Id.

Similarly, WCW's exclusively Caucasian decision-makers were
able to readily perpetuate the dominance of Caucasian wrestlers.
Significantly, although the Turner Defendants provided Human
Resource managers to assist WCW, these managers did not even
have "any official duties as related to [wrestling] talent."
(Goodly at 63). Loretta Walker, a Turner Human Resource manager
assigned to WCW, testified that she was not responsible for
preventing discrimination against wrestlers because they were
not deemed to be "employees." (Walker at 12-13). Furthermore,
although the witnesses are completely inconsistent as to who, if
anybody, was responsible for ensuring that the wrestlers were
not victims of discrimination,[5] the evidence is clear that no
Turner or WCW employee/officer who had even minimal training in
equal opportunity or anti-discrimination laws took any
responsibility for ensuring that the African-American wrestlers
were being treated fairly, which is further evidence of
discrimination. See Rowe, supra, at 359 (finding that

---

[5] Compare Goodly at 65-67 (testifying Bischoff and possibly Myers and Busch
were responsible) with Loretta Walker at 21 (testifying that although she was
Human Resource Manager for employees, she did not know who was responsible
for protecting wrestlers from discrimination).

Defendants' decision-making process violated Title VII, in part,
because "there are no safeguards in the procedure designed to
avert discriminatory practices").

> b. WCW demonstrated racial bias in the
> scripting and staging of wrestling events.

WCW's pattern and practice of discrimination is also
illustrated in the manner in which it scripted its matches.
Perhaps most illustrative is when WCW directed a Caucasian
manager, Colonel Parker, to dress like a "southern gentleman"
and lead his African-American wrestling tag team, "Harlem Heat"
into the arena shackled in chains.  In short, the wrestlers were
"dressed like slaves," and Colonel Parker was dressed like a
"slave owner." (Kearce at 34-36).

Also, during a main event, WCW instructed a Caucasian
wrestler, Buff Bagwell, to appear in the ring with his face
painted black in order to mock African-American Ernest Miller.
Taylor even commented to Miller: "he [looks] like you.  He
look[s] like a nigger."  (Miller at 149).  WCW officials also
frequently wanted African-American wrestlers to dress like
"pimps" based on the racial stereotype that black men are pimps.
(Miller at 194-195; Norris at 180).

- 22 -

c.    African-American wrestlers were treated
      differently at WCW's Power Plant.

Although Caucasian "rookies" performed limited manual labor
at the Power Plant, the evidence establishes racial disparities
regarding the amount of physical labor performed by African-
American wrestlers.  (Smith at 27-28; Davis at 77).  As
Plaintiff Walker testifies, the black wrestlers "didn't have a
choice" because if they did not work the managers believed that
they had a "bad attitude," but white wrestlers often left early
without doing physical work or helping out.  (Walker at 102-
103).

Similarly, as explained by a WCW trainer, whenever a
Caucasian trainee made a mistake, the Caucasian was given
another opportunity. (Whatley at 101, Tab BB).  In contrast,
when African-American wrestlers faltered, WCW officials
concluded that he "didn't want to be there" or "had a bad
attitude."  (Id.)

d.    In response to Plaintiffs' Walker's and
      Norris' suit, WCW pushed African-American
      wrestlers to deflect racial allegations.

Throughout its entire history, the only two times that WCW
made an African-American the heavyweight champion, it was facing
a charge of or suit for racial discrimination.  In January 1992,
WCW received notice of an EEOC charge filed by African-American

- 23 -

wrestler Ranger Ross. (Ross EEOC Charge, Tab G). Instead of
adequately responding to Ross' allegations, in August 1992, WCW
made another African-American, Ron Simmons, its first African-
American heavyweight champion. (List of Champions, Tab U). In
addition to the suspicious temporal connection, WCW official
Olie Anderson admitted that WCW was promoting African-Americans
to respond to racial complaints at that time. (See Anderson
Interview, Tab H) (explaining that a WCW official stated, "we've
taken a black team and we've made them champion so that they
wouldn't have any bitch from a racial point of view").

Similarly, after Plaintiffs Walker and Norris filed their
complaints of race discrimination in February 2000, WCW once
again responded by making another African-American, Booker T,
the heavyweight world champion on July 9, 2000. Significantly,
Taylor told Russo that he wanted to "take the heat off" the
racial allegations. (Snakovsky Aff. ¶ 20, Tab D; Snakovsky at
99-100). Indeed, virtually every witness agrees that the
circumstances under which Booker T became the champion were very
unusual. (Williams at 151-160, 165; Schiavone at 22-26).

WCW's actions after the event are also revealing. For
example, Schiavone recalls conducting an initial interview with
Russo about Booker T's championship, but this interview was not
aired and WCW had Schiavone tape a second interview. (Schiavone

at 29-33). As to the initial interview tape, Assistant Producer
Michelle Bayens stated:

> I knew that when the tape came back and they put it up
> and I asked about why all the secrecy, and they said
> because there was a lot of discriminating things, or
> that could be construed as discriminatory within the
> interview, so they - the powers that be had to take a
> look at it to see whether it could air or not.  And a
> second interview was shot just in case.

(Bayens at 99).[6]

Thus, a reasonable jury could conclude that WCW's conduct
including belatedly and reluctantly promoting African-Americans
to deflect racial allegations, as well as its many concerns
about the racial issues surrounding Booker T, further shows that
it was engaged in discrimination.

> e.   WCW personnel admit racial slurs, race
>      discrimination and lack of diversity.

Turner's Human Resource manager, Goodly, admitted to Reeves
that he was aware of discrimination at WCW, but that he "had a
job too."  (Reeves at 254).  Goodly also noticed a lack of
diversity in the upper talent at WCW, (Goodly at 69-73), and
suggested to Bischoff that WCW should get a "fresh set of eyes,"
such as Konan (Hispanic) or Booker T (African-American) on the
Booking Committee, (Goodly at 89-91).  Goodly also acknowledged
that WCW's practice of not using African-Americans as world

---

[6] Bayens further recalls, "I know they talked about him [Booker T] being Black
and if that was an issue.  I don't remember the answers."  (Bayens at 104).
She also states, "yes, it was a great concern."  (Bayens at 100-106).

champions might be a "red flag of discrimination" that could lead to differing opinions as to the practice of not selecting African-American champions.  (Goodly at 95-97; see also Goodly at 176 ("I just didn't think we had strategies in place to market diverse talent, to market all talent as well as the competition")).

In addition, other WCW employees knew about the obvious discrimination and racism at WCW.  (See Bayens at 94 ("When you take a step back . . . [minority wrestlers] were treated less favorably or weren't promoted because of the color of their skin"); Kearce at 27-28 (testifying about "bigotry" and "racism" at WCW); Collins Aff. at ¶¶ 3-5, Tab J (observing that "Caucasians dominated WCW")).

> f.  WCW discriminated against African-American wrestlers in merchandising.

Reeves has established evidence that WCW disparately merchandised its wrestling products, such as T-shirts and other props, based on race.  (Miller at 117-119; see also, Williams at 69-72 (testifying that although many of the younger fans requested more merchandise for the African-American wrestlers, WCW did not adequately merchandise for minority wrestlers)).

Moreover, WCW officials Taylor and Arn Anderson admitted that WCW did not merchandise items for African-Americans because

black people "don't buy anything when they come to the show" and "white people ain't [going] buy merchandise T-shirts with black faces on it."   (Miller at 120).

> g.   WCW discriminated against African-American employees.

In considering WCW's pattern and practice of racial discrimination, evidence that WCW discriminated against African-American non-wrestling employees is revealing.  WCW only employed about 12% African-Americans.  Of these, only two were mid-level managers, and none were senior managers.  (See Smith Aff., Tab I; Collins Aff. ¶ 4, Tab J).  Indeed, even Goodly acknowledges that minority representation at WCW was not "consistent with what [he] knew to be good HR practice." (Goodly at 49).

In addition:
- WCW routinely favored Caucasian personnel who had less experience than more qualified African-Americans.  (Smith at 39-42, 44-45, 151-152, 180-181, 189; Williams at 217-222).
- WCW's Security manager Doug Dillinger expressly refused to hire a "black" security person.  (Williams at 134-135; Carr at 111, Tab Z).
- A Caucasian supervisor requested security personnel to check the bags and belongings of African-Americans, but did not similarly request that the security personnel to check the belongings of the Caucasians.  (See Neal Aff. ¶ 7, Tab K).

Accordingly, only a jury can decide whether all of the above-described evidence, when considered collectively,

demonstrates a pattern and practice of racial discrimination. See Hipp v. Liberty National Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir. 2001) (the proper method of adjudicating pattern and practice cases is to submit a verdict form to the jury).

B.   REEVES IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS ESTABLISHED DIRECT EVIDENCE OF RACE DISCRIMINATION.

Even if the Court does not find sufficient direct evidence of a pattern and practice of discrimination, the above-referenced evidence, (see supra at pp. 14-18), nevertheless constitutes direct evidence of discrimination against Reeves. Where an individual plaintiff establishes direct evidence of discrimination, summary judgment is inappropriate.  See Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999) (stating that judgment as a matter of law is not appropriate where non-movant presents direct evidence).

Reeves has established direct evidence because Taylor informed Reeves that, **"we got enough of y'all already."**  (Reeves at 55-56).  Similarly, Hamilton rejected Reeves' request to wrestle for WCW, and told Reeves, **"we got enough of your kind down here."**  (Reeves at 59).  These statements reveal discriminatory intent without any inference needed as they were clearly referring to Reeves' race.

Also, as noted above, WCW's principal decision-makers, Taylor (who was the principal decision-maker as to Reeves),

- 28 -

Bischoff, and Russo each made blatantly discriminatory remarks
that establish "the existence of discriminatory intent behind
their adverse decisions regarding Reeves "without any inference
or presumption." Standard v. ABEL Serv., Inc., 161 F.3d 1318,
1330 (11th Cir. 1998). Moreover, Russo, Bischoff and especially
Taylor's remarks demonstrate a fundamental belief that African-
Americans, as a class, were not as suited for the wrestling
business as were Caucasians. Thus, Reeves has established
direct evidence that WCW discriminated against him. See Burrell
v. Bd. of Trustees, 125 F.3d 1390, 1394 n.7 (11th Cir. 1997)
("[s]uch statements because of their breadth -- may obviate the
need for inferences about the speaker's motivation for a wide
category of employment decisions"); see also EEOC v. Alton
Packaging Corp., 901 F.2d 920, 924 n.6 (11th Cir. 1990)
(decision-makers comments constituted direct evidence where the
statements indicated "a decidedly negative attitude toward black
people"). Lastly, Reeves' evidence shows that Dillon frequently
used the word "nigger," and simply "did not like black persons."
(Williams at 27; Bobby Walker at 168; Whatley at 62-63, Tab BB;
Patterson at 101). Thus, because Reeves has established direct
evidence of discrimination, summary judgment is inappropriate.

- 29 -

C.   REEVES IS ALSO ENTITLED TO A JURY TRIAL BECAUSE HE CAN
     EASILY ESTABLISH DISCRIMINATION UNDER THE MCDONNELL
     DOUGLAS METHOD OF PROOF.

As established by the United States Supreme Court, the

"prima facie" case established in McDonnell Douglas, was "never

intended to be rigid, mechanized or ritualistic," United States

Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715

(1983).

And as set forth below, Reeves is entitled to a jury trial

because Defendants have not offered a non-discriminatory reason

even though Reeves can prove, by a preponderance of the

evidence, a prima facie case of discrimination.

1.   Reeves Can Establish a Prima Facie Case of
     Discrimination.

     a.      Reeves establishes a prima facie case of
             discrimination because Defendants'
             maintained a subjective and discriminatory
             selection process.

Defendants argue that Reeves cannot make out a "prima facie

case," but Defendants misconstrue Reeves' claims, as well as the

applicable law.

This Court should not grant summary judgment merely because

Defendants contend that Reeves cannot produce any evidence that

he "actually applied for an open position with WCW." (DB at

13). Defendants are essentially taking the anomalous position

that even though it did not provide a formal application process

- 30 -

to wrestlers, and even though Reeves followed each and every

informal means by which Caucasians got their wrestling jobs at

WCW, that Defendants are nevertheless entitled to summary

judgment.

Although a plaintiff ordinarily must show that he applied

for a job, this requirement is not necessary where a decision-

maker "disseminates information about available positions

through informal channels."   Walker v. Prudential Property &

Casualty Ins. Co., 286 F.3d 1270, 1275  (11th Cir. 2002).

Thus, "when an employer uses such informal methods, it has

a duty to consider all those who might reasonably be interested"

in the available position.   Id.; see also, Carmichael v.

Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984).

In Carmichael, the court held that the district court erred

in finding "no indication" that plaintiff "applied for or that

he expressed a prior interest in the job."   The Court Of Appeals

held that the plaintiff "was not required to ask specifically

for that job" when he did not know about it and "where there was

no formal mechanism for expressing his interest."   Id.   The

court stated that because the defendant used no "formal

procedures for posting notice of available promotions or for

determining who would be offered the promotion," this procedure

could lead to "racial discrimination."   The court concluded: "in

- 31 -

these circumstances, [plaintiff] was not required to do more than indicate as best he could that he would take any available job." Id. at 1132.

Defendants' position, therefore, is misplaced because Reeves pursued every possible avenue to receive an opportunity and a contract at WCW to the best of his ability.  In addition to speaking with WCW's Talent Manager Dillon and WCW's top booker, Taylor, and in addition to sending in tapes of his wrestling abilities, Reeves even offered to further train at the Power Plant, but was nevertheless denied the opportunity or contract because of his race.  (Reeves at 60-61; Reeves Aff. at ¶¶ 4-12, Tab A).  Moreover, Reeves even personally visited the Ramada Inn where Terry Taylor was interacting with other wrestlers on several occasions, and gave him several tapes. (Id.; Reeves at 55).

The courts have routinely rejected summary judgment where, as here, the employer argues that the employee never actually applied for a job where the employer does not post job opportunities and does not provide establish uniform criteria for job selection.  Harris v. Birmingham Bd. of Educ., 712 F.2d 1377, 1383-84 (11th Cir. 1983).

In Harris, the Plaintiff was an African-American football coach who was denied an opportunity at a particular school.  The

Defendant School Board argued that the Plaintiff was not given the coaching job because he was "not interested in a head football coaching position." Id. at 1383.  In rejecting the Board's position, the Court stated:

> Title VII, Supreme Court precedent, and our holdings would be rendered a farce if a public employer, without notification of job opportunity procedures, without uniform criteria for determining qualifications, and with a totally subjective system of selection could rebut a prima facie case by a prospective employee of a protective class by showing that the employee never had the opportunity to learn of and apply for the job.

Id. at 1384.

Furthermore, to the extent that WCW's decision-makers such as Terry Taylor routinely favored the Caucasians whom they interacted with, such as Joey Maggs, (Snakovsky at 84-86), Reeves was at a huge disadvantage because Reeves, an African-American was not in the same social circles as WCW's exclusive Caucasian decision-makers.  See Roberts v. Gadsden Memorial Hosp., 1988 U.S. App. LEXIS 19507 at *14 (11th Cir. 1988) (the "informal methods necessarily and intentionally favored those who moved within his social circles - i.e., white people"); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1551-52 (11th Cir. 1986) (the defendant maintained the discriminatory system through word of mouth hiring - the system was entirely one of subjective evaluation); see also, Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) (noting that employer

- 33 -

had a "duty" to consider a black employee for a position and the employer was "not entitled to assume that the employee was not interested" where the employee was prevented from receiving notice of "word of mouth" promotions).

Summary judgment is also inappropriate because a wrestler's success was limited only by the creative imaginations and intentions of the Caucasian Bookers. (See Sullivan at 35 (testifying to the fallibility of process because matches were "not real"); see also Hicks Aff. ¶¶ 9-11, Tab L). As noted by a WCW producer, WCW could have made Reeves a superstar because WCW can "make anybody they want to a superstar." (Kearce at 82).

Although Defendants claim that their representatives did not know or remember Reeves by name, he met with each of them, and thus Hamilton and Taylor each knew Reeves when he met with them. (See Reeves Aff. at ¶¶ 4-12, 17). The fact that they rejected him because he was African-American and now claim they don't remember him by name is insufficient to prevail, as a matter of law.

In sum, although Defendants contend Reeves did not apply, Reeves constantly submitted his wrestling tapes, met with and called J.J. Dillon six or seven times a month for four years, and asked Dillon, Anderson, Taylor, and Hamilton for a job repeatedly on many occasions. (Reeves at 35, 45-50, 54-56, 59-

- 34 -

63).  Reeves also made himself a presence at the Ramada Hotel where the WCW wrestlers stayed and spoke to Mr. Taylor there. (Reeves at 54-55; Reeves Aff. at ¶ 4-12).  Also, Reeves did not merely ask Mr. Hamilton if he could "help," as Defendants selectively state, but asked him and others many times over if he could have a job.  (Reeves at 59).

Thus, Reeves has established a prima facie case of discrimination, especially in light of Defendants' subjective and informal decision-making process.  See Crawford v. Western Electric Co., 614 F.2d 1300, 1315-20 (5th Cir. 1980) (plaintiffs established prima facie case where subjective criteria was used and plaintiffs' evidence showed Caucasians were generally advanced more readily).

> b.    Reeves Has established a Prima Facie Case
>       of Discrimination because he was as
>       qualified, if not more qualified, than
>       WCW's Caucasian wrestlers.

Defendants cite cases where a plaintiff's sole evidence is the comparison of his or her qualifications to the person who received a particular position.  See, e.g., Dennis v. Columbia Colleton Medical Ctr., 290 F.3d 639, 648 (4th Cir. 2002) (evidentiary standard that a plaintiff's superior qualifications must "slap one in the face" only applies where a plaintiff's "sole evidence of pretext is the superior qualifications of the plaintiff").  However, Reeves' evidence is not solely that his

- 35 -

63).  Reeves also made himself a presence at the Ramada Hotel
where the WCW wrestlers stayed and spoke to Mr. Taylor there.
(Reeves at 54-55; Reeves Aff. at ¶ 4-12).  Also, Reeves did not
merely ask Mr. Hamilton if he could "help," as Defendants
selectively state, but asked him and others many times over if
he could have a job.  (Reeves at 59).

     Thus, Reeves has established a prima facie case of
discrimination, especially in light of Defendants' subjective
and informal decision-making process.  See Crawford v. Western
Electric Co., 614 F.2d 1300, 1315-20 (5th Cir. 1980) (plaintiffs
established prima facie case where subjective criteria was used
and plaintiffs' evidence showed Caucasians were generally
advanced more readily).

          b.    Reeves Has established a Prima Facie Case
                of Discrimination because he was as
                qualified, if not much more qualified, than
                WCW's Caucasian wrestlers.

     Defendants cite cases where a plaintiff's sole evidence is
the comparison of his or her qualifications to the person who
received a particular position.  See, e.g., Dennis v. Columbia
Colleton Medical Ctr., 290 F.3d 639, 648 (4th Cir. 2002)
(evidentiary standard that a plaintiff's superior qualifications
must "slap one in the face" only applies where a plaintiff's
"sole evidence of pretext is the superior qualifications of the
plaintiff").  However, Reeves' evidence is not solely that his

- 35 -

qualifications were superior to those hired for a particular
position; thus, these cases are inapposite.

Moreover, despite the fact that Reeves had wrestled in
other organizations, and was qualified enough to wrestle in a
championship match for Mid-South Wrestling (Reeves at 165), and
to actually win the heavyweight championship at BWA (Reeves at
164), Reeves was given no opportunity because of the
demonstrated racial bias of Taylor (see supra at 15-17), Dillon
(Whatley at 62, Tab BB; Patterson at 101), and Hamilton who
followed WCW's policies regarding racial discrimination at the
Power Plant. (See Smith at 19, 21, 34, 122; Whatley at 95-96,
Tab BB (testifying that when Hamilton saw African-American
trainees, he stated "oh, a different color . . . that's not
something he "expected.")).

Indeed, he was even denied the opportunity to physically
demonstrate his skills as were Caucasians. For example, one of
the ways a wrestler received an opportunity at WCW was to send
in a tape. As set forth supra, Reeves provided many tapes to
WCW. And while Taylor set up a special try-out for Caucasians
who had sent in tapes, he did not similarly provide Reeves with
the same opportunity because of his race. (Tab M)
(demonstrating that Taylor was setting up a special try out for
wrestlers who had sent in tapes; Smith at 93-94, Tab N

(testifying that all those who attended this particular tryout
and had sent in the tapes were Caucasian)).

In addition, Reeves has identified many Caucasian
individuals whom he was as qualified or more qualified,
including Caucasian wrestler Nash, who was made a superstar even
though he was a bouncer at the Adult entertainment
establishment, the Gold Club.  (Reeves at 38); Tank Abbott, for
whom WCW provided a very hefty contract to Tank Abbott even
though he did not have any wrestling experience (see Defendants'
Supplemental Responses to Interrogatories, Tab CC); Palumbo;
Stasiak; Kidman; and Saturn and others.  (Reeves at 73-75).

Furthermore, Reeves establishes that he was much more
qualified than a Caucasian wrestler whom Taylor provided many
opportunities named Joey Maggs.  (Walker Aff. at ¶¶ 8-9, Tab P).
Maggs is a perfect example of how WCW's decision-making process
was discriminatory.  According to testimony, Taylor routinely
favored the Caucasians whom he interacted with, such as Joey
Maggs, whom Taylor had a close, if not sexual relationship.
(Snakovsky at 84-86).  Reeves was at a huge disadvantage because
Reeves, an African-American, was not in the same social circles
as WCW's exclusive Caucasian decision-makers, and certainly was
not close to Taylor as was Maggs.  See Roberts v. Gadsden
Memorial Hospital, 1988 U.S. App. LEXIS 19507 at *14 (11th Cir.

1988) (the "informal methods necessarily and intentionally favored those who moved within his social circles – i.e., white people"). Significantly, Reeves was more qualified than Maggs. According to WCW wrestler, and referee, Snakovsky, Maggs "couldn't wrestle a lick. I mean, this kid would hit the rope and trip and fall." (Snakovsky at 85). Nevertheless, Taylor pushed Maggs, who was compensated by WCW even though Reeves was much more qualified. Id.; Walker Aff. at 8-9, Tab P; see also, Tab CC at Ex. A (demonstrating that Maggs was compensated).

Similarly, Reeves was passed over even though Bischoff promoted his Caucasian friend Diamond Dallas Page. (Reeves at 74). And although he could not remember all of the names in his deposition, Reeves is entitled to demonstrate he was more qualified than other Caucasians such as Dale Torborg ("Demon"). Again, because Reeves, an African-American, was not in these Caucasian decision-makers' social circles, he was denied the opportunities afforded Caucasians.

Lastly, Reeves shows that he was qualified because he offered WCW precisely what Paul Orndorff, whose affidavit Defendants submit in their Motion, stated that he was looking for "larger athletes" who "can really move." (Orndorff Interview at 3, Tab Y) This describes Reeves exactly as Reeves was a large size and had athletic ability and quickness, as

demonstrated by his swimming and his college football

experience.  (Reeves Aff. at ¶ 1).

> c.      Reeves Has Established Additional
>         Overwhelming Evidence of a Prima Facie
>         Case of Discrimination.

    (i)  Statistical Evidence of Discrimination:

In addition to establishing a pattern and practice of

evidence, Walker's statistical evidence further demonstrates a

prima facie case of discrimination.  See Teamsters v. United

States, 431 U.S. 324 (1977); see also Washington v. Brown &

Williamson Tobacco Corp., 756 F. Supp. 1547, 1554 n.5 (N.D. GA.

1991), aff'd 959 F.2d 1566 (11th Cir. 1992) (statistical

disparities, "which are insufficient to demonstrate a pattern

and practice of discrimination, might still be relevant to

making out a prima facie case or proving pretext") (emphasis

added).

    (ii) Racial Slurs and Racial Bias:

Even if the Court somehow does not find that the constant

racial slurs and blatantly racist comments do not constitute

direct evidence, the Court must consider all such slurs and

remarks because they amply demonstrate a prima facie case of

discrimination.  See Damon v. Fleming Supermarkets of Florida,

Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that although

statements regarding a discriminatory animus toward older

managers did not constitute direct evidence, the evidence did not constitute "probative circumstantial evidence of age discrimination").

Moreover, each of the three principal decision-makers Taylor, Dillon, and Hamilton each demonstrated racial bias. (supra at 15-17 [Taylor]; Williams at 27, Whatley at 62-63, Tab BB, Walker at 168; Patterson at 101 [Dillon]; Smith at 19-21,34-35,122; Patterson at 30, 117; Whatley at 95-97, Tab BB; Carr at 55, 97, Tab Z; Boulware at 59-61, 73, 150, Tab AA [Hamilton]).

If nothing else, Reeves is entitled to allow a jury decide whether or not Taylor was referring to race when Taylor said, "we got enough of y'all boys already," especially in light of the overwhelming evidence of Taylor's expressed racial bias against African-American wrestlers (see supra). Similarly, given Hamilton's many statements about the racial composition of wrestlers, as well as his expressed racial bias, a jury should also be entitled to find that Hamilton was referring to Reeves' race when he said, "we got enough of your kind down here." (Reeves at 58).

Accordingly, even if this Court does not find that Reeves has direct evidence, he certainly has established sufficient evidence to demonstrate a prima facie case of discrimination.

(iii)     Additional Evidence of a Prima Facie Case

Reeves further establishes a prima facie case based on additional circumstantial evidence of discrimination.  See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998). As noted supra, Reeves has established significant anecdotal evidence of discrimination (see supra at 20-28).  Even assuming this Court does not find a pattern and practice of discrimination, the court must consider Reeves' additional evidence, supra, which further establishes his prima facie case.

Accordingly, even if this Court applies McDonnell Douglas, Defendants are not entitled to summary judgment because Walker has established an abundance of evidence from which a reasonable jury could conclude that Reeves has established a prima facie case of discrimination.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981) (plaintiff is entitled to "directly persuade" the Court that a "discriminatory reason more likely motivated" adverse treatment).

2.   Because Defendants have not proffered a non-discriminatory reason, summary judgment is inappropriate.

Once a plaintiff establishes a prima facie case, a defendant is then entitled to rebut the prima facie case with a non-discriminatory reason and support it with a "clear and

- 41 -

reasonably specific" factual basis.  See <u>Texas Dep't of</u>
<u>Community Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981).

**Summary Judgment is inappropriate because Defendants have**
**failed to identify <u>any</u> non-discriminatory reason upon which they**
**now rely to defend their adverse treatment of Plaintiff.**

The Supreme Court, in <u>St. Mary's Honor Ctr. v. Hicks</u>, 509
U.S. 502, 509-510 n.3 (1993), established that if a plaintiff
proves a prima facie case of discrimination, and the defendant
fails to introduce evidence of a non-discriminatory reason, the
plaintiff is entitled to a judgment against the defendant.  The
Supreme Court explained that if the "defendant has failed to
sustain its burden, but reasonable minds could differ as to
whether a preponderance of the evidence establishes the facts of
a prima facie case, then a question of fact does remain, which
the trier of fact will be called upon to answer.  <u>Id.</u> at 509-
510.  And if the jury concludes that the plaintiff has proved a
prima facie case, "it must" render a verdict for the plaintiff.
<u>Id.</u> at n.3.

In <u>EEOC v. Joe's Stone Crabs Inc.</u>, 296 F.3d 1265, 1273-1274
(11th Cir. 2002), the Eleventh Circuit properly held that the
plaintiffs were entitled to a judgment against the defendant
where the plaintiffs established a prima facie case of

discrimination by a preponderance of the evidence, and where the defendant failed to rebut the prima facie case.

Thus, as set forth in Joe's Stone Crabs, the sole issue before this Court is whether or not Reeves has established sufficient evidence of a prima facie case of discrimination to submit to a jury.  If the jury then finds that Reeves' prima facie case is supported by a preponderance of the evidence, the jury must "render a verdict" for Reeves.  Hicks, at 510 n.3.

Accordingly, because Reeves has established overwhelming evidence of a prima facie case of discrimination, and because Defendants have not proffered any non-discriminatory reason for its adverse treatment of Reeves, summary judgment is not appropriate.[7]

## II.  REEVES SECTION 1981 CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Defendants' reliance on the statue of limitations as to Reeves Section 1981 claims is misplaced.  Even assuming that Reeves' claims are governed by a two-year statute of limitations, he made many attempts to obtain a wrestling contract and other opportunities to work for WCW well within the two-year period prior to filing his suit on July 10, 2000.

---

[7] Because Defendants have not proffered a non-discriminatory reason, Reeves has not been afforded an opportunity to show pretext, and thus he will not do so.  In any event, his evidence is sufficient to withstand summary judgment under any analysis.

As set forth in his deposition, he made attempts to secure a wrestling job by calling Dillon and Taylor well into 1998 and 1999. (Reeves at 65). Moreover, although he could not recall exactly, he also sent in wrestling tapes during 1998 and 1999.

Furthermore, he personally met with Taylor at the Ramada Inn after November 10, 1999, which was the date Taylor returned to WCW. Taylor testified that he left WCW for about ten months and returned to WCW on November 10, 1999. (Taylor at 29). Reeves testified he called and met with Taylor at the Ramada Inn after Taylor returned. (Reeves at 54-55). And now that he has reviewed Taylor's testimony, Reeves states that he is now certain that he met Taylor in late 1999, and believes he approached Taylor in 2000, as well. (Reeves at 54-57; Reeves Aff. at ¶ 18, Tab A).

Thus, Reeves has no problem showing actionable discrimination within the statutory period.

As to WCW's continual pattern of discrimination prior to 1998, Reeves should be entitled to recover because to the extent that WCW officials kept encouraging him, he could not "exactly" pin point the date in which his claims may have accrued. (Reeves at 53). If nothing else, the conduct throughout the 90's is relevant to Reeves' claims and further shows he has established a prima facie case of discrimination.

- 44 -

## III. REEVES IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS ESTABLISHED EVIDENCE OF ILLEGAL RACE-BASED WRESTLING DECISIONS

In addition to establishing blatant racist discrimination, Reeves demonstrates evidence of race-based decision-making, which is illegal, regardless of the specific intent, or racial animus, of the decision-makers. Equal Employment Opportunity Commission v. Joe's Stone Crabs, Inc., 220 F.3d 1263, 1284 (11th Cir. 2000); Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1254-65 (N.D. Ala. 2002) ("[I]t is well established that making work assignments along the lines of race or color is forbidden . . . .").

Eric Bischoff essentially instructed Bookers not to use African-American wrestlers because "blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV." (Anderson at 74-75, 177). Bischoff asked, "why are we pushing some of the blacks and some of the niggers on our television show?" (Anderson at 74-75). Moreover, Taylor and Arn Anderson each admitted that Turner had conducted a survey, and that because black people were not coming to the matches they were not going to "use all the blacks." (Boulware at 96, 124-125, Tab AA). Also, WCW personnel acknowledged the belief/perception that African-Americans would not pay to see a live event, or pay

for pay-per-views. (Smith at 58; Anderson at 184-185; Reeves at 96-97).

WCW also retained the services of independent marketing companies such as Grace Market Research Inc. to ascertain, among other things, the racial demographics of WCW's viewing audiences. (See Grace Aff. ¶ 6, Tab Q). Grace conducted an online research survey for WCW, which asked respondents to provide their racial identity. (Id.) Similarly, Defendants conducted a study through Nielson, which provided detailed findings regarding the racial demographics of WCW's audiences. (Pls.' Ex. 72, Tab R). In addition, Ferrara states that he attended a presentation from a marketing research firm that reported that more black persons who were watching WCW on television than were actually paying for tickets to see live events. (Ferrara at 59; see also Sullivan at 23 (testifying that the audience was predominantly white)).

Moreover, the evidence demonstrates that WCW frequently used, or did not use, black wrestlers based on such marketing data. (Reeves at 80; Boulware at 150, Tab AA; Randall Anderson at 74-74, 144-145; Whatley at 132-134, Tab BB; Miller at 66, 101).[8]

---

[8] At times, WCW even maintained lists of wrestlers, designating the various categories of wrestlers, including the "Mexicans" and "the blacks." (Anderson at 95-97).

Accordingly, based on all of the admissions and statements regarding WCW catering to the racial demographics of the viewing audience, Reeves has established ample evidence that Defendants were engaging in illegal race-based decision-making which prevented Reeves, a qualified African-American from getting the same treatment given Caucasians.  See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472-475 (11th Cir. 1999).

## IV.   PLAINTIFF IS ENTITLED TO A JURY TRIAL AS TO HIS TITLE VII CLAIMS.

Reeves is entitled to a jury trial because Defendants failed to make him an employee because of his race.  Although Defendants argue that a plaintiff must establish an employee relationship under Title VII, Defendants fail to recognize that denial of employment based on race in and of itself violates Title VII.  Also, Reeves clearly expressed a desire not only for a wrestling job, but that he wanted any job with WCW as well. (Reeves Aff. at ¶ 16; Reeves at 16).

## V.   PLAINTIFF IS ENTITLED TO A JURY TRIAL AS TO HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Reeves seeks to recover against Defendants for their negligent retention of Terry Taylor, (See Tabs B and C) who intentionally inflicted emotional distress upon Reeves.

Reeves submits that the evidence is sufficient to demonstrate that Taylor's conduct was outrageous and beyond the

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by hand delivering a copy of the same, addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This 30th day of January, 2003.

Charles J. Gernazian
Georgia Bar No. 291703

G:\WCW\Reeves\pleadings\Resp to SJ Motion.doc

**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 3 0 2003

LUTHER D. ████, Clerk
By: ████  Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RICK REEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1-00-CV-1720-CC |
| | ) | |
| UNIVERSAL WRESTLING, | ) | |
| CORPORATION f/k/a | ) | |
| WORLD CHAMPIONSHIP WRESTLING, | ) | |
| INC., TURNER SPORTS, INC., | ) | |
| TURNER ENTERTAINMENT GROUP, | ) | |
| INC. and TURNER BROADCASTING | ) | |
| SYSTEM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS TO WHICH
THERE EXIST GENUINE ISSUES TO BE TRIED**

Pursuant to Local Rule 56.1(b)(2), in response to

Defendants' Motion for Summary Judgment, Plaintiff Rick Reeves,

hereby files this Statement of Material Facts to Which There

Exist Genuine Issues to be Tried, showing the Court the

following:

## I.   DISPUTED FACTS REGARDING WCW'S HISTORY OF ITS TREATMENT OF AFRICAN-AMERICANS

1.

In 1993 or 1994, when baseball legend **Henry ("Hank") Aaron participated in a WCW** event, the existing WCW president, Bill Watts, stated that he did not want "that nigger on my TV." (Randall Anderson Dep. at 102).

2.

Bill Watts was a very "bigoted individual" who used racial slurs or racially derogatory language about "every other sentence."  (Juster Dep. at 119).

3.

Bill Watts referred to the compensation that he paid to legendary African-American wrestler Junkyard dog as "slave wages."  (Juster Dep. at 118).

4.

Ole Anderson, a "Booker" who worked on WCW's "Booking Committee," which determined the storylines for WCW wrestling matches, told Thunderbolt Patterson, an African-American wrestler, that the Turner and WCW officials did not really consider him "as [a] person)"; "you are a nigger -- you will never be a promoter like you want to be."  (Patterson Dep. at 42-43).

5.

In the mid-nineties Black Jack Mulligan, a WCW trainer, informed Bobby Walker that "the only reason you're here is because they need color on the TV." (Bobby Walker Dep. at 162-163).

6.

Timothy Goodly, the Turner Sports Human Resource manager who was assigned to provide Human Resource support to WCW, acknowledged that the fact that WCW only had Caucasians become world champions "might be considered a red flag" as to whether WCW's decision-making process was discriminatory. (Goodly Dep. at 95-97).

**II. WCW'S MANAGEMENT WAS VIRTUALLY ALL CAUCASIAN**

7.

With the exception of Valerie Ragsdale, WCW's Senior Webmaster from 1997 to 1999, and Pie Smith, a mid-level manager at WCW's merchandising warehouse, WCW did not have any African-American managers. (Goodly Dep. at 34, 37-39; Loretta Walker Dep. at 18, 49-50).

8.

Although Tim Goodly identified Ms. Pamela Collins as an African-American mid-level manager, (Goodly Dep. at 38-39), WCW

-3-

never actually provided Ms. Collins a management position, as she remained the call-center "coordinator." (Collins Aff. ¶¶ 3-4, Tab J; see also Plaintiffs' Ex. 5, Tab X).

9.

Goodly acknowledged that the minority representation at WCW "was not, I guess, consistent with what I knew to be good HR practice." (Goodly Dep. at 49).

III. **DISPUTED FACTS AS TO WHETHER TURNER SPORTS, TBS, TEG, and WCW MAINTAINED ANY POLICY OR PROCEDURE TO ENSURE THAT WCW DID NOT DISCRIMINATE AGAINST WRESTLERS**

10.

WCW did not have any policies or procedures to ensure that wrestlers were not discriminated against. (Ferrara Dep. at 52; Smith Dep. at 95; Loretta Walker Dep. at 21).

11.

Ed Ferrara, a Booker, was not aware of any WCW official that had communicated that WCW needed not to discriminate against wrestlers. (Ferrara Dep. at 52-53).

12.

Human Resource Manager Timothy Goodly was only concerned with WCW "employees" in fulfilling his job duties as Director of Human Resources for WCW; Goodly didn't have "any official duties as related to talent." (Goodly Dep. at 63).

-4-

13.

As to the persons who were supposedly ensuring that WCW did not discriminate in its handling of contracts with wrestlers, Goodly testified that Eric Bischoff, WCW's President, was primarily responsible, but possibly Diana Meyers, WCW's attorney, and Bill Busch, a Vice President at WCW, as well. (Goodly Dep. at 65-67).

14.

Loretta Walker, who replaced Timothy Goodly as the person responsible for providing human resource support to WCW, testified that she did not know who, if anybody, was responsible for ensuring that the wrestlers did not suffer discrimination. (Loretta Walker Dep. at 6-13).

15.

Loretta Walker agreed that she did not have any duties with respect to the wrestlers because it was Turner's practice not to provide assurance that persons who were classified as independent contractors would be treated in a fair and non-discriminatory manner.  (Loretta Walker Dep. at 12-13).

16.

Loretta Walker did not believe that she had any duty to ensure that workers classified as independent contractors at

-5-

Turner Entertainment Group ("TEG") or Turner Studios were free from discrimination in the workplace. (Loretta Walker Dep. at 23, 73-74).

17.

Although Loretta Walker testified that an "independent contractor" who had an issue regarding discrimination could have reported it to WCW's attorney, Diana Myers, Ms. Walker was not aware of any actions taken by Diana Myers to ensure that the persons performing on a contract basis at WCW were not discriminated against based on their race. (Loretta Walker Dep. at 74-75, 79).

18.

Diana Myers stated that if an "independent contractor at WCW felt he was discriminated against, he should complain to J.J. Dillon." (Myers Dep. at 175).

19.

Even though Goodly did not have an official role as to WCW wrestlers, he noticed a lack of diversity and therefore told Eric Bischoff, WCW's President, that WCW needed more "diverse talent." (Goodly Dep. at 69-70).

-6-

20.

In response to Goodly's suggestions, Bischoff stated that
he was going to ensure that the talent pool at the Power Plant
would be diverse, but Goodly was not aware of any actions taken
to ensure that any minorities at the Power Plant actually
received exposure or meaningful opportunities to succeed.
(Goodly Dep. at 74-78).

21.

Goodly admitted to Bobby Walker that he was "aware" of
WCW's discrimination, but he had a "job" too.   (Bobby Walker
Dep. at 254).

## IV.   DISPUTED FACTS REGARDING WCW'S DECISION MAKERS USING RACIAL SLURS AND/OR DEMONSTRATING RACIAL BIAS

### A.   TERRY TAYLOR

#### 1.   Taylor's Role at WCW

22.

Terry Taylor worked on WCW's Booking Committee beginning in
1996; Taylor was also responsible for locating and recruiting
wrestling talent and for working in talent relations.   (Taylor
Dep. at 44).

23.

Terry Taylor was also specifically involved in selecting
WCW wrestlers from the Power Plant; he "worked pretty close with

-7-

the Power Plant and the young guys" and frequently went to the Power Plant to evaluate wrestlers. (Lunde Dep. at 13-14).

24.

Jody Hamilton, manager of the Power Plant, testified that Terry Taylor was one of the principal persons who evaluated the wrestling talent at the Power Plant. (Hamilton Dep. at 29).

25.

Terry Taylor was also responsible for working with some of the wrestlers on their wrestling moves and techniques. (Ferrara Dep. at 51).

## 2. Taylor's Statements and Remarks

26.

Terry Taylor used the word "nigger" quite a bit." (Randall Anderson Dep. at 107).

27.

Terry Taylor would say "that stupid nigger" when referring to an African-American wrestler, and often used the word "nigger" when talking to other WCW officials while traveling on WCW business. (Randall Anderson Dep. at 85, 172-173).

28.

On one occasion, Terry Taylor stated that "there [wouldn't] be any brothers on the show" because he did not want any African-Americans to take the "limelight" from a Caucasian

-8-

wrestler, Hulk Hogan.  (Williams Aff. ¶ 39, Tab E; Williams Dep. at 54-57).

### 29.

There were no African-Americans on the televised portion of above-described WCW show.  (Id.)

### 30.

Terry Taylor stated "that damn Hardbody is a no good nigger."  (Snakovsky Dep. at 108, 140; Snakovsky Aff. ¶ 18, Tab D).

### 30.

Terry Taylor frequently used racial slurs, including "nigger" when referring to WCW wrestlers and while working on the Booking Committee.  (Sullivan Dep. at 51).

### 31.

Terry Taylor stated to Hardbody Norris, "why don't you take your dumb ass and black self and get the hell out of here?"  (Snakovsky Dep. at 62).

### 32.

Terry Taylor constantly used the word "nigger" whenever he was talking about African-American people and African-American wrestlers.  (Snakovsky Dep. at 75-77; Snakovsky Aff. at ¶ 4, Tab D).

33.

Michelle Bayens, an assistant producer to whom Terry Taylor once confided on a regular basis, testified that when Taylor informed her that Bobby Walker had called him a "racist," he stated, "I don't know if I'm a racist but I know that . . . [h]e's a nigger with no talent." (Bayens Dep. at 19).

34.

Terry Taylor stated that neither Bobby Walker nor Hardbody Harris would make it in the wrestling profession because they were "black" and each was a "nigger" with "no talent." (Snakovsky Aff. ¶ 7, Tab D; Snakovsky Dep. at 76).

35.

Terry Taylor told Rick Reeves, an African-American wrestler, "we've got enough of y'all boys already." (Reeves Dep. at 54-56).

36.

Plaintiff Rick Reeves heard Terry Taylor use the word "nigger" in various conversations. (Reeves Dep. at 85).

37.

Terry Taylor stated that black wrestlers "weren't much of a draw" in his opinion. (Bayens Dep. at 19, 62-63).

-10-

38.

Terry Taylor stated that black persons had great physiques because they were genetically inclined or predisposed, but that he questioned their ability to wrestle.  (Bayens Dep. at 21-22, 64-65).

39.

Terry Taylor stated that Ernest Miller, an African-American wrestler, was "another nigger with no talent . . ." and joked about having called Ernest Miller a nigger to his face.  (Bayens Dep. at 20).

40.

Terry Taylor stated that black wrestlers "shouldn't be in our sport, they should be in basketball."  (Snakovsky Dep. at 78).

41.

Terry Taylor stated that "a lot of the black people wouldn't make it in the business because they are black as long as he had something to do with it."  (Snakovsky Dep. at 78).

42.

As to the African-American wrestler Elix Skipper, Terry Taylor once stated that "I don't care if this kid is good or not.  He is a black kid.  He ain't going nowhere in this business."  (Snakovsky Dep. at 79).

-11-

43.

On one occasion, when Hardbody Norris, an African-American wrestler, was performing at Disney World, Terry Taylor stated "he ain't never gonna make it in this business" and that he should go back to basketball or ultimate fighting, or whatever he was doing prior to wrestling.  (Snakovsky Dep. at 82-83).

44.

As to Bobby Walker, when Bobby Walker was jumping off the ropes, Taylor stated "that nigger, he's not good for jumping, so he should go play basketball too."  (Snakovsky Dep. at 83-84).

45.

Terry Taylor constantly reminded Ernest Miller that Miller only had a job because he was black, and that WCW did not market toward blacks because "we only have white fans and they're [going] to look at you as a nigger."  (Miller Dep. at 66, 101; Hart Dep. at 70-71).

46.

According to Snakovsky, a WCW performer, Terry Taylor also demonstrated bias against minorities by the "way he would talk to them and his actions towards them."  (Snakovsky Dep. at 98).

47.

Terry Taylor told African-American wrestler Booker T
Huffman that the only reason Huffman was successful was because
he was black.  (Goodly Dep. at 81-82).

48.

When African-American wrestler Ernest Miller was not
required to work on a particular occasion, Terry Taylor told him
that "I know y'all like to take the day off."  (Miller Dep. at
60).

49.

Terry Taylor stated that "blacks don't buy wrestling
tickets."  (Williams Aff. ¶ 14, Tab E).

50.

Terry Taylor called Ernest Miller a "nigger" on several
occasions.  (Miller Dep. at 66, 99-101).

51.

Moses Williams, who worked in WCW production, also heard
Terry Taylor use the word "nigger" while Terry Taylor was in
charge of the Booking Committee.  (Williams Dep. at 108-109).

52.

On one occasion, when WCW's ring announcer, David Penzer,
brought in a Caucasian wrestler to replace an African-American

-13-

wrestler, Terry Taylor told him: "don't worry about the niggers, I'll take care of that."   (Williams Dep. at 110).

53.

Terry Taylor openly stated to Vince Russo, the Creative Director at WCW, that wrestling fans were White and that "Blacks don't buy wrestling tickets."   (Williams Dep. at 111, 114-116; Williams Aff. ¶ 14, Tab E).

54.

Terry Taylor did not observe African-American wrestlers in their matches.   (Williams Dep. at 113).

55.

Terry Taylor went out of his way to provide opportunities for white wrestlers even when they did not have any talent, but he would not similarly create opportunities for African-Americans.   (Williams Dep. at 124-125).

56.

Sharon Hill told Moses Williams that Terry Taylor had stated that Harrison Norris "ain't going to ever make it," and that Taylor called Harrison Norris "the dumb nigger."   (Williams Dep. at 140-141).

57.

When an African-American wrestler would make a mistake, Terry Taylor would make comments such as "that stupid nigger,"

-14-

or "just different stuff like that."  (Randall Anderson Dep. at
111).

58.

On a very cold winter day, Terry Taylor stated, "you'd
better turn on the air conditioner because you know those
niggers can't take the cold."  (Carr Dep. at 92-93, Tab Z).

59.

Terry Taylor once stated that a wrestling association for
Black wrestlers was a "big joke."  (Carr Dep. at 103, Tab Z).

60.

On one occasion, when African-American Tony Carr was going
to play a role as a fan in a show filmed for WCW in Montana,
Terry Taylor said Carr could not play the role "because no one
would believe there were niggers in Montana."  (Carr Dep. at
139, Tab Z).

61.

Apparently referencing a demographic survey that was done
by Turner, Terry Taylor stated that "Turner told us we don't
need to use you all niggers."  (Boulware Dep. at 71, 124-125,
Tab AA).

62.

Terry Taylor admitted to Vince Russo, the Creative Director
at WCW, that he had told Ernest Miller that the only reason why

-15-

WCW hired Miller was because Miller was black.   (Russo Dep. at 64).

63.

When African-American wrestler William "Rocky" Boulware confronted Terry Taylor, and asked Taylor if a Caucasian wrestler got a contract instead of him because he was black, Taylor stated, "What do you think? Yes, it's because you're black."   (Boulware Dep. at 101-102, Tab AA).

64.

When Rocky Boulware discussed pay differences between his salary and that of Caucasian wrestlers with Terry Taylor, Terry Taylor said that it was "the color of your skin, and you're not in the clique."   (Boulware Dep. at 122-124, Tab AA).

### 3.    Disputed Facts Regarding WCW's Knowledge Of Taylor's Racial Bias

65.

On March 1, 1998, Plaintiff Bobby Walker sent a letter to Eric Bischoff, the President of WCW, via certified mail, which stated that "Terry Taylor has made statements to me and others about how he felt about blacks" and that "I like I lost my job because of Terry Taylor's deep dislike for blacks."   (Bischoff Dep. at 122-23; Plaintiffs' Exhibit 10, Tab B).

-16-

66.

On March 1, 1998, Mr. Walker sent a letter to Dr. Harvey Schiller, an executive at Turner Sports, regarding "racial discrimination," and informed Dr. Schiller that "I felt like I lost my job because of Terry Taylor's deep dislike for blacks." (Plaintiffs' Exhibit 15, Tab C).

67.

Eric Bischoff acknowledges that he knew that Terry Taylor had remarked that the only reason Ernest Miller was hired was because he was black.  (Bischoff Dep. at 39).

68.

Eric Bischoff knew that Terry Taylor had a conflict with the African American wrestling tag team, the Harlem Heat, and acknowledges that Taylor's actions or comments regarding the Harlem Heat were "racially offensive."  (Bischoff Dep. at 41-42, 173).

69.

Timothy Goodly, the Turner Manager assigned to address WCW's human resource issues, recalls a discussion with Eric Bischoff in which Bischoff informed Goodly that Terry Taylor had upset African-American wrestler Booker T by stating that "It [was] a good thing [he was] black."  (Goodly Dep. at 81-82).

-17-

70.

According to Timothy Goodly, the only discipline that Bischoff took against Terry Taylor was in stating to Taylor that the comments were inappropriate. (Goodly Dep. at 83).

71.

Taylor remained in the same position on the Booking Committee after Bischoff purportedly reprimanded Taylor. (Goodly Dep. at 83-85).

72.

In 1999 Taylor left WCW for ten months, but returned to WCW in or about November, 1999 (Taylor Dep. at 29, 37).

**B.    ERIC BISCHOFF**

    **1.    Bischoff's Role**

73.

Randall Anderson, who worked on the Booking Committee in 1996 and 1997, testified that Eric Bischoff had to approve all decisions made by the Booking Committee. (Randall Anderson Dep. at 51-53).

74.

Eric Bischoff was the ultimate decision maker as to the top two or three matches on WCW's main events. (Bischoff Dep. at 48).

-18-

75.

At all times that Eric Bischoff was in charge of WCW, he was ultimately responsible for determining which WCW wrestler would become the world heavyweight champion.  (Lunde Dep. at 67-68).

### 2.  Bischoff's Statements

76.

Eric Bischoff told members of the Booking Committee about a certain age group of Black persons who ostensibly would not watch WCW live events, and indicated that some Blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV.  (Randall Anderson Dep. at 177).

77.

In this context, Bischoff told the members of the Booking Committee that they shouldn't worry about "pushing a Black or a nigger."  (Id.)

76.

Eric Bischoff asked, "so why are we pushing some of the blacks and some of the niggers on our television show?" (Randall Anderson Dep. at 74-75).

77.

Teddy Long and Harold Hogue, both African American wrestlers, told Bobby Walker that Bischoff had stated that

-19-

blacks would not pay to come to a Nitro event and "they'd rather watch it on TV."   (Bobby Walker Dep. at 178).

78.

On one occasion, when African-American wrestler Hardbody Harrison dressed up in a 70's disco outfit and had a big afro, Eric Bischoff stated "that's too niggerish for my television" and "canned" the idea.   (Randall Anderson Dep. at 90, 177-178).

79.

Eric Bischoff once stated that he "couldn't understand why [he was] putting all his money and TV time into a Black guy when they couldn't draw an arena house show."   (Randall Anderson Dep. at 199-200).

80.

On one occasion, when Eric Bischoff saw an African-American on a TV monitor, he stated "we need to get that crack nigger off the TV."   (Randall Anderson Dep. at 76-77, 202).

81.

An assistant producer testified that Eric Bischoff used the word "nigger" in relation to wrestlers on more than one occasion.   (Kearce Dep. at 42-43).

82.

On one occasion, during a wrestling event at the Omni, Bischoff removed all African-American wrestlers from the

-20-

schedule and indicated that it was "white night."   (Whatley Dep.

at 132-134, Tab BB; Smith Dep. at 57; Bobby Walker Dep. at 177-

178).

83.

When Eric Bischoff denied a contract to Africa-American

Rocky Boulware and Boulware asked J.J. Dillon, a trainer at the

Power Plant, the reason for the denial, Dillon indicated that it

was because Boulware was "Black."   (Boulware Dep. at 135, Tab

AA).

84.

When Thunderbolt Patterson, an African-American wrestler,

tried to negotiate a contract with WCW through Eric Bischoff and

Bill Busch, Bischoff stated, "we ain't fooling with niggers."

(Patterson Dep. at 31).

85.

When Thunderbolt Patterson wanted to work as a manager,

Bischoff told him they didn't need any more managers; Bischoff

also stated, "we don't need no niggers."   (Patterson Dep. at 76,

93).

## C.   **VINCE RUSSO**

86.

At or about the time that Vince Russo, WCW's Creative

Director, was hired for WCW, he expressed his belief that Asians

-21-

and Hispanics should not succeed at WCW.   (Plaintiffs' Exhibit
2, Tab W).

87.

Despite Russo's racist comments, WCW hired/retained Russo
to work as its creative director on October 10, 1999.   (Russo
Dep. at 15).

88.

During the time that Vince Russo was the Creative Director,
he "had the last word" on booking decisions, who would win the
championships, and ultimately decided which wrestlers would
receive a "push" and television exposure and which wrestlers
would not.   (Juster Dep. at 83 –84, 86-87; Ferrara Dep. at 11-
14; Lunde Dep. at 67).

89.

When Terry Taylor stated that the African-American
wrestlers were not as good workers as the White wrestlers, Vince
Russo agreed and said "they're not as good workers."   (Snakovsky
Dep. at 82).

90.

Vince Russo used racial slurs, including the word "nigger"
when referring to wrestlers.   (Sullivan Dep. at 55-56; Williams
Dep. at 97-98; Kearce Dep. at 38).

91.

According to Kevin Sullivan, a member of WCW's Booking Committee, Russo also called African-Americans "Moolions," which (according to Sullivan) refers to a tribe from Africa that battled with Sicilians.  (Sullivan Dep. at 56).

92.

Vince Russo indicated his racial bias by specifically referring to African-Americans as the "blacks" or "the brothers."  (Williams Dep. at 86-88).

93.

Vince Russo "went out of his way not to do anything special for Black wrestlers or non-White wrestlers" and focused his attention on Caucasians.  (Williams Dep. at 89).

94.

In one particular match, Vince Russo wanted Jeff Jarrett, a Caucasian wrestler, to hit African-American wrestler Booker T over the head, hit Booker T's wife and then put a noose around Booker T, as if he were going to hang him.  (Williams Dep. at 92-93).

95.

Vince Russo stated that "Whites" rule wrestling.  (Williams Dep. at 94-96).

-23-

96.

Vince Russo indicated that "Black folks don't buy wrestling tickets anyway, wrestling fans are White." (Williams Dep. at 94-96).

97.

In response to questions about the future of Booker T, an African-American wrestler, Russo stated, "if I say we're going to have a White champion, we'll have a White champion and you will know we'll have a Black champion when I say we're going to have one and not before then." (Williams Dep. at 94-96).

98.

Moses Williams, who worked on WCW's production team, personally observed that Vince Russo avoided interaction and conversation with African-Americans. (Williams Dep. at 97-98).

99.

Vince Russo demonstrated his favoritism for Caucasians by his body language and overall attitude; Russo would take the time to speak with Caucasian wrestlers, but would not similarly interact with wrestlers who were Spanish, Oriental, or Black. (Williams Dep. at 104.)

100.

Vince Russo also stated that wrestling was a "white man sport" and that this was "why we don't have many black wrestlers."  (Williams Aff. ¶ 12, Tab E.)

101.

Vince Russo indicated that WCW was going to have a "white champion" because "that's the way I want it."  (Williams Aff. ¶ 12, Tab E).

**D.**   **JAMES MORRISON (J.J. DILLON)**

102.

At some point, James Morrison (a/k/a J.J. Dillon) became the manager of Talent and one of the principal decision-makers of WCW Talent.  (Dillon Dep. at 31; Hamilton Dep. at 39).

103.

J.J. Dillon referred to Moses Williams as the "good nigger" because Moses Williams "didn't make waves."  (Williams Dep. at 27).

104.

Moses Williams was told that when Darrell Miller, an African-American, sued WCW, Dillon asked why Miller was going to sue the company and asked "why doesn't he be like that good nigger Moses."  (Williams Dep. at 27).

-25-

105.

J.J. Dillon stated that he thought that a country music western song that used the word "nigger" was a "great" song. (Whatley Dep. at 62-63, Tab BB).

106.

According to Pez Whatley, a WCW trainer, J.J. Dillon prevented African-Americans from advancing at WCW because J.J. Dillon was "as racist as they come." (Whatley Dep. at 62, Tab BB).

107.

Teddy Long, a WCW wrestler, informed Bobby Walker that he knew that J.J. Dillon "did not like black persons." (Bobby Walker Dep. at 168).

108.

Thunderbolt Patterson, an African-American wrestler, considered J.J. Dillon racist based on Dillon's conduct over several years, including Dillon's use of racial slurs such as "niggers." (Patterson Dep. at 101).

**E.   WCW Bookers**

109.

From 1995 through the end of WCW, the following persons worked as the primary Bookers and writers at WCW:  Kevin Sullivan, Terry Taylor, Jimmy Hart, Annette Yother, Ed Ferrara,

-26-

Dusty Rhodes, Terry Allen, Arn Anderson, Kevin Nash, Greg Gagne, Ric Flair, Paul Orndorff, and wrestler Glen Gilberti. (Smith Dep. at 131; Yother Dep. at 13-16; Schiavone Dep. at 16-24; Sullivan Dep. at 13-14).

### 110.

On one occasion, Arn Anderson and other WCW officials decided to have Rocky Boulware change his name to "Little Richard Marley . . . the nigger that was standing out in the yard;" they joked, "paint the nigger up." (Boulware Dep. at 49-50, Tab AA).

### 111.

Kevin Sullivan routinely used racial slurs, including "nigger." (Randall Anderson Dep. at 111; Kearce Dep. at 31-33).

### 112.

Randall Anderson, who was a personal friend of Kevin Sullivan, Terry Taylor, Arn Anderson, and J.J. Dillon, testified: "I'm just saying they said the racist remark. And I know they didn't like blacks too much." (Randall Anderson Dep. at 109-110).

### 113.

According to Randall Anderson, Arn Anderson would not share a room with African-Americans. (Randall Anderson Dep. at 111).

114.

Arn Anderson called Teddy Long, an African-American wrestler, a "nigger". (Randall Anderson Dep. at 83, 175; Bobby Walker Dep. at 211).

115.

Arn Anderson regularly used the term "nigger". (Randall Anderson Dep. at 83-84).

116.

Both African-American and Caucasian wrestlers told Moses Williams that Arn Anderson did not care for Black wrestlers and that he had his Caucasian favorites. (Williams Dep. at 252).

117.

On one occasion, when Plaintiff Bobby Walker was walking past the room where the Bookers met to decide the roles of the wrestlers regarding upcoming matches (the "war room"), he heard one of the persons in the war room comment, "What nigger we got tonight?" (Bobby Walker Dep. at 210-211).

118.

One of WCW's producers testified: "a lot of the guys on the booking committee were, you know, white guys . . . and they just, I don't know, they felt different about putting Mexicans or black people or Asians over." (Kearce Dep. at 29).

-28-

119.

Members of the Booking Committee "frequently" used racially derogatory language about people's race.   (Kearce Dep. at 41).

120.

Arn Anderson stated "I ain't piling a bunch of niggers in my car or a bunch of Mexicans in my car."   (Randall Anderson Dep. 174).

121.

Gary Juster, an executive at WCW, was sure he heard members of the Booking Committee use racial slurs: "virtually every minority, gay person, anyone out of the mainstream was joked about because that's the culture of pro sports, pro entertainment type of locker room."   (Juster Dep. at 116).

122.

According to Juster, "nothing was sacred" and people constantly joked "about just about everything . . .  even about women, believe it or not."   (Juster Dep. at 117).

123.

## F.   WCW'S MANAGERS AT THE POWER PLANT

### 1.   Jody Hamilton

124.

According to Brenda Smith, assistant to the Power Plant Manager, Jody Hamilton, when Jody Hamilton spoke on the

telephone with WCW officials about wrestlers in the Power Plant, he used words such as "jiggerboggie and lackey" to designate which wrestlers were African-American. (Smith Dep. at 19, 21, 122.)

125.

Brenda Smith believed that Jody Hamilton was racist based upon the manner in which he treated Caucasian wrestlers as compared to African-American wrestlers; Hamilton "picked on the Afro-Americans more so than he did on the Caucasians, as he pushed the Afro-Americans harder." (Smith Dep. at 34).

126.

Brenda Smith stated that when Hamilton saw an African-American wrestler sitting or talking, he would make a statement such as "you need to get up off your lazy behind and do something," but he did not similarly address Caucasian wrestlers. (Smith Dep. at 34-35).

127.

Brenda Smith stated that Jody Hamilton "would suggest the Caucasians to the bookers more so than he would the Afro-Americans." (Smith Dep. at 35).

-30-

128.

Based upon the conversations she overheard with Jody Hamilton, Smith believed that his comments reflected racial bias in the wrestling industry.  (Smith Dep. at 20).

129.

Jody Hamilton told Thunderbolt Patterson that WCW officials wanted to "keep all the niggers in place."  (Patterson Dep. at 30).

130.

On one occasion, Hamilton arrived at the Power Plant after an absence, and, upon observing that many of the new WCW wrestling trainees were African-American, he responded "oh, a different color"  and then indicated that this was not "something [he] expected."  (Whatley Dep. at 95-96, Tab BB).

131.

Black Jack Mulligan, a WCW trainer, told Pez Whatley, another WCW trainer, that Jody Hamilton had commented that there were "too many people of different color" at the Power Plant and discussed the color of the trainees.  (Whatley Dep. at 97, Tab BB).

132.

While manager of the Power Plant, Jody Hamilton stated to
Tony Carr, "I don't know who's blowing smoke up your ass they
ain't hiring no niggers." (Carr Dep. at 55, Tab Z).

133.

On another occasion, Jody Hamilton indicated to Tony Carr
that WCW was "not hiring any Blacks, you know." (Carr Dep. at
55, Tab Z.)

134.

Jody Hamilton made the following comment to Tony Carr:
"Martin Luther King started off this problem and that's why
Black people are having so much trouble now. -- He started
segregation. -- A lot of Black people got, you know, sucked up
in it because they weren't smart enough to keep up with the
White people, so it's bringing down the society." (Carr Dep. at
97, Tab Z).

135.

When African-American performer Rock Boulware was allowed
to work as a referee, Hamilton "got mad" and stated to Boulware
that "you know that no Black person go over me and become no
referee." (Boulware Dep. at 59-61, Tab AA).

136.

According to Rocky Boulware, Jody Hamilton regularly used words such as "nigger, buckwheat, crackhead." (Boulware Dep. at 73, Tab AA).

137.

Jody Hamilton told Rocky Boulware that there was a survey that showed that Black people would not pay $100 or $200 for a ticket and that Turner had said "why use the Blacks? We don't need them." (Boulware Dep. at 150, Tab AA).

138.

Jody Hamilton told African-American wrestler Rick Reeves that "we got enough of your kind down here." (Reeves Dep. at 59).

139.

Jody Hamilton told Thunderbolt Patterson: "they don't fool with no niggers that they got problems. You're a problem. They don't want you to influence the other blacks. You asked for your money, you asked for equal opportunity, and they hadn't given it to you." (Patterson Dep. at 117).

### 2.    Paul Orndorff

140.

According to Randall Anderson, a member of the Booking
Committee, Power Plant manager Paul Orndorff "hated blacks."
(Anderson Dep. at 106-107).

141.

Paul Orndorff used the word "nigger" while he was a
wrestler at WCW.   (Randall Anderson Dep. at 170).

142.

On one occasion, Paul Orndorff stated that "some of our
black wrestlers are good . . . then you got some of the
wrestlers that are niggers."   (Hart Dep. at 117).

143.

On one occasion, Paul Orndorff stated that the problem with
America was that "niggers" were causing crimes and were
responsible for "unemployment and rapes."   (Onoo Dep. at 254-
255).

144.

Paul Orndorff told African American wrestler Tony Carr that
WCW was not "hiring niggers." (Carr Dep. at 95, Tab Z).

145.

Paul Orndorff told Rocky Boulware that he had received
information from Turner Sports that "black people don't buy

-34-

tickets; they don't use no niggers." (Boulware Dep. at 72-73, Tab AA).

146.

Paul Orndorff also used terms such as "nigger, buckwheat, and crackhead" to refer to African Americans. (Boulware Dep. at 72-73, Tab AA).

## V. DISPUTED FACTS AS TO WCW PROMOTING AFRICAN-AMERICANS AFTER PLAINTIFFS FILED SUIT REGARDING RACE DISCRIMINATION

147.

Although African-American Booker T became the champion on June 9, 2000, Vince Russo and Terry Taylor indicated that WCW made him the champion to respond to allegations of race discrimination. (Snakovsky Aff. ¶ 20, Tab D; see also Williams Aff. ¶¶ 20-23, Tab E).

148.

Terry Taylor told Vince Russo that "they've got this discrimination against us -- we're going to have to do something, you know give somebody the belt -- Booker T looked really good and Booker T is a really great athlete . . . you know, maybe this will get rid of some of the heat on us right now." (Snakovsky Dep. at 86-87, 99-100, 102).

## VI.   ADDITIONAL DISPUTED FACTS

### 149.

Ed Ferrara, a Booker, testified about a presentation from a marketing research firm to WCW, as follows:

Q.   You understood them to say that basically there was going to be more black persons who were going to be watching it than there are going to actually be paying tickets to the events?

A.   That's what I understood they were trying to get across, the facts they were trying to get across.

(Ferrara Dep. at 59).

### 150.

WCW maintained lists that designated wrestlers based on their race: "while you have your babyface talent, of course -- You have your heels and you'd have girls.  Then Mexicans.  You'd have blacks."  (Anderson Dep. at 95-97).

### 151.

Terry Taylor, Arn Anderson, J.J. Dillon and Dusty Rhodes all indicated to Rocky Boulware that "the Turner people basically told them, when no Black people come to the show, they didn't have to use no Black."  (Boulware Dep. at 96, 124-125, Tab AA).

152.

Ms. Smith heard *rumors* that WCW officials believed Blacks "didn't pay for pay-per-views."  (Smith Dep. at 58).

153.

One of the principal bookers, Kevin Sullivan, testified that he was aware of the racial demographics of WCW's audience, which he believed was "predominantly white."  (Sullivan Dep. at 23).

154.

Many *statements* and rumors circulated throughout WCW that there were not enough "blacks" in the viewing audience and that African-Americans would *not* pay to see a wrestling event live. (Anderson Dep. at 184-185; Bobby Walker Dep. at 96-97).

155.

Kevin Sullivan commented to Jimmy Hart that WCW had information that *black fans* were not going to pay for an arena seat.  (Hart Dep. at 68-69).

156.

Kevin Sullivan told Bobby Walker that WCW normally did not have "black on *black*" wrestling matches, i.e., a black wrestler opposing another black wrestler in the same match.  (Bobby Walker Dep. at 80).

157.

At times, Caucasian wrestlers indicated they did not want to wrestler with black wrestlers; for example, Lex Luger had a problem wrestling with African-American Junkyard Dog. (Randall Anderson Dep. at 113).

158.

One of WCW's Caucasian decision-makers, testified that a new white wrestler would have a better opportunity than a new black wrestler. (Randall Anderson Dep. at 154-155).

159.

Randall Anderson could not identify one African-American wrestler who came to WCW without experience and received intensive training similar to that provided to Caucasian wrestlers. (Randall Anderson Dep. at 159-160).

160.

WCW security manager Doug Dillinger told Rocky Boulware that refereeing dog matches was a thing that "the nigger do." (Boulware Dep. at 61-62, Tab AA).

161.

On different occasions, Terry Taylor, J.J. Dillon and other members of WCW management told Rocky Boulware that he was paid differently because of his race. (Boulware Dep. at 127, Tab AA).

-38-

162.

On one occasion Terry Taylor and J.J. Dillon told Rocky
Boulware not to bring his "White woman" around the matches.
(Boulware Dep. at 138, Tab AA).

163.

When an African-American wrestler was in the ring at the
WCW Power Plant, a Caucasian trainer stated that there was "soul
food in the ring." (Carr Dep. at 92, Tab Z).

164.

On one occasion, in the presence of other individuals,
David Crockett, a WCW Booker and executive, told Tony Carr to
"get your Black ass back in there and tape those ropes." (Carr
Dep. at 100, Tab Z).

165.

Randy Savage, a Booker and wrestler, told Pez Whatley that
they were going to have changes in the Booking Committee, but
that Whatley would not be selected and then "pointed to
[Whatley's] skin." (Whatley Dep. at 135, Tab BB).

166.

WCW trainer Pez Whatley warned African-American wrestlers
that they were not going to get an equal opportunity and that it
was going to be twice as hard for them to succeed. (Whatley
Dep. at 139-140, Tab BB).

167.

WCW trainer Pez Whatley concluded that African-American
wrestlers had to be "twice as good as the White boys." (Whatley
Dep. at 140, Tab BB).

168.

On one occasion, wrestler Buddy Landell told Pez Whatley
that "they ain't going to use you because you know what to do
and they don't want no smart niggers working." (Whatley Dep. at
153-154, Tab BB).

169.

On one occasion, WCW's ring announcer, David Penzer,
indicated that WCW was not going to use Pez Whatley on a
particular occasion because they already had "a token Black on
TV." (Whatley Dep. at 154-155, Tab BB).

170.

Pez Whatley, who worked in various jobs throughout WCW,
stated that it was "not unusual for you to hear amongst the
workplace, you know, the n-word or darkie." (Whatley Dep. at
161, Tab BB).

171.

Pez Whatley testified that, as an African-American male, he
had to be careful when interacting with Caucasian females to

-40-

make sure that Caucasian males did not perceive him to be trying to entice the Caucasian females.  (Whatley Dep. at 161, Tab BB).

172.

On one occasion, Doug Dillinger, head a WCW security, stated that he didn't want to "hear no more of that nigger music."  (Whatley Dep. at 167, Tab BB).

173.

Pez Whatley stated that he heard Caucasian wrestlers Chris Kanyon and Diamond Dallas Page use the term "nigger" when referring to other wrestlers.  (Whatley Dep. at 174, Tab BB).

174.

On one occasion, Pez Whatley heard a Caucasian worker at WCW state that "I had to wait behind a Darkie too."  (Whatley at 180-181, Tab BB).

175.

Assistant Producer Michelle Bayens, a Caucasian, stated that "when you take a step back . . . it can definitely be said that [minority] wrestlers were treated less favorably or they weren't promoted because of the color of their skin."  (Bayens Dep. at 94).

176.

Some Caucasian wrestlers did not want to wrestle with African-Americans Craig Pittman and Ernest Miller.  (Randall Anderson Dep. at 115-116).

177.

Production worker Moses Williams often observed the tryouts at the Power Plant, and stated that he bet against African-American trainees "because they were destined to fail" regardless of how good they were.  (Williams Dep. at 43-44).

178.

WCW Caucasian trainer Mike Wenner did not "communicate well with Afro-Americans", treated Caucasian wrestlers differently, and did not give African-American wrestlers "the same respect that he would give the Caucasians" as he would work the African-Americans harder: [the] "Caucasian would just stop, when the Afro-American had to do 100 more push-ups and more."  (Smith Dep. at 48-49).

179.

Terry Taylor never said anything positive about any African-American wrestlers.  (Williams Dep. at 54-56).

180.

WCW routinely trained and assisted Caucasian wrestlers in their development; for example, some Caucasian wrestlers would

-42-

receive round-the-clock personal training, and would receive
necessary public exposure, but "I've never known of a Black
wrestler they did that for."  (Randall Anderson Dep. at 181).

181.

Caucasian wrestlers were allowed to practice their public
speaking abilities by using a microphone at a CNN studio;
African-American wrestlers were not provided with this
additional microphone training.  (Randall Anderson Dep. at 182-
183).

182.

The wrestlers routinely used racially derogatory language.
(Randall Anderson Dep. at 103).

183.

Juster stated that he "probably" heard wrestlers use racial
slurs because "it was an atmosphere where there was a lot of
joking around about virtually everything . . .whether it was
racial, ethnic, sexual preference, male/female, political.  It
was a rowdy locker room type of atmosphere."  (Juster Dep. at
124-125).

184.

Several wrestlers did not want to wrestle Hardbody Norris,
in part, because he was black.  (Randall Anderson Dep. at 115).

-43-

receive round-the-clock personal training, and would receive
necessary public exposure, but "I've never known of a Black
wrestler they did that for."  (Randall Anderson Dep. at 181).

181.

Caucasian wrestlers were allowed to practice their public
speaking abilities by using a microphone at a CNN studio;
African-American wrestlers were not provided with this
additional microphone training.  (Randall Anderson Dep. at 182-
183).

182.

The wrestlers routinely used racially derogatory language.
(Randall Anderson Dep. at 103).

183.

Juster stated that he "probably" heard wrestlers use racial
slurs because "it was an atmosphere where there was a lot of
joking around about virtually everything . . .whether it was
racial, ethnic, sexual preference, male/female, political.  It
was a rowdy locker room type of atmosphere."  (Juster Dep. at
124-125).

184.

Several wrestlers did not want to wrestle Hardbody Norris,
in part, because he was black.  (Randall Anderson Dep. at 115).

185.

According to one of WCW's producers, at WCW that "there's a lot of lies thrown around. -- There's a lot of bigotry thrown around. -- There's a lot of racism thrown around. -- There's a lot of sexual harassment thrown around."  (Kearce Dep. at 27-28).

186.

WCW trainer Pez Whatley testified that African-American wrestlers were overlooked by WCW's Caucasian personnel and gave the following example:  Keith Mitchell, a Caucasian who worked on WCW's production team, and, Annette Yother, a Caucasian who worked on the Booking Committee, often overlooked big strong African-American wrestlers and preferred Caucasians, stating that they thought the Caucasians were "cute or had the long hair enough or they dyed their hair blonde."  (Whatley Dep. at 142-143, Tab BB).

187.

WCW selected many of the Caucasian wrestlers whom trainer Pez Whatley recommended for advancement, but never used any of the African-Americans he recommended in a main event.  (Whatley Dep. at 144, Tab BB).

188.

During a match, Willie Worthen, an African-American wrestler, was introduced as "Willie B" in reference to the famous gorilla at the Atlanta Zoo; when Mr. Worthen reported this to WCW trainers, "they just laughed about it."  (Worthen Dep. at 101-102).

189.

On one occasion, when Booker T. got a tremendous reaction from the crowd, a wrestler asked trainer Dwayne Bruce "do you think that it is because of his super tan? and Bruce responded, "it doesn't take a scientist to figure out everything." (Easterling Dep. at 72-73).

190.

A cameraman warned Easterling that WCW was a "good ol boys" network and that if someone used the "n" word, he should just "let it slide" if he wanted to succeed.  (Easterling Dep. at 76-77).

191.

Rocky King stated that WCW was "not hiring no blacks." (Carr Dep. at 49, Tab Z).

192.

On one occasion, the manager of WCW's Security Department, Doug Dillinger, stated that "yes, I used the N-word and I will use it again." (Williams Aff. ¶ 38, Tab E; Williams Dep. at 132-133).

193.

Doug Dillinger, expressly stated that he would not have a "black" security person at WCW, and he never did employ an African-American. (Williams Dep. at 134-135).

194.

When Tony Carr spoke with Doug Dillinger about becoming a security guard, Doug Dillinger informed Mr. Carr that he did not hire Blacks.  (Carr Dep. at 111, Tab Z).

195.

Doug Dillinger never provided any merchandise or WCW paraphernalia to any African-American children.  (Williams Dep. at 226-227).

Respectfully submitted, this __30ᵗʰ__ day of January, 2003.

-46-

_Charles Gernazian_ (signature)

Cary Ichter
Georgia Bar No.: 382515
Charles J. Gernazian
Georgia Bar No.: 291703
Michelle M. Rothenberg-Williams
Georgia Bar No.: 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
14 Piedmont Center, Ste. 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020 (Telephone)
(404) 261-3656 (Facsimile)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **PLAINTIFFS' CONSOLIDATED STATEMENT OF MATERIAL FACTS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED** by hand delivery to:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ____ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 291703