IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERKS OFFICE
U.S.D.C. Atlanta

JAN 30 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

RICK REEVES,                          )
                                      )
        Plaintiff,                    )
                                      )       Civil Action File No.:
v.                                    )       1-00-CV-1720-CC
                                      )
UNIVERSAL WRESTLING,                  )
CORPORATION f/k/a                     )
WORLD CHAMPIONSHIP WRESTLING,         )
INC., TURNER SPORTS, INC.,            )
TURNER ENTERTAINMENT GROUP,           )
INC. and TURNER BROADCASTING          )
SYSTEM, INC.,                         )
                                      )
        Defendants.                   )
_____)

## PLAINTIFF'S NOTICE OF FILING APPENDIX

Plaintiff, RICK REEVES, hereby serves notice that he is filing herewith in the above-styled case an Appendix containing copies of relevant deposition testimony and exhibit documents in support of his Response To Defendants' Motion For Summary Judgment, Plaintiff Reeves Response to Defendants' Statement of Undisputed Facts, and Plaintiff Reeves Statement of Undisputed Facts filed with this Court.

This 30th day of January, 2003.

_____
Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:    (404) 261-3656

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICK REEVES,                           )
                                       )
        Plaintiff,                     )
                                       )        Civil Action File No.:
v.                                     )        1-00-CV-1720-CC
                                       )
UNIVERSAL WRESTLING,                   )
CORPORATION f/k/a                      )
WORLD CHAMPIONSHIP WRESTLING,          )
INC., TURNER SPORTS, INC.,             )
TURNER ENTERTAINMENT GROUP,            )
INC. and TURNER BROADCASTING           )
SYSTEM, INC.,                          )
                                       )
        Defendants.                    )
_____)

## APPENDIX OF EXHIBITS AND DEPOSITION EXCERPTS

A.    Affidavit of Rick Reeves

B.    Plaintiffs' Exhibit No. 10

C.    Plaintiffs' Exhibit No. 15

D.    Declaration of J.P. Snakovsky

E.    Affidavit of Moses Williams

F.    Supplemental Report of Dr. David Rasmussen

G.    EEOC Charge Against WCW

H.    Interview of Olie Anderson

I.    Declaration of Brenda Smith

J.    Declaration of Pamela Collins

K.    Declaration of Catherine A. Neal

L.    Declaration of Sgt. Steve Hicks

M.    Dillon Memorandum Regarding Tryouts

N.  Dillon Memorandum with Smith notations

O.  Ross Memorandum of Law In Support of Defendants' Motion
for Summary Judgment

P.  Walker Affidavit

Q.  Declaration of George Grace

R.  Plaintiffs' Exhibit No. 72

S.  Plaintiffs' Rule 26(a)(2) Disclosures of Expert J. Steve
Hicks

T.  Rule 26(a)(2) Report of Plaintiffs' Expert Dr. David
Rasmussen

U.  List of Heavyweight Champions

V.  Plaintiffs' Exhibit No. 18

W.  Plaintiffs' Exhibit No. 2

X.  Plaintiffs' Exhibit No. 5

Y.  Orndorff Interview

Z.  Excerpts of Deposition Transcript of Tony Carr

AA. Excerpts of Deposition Transcript of William Boulware

BB. Excerpts of Deposition Transcript of Pezavan Whatley

CC. Defendants' Supplemental Responses to Plaintiffs'
Interrogatories

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiff's Notice of Filing Appendix** by hand delivery to:

> Eric Richardson
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This 30th day of January, 2003.

Charles J. Gernazian



# EXHIBIT / ATTACHMENT

## A

(To be scanned in place of tab)

## DECLARATION OF RICK REEVES

STATE OF GEORGIA
COUNTY OF Foulton

Rick Reeves gives the following Declaration under penalty of perjury and states as follows:

1.

I was a college football player, and started as a linebacker for West Georgia College. Although I did not play professional football, I was considered an excellent athlete. I also received a scholarship to the University of Tennessee for swimming, but I declined that opportunity. Because I was a linebacker, I learned quickness and agility. In swimming, I learned to move around very quickly.

2.

Throughout the nineties, I regularly wrestled in various organizations. I wrestled for smaller wrestling organizations throughout Georgia and Tennessee as well as Alabama.

3.

I also wrestled for the BWA, which was the Boulware Wrestling Alliance. I was very successful at BWA and became the heavyweight champion.

4.

Throughout the many years that I tried to become a wrestler for WCW, I recall WCW providing opportunities to various Caucasians who had no prior wrestling experience. For example, I am aware that Kevin Nash, who did not have wrestling experience was recruited to become a wrestler. He was given a push and became very successful and even became a member of the New World Order, which was a very prestigious wrestling group at the WCW.

5.

Based on my personal knowledge, the only experience that I am aware Kevin Nash had was that he was a bouncer for the

nightclub known as the Gold Club. I am not aware that he had any wrestling experience prior to coming to WCW.

6.

Similarly, I recall WCW providing an opportunity to Caucasian wrestler David Flair, who did not have any prior wrestling experience. Although they sent him to the Power Plant for a little bit of training, they provided him with a contract and the ability to appear on television, and he did not have nearly the level of experience and abilities as did I. Flair did not have my athletic ability either.

7.

I also recall speaking with Olie's "wrestling brother" (which means that they were not actually blood brothers but portrayed themselves as brothers for wrestling shows) who was known as Gene Anderson. Gene Anderson told me to sit and watch all of the wrestling matches at the taping so that I can learn. I complied with the request of Gene Anderson so that I could get more experience and become a better wrestler.

8.

At no time did WCW ever advertise, post, or otherwise make public any wrestling opportunities were available. Because WCW did not advertise any positions, I was forced to follow the informal methods that were established by WCW Caucasians. For example, in addition to attending all of the taped sessions in order to get an opportunity to wrestle, I also submitted many tapes showing my wrestling abilities to the persons who were in charge. I am aware that WCW received my tapes. I am certain that Taylor received my tapes because I personally handed them to Taylor.

9.

If WCW had asked me to do anything as part of the application process, I would have complied. I would have been happy to provide a live wrestling demonstration at the Power Plant, or anywhere, to show that I could wrestle. I would have also been delighted to get an opportunity to wrestle with one of WCW's better known wrestlers to show what I could do in the ring.

10.

When I personally met Mr. Dillon, I told him I wanted to wrestle for WCW. At the time, I believe he knew who I was and could recognize me. Also, when I referenced the "Talent guy" in my deposition, I was referring to J.J. Dillon.

11.

Some time in the late nineties, I became aware that Terry Taylor was the "top booker" or the "head booker." Also, during this time, WCW wrestlers routinely and regularly stayed at the Ramada Inn hotel on Riverdale Road near the Atlanta airport. I went to the Ramada Inn because I knew that is where Terry Taylor was meeting various people. I also knew that Terry Taylor was making decisions about wrestlers while informally talking to other people at the bar area.

12.

Because I did not have access to Taylor other than at the Ramada Inn and had tried everything else, I specifically went up to Terry Taylor and asked him for an opportunity. In addition to trying to get a job from Terry Taylor at the Ramada Inn, I also left Terry Taylor various phone messages. I did not feel welcome to just show up at the WCW offices so I was forced to meet Taylor at the Ramada Inn, meet J.J. Dillon when he was in public, and leave phone messages. I believe that if I had of just shown up, without an appointment, at WCW offices, that I would've not been well received, and may have been evicted with security.

13.

During my deposition, I was asked if I "knew" what Taylor meant when he said "we got enough of y'all already." I testified that it was "offensive" to me as an African-American. I felt it was offensive because Taylor was clearly telling me I would not get a chance at WCW because of my race as WCW had enough African-Americans.

14.

When I first began to wrestle and wanted to wrestle for WCW, WCW did not officially have its "Power Plant." I became

aware that the Power Plant was established. However, after the Power Plant was established, I had already acquired the necessary skills and abilities to actually perform as a wrestler. I did not need to begin training all over again as I had wrestled in other organizations, and had done what I needed to do to become ready for wrestling events, including televised and public wrestling shows.

15.

If, however, anybody had asked me to go to the Power Plant to receive additional training or to go through the Power Plant process that other Caucasians were given to make them "TV ready" I would have gladly complied.

16.

Although I was working throughout most of the time that I was trying to become a wrestler, I would have gladly left my job if I had been given a meaningful opportunity or a wrestling contract. I was also willing to work in a physical labor position such as setting up the rings or doing other physical jobs for WCW if that would have helped me become employed and become a wrestler.

17.

I am aware that Jody Hamilton has testified that he did not know who I am. Although I believed he knew my name, he referred to me by saying "hey kid." In any event, he certainly knew who I was. Also, he knew I was African-American when he told me that "we got enough of your kind down here."

18.

I testified that I asked Terry Taylor for a job at the
Ramada Inn before and after he went to WWF in New York.  I have
now reviewed Taylor's deposition and he states he returned to
WCW on November 10, 1999.  I am certain that I visited the
Ramada Inn after Taylor returned in late 1999, and I believe
approached Taylor in 2000, as well.

19.

I declare under penalty of perjury that the foregoing is
true and correct.

_Rick Reeves_

Rick Reeves

_1/30/03_

Executed on (Date)



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)



**BOBBY HARDWORK WALKER**
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:     ERIC BISHOFF
SUB.    Racial Discrimination
FROM:   Bobby Walker

MARCH 01,1998

DEAR SIR:

 In the past Terry Taylor has made statements to me and others how he felt about
blacks. Since he has had the top booking job, I have had nothing but problems. Ever
since I talked to Terry in Orlando Fl., about my future in WCW, the problem has
gotten worse. I feel like I lost my job because of Terry Taylor deep dislike for Blacks.
I have alwas tried to talk to you about any problems.  I want to know from you why
I lost my job? Please contact me at 770-716-6830.  I look forward to hearing from
you soon.  Thanks in advance for your assistance in this matter.


Bobby Walker.



CC: ERIC BISHOFF



WCW 009452
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## _____C_____

(To be scanned in place of tab)



**BOBBY HARDWORK WALKER**
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.
——
Telephone 770-716-6830

TO:     DR. HAVEY SCHILLER
SUB.    Racial Discrimination
FROM:   Bobby Walker

**MARCH 01,1998**

**DEAR SIR:**

I know that you are a very busy man. Could you Please arrange a meeting with me, to talk about this problem. In the past Terry Taylor has made statements to me and others how he felt about blacks. Since he has had the top booking job, I have had nothing but problems. Every since I talked to Terry in Orlando Fl., about my future in WCW, the problem has gotten wrost. I feel like I lost my job because of Terry Taylor deep dislike for Blacks. I want to know why I lost my job? Please contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in advance for your assistance in this matter.


Bobby Walker.



CC: DR. HAVEY SCHILLER



PLAINTIFF'S EXHIBIT
15
3/19

P00593



# EXHIBIT / ATTACHMENT

## _____D_____

(To be scanned in place of tab)

## DECLARATION OF JOHN SNAKOVSKY

STATE OF GEORGIA
COUNTY OF _____

    John Snakovsky gives the following declaration under penalty of perjury and states as follows:

1.

    I became a wrestler WCW in 1996. My wrestling name and professional name is Johnny Boone.

2.

    In 1999, I became a referee. In my capacity as a wrestler, and then as a referee, I was in a position to personally observe many of the WCW officials, especially those who worked in the Booking Department.

3.

    On numerous occasions, I heard Terry Taylor use offensive and negative words in describing minorities. I heard him call Sonny Onoo a "Jap" on several occasions. I also heard him refer to Sonny Onoo as a "Gook."

4.

    I also heard Terry Taylor use the word "nigger" on many occasions. In fact, he constantly used that word when referring to African-American wrestlers.

5.

    I heard Terry Taylor call Ernest Miller ("The Cat") a "nigger."

6.

    I also heard Terry Taylor call Harrison Norris ("Hard Body") a "nigger."

On one occasion, I heard Terry Taylor state that neither Bobby Walker nor Hard Body Norris would make it in the wrestling profession because they were "black."

8.

Based on my observations of Mr. Taylor, including his use of the words "nigger" and "gook" I believe

9.

For example, I recall that Terry Taylor often "pushed" a Caucasian wrestler by the name of Joey Mags. Upon information and belief, Mr. Mags had many personal problems. Joey Mags did not possess many skills and abilities as a wrestling performer. Nevertheless, I am personally aware that Terry Taylor "pushed" Joey Mags over Ernest Miller. Although Ernest Miller was a much better athlete, better wrestler, and better performer, Terry Taylor "pushed" Joey Mags over Ernest Miller.

10.

I also am aware that Terry Taylor pushed Joey Mags, but did not push Hard Body Norris or Bobby Walker.

11.

I personally observed Terry Taylor treat Sonny Onoo horribly. Terry Taylor always referred to Sonny in a negative and/or racist manner, and never provided Sonny with an opportunity fully use his talents.

12.

Sonny played a very unique role at WCW. Sonny was neither a wrestler nor a referee, but worked as a manager/entertainer. Sonny was extremely professional, very diligent, and always demonstrated a thorough understanding and knowledge of the wrestling industry.

13.

Based on my observations and experience, Sonny Onoo was a much better entertainer and/or manager than Sherry Martil. Similarly, he was much better than Tori Wilson. As to each of

these individuals, Sonny demonstrated much better role-playing and more professionalism.  He also demonstrated a greater degree of wrestling expertise in his approach to wrestling events. Nevertheless, these non-Asian persons received more compensation.

14.

Sonny Onoo was also a better manager/entertainer than Colonel Parker.  I believe that Sony was better at involving the crowd, and getting a crowd reaction to various staged events than was Colonel Parker.  He also was more knowledgeable about wrestling, and was a much harder worker than Colonel Parker. Colonel Parker, a non-Asian, was paid more than Sonny Onoo.

15.

In addition to Terry Taylor, I heard many other WCW officials use racist and/or negative words such as "nigger."  I cannot recall with certainty the identity of the other individuals, but I am confident that I heard these words from WCW officials in addition to Terry Taylor.

16.

In the summer of 2000, I was working as a referee.  That night, the WCW held a World Championship wrestling match.  The match was scheduled between Booker T and Jeff Jarrett.  Based on my recollection, Booker T was not "pencilled in" to win the fight.  As those of us in the industry know, a particular wrestler is scripted to prevail in a fight.  I believe that Jeff Jarrett was scripted to win the world championship over Booker T on that particular date.

17.

Prior to actual wrestling match, I heard Vince Russo and Terry Taylor discussing a lawsuit filed by Hard Body Norris and Bobby Walker.  I believe I also heard them refer to a wrestler named Ice Train during this conversation.  All of these individuals are African-American.

18.

During the conversation, I heard Terry Taylor and Vince Russo state that these African-American wrestlers had sued WCW

for racial discrimination.  I recall Taylor saying, in reference to Hard Body Norris, "that nigger Hard Body is no good."

19.

During the same conversation, I heard Vince Russo and Terry Taylor state that they would have to do something about the racial allegations against WCW.

20.

Each of them indicated that they would have to do something to deflect racial allegations brought against WCW.  During the conversation, they made it clear that they were going to make an African-American the champion in order to make it appear that they were not discriminating against African-Americans.  During that conversation, they decided that they would make Booker T the WCW champion.  Terry Taylor indicated that by making Booker T, an African-American, the champion, it would "get them off of our backs."  In sum, they made it clear that they were concerned about racial allegations brought by Bobby Walker, Hard Body Norris, and other African-American wrestlers.  In order to make themselves appear not to be racist, they scripted Booker T, an African-American, to become the WCW champion in response to the lawsuit alleging racial discrimination.

I declare under penalty of perjury that the foregoing is true and correct.

_John Snakovsky_

_2/27/02_
Executed on (Date)



# EXHIBIT / ATTACHMENT

## _____ E _____

(To be scanned in place of tab)

# AFFIDAVIT OF MOSES WILLIAMS

STATE OF GEORGIA
COUNTY OF FULTON

Personally appeared before the undersigned officer, duly authorized to administer oaths, Moses Williams, who, upon having been first duly sworn, deposed on oath and states:

1.

I worked for World Championship Wrestling ("WCW") in various capacities. I was initially hired as a stage carpenter in October, 1991, and worked as a stage coordinator when my employment was severed by WCW in March, 2001.

2.

In addition to the work that I did at WCW, I have extensive experience in stage production, and have worked on many large events. Among other clients, I have worked with entertainment groups such as the Rolling Stones and Michael Jackson. I was also involved in Farm Aid.

3.

Throughout the approximate nine and one-half years of working with WCW, I was always a very loyal and dedicated employee. I was extremely courteous to all personnel, and treated everyone with respect. I was also very respectful of managers and officials at WCW.

4.

Even though I was always very dedicated to WCW, I observed many actions that demonstrated a racial or ethnic bias against anybody who was not a Caucasian. I myself, am African-American. Although some of the WCW officials were more overt about their racial biases than others, I believe that there were many actions and decisions that were made based on a racial or ethnic bias.

5.

Over the years, I observed certain WCW officials make statements and take actions in order to protect the "good old boy" establishment. Unfortunately, the "good old boy" establishment was exclusively Caucasian. Also, in my experience, the favoritism and better treatment given to Caucasians over minorities was pervasive throughout WCW.

6.

During nine and a half years at WCW, WCW never had an African-American work in Security in any capacity. I even recommended some qualified persons for Security, but they were not hired. The decision-maker, Mr. Doug Dillinger, expressly stated that there would not be a black "security" person at WCW. True to his word, there never was an African-American hired to work in Security. As I indicate further in this affidavit, Mr. Dillinger made other statements showing his racial bias.

7.

Similarly, there was never an African-American hired to work in Lighting at WCW. The decision-maker was Frank Santoro. Mr. Santoro overlooked many qualified African-Americans. I personally recommended several qualified African-Americans directly to Mr. Santoro, but he did not hire an African-American person for Lighting.

8.

Similarly, Mr. Santoro was also responsible for hiring truck drivers for the WCW tractor-trailers. In the years I was with WCW, I only recall one African-American truck driver (female). She was involved in a minor incident, whereby she collided with a painted post (or similar fixture) and did a little damage to the truck. The truck had been leased, and I myself inspected the truck. I did not see any significant damage to the truck. The woman was crying as she told me that Frank Santoro fired her for the accident. I did not feel this was fair because I was aware of at least two Caucasian drivers who were involved in much more serious accidents, but were not fired. One Caucasian driver was involved an accident in Nashville, Tennessee, whereby he took out a whole street light and the pole it was on. There was damage to side of truck, and the pole was destroyed. The police even came and took a report.

As to the other Caucasian driver, in Indiana, the driver lost control of the truck and it effectively destroyed the truck and the trailer. But this Caucasian driver was not fired.

9.

WCW also never hired an African-American to work in Audio. Al Smith was the decision-maker for Audio. I submitted many highly qualified African-Americans for his consideration, but he never hired an African-American for Audio.

10.

The Production Manager was William Byrd. As Production Manager, Mr. Byrd was ultimately responsible for Staging, Lighting, Audio, and Trucking. He was the supervisor of Mr. Smith and Mr. Santoro. I am aware that Mr. Byrd often asked if a prospective employee was Jewish. If a prospective employee was Jewish, Mr. Byrd said to hire the individual. I felt that this bias was unfair because many minorities were not Jewish. I also recall a statement Mr. Byrd made about the child of another WCW employee, Steve Small, who married an African-American woman. Mr. Byrd stated, "Steve's kids will have problems in life because they are half black."

11.

Vince Russo often made statements demonstrating that he preferred Caucasian persons, especially Caucasian males, over other persons for WCW management and control. I heard Vince Russo often refer to people as "blacks," "Japs," "spics" or "wetbacks."

12.

I heard Vince Russo make statements suggesting that "whites" were in control at WCW. For example, I heard him say, "whites rule wrestling." I also heard him say that it was a white man's sport and that "is why we don't have many black wrestlers." I also heard him say I am running things the way that I want and we are going to have a "white champion" because that's the way I want it. Vince Russo made it clear that he did not want oriental persons, African-Americans, or Hispanics succeeding at WCW, much less gaining any position of management or control.

13.

Similarly, I heard Terry Taylor make statements demonstrating his racial and ethnic bias against persons who were not Caucasian. Although he was somewhat careful around me, I have heard from other persons that he routinely used words such as "nigger." I did, however, hear Terry Taylor express his desire to promote Caucasian wrestlers. For example, I witnessed Mr. Taylor overtly "push" Caucasian wrestlers, but not "push" African-Americans.

14.

I also heard Terry Taylor make statements about his opinions of African-American fans. I heard him say, "blacks don't buy wrestling tickets."

15.

In my experience, WCW officials such as Taylor and Russo treated Caucasians better than African-Americans, Hispanics, and Asian-Americans. Based on my observation, non-Caucasians received a "B" treatment. I use the term "B" treatment to indicate that minorities were not treated as favorably as Caucasians.

16.

I have personally observed WCW, through its employees and managers, treat minority wrestlers differently than Caucasian wrestlers. For example, on numerous occasions, I observed WCW officials "push" a Caucasian wrestler over a non-Caucasian wrestler. In wrestling terms, a wrestler is "pushed" when that wrestler is provided television exposure and/or is scripted to prevail in a particular match. As it is well known in the industry, the WCW officials would write scripts as to which wrestler would prevail. On numerous occasions, I believe that the Caucasian wrestler was unnecessarily scripted to prevail over the African-American wrestler.

17.

For example, I recall a wrestling match between a wrestler named Stevie Ray (African-American), who was one of two members of the very successful Harlem Heat duo. On that particular match, the Caucasian wrestler, David Flair, was scripted to prevail over Stevie Ray. Although Stevie Ray had been extremely

successful in his participation with the Harlem Heat duo, and although Stevie Ray was considered by myself and others a much better athlete and performer than David Flair, David Flair was scripted to prevail over Stevie Ray, nonetheless. It is my belief that this decision is one of the many times that wrestling victories were scripted based on a racial bias.

18.

Similarly, David Flair was routinely scripted to prevail over Ice Train (African-American) even though Ice Train was a very strong and solidly built wrestler who was much bigger than David Flair. And on the one occasion when David was not scripted to prevail, Ice Train effectively destroyed (and even injured) David Flair.

19.

I also observed the treatment of an African-American wrestler named "Hard Body" Norris. I was told Hard Body was referred to as a "dumb nigger." I note that Hard Body was never given any meaningful chance, and was never pushed. Hard Body was really badly treated. A fan indicated that it seemed puzzling that Hard Body was getting beaten so easily at WCW even though he was winning the "Tough Man" Competition. Another "Tough Man" competitor, Tank Abbott (Caucasian) was pushed very hard, and had great exposure.

20.

I recall another interesting event when a wrestler by the name of Booker T was scheduled to wrestle Scott Steiner. I believe this was in the summer of 2000, and was a very big WCW event. Because it was a big event, I was very involved in the stage production for that particular fight.

21.

I specifically recall everybody talking about the match, and everyone stated that Scott Steiner (Caucasian) had been scripted to win that match over Booker T (African-American). Indeed, even during some of the stage preparations, it was a known fact that Scott Steiner would be the world champion for WCW by the end of the night.

22.

Even though Scott Steiner had been designated the world
champion, I was informed before the match that there had been a
change.  I was informed that Booker T would become the champion
instead of Scott Steiner.  During my production work, I had my
headsets on and I heard various conversations.  During these
conversations, I heard Vince Russo and Terry Taylor calling the
shots.  These two individuals made it known to the WCW workers
that Booker T would be the champion that night, and not Scott
Steiner.

23.

I was extremely surprised and taken back.  In my
experience, I had never witnessed a change of the designated
winner so close before the match.  Myself and many people all
wondered what the reason was for the abrupt change in the
scripted winner.  We thought it was quite unusual, if not
bizarre, to change the designated world champion on the day of
the match.  Even after the show, people were shocked at the
abrupt change.

24.

I heard several WCW employees state that the reason for the
abrupt change was a response to the racial allegations raised by
wrestlers against WCW.  These employees, recognizing that Booker
T. was African-American, concluded that WCW officials such as
Russo and Taylor made this move to conceal their racially
discriminatory practices and to provide a defense to the
lawsuits involving racial discrimination.

25.

Although I witnessed many discriminatory acts and
statements, I did not personally raise any formal complaints.  I
am aware that another African-American, Pez Whatley, did
vocalize his opposition to racially discriminatory practices
that he perceived.  I believe that Pez Whatley suffered
retaliation for raising his concerns of racial issues and
discrimination.  For example, Pez Whatley was no longer pushed,
was no longer involved in training as he had done before, and
was essentially removed from wrestling and demoted to menial
labor such as setting up the ring.

In addition to discrimination against African-American wrestlers, I also believe that WCW has favored Caucasian wrestlers over Asian-American and Hispanic wrestlers. I recall a particular group of Asian-American wrestlers known as the Young Dragons. Although I felt that they had much to contribute to the wrestling entertainment, these individuals were never "pushed" or given any meaningful exposure. I recall one match whereby the fans were overwhelmingly in favor of the Young Dragons over Three Count (all of whom were Caucasian). Nevertheless, the Young Dragons were not pushed after this event, but WCW did continue to push Three Count.

27.

As to another individual Sonny Onoo, I believe that he was treated differently because he was not part of the "good old boys" network as I described earlier. Sonny, an Asian-American, was never accepted and brought into the inner circle even though he was extremely knowledgeable about the wrestling industry, and was a very capable and hard working person.

28.

As to Sonny Onoo, I am now aware that Sonny Onoo was not a full time employee of WCW. This surprises me because Sonny had an office, was listed on the extension list of WCW personnel, and contributed greatly to WCW. In addition to serving in numerous capacities such as agent, entertainer, coordinator of talent, Sonny also translated for Hispanic and Asian wrestlers.

29.

Jimmy Hart's work was very similar to the work done by Sonny Onoo. Similar to Sonny, he was responsible for recruiting and developing talent. Although Jimmy didn't work as a translator, they essentially performed similar work. Although I am not taking anything away from Jimmy Hart, I believe that Sonny was just as qualified (or even more so given his language skills) as Jimmy Hart.

30.

As to Asian-Americans, I also recall seeing a "Chinese menu," on the bulletin board at WCW. This "Chinese menu" portrayed Chinese in a very negative manner. This is one

example of the atmosphere at WCW, which tolerated and
perpetuated racial stereotypes and racial prejudices.

31.

As for me, I also believe that I was personally treated
differently because of my race when WCW hired Caucasians, and
paid them more compensation than I was receiving.

32.

As I indicated earlier, I have much experience in stage
production and am capable of performing every aspect of
preparing a stage event. At one point, I was working as the
prop master, carpenter, stage manager, and performing any and
all other work for WCW. Although I felt that I was being
overworked, and spread too thin, I did not complain and did what
was asked of me.

33.

I did become quite upset, however, when WCW hired
Caucasians to perform my tasks, but paid them even more than I
was making. For example, WCW hired Trevor George, Art Shipley,
and Scott Stevens (all of whom are Caucasian) to work on the
props. I believe that WCW paid each of these Caucasian
individuals more than what I was making even though they were
only doing one part of the job that I had done, and even though
they did not have nearly the extensive experience in stage
management and production. Similarly, WCW hired Ellis Edwards to
do the stunts and the props, and also paid him more than I was
making. Again, I was much more qualified for the type of work
than Mr. Edwards, but I believe WCW paid him more than I was
paid.

34.

I believe that the manner in which WCW handled this
situation, and paid the Caucasian workers more money than I was
making was racially biased.

35.

As I indicated earlier, I did not confront the WCW
officials with my complaints about discrimination. I heard from
several individuals that I was known as the "good nigger." I
was basically told that because I did not make any waves, called

the Caucasian officials "Sir" and "Mr.," and because I did everything that I was told, that I was considered "a good nigger."

<center>36.</center>

In addition to the racial discrimination against WCW wrestlers and employees, I also believe that WCW officials discriminated against wrestling fans based on race.

<center>37.</center>

I previously addressed Doug Dillinger. I also add that, on numerous occasions, I observed Doug Dilinger, the chief of security, provide promotional gifts and souvenirs to Caucasian children, but did not treat African-American children the same.

<center>38.</center>

I was offended by Mr. Dillinger's flagrant favoritism towards Caucasian kids. I made my best effort to treat all of the children the same, regardless of their race (although I did go out of my way to take care of any children with apparent handicaps). As to Mr. Dillinger, I recall, during the O.J. Simpson trial stating that "yes I used the "N word," and I will use it again." He then stated that it would not effect the way he would act in the work place, but I believe that his actions speak louder than his words.

<center>39.</center>

I recall Terry Taylor stating that they did not need to "worry about spies or brothers; they just need to get to the back of the line." I believe that he was referring to African-Americans, and any person who would raise complaints about the treatment of African-Americans. He was indicating that they would be put at the back of other persons seeking advancement at WCW.

<center>M. W.</center>

As to Terry Taylor, I was told by another person that when WCW signed Hulk Hogan, that Terry Taylor stated that WCW was bringing in Hogan, and he didn't want any blacks on the show to take away from Hogan coming back into the limelight. From my understanding, Taylor didn't want any black wrestlers to take away from his intended effect in bringing in Hogan.

I have read the above. It is true and correct.

FURTHER THE AFFIANT SAYETH NOT.

_____
Moses Williams

Sworn to and Subscribed
Before me this _18th_ day of
_February_ , 2002.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES NOV. 13, 2002



# EXHIBIT / ATTACHMENT

## F

(To be scanned in place of tab)

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

COPY

FILED IN CLERK'S OFFICE

JAN -6 2003

LUTHER......., ....., Clerk

Deputy Clerk

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

## SUPPLEMENTAL EXPERT REPORT FOR PLAINTIFFS
## TESTIMONY OF DR. DAVID W. RASMUSSEN

This supplemental report uses more recent evidence on the
number of African-Americans attending wrestling tryouts
sponsored by WCW. Additional testimony confirms the results
reported in my initial report, i.e., that the average estimate
of the availability of African-Americans for employment as
wrestlers is about 25 percent. This report also uses more
complete data on the racial identification of wrestlers training
at the Power Plant and those actually employed as wrestlers.
The substantive conclusions reported in the original report are

not only confirmed, but the statistical evidence that African-Americans are under-represented as wrestlers is in fact stronger than previously reported.

The availability of African-Americans, the benchmark by which African-American representation is to be evaluated, was based on the personal impressions of five individuals familiar with try-outs held at the Power Plant. I have now received data on the impressions of three more persons whose estimates of African-American availability are included in this report.

The methodology used here is identical to that of the initial report. Seven individuals who have testified as to their impressions of the representation of African-Americans among persons at the try-outs are recorded in Table 1.[1] As is clear in the Table, four of these individuals provide an estimated range and three provide a specific figure. Estimates of the percent African-American range from 10 to 40 percent. Column 1 counts each estimate as an independent observation, so Hamilton, Norris, Snakovsky, and Walker, in effect, get two votes. The mean of these eleven estimates is 26.0 percent

---

[1] This information is given in depositions or by declaration, the date of which is following the person's name: D.E. Bruce (November 21, 2002); Joseph N. Hamilton (March 22, 2002); H. Norris (December 13, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); B. Walker (November 7,2002); and Moses Williams (May 28, 2002). Tony Byron Carr provided his impressions of African-American participation in a deposition (January 28, 2002) and his estimates were included in my original report. His estimates varied widely (from a low of 10 percent to approximately 40 percent), but upon further inspection it is not clear whether these estimates pertain to wrestling tryouts or training at the Power Plant. Given the uncertainty of his testimony, his estimates are not included in this summary report. However, including this estimate has virtually no effect on the benchmarks reported in Table 1 below.

TABLE 1

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN AMERICAN | |
| --- | --- | --- |
| | ESTIMATES | AVERAGE |
| D. E. Bruce | 33 | 33 |
| J. N. Hamilton | | 12.5 |
| Low | 10 | |
| High | 15 | |
| H. Norris | | 35 |
| Low | 30 | |
| High | 40 | |
| J. Snakovsky | | 35 |
| Low | 30 | |
| High | 40 | |
| B. F. Smith | 12 | 12 |
| B. Walker | | 18 |
| Low | 16 | |
| High | 20 | |
| M. Williams | 40 | 40 |
| Mean | 26 | 26.5 |
| Median | 30 | 33 |
| Mode | 40 | 35 |

African-American, the median (the mid-point of the range of

estimates) is 30 percent, and the mode (the most frequent

estimate) is 40 percent.

As noted in the original report, one could reasonably

object to counting any individual's estimate twice, so column

two provides the mid-point of the ranges provided by Hamilton,

Norris, Snakovsky, and Walker. The resulting mean is 26.5

percent African-American, the median is 33 percent, and the mode is 35 percent.[2]

Another source of information about the availability of African-Americans as wrestlers was provided in a list that identifies the race of 82 individuals who were trainees at the Power Plant over the 1996-2000 period. I have been informed that the most complete list of such persons, identified by whether they are African-American, is in the Declaration of Harrison Norris (dated December 13, 2002). Of 82 persons being trained at the Power Plant, 14 (17.1 percent) are identified as being African-American.

Five benchmarks are used in the following statistical analysis. The lowest is the 17.1 percent that represents the actual known African-American participation in the Power Plant. The others are from Table 1: the mean, median, and mode of column one (26, 30 and 40 percent respectively) and the mode of column 2 (35 percent).

As in the initial report, Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period. First consider Table 2. The first column shows the number of contract wrestlers reported in the Declaration of H. Norris. Column two shows the

---

[2] Recall that even if collectively these approximations of applicant flow give an accurate picture of African-American representation at the Power Plant, this estimate of interest among qualified African-Americans could be biased downward due to the chilling effect that was described in the initial report.

various benchmarks, the percent African-American expected among these wrestlers. Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in the declaration of Harrison Norris, and column five reports the difference between the actual and expected numbers of African-Americans. The last column shows the number of standard deviations. Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

The first benchmark, African-American representation among trainees at the Power Plant, is 17.1 percent. WCW hired 227 persons during 1996-2000, and had they hired African-Americans at a rate of 17.1 percent the expected number of African-American hires would be 38.8. Instead, only 17 were hired; -5.26 standard deviations from the expected number of 38.8. This is statistically significant.

Subsequent benchmarks, as noted above, come from Table 1. The number of standard deviations range from -6.36 to -10.0, far beyond the standard of -2.00 standard that indicates that chance accounts for the under-representation of African-Americans at WCW. When the shortfall of African-American wrestlers is more than -6.00 standard deviations, as in row two of Table 2, this result is expected by chance in less than 1 chance out of

- 5 -

100,000.[3] The subsequent comparisons are even less likely to occur from an equal opportunity employer if the benchmarks reflect African- American availability and interest in a wrestling career.

TABLE 2

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
REPRESENTATION AMONG WRESTLERS (1996-2000)

A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 227 | 17.1 | 38.8 | 17 | -21.8 | -3.85 |
| 227 | 26.0 | 59.0 | 17 | -42.0 | -6.36 |
| 227 | 30.0 | 68.1 | 17 | -51.1 | -7.40 |
| 227 | 35.0 | 79.5 | 17 | -62.5 | -8.69 |
| 227 | 40.0 | 90.8 | 17 | -73.8 | -10.00 |

B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 231 | 17.1 | 39.5 | 20 | -19.5 | -3.41 |
| 231 | 26.0 | 60.1 | 20 | -40.1 | -6.01 |
| 231 | 30.0 | 69.3 | 20 | -49.3 | -7.08 |
| 231 | 35.0 | 80.9 | 20 | -60.9 | -8.39 |
| 231 | 40.0 | 92.4 | 20 | -72.4 | -9.72 |

Panel B of Table 2 is identical to Panel A except that the four disputed wrestlers are included in the analysis. Three of the disputed persons are African-American, so the total number of wrestlers rises to 231 and the actual number of African-Americans hired rises to 20. The results do not change: the number of standard deviations range from -3.41 to -9.72, once

---

[3] In Table 2 of the original report there was a typographical error in row two of Panel A. When the benchmark is 23.5 in that table, the number of standard deviations is -5.71, not -7.71 as originally reported.

again indicating statistically significant under-representation of African- Americans. The number of African-American wrestlers will be 3.41 standard deviations below the expected number by chance alone about one time in 1,000. Recall that -6.00 standard deviations will occur less than one chance in 100,000 cases.

As noted in the initial report, the analysis in Table 2 is flawed in that it considers the number of persons in Exhibit A but does not account for the actual frequency of employment. As an illustration, suppose an employer hired two persons, a Caucasian and an African-American, over a 10-year period. Using the method employed in Table 2, African-American representation would be 50 percent. But suppose that the Caucasian worked in each of the 10 years and the African-American worked in only one. By looking at African-American representation by salary years a very different picture emerges: instead of 50 percent, African-American representation is only 1 out of 11, or 9.1 percent.

Table 3 investigates African-American representation among WCW wrestlers using salary years as the unit of observations. Based on data used in the original report and the Norris Declaration, there are 680 cells in which a person is reported to have received a salary. Of these cells, 51 (7.5 percent)

represent salaries earned by African-Americans.[4]  The benchmarks
that measure African-American availability are identical to
those in Table 2.  When the benchmark is 17.1 percent, the
lowest in the table, the shortfall of African-American wrestlers
is -6.65 standard deviations from the expected number.  As in
Table 2, the number of standard deviations rises with the
benchmark: when the benchmark is 40 percent, the shortfall is
-17.30 standard deviations.  There is less than one chance in a
million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 680 | 17.1 | 116.3 | 51 | - 65.3 | -6.65 |
| 680 | 26.0 | 176.8 | 51 | -125.8 | -11.00 |
| 680 | 30.0 | 204.0 | 51 | -153.0 | -12.80 |
| 680 | 35.0 | 238.0 | 51 | -187.0 | -15.03 |
| 680 | 40.0 | 272.0 | 51 | -221.0 | -17.30 |

This analysis strongly suggests that African-Americans are
significantly under-represented among wrestlers at WCW.  Even
when African-American representation at the Power Plant is used
as the benchmark, African Americans are significantly under-
represented.  Even the highest benchmark in Tables 2 and 3 may
under estimate the true availability of qualified African-

---

[4] In the original report there were 681 total salary years, 51 of which were
African-American.

Americans, as noted in the previous report, since it is possible that if WCW was a truly equal opportunity employer it would confront an applicant pool of interested and qualified persons that mirrored that of professional basketball or professional football.

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This 3rd day of January, 2003.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA 30305
Telephone: (404) 261-6020
Telecopy:   (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this date served

opposing counsel to this action with the foregoing

**Supplemental Expert Report for Plaintiffs' Testimony of**

**David W. Rasmussen** via hand delivery, addressed as follows:

John J. Dalton
James Lamberth
Eric Richardson
Evan Pontz
Troutman Sanders LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-22165

This 6ᵗʰ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680



# EXHIBIT / ATTACHMENT

## _____G_____

(To be scanned in place of tab)

# CHARGE : DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 11C92C735 |
| ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Nr., Ns., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Robert L. Ross, Jr. | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETTS WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat A (15-100) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CENTER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST *(ADEA/EPA)* | LATEST *(ALL)* |
| / / | 07/14/91 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I. On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91.

II. Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons.

III. I believe that I have been discriminated against because of my race/black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely filed with the Commission on 01-10-92."

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 2/14/92 *(Date)*    *Robert L. Ross Jr.* *Charging Party (Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |

EEOC TEST FORM 5 (09/01/91)

FILE COPY

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 110 920735 |
| ☒ EEOC | AMENDED |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Robert L. Ross | (404) 974-8145 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6309 PICKETT WAY, ACWORTH, GA 30101 | | 07/15/59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| WCW WORLD CHAMPIONSHIP WRESTLING | Cat C (201-500) | (404) 827-2066 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 CNN CTR., STE. 1280, SOUTH TOWER, ATLANTA, GA 30303 | | 121 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST(ADEA/EPA) | LATEST(ALL) |
| 07/14/91 | 07/14/91 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

(AMENDED CHARGE)

I.  On 7-14-91 I was discharged from my position as a professional wrestler. I had been employed since 1-15-91. During my tenure I was paid less wages than similarly situated White wrestlers.

II.  Mr. Jim Heard, executive vice-president, Dusty Rhodes, booker and T. A. Magnum, assistant booker, stated that my contract was not being renewed because of budgetary reasons. When I inquired about the difference in wages, Jim Heard told me that I should just be glad that I had a job.

III.  I believe that I have been discriminated against because of my race/Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

"This perfects my original correspondence that was timely with the Commission on 01-10-92."

RECEIVED EEOC '92 MAR 27 A 11:12

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *Robert L. Ross Jr.* 27 Mar 92 | |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date          Charging Party *(Signature)* | |

EEOC TEST FORM 5 (09/01/91)

FILE COPY

WCW 102035

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

┌ Mr. Jack Petrik, General Mgr. ┐
CEO
WCW World Championship
Wrestling
1 CNN Center
Atlanta, GA. 30303
└ ┘

PERSON FILING CHARGE

| THIS PERSON (Check One) |
| --- |
| CLAIMS TO BE AGGRIEVED |
| IS FILING ON BEHALF OF OTHER PERSON(S) |

DATE OF ALLEGED VIOLATION
7-14-91

PLACE OF ALLEGED VIOLATION
Atlanta

CHARGE NUMBER
110920735

# NOTICE OF CHARGE OF DISCRIMINATION
*(See reverse side of this notice for additional information)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] **Title VII of the Civil Rights Act of 1964.**

[ ] **The Age Discrimination in Employment Act of 1967.**

[ ] **An Equal Pay Act (29 USC, §206(d)) investigation will be conducted concurrently with our investigation of this charge.**

The boxes checked below apply to your organization:

1. [X] No action is required on your part at this time.

2. [ ] Please submit by _____ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ms. Carolyn Daniel Supervisor
*(Commission Representative)*

(404) 331 0632
*(Telephone Number)*

[ ] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[X] RACE    [ ] COLOR    [ ] SEX    [ ] RETALIATION    [ ] AGE    [ ] RELIGION    [ ] NATIONAL ORIGIN

CIRCUMSTANCES OF ALLEGED VIOLATION:

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
| --- | --- | --- |
| 1-17-92 | CHRIS ROGGERSON, DISTRICT DIRECTOR | |

EEOC FORM 131 (REV.2/80)    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

WCW 102033



# EXHIBIT / ATTACHMENT

## _____H_____

(To be scanned in place of tab)

This is the interview of Olie Anderson taken at the law offices of Bentley & Bentley by Randall Bentley and Ronald J. Freeman at 9:55 a.m. on January 23, 1992.

Q:   For the record, could you please state your full name.

A:   Olie Anderson.

Q:   Could you please give your name that you were given at birth.

A:   Allen Robert Rogalsky.

Q:   What are you commonly known as in the Atlanta area?

A:   Olie Anderson.

Q.   Can you please give us your business address and your residential address.

A:   The residential address is 1660 Rock Springs Lane, Woodstock, Georgia.

Q:   Zip code?

A:   30188

Q:   And your residential address?

A:   That is the residential address.

Q:   For the record, could you please tell us a little bit about your educational background?

A:   High school, four years of college, no degree.

Q:   Where did you attend high school?  City and State.

A:   St. Paul, Minnesota.

Q:   And where did you attend college?

A:   University of Colorado, University of Minnesota and St. Cloud State University.

Q:   After you left college, what did you do then?

A:   Served in the Army.

Q:   How many years were you in the Army?

**A:** Two years, nine months, 1 day.

**Q:** Were you recruited for the Army or did you volunteer?

**A:** Drafted and then volunteered, September, 1964.

**Q:** Did you serve during any war time?

**A:** During Viet Nam. Viet Nam started then.

**Q:** Did you in fact serve in Viet Nam?

**A:** No, I did not. I was in Germany.

**Q:** What is the highest rank that you attained while in the service?

**A:** E-4.

**Q:** What branch of the service were you in?

**A:** Army.

**Q:** Which level was it, infantry, quartermaster?

**A:** I was a clerk personnel specialist.

**Q:** Now upon leaving the Army, what did you do?

**A:** I went into professional wrestling.

**Q:** How did you first become involved with professional wrestling?

**A:** I was approached by a couple of people involved in professional wrestling in Chicago, where I was later stationed while I was still serving in the Army and was told that they would consider making an offer for me to get into professional wrestling. One was Vern Gagne, the other was Dick the Bruiser.

**Q:** Did you eventually become involved in professional wrestling?

**A:** In September of 1967 I started professional wrestling in Minneapolis.

**Q:** Now, kind of chronologically walk us through your history of professional wrestling up in Minneapolis up until the time you arrived in Atlanta, Georgia.

**A:** I wrestled in Minneapolis for approximately 6 months. In April of 1968 I went to Canada for a very short time. In

June of 1968 I went to North Carolina - my first NWA. NWA at that time was recognized as being the largest sanctioned body of wrestling. I wrestled in North Carolina until September of 1970. I was injured and was out of wrestling for approximately a year. I came back into wrestling in the summer of 1971 by wrestling for the NWA again in Florida. I stayed there until January of 1972 and was asked to come back to the Carolinas. I stayed in the Carolinas until 1974. I went to Florida and then came back to...or went to Georgia in about April of 1974. I wrestled again off and on in Georgia and Florida, or Georgia and Carolina I should say, and then came to the Carolinas...I mean Georgia, in 1976 in September or October of that year as a wrestler and for the first time in a management position as a booker and stayed like that through December of 1979. I got out of wrestling for approximately 5 or 6 months and was asked to come back in the manager and wrestling capacity in May of 1980, again in Georgia, and then became a booker in the Carolinas in 1981.....I think around March of 1981....and a few months after that became the booker for both Georgia and Carolina until approximately June of 1982, when I became the booker of Georgia exclusively until 1985, when I sold out my position in wrestling and essentially retired.

Q: Since being the exclusive booker here in Georgia in 1985, have you maintained any other managerial or wrestling positions with the WCW or the NWA?

A: In 1989 I was hired by WCW at that time to be a road agent and later in 1990....May of 1990.....I was asked to be placed in the position of being the booker until November of 1990.

Q: Now while at the times when you were in a booker or manager position with the NWA or the WCW, were there any other black managers employed with the NWA or the WCW?

A: No. By managers again, you mean by administrative?

Q: Administrative.

A: No.

Q: Throughout your entire tenure here in Georgia....or throughout your entire tenure with the NWA, have you ever known them to employ a black booker?

A:


Q: You were telling me about Ernie Ladd, can you give me the dates and what position you understood Mr. Ladd to hold.

A: Well, Ernie was, I think, helping Bill Watts in booking the areas of Mississippi, Louisiana, Arkansas. I believe it was probably in the early '80's......'81, '82, something like that.

Q: Do you know what Ernie Ladd's title was at that time?

A: I couldn't honestly say that he had a title, and I wouldn't say that he.....I don't know that he necessarily received any compensation for that job either.

Q: Was he wrestling during that time period?

A: Yeah, I think so.

Q: Now Bill Watts, was he a white male?

A: Yeah.

Q: Is he a white male?

A: Yes.........still is.

Q: With the exception of Ernie Ladd, have you ever known any black to hold a booker or any other administrative position in the NWA or WCW?

A: No, I don't think there has any time where a black has held a particular position as booker where he received any compensation for that particular situation.

Q: Was it your understanding that white males that held those positions were paid salaries or other types of benefits?

A: Yes.

Q: Now, during the time that you were a booker exclusively here in Georgia, can you tell me approximately how many black wrestlers that you had either under a written contract or an oral contract to wrestle?

A: Personally had?

Q: That you personally had.

A: When I was doing the booking and when I owned a portion of Georgia Championship Wrestling I used, I think, every black wrestler that existed. What are we looking for at this point....names?

Q: No....just.

A: Everybody that was there.

**Q:** Okay. Were you ever questioned by your superiors concerning your frequent use of black wrestlers?

**A:** Prior to my coming to WCW I would say probably not.

**Q:** And when you came to WCW.....tell me about the people that took over at WCW and what type of questions they raised concerning your hiring practices of black wrestlers.

**A:** When I got to the WCW I was working for a man by the name of Jim Heard. Jim Heard at one point I think just made a comment as to why or what favors I might have owed wrestlers that I had. At that time I was trying to bring in Thunderbolt Patterson. I had brought in Junkyard Dog, Ranger Ross.........there were conversations I think about Abdullah the Butcher and several other people, and I think....the best I can remember is that Heard asked me what allegiance or what favors or whatever that I owed these people. I tried to work out things for instance with Thunderbolt Patterson because I thought he would be a way to encourage people to come to wrestling matches, particularly blacks, because we went to a lot of cities that had black populations....and had some things set up for Thunderbolt Patterson too which would have been economically sound....and the WCW wouldn't do it.

**Q:** Had you ever experienced those types of problems prior to your coming on board with the WCW?

**A:** No.

**Q:** Okay, Olie, start describing to me the time when Ted Turner bought out the NWA.....and what your understanding of the name change...and what your position was with the WCW.

**A:** My understanding is that Turner bought out Jim Crockett Promotions. Jim Crockett Promotions at the time was a member of the NWA....and I didn't have any association to do with that until a year later....September of 1989.....in the capacity of a road agent, which was basically nothing.....going to the towns and watching over the matches and the wrestlers. During that time there was....

**Q:** What was your understanding of your duty as a road agent.....as it relates to the wrestlers?

**A:** Well, primarily to see that they were there....to watch the matches. That would be basically it.

**Q:** So you just watched the matches.....made sure the wrestlers showed up?

**A:** Yeah, there were some things going to the televisions and things like that. I also sat in on different meetings that

they had.....talking about what they were going to do, programs they were going to have and talent that they were using, that type of thing.

Q: As a road agent, did you have anything to do with who would be wrestling that night?

A: At that point, no.

Q: Did you have anything to do with who....could you enter into a contract with a wrestler to come to work for the WCW?

A: No.

Q: Okay, what position held that responsibility?

A: Well, that would have been up to the booker and primarily to the guy that was the vice president of WCW working for Turner, and that would have been Jim Heard.

Q: Who was the booker when you came on board as the road agent?

A: They had several...they had a booking committee.....I was a part of that committee, supposedly.....and then there were several of the wrestlers as well.....as well as at least one announcer. There were maybe 8 or 9 people who were in this so called booking committee who decided what they were going to do.

Q: Were there any black wrestlers or black people on that booking committee that you knew about?

A: No.

Q: Were there any blacks in management with the WCW during that time period?

A: Administratively, no.

Q: Do you recall how many black wrestlers were involved with the WCW during the time that you came on board as a road agent?

A: I think there were four. Ranger Ross, Teddy Long, Butch Reed and Ron Simmons come to mind as the only ones that were there.

Q: Now out of the four that you just named, do you know how many had contracts with WCW?

A: I think that they all did, although I'm not sure. I thought they might have all had contracts. I never saw them.

Q: Now, you were a road agent for how long?

A:   Until May of '91.

Q:   And what happened in May of '91?

A:   In May of '91 they apparently thought they....being Heard
     and the organization.....Turner decided that they weren't
     doing well enough for....things needed to be
     changed......and I was asked by Jim Heard if he and I could
     get along and that he would recommend me and like to have me
     take over the job as booker.

Q:   Now tell me from your own personal observation what was
     going on as far as the revenue that WCW was able to generate
     based on the attendance at the matches?

A:   Well, things hadn't hit the bottom yet, although they felt
     that they were at the bottom, and because of the fact that
     they weren't doing the money that they wanted to do, they
     decided that there had to be a change.  The houses were
     probably....well significantly less than they had been in
     the '70's and the early '80's, and they were concerned about
     it and they thought that a change was needed, and that was
     when I was asked to become the booker.

Q:   Now, what cities were you'all servicing around May of '91?

A:   Everywhere in the country.

Q:   Did a lot of these cities have a majority black population?

A:   Yes.

Q:   Can you tell me in your opinion what was the percentage of
     attendance at the matches?

A:   Blacks to whites?

Q:   Blacks to whites.

A:   Well, I think in cities like Atlanta, Chicago, Baltimore,
     Philadelphia were....I personally have wrestled before and
     have booked before and have seen the crowds well enough to
     have an idea.  I would say that while I was with WCW there
     were virtually no blacks that came to the wrestling matches.
     The Atlanta area used to be...I would guess 30 to 40% blacks
     ten years ago in attendance.  Columbus, Georgia would easily
     have been 40% blacks.  Augusta auditorium would have had
     that same type of figure.  WCW might have lost total
     attendance in terms of the total number of people that were
     going, but the black attendance dropped off to a point where
     I think I would hazard a guess as to percentage.  It would
     be easier to say there just were no blacks that were coming
     to the wrestling matches.

Q: By this time, how many years of experience had you had in the wrestling industry?

A: Starting in 1967 and this was in 1989, 1990.

Q: Now during the time that there were a lot of blacks in attendance at wrestling matches, were there also a lot of black wrestlers?

A: Yes, more so than there are now or that where were when I came to WCW.

Q: Did you attribute the decrease of black attendance to any particular fact that was going on in '90 or '91 when you were a road agent and booker with WCW?

A: Yeah, I thought definitely that....

Q: What did you attribute it to?

A: The fact that we didn't have the blacks that were wrestling.

Q: Did you present that idea to anyone?

A: Yes I did. I presented it to the committee at various times, and when I became the booker, that idea was presented to my boss at that time, Jim Heard.

Q: When you presented it to the committee, what type of response did you get?

A: The committee, I think, was basically ruled by Jim Heard, so I was kind of......nobody had an opinion.....unless it was voiced by Jim Heard.....and then they would mimic that opinion, I think.

Q: Did you eventually go to Jim Heard and get his opinion?

A: Yeah, I think his comment as I mentioned was something like "what favors do you owe that would make you want to have these people or have this guy or that guy wrestle." My answer was "I don't owe this person anything, and I don't owe anybody any favors. I'm just looking at it from the standpoint of trying to be able to draw a crowd and bring spectators into the buildings; and I think for that we need to have blacks as well as the whites in order to do that."

Q: Once you assumed the role of booker, did you begin to sign more blacks?

A: Yeah, the first guys I tried to get were.....the first one I brought in was Junkyard Dog.

Q:   Okay, did you enter into a contract with Junkyard Dog?

A:   I can't say that we've made a contract.  There was a verbal agreement with Junkyard Dog for sure.  Whether there was a contract, I don't know.

Q:   Do you remember what the salary was?

A:   I believe it was around $400 or $450 per event, and of that sum I think it was $100 that was to be withheld until the end of the month, at which time he would then be paid that sum.

Q:   Was there a certain number of events that he was to participate in per month?

A:   No.  That was pretty much up to me, but I booked him regularly.....I booked him as much as I could.

Q:   So in '91 the first person you remember...

A:   May of '90.

Q:   May of '90, the first person you remember entering into a contract with was Junkyard Dog, and it was based on the events.........he was being paid a certain salary based on the number of events that he participated in.

A:   Yeah.......based on a per event situation.

Q:   Per event situation.  Were there any other black wrestlers that you entered into that same type of agreement with.

A:   No.  I ran into a lot of flack when I brought in Junkyard Dog.

Q:   What kind of flack did you run into?

A:   Well, as I've said, what favors did I owe?  What past deals might there be between he and I?  There was just a lot of heat, as I would call it, to have Junkyard Dog, because nobody seemed to want to have him there.  The reasons were because he was overweight, because he was fat, because he was undependable.  They didn't know if he was going to show up and that type of thing.

Q:   Were there any overweight white wrestlers that were on contract?

A:   I don't know.

Q:   Can you think of anyone that was proportionately the same size as Junkyard Dog that happened to be a white wrestler that was wrestling during this time period?

Patterson is in the same situation, having drawn sell-out crowds in all parts of the country, particularly here in the southeast. A guy like Tony Abbus....the same exact situation....sell-out crowds. A guy like Abdullah the Butcher....the same type of situation....sell-out crowds. Ernie Ladd......sell-out crowds. I've seen these people sell the buildings out because I either was with them or worked with them or I was booking them. Conversely, if I look at Sid Vicious....I don't believe there has been one sell-out....well, in fact there hasn't been a sell-out crowd in years.....so I guess he couldn't have been responsible for a sell-out crowd, because there hasn't been any. Lex Luger is the same way. Lex Luger is paid a high salary, but there is never any evidence anywhere to show that he's ever drawn any money.

Q:   Now, during the time that you were the booker, was the policy of WCW to pay black wrestlers a lower salary than what they were paying white wrestlers?

A:   Yeah, I don't think there is any question. I think that I offered, for instance in JYD's case....I offered him several hundred dollars per event less than I would have offered a white person, and did do that. In the case of JYD I think offered him $450 an event, $100 to be withheld to be paid later on at the end of the month, and approximately a month later or so I hired a guy by the name of Stan Hanson, who was white, and paid him $600, because I knew it was going to be difficult for the black man to argue about it...for JYD to argue about it. He was kind of between a rock and a hard spot and pretty much had to take what we'd offered, where Stan Hanson was in a better position to argue about his wages and said I'll go for $600. If I would have suggested $450 he would have just thrown it back in my face. In fact, now I'm remembering Paul _____ I think offered him something like $400/$450. He wouldn't take it.....he said no.....and I think we upped his to $600. Thunderbolt Patterson, when I started him I paid him $100 because I felt that there was so much heat and so much flack from hiring anybody who was black. When I suggested Tony Atlas everybody just kind of farted at it and decided that they didn't want Tony Atlas, and I don't know whether they thought I was gonna flood the place with blacks or what, but my intention was simply to be able to draw money, that's all, and business. I didn't care about it. I wasn't pro black, white, green....I just wanted to try to draw money, and the only way I knew how to do it was the way that it had been successful for years and year and years and years, and that is to have blacks on the card to draw not only blacks, because that wasn't the idea exclusively to draw blacks, it was a black that could perform to the point where he would draw blacks as well as whites.

Q:   Now how long did you say in a booker position with WCW?

**A:**

**Q:** You were talking about...they had raised some concerns concerning JYD's dependability....do you have an opinion as to Junkyard Dog's dependability?

**A:** Well, the time that he worked for me off and on during the years prior to my being with WCW there was never a problem. He always was on time, and he always showed up. I had no reason to question whether or not he would make it.

**Q:** Did he work with you while you were with the WCW?

**A:** Well, I hired him. That's when he first came to work for WCW.

**Q:** Were there any wrestlers that you were having problems with concerning their dependability?

**A:** Yeah, a lot of them.

**Q:** Can you tell me....can you give me the names of a couple of them and the types of problems that you had with them?

**A:** We had two wrestlers that were chronically a problem....one in particular by the name of Lex Luger, who was making....my understanding was he was making $500,000 a year....and he was always a problem. He was always late. I talked to him several different times about his being tardy because it raised problems in the buildings and required that in some cases we give money back. We had to inform the spectators that he wasn't there, and I told him that unless he showed up we had no way of knowing if he intended to be there later or if something had happened where he couldn't be there....so he needed to be there on time. At the very least, on occasion, he needed to give us a phone call. If he couldn't be there on time he needed to give us a phone call and say he was running a little bit late. Well, he never thought that that was important, and I thought that was kind of funny.....well, difficult to deal with because I wouldn't do business that way. They were so concerned about JYD, and I never had a problem with JYD, and for the period of time that I was there, to my knowledge there was never a problem with JYD. And yet the guys that they had problems with, Lex Luger, Sid Vicious and a few others.....nothing was done...except in most cases they gave them a raise.

**Q:** Now isn't it your professional opinion that a JYD or a Thunderbolt Patterson could draw a larger crowd that a Lex Luger or a Sid Vicious.

**A:** Well, I can only say that the past tells me that JYD has drawn large crowds....sell outs.....in various parts of the country. Personally I know that. A guy like Thunderbolt

**A:** From May '91 until November of '91....November 22 or 23, something like that.

**Q:** Now prior to your becoming a booker with WCW, can you tell me how many blacks you understood were on contract with WCW, prior to May of 1991?

**A:** I think four would be about it. There might have been one two more. I'm thinking Teddy Long, Butch Reed, Ron Simmons and Ranger Ross I think at that time might have been under contract, or he had been prior to that.

**Q:** Now once you became booker you said that you signed Junkyard Dog. Were there any other blacks that you signed?

**A:** Well no, I said that I don't know about a contract, because I didn't personally negotiate any contract. I negotiated a verbal commitment on my part. Whether that translated to a written contract later on or even at that time, I don't know. But I brought in JYD. I tried to bring in Tony Atlas.

**Q:** What happened when you tried to bring in Tony Atlas?

**A:** Everybody just nixed the idea. He had been in a lot of trouble. He was another unpredictable commodity, and I think again the comment against was something like "What do you owe these people, anyway?"

**Q:** Had you ever wrestled with or signed Tony Atlas prior to your association with the WCW?

**A:** I started Tony Atlas. My brother Gene and myself...we started Tony Atlas. He's from Roanoke, Virginia.....one of the toughest kids that I've ever run into. In all the years that I wrestled we only started about three people. We only introduced two that I can think of....one being Tony Atlas....that we introduced to wrestling, so we were rather selective over a period of 20 years. Tony Atlas, in my estimation, was probably one of the.....he was a draw very much like Thunderbolt Patterson.....very much like Junkyard Dog. He had the ability to talk. He looked good. He fit the mold that WCW seemed to want....that is the Superman type of mold.....the body builder. Tony Atlas was a body builder before Lex Luger knew how to put his pants on. Tony Atlas was a legitimately strong individual as well. He did demonstrations where he would bench press 500 pounds and so forth and so on.....and he was a legitimate guy. He was also the kind of guy that I could work with. I took him to the Children's Hospital and did community service type things that I thought were important to help wrestling and to help Tony Atlas become popular in wrestling, and he was willing to do it. He was just....he was, I thought, an

outstanding individual, and he would have contributed an awful lot to wrestling. At that point the argument couldn't be made, like Junkyard Dog, that he was heavy, because he wasn't. They couldn't make the argument that he was old, because he wasn't. They couldn't make any argument that would go against him, so I could only draw my own conclusion, and that was they just didn't want Tony Atlas; and I guess I can go further to say that I would assume that it had to be because he was black. If there was another reason, I don't know what it would be. But in any event, we never got Tony Atlas.

Q:   Were there any other blacks that you attempted to introduce?

A:   Thunderbolt Patterson.

Q:   What happened with Thunderbolt Patterson.

A:   I just ran into a lot of crap all the time. I had Thunderbolt show up every week I think for three months. I hope he'll remember better than I do. I'm not quite certain the length of time. For somewhere in the neighborhood of like three, maybe four months, I had Thunderbolt Patterson come to the TV tapings. I had him on occasion do an interview or two. Every time I did that the word got back to the office...Jim Heard...in such a way that it was brought to me the next day or whatever....wanting to know what in the world I intended to do with the guy and so forth and so on, and I just made it very low key then for Thunderbolt, and I explained to him many times that it's real tough. I said just take it easy and maybe we can work this doggone thing out and maybe I can finally get you into a position where we can try to draw some money with you, either by having you in the ring or by having you manage somebody in the ring, which was the choice, or by putting you in a position, which I suggested several times, where you would be involved directly in our management in a way where we could help to promote wrestling through the black community, and let Thunderbolt Patterson, who was well known in the black community in cities all over the country, work in that capacity to encourage black participation. We had a deal set up for him to go to the.....or I should say I had an idea set up for Thunderbolt to attend the black tenants association, which was taking place in Washington, D.C., and it would have cost WCW say a thousand dollars. That would have been way more than was necessary for the plane ticket, hotel, the whole works, to attend this meeting, which I think lasted two or three days, which I thought could have done a lot of elbow rubbing, etc. with the intention of following that up by going to black mayors all around the country and black officials, politicians or whatever and try to put wrestling back on the map and try to get communities and those people interested in wrestling again through black participation, by bringing blacks in, not only to wrestle,

but by having blacks in management and to show that things
had changed, that Turner, who is the humanitarian as we now
know....the man of the decade....was trying to change things
that had happened in the past....to include
segregation.....to include the Ku Klux Klan and all that
crap.  Thunderbolt Patterson used to say it's a new day,
it's a new day, and we tried to expound on that to show that
this was in fact a new day, and that was our idea....that
was our theory....that we would be able to go to the
officials at WCW.....Jim Heard let's say in this
case.....and convince him that would be something that would
on paper sell and would in fact could become reality.  It
could make a significant change.    Whether Heard actually
felt that way or anybody else felt that way, or for that
matter, whether I felt that way in terms of making some kind
of a sociable economic change.....I'm not trying to be that
damn goody goody....but I could see where a person could
make money out of it.  I could see where business could be
improved, and I was all for it.  So when that idea was
presented, the same thing.  What do you owe the guy?  Just
comments that indicated that I was treading on thin ice.

Q:  Who made those comments?

A:  Well it was kind of general feeling, but primarily it would
be Jim Heard.

Q:  Were there any other black wrestlers besides Junkyard Dog,
Tony Atlas and Thunderbolt Patterson, that you tried to
introduce during that time period of May '91 through
November of '91?

A:  Yeah, there were quite a few, and I'm sure that I could just
about name them.  I can think of Abdullah the Butcher, Pez
Whatley, Ranger Ross, who was, I think, out at that time,
and I would see him frequently looking for employment.
Something had happened in there, and I didn't even know what
it was.  I was really busy so I can't......I'm not quite
sure.  But I just had an overall view of the situation,
which was to promote and utilize black wrestlers because we
weren't doing business, because we didn't have the black
wrestlers and the population in terms of the wrestling body
that I thought was necessary in order to bring business back
to a comfortable level.

Q:  Now during the time that you served as the booker, what was
the average salary of a white wrestler?

A:  I couldn't tell you what the average salary was.  I can tell
you what I thought some of the salaries were.....Lex Luger
at $500,000 and Sting I think at $350,000 and Rick Flair at
probably $700,000 or $750,000.  They were white.  I think
the Steiners were probably promoted later on at about
$250,000 a piece.  Sid Vicious was in the range of $180,000

I think I told you, and then he was raised to $250,000.  I think the Freebirds and Brian Pillman and those people were probably making around $104,000.  To my knowledge all the white wrestlers, save one, made in excess of $100,000.  The once exception would have been Tommy Rich, and my understanding there was he was making $1,500.00 a week.  The black wrestlers, I don't know what they were making.  I thought Ranger Ross was making like at $100,000 or $104,000.  Simmons and Reed I thought were making somewhere between $104,000 and $150,000.  Teddy Long I thought was like at $104,000, and that takes care of all the black wrestlers.

Q:  Now Butch Reed and Ron Simmons at one point were the heavy weight champions.

A:  Tag champions.

Q:  Tag champions.  Do you know the average salary for two white males when they held the heavy weight tag team championship with the WCW?

A:  Well I don't know who had the tag.....I guess the Steiners did.  At one time I think there were probably some _____ there in terms of salaries....if, in fact, Simmons and Reed were making $150,000.  The Steiners, I think, also held those titles, and I think they were making $150,000.  But I'm quite certain as of now that the Steiners are making $100,000 more.  Arn Anderson was there, and he started at about $150,000, but if I'm not mistaken I think his salary has provision for a wage increase for something like $200,000 after the first year and $250,000 in the final year.  I don't know that those provisions existed for Ron Simmons or Butch Reed, and of course, Butch Reed is no longer there.  I know they wrestled Sting.  I know they wrestled Luger.  I know they wrestled Flair and Arn, and I know they wrestled a lot of other white people who without question were making more money than Ron Simmons and Butch Reed.

Q:  Now as a booker, how were you paid?

A:  I was an employee.  I had no contract.  I was paid $250,000 a year.

Q:  Were you paid a straight base salary at $250,000 a year?

A:  Yeah.

Q:  Were you to receive any commissions based on the gross revenue at the event?

A:  The deal with Heard was in his office.  Prior to my becoming a booker I was given an appearance fee or talent fee I think they called it....one or the other.....interchangeably

probably....for any participation in any matches, and we did the one thing with the Black Scorpion where I was the whole thing, and they agreed to pay me then for all appearances and they agreed to pay me for all pay-per-view events. Since I was the once that booked it, since I was the once that put the talent in the thing, and I was responsible for making it work, it was only right in my opinion, and they agreed, that I would get a percentage, because later on I found out that they had offered something like $50,000 for each show that Sid Vicious might appear in or that Rick Flair might appear in. They were just going to give him fifty grand. Now that's what I was told by Heard. It kind of let it slip when we were arguing about my deal. So since I was the one that would orchestrate what Rick Flair would do and provide everything that would enable him to be in that show, and the same thing as far as Sid Vicious was concerned, and they could pick up fifty by just doing what I told them to do, I didn't find it too difficult to imagine that my compensation might be a little bit more, as it always had been in years past, because a booker was considered to be the glue that put everything together.... well, more than the glue. He was the glue and he was the parts and he was the man that wrote, directed, produced....everything....and that was the way it used to be. He used to have the ability to hire, fire, and so forth and so on, and I was told that I would have one year to turn this thing around.

Q:   Who told you that you had one year?

A:   Jim Heard.

Q:   And that year commenced in May of '91?

A:   It commenced in May of '91 and ended in November of '91.

Q:   It was your understanding that it was to run until April of '92?

A:   It should have run until May 1 of '92.

Q:   And in fact you remained the booker until...

A:   I was actually there....the first two months....May....it was nothing to do with me or anything.....I started out as a booker, but things had already been in the works by the previous people. So there was discussion at that point because the business was still horrible, and there was discussion at that point....I said well, you know, I need a grace period here because certainly this May thing isn't mine, and part of June wasn't mine. I was making up the TV's for May and June, but they weren't going to be played until the latter part of June, because we were like four to six weeks ahead. So I said we won't be able to see what I'm

able to do until six weeks down the road. All I'm doing is just cleaning up all the crap that's been thrown my way. So when we got to July, August, September, October and November, I booked such things as the Clash in September, the July Bash, and the Halloween Havoc in October. The Clash turned out to be the best numbers they had. It was a classic example of how things should be. August revenues....my understanding was the August revenues were in excess of $1,000,000. Revenues now on a monthly basis are probably $250,000 - $300,000. The numbers went as high as a seven two if I remember right on the Clash in September. The Halloween Havoc....Heard badmouthed me and told everybody before....the personal crap. He told me when I talked about getting my money for pay-per-view, he said that was the worst show they ever had so I should just hide my head in shame and walk out the damn door. It turns out that that was the best pay-per-view they ever had, but still there was no money forthcoming. Anyway....that period of time was the best that they've had as far as numbers as concerned, as far as revenues are concerned, as far as pay-per-view things are concerned. When the five months got over, because I think I argued vociferously, if that's the word I can use, for different things that I thought should be done to a make it right. I think he just got tired of listening to me and just decided that they didn't need me, and then after that we can draw our own conclusions as to why.

Q:   Now for the pay-per-view, did you have any idea how much money you thought you were entitled to?

A:   I'm from the old school, and in the old school there were no set figures, you know. If a person treated you right, you worked for them. If a person didn't treat you right, you walked away. A lot of things were done on handshakes. In fact, there were no contracts back then. You walked in and you say, well, I'm gonna work blah, blah, blah, and once again you had an idea what the house was....they wouldn't have to tell you....the house was $20,000. If I was_____, I could expect that I would make somewhere between 6, maybe 7, 8 percent of that figure. When I'd get my pay check and I could compute what 6% of $20,000.....1,200 bucks.....if I'd get 1,200 bucks I was happy. If I got 1,300 bucks I was happy. If I got 1,100 bucks, I wasn't going to argue about it. If I got 800 bucks I'd go in and argue. I'd say something. To hell with this thing....hold it....what's going on here. Then they might tell me their story, whatever it might be. If it sounded plausible, like there were extra guys on the doggone card, or if we had unusual expenses, you might just swallow it and say okay, live and let live, and we all got to get along. So when you say did I anticipate anything out of the pay-per-view. All I could do was say that I would anticipate that whatever they had offered completely to somebody, that

I had to be entitled to at least to that. And if they offered that to several people, well then it kind of gets screwed up because if there were ten people and they were all offered $50,000, I wouldn't reasonably say I should get $500, but I'll tell you when I first took the job I didn't know what some of the other wrestlers were making, and when I found out and found out that Flair was making $700 or $750 and Luger $500, I seriously, based on the old days, said well, the booker always makes more, because the booker was responsible for putting that guy in that position to make that money, and so I was going to go with the argument and say, I'll settle for the same as Luger's got - $500. Well shoot, they'd have laughed me right out of the deal. So I said okay, $250, and they went for $250. But there again the $250 was to be sliced with the pay-per-view, which in my estimation could have brought it up to something significantly better that $250.

Q: During your six months as a booker did they pay you based on an annual salary of a quarter of a million dollars a year?

A: Yes.

Q: Mr. Anderson, let me just ask you some housekeeping questions now. Have you given this statement based on your own personal knowledge?

A: Yes, I have.

Q: Has anyone promised or induced you in any way to give this information.

A: No.

Q: Are you presently under the influence of any drugs or alcohol?

A: No.

Q: Have you given this statement on what you believe to be the truth as it relates to your employment with the NWA and the WCW?

A: Yes, I have.

Q: That concludes the statement of Olie Anderson.

Q: This is a continuation of the statement of Olie Anderson. Could you please give us your opinion as it relates to who's really behind taking a wrestler and helping him to ascend to the ranks of Heavyweight Champion or Television Champion?

**A:** Going back, it used to always be the booker or the owner of the territory as such that would be able to determine who was going to be what. With the acquisition by Turner it became even more pronounced that the ability to make a star was with the position of either the booker or whoever it was that was running the organization. In this case it would have been like Jim Heard. You just took a body and did whatever you wanted to do.

**Q:** Can you tell us about the facts or circumstances that led up to Ron Simmons and Butch Reed becoming the Tag Team Heavyweight Champions.

**A:** Well, I think there was a period there in the summer or so of '91 where there was some concern. Some of the black wrestlers.....Rocky King was rumored to being upset...unhappy with his situation in the wrestling world....not making enough money or whatever. The rumor was pretty much that he may be attempting to make some kind of a legal problem as a result of racial discrimination or whatever, and we then made black tag team of Ron Simmons and Butch Reed. Somewhere in that time period we made them the World Tag Team Champions, and as Heard said, this should prove that we're not discriminatory. This should prove that we've taken a black team and we've made them champion so that they wouldn't have any bitch from a racial point of view.....not using blacks and not making them champion.

**Q:** So it's your opinion that that was done to pacify the black community such that they would believe that the WCW did not discriminate against black wrestlers?

**A:** Yeah, I would say so.



TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366

GINGER S. McRAE
Assistant General Counsel
(404) 827-3113
Telecopy (404) 827-1995

April 8, 1992


Ms. Lois S. Madison
Investigator
Equal Employment Opportunity Commission
Citizens Trust Building, Suite 1100
75 Piedmont Avenue, N.E.
Atlanta, GA  30335

          Re:   Robert L. Ross v. World Championship Wrestling, Inc.
                EEOC Charge No. 110920735

Dear Ms. Madison:

     This letter is in response to your request for a position
statement and certain other information with respect to the
referenced Charge.  This response is provided with the
understanding that all information and documents will be kept
confidential.

I. Position Statement

     World Championship Wrestling, Inc. ("WCW") is a company which
promotes matches between professional wrestlers for viewing by
live and television audiences.  WCW associates professional
wrestlers under various arrangements to perform in its matches.
None of these wrestlers is employed by Respondent.  Some of them
are associated by the event and others are associated over a
longer term for a larger number of events.

     Charging Party is a professional wrestler who performed
services for Respondent at various times.  He first worked for
Respondent from February 1989 to April 1990.  He performed
services pursuant to a verbal agreement for $2,000.00 bi-weekly.
The decision to associate Charging Party for this period was made
by Jim Herd, Respondent's Executive Vice President at the time.
Of course, Mr. Herd was aware Charging Party is black.  Charging
Party made no complaints of race discrimination at the end of
this initial association with Respondent.

     In late 1990 or early 1991, Charging Party approached
Respondent about again using him as a wrestler.  He had adopted

TBS SUPERSTATION • TNT • ATLANTA BRAVES • CNN • ATLANTA HAWKS • HEADLINE NEWS

WCW 102084

the professional name "Ranger Ross", and portrayed himself as loosely connected with the military to take advantage of the Persian Gulf War and the current popularity of people and things associated with the military. Mr. Herd was interested in this idea and thought it might play well to Respondent's audience. He therefore agreed to a contract to use Respondent's services for a six-month term, to expire July 14, 1991. The agreement entered into by Charging Party and Respondent is attached as Exhibit A. It is entitled "WCW Freelance Wrestler/Independent Contractor Agreement" and clearly sets forth that Charging Party is an independent contractor. Charging Party explicitly acknowledged this fact in signing the contract. He agreed that the commitment was for a definite term of six months. He agreed that he, not Respondent, was fully responsible for all taxes owed by him on compensation for his services and that he was not entitled to the benefits provided by WCW to its employees.

The agreement signed by Charging Party did not limit his ability to work elsewhere. He provided his own costumes and makeup in performing as "Ranger Ross". Charging Party performed and was paid through July 14, 1991. Respondent fully performed its contractual obligations to him. At the end of his term, he was told by Mr. Herd, who had associated Charging Party on both occasions, that "Ranger Ross" had not achieved a satisfactory level of success with WCW's audiences and WCW was not interested in signing him to a new contract. Charging Party and a number of white wrestlers whose achievement of success with audiences also had been unsatisfactory ceased services for Respondent in the summer of 1991.[1]

It is clear that Charging Party was not an employee covered by Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(f); Mathis v. Standard Brands Chemical Industries, 10 FEP cases 295 (N.D. Ga. 1975). Although, as is customary in the industry, Respondent gave Charging Party direction as to the ultimate outcome of his matches, the details of his performance were left to him. He supplied his own professional name and persona, and accompanying costumes and makeup. The agreement between the parties clearly specified that Charging Party was an independent contractor and Charging Party freely acknowledged that fact in signing the agreement. The agreement allowed Charging Party the freedom to work elsewhere. He did not receive the benefits provided by Respondent to its employees. The industry has consistently treated professional wrestlers such as Charging Party as independent contractors. All these facts are indicative of an independent contractor situation. Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir.), cert. denied, 459 U.S. 874 (1982).

_____

[1]Charging Party was asked to and agreed to perform for one event on September 5, 1991.

-2-

WCW 102085

Assuming for purposes of argument only that Charging Party was an employee, it is clear he was not discriminated against in any way. Mr. Herd made the decision to use Charging Party's services on both occasions. Mr. Herd also made the decision not to offer a new contract when Charging Party's contract expired in July 1991. When such a short time passes between such actions, and the same manager is involved in both decisions, a claim of racial animus in the discharge, but not in the hire, is irrational and does not support any finding of intentional discriminations. Proud v. Stone, 945 F.2d 796 (4th Cir. 1991).

Moreover, as stated above, a number of white wrestlers were released in the summer of 1991. A list of those individuals is attached as Exhibit B. A number of black wrestlers and other performers worked for WCW at this time and were retained. They are Curtis Hughes, Teddy Long, Sylvester Ritter and Ronald Simmons. All these individuals still perform for WCW. Obviously, race was not a criteria for the releases in the summer of 1991. Rather, it was based on purely business reasons.

Further, it is clear that race was not a factor in Charging Party's compensation. There are no scales or ranges of compensation for wrestlers. The compensation a wrestler or other performer receives in each case is wholly dependent on negotiation between the parties. Obviously, Respondent strives to negotiate as low an amount as possible and the wrestler seeks to get as much money as possible. The resulting amount depends on the wrestler's stature in the industry, his bargaining skills, Respondent's economic capacity at the time, Respondent's bargaining skills and many other factors. White wrestlers similar to Charging Party made comparable amounts. Thus, Rick Jones was paid five $250.00 per event and worked about five times every week, a total of $1,250.00, an amount less than Charging Party. Richard Slater earned $300.00 per event for about five events per week, or about the same as Charging Party. Matt Osburne made $3,000.00 every two weeks, the same as Charging Party, who made $1,500.00 per week. Charging Party's wage claim is without merit.

## II. Response to Charge

1. As explained and supported in Section I, Charging Party performed as an independent contractor from January 15, 1991 through July 14, 1991 pursuant to a written agreement. As set forth above, compensation of wrestlers is individually negotiated and is the result of many factors, and therefore comparisons to other wrestlers have little value. However, as shown above, Charging Party's earnings were about the same as or more than several white wrestlers.

2. Charging Party was told WCW was not interested in signing a new contract with him due to his lack of success during the

-3-

WCW 102086

term of his agreement, as explained above. Respondent cannot admit or deny the second sentence of this paragraph; however, as also explained above, each wrestler's compensation is individually negotiated and comparisons are not especially meaningful.

3. Respondent denies that it discriminated against Charging Party in any way.

## III. Response to Request for Information

1. Information shown on the Charge is correct.

2. See Section I above.

3. Charging Party was an independent contractor, as explained in Section I, and written rules, policies and procedures for employees did not apply to him. With respect to independent contractors such as Charging Party, it is up to the manager to decide whether and when to use their services.

## Discharge

1. As explained fully in Section I, Charging Party was not "discharged". Respondent complied in every way with its agreement with Charging Party, set forth in Exhibit A. Respondent opted not to enter a new agreement with Charging Party, as it had every right to do. The agreement did not contemplate any extension and Respondent was under no obligation to offer one. Jim Herd, then Respondent's Executive Vice President, white, made the decision not to enter a new agreement with Charging Party in conjunction with discussions with his assistants. Charging Party had no personnel file. The independent contractor agreement is attached as Exhibit A and documents regarding Charging Party's compensation are attached as Exhibit C.

2. Because Charging Party was an independent contractor, not an employee, and was not "discharged", Respondent objects to this request.

3. See response to 2 above.

4. See response to 2 above.

5. See response to 2 above. But see Exhibit B for a list of white wrestlers released in the summer of 1991.

## Additional Questions

1. a. See Exhibit A.

-4-

WCW 102087

b. See Exhibit C. Charging Party was paid in accordance with Respondent's and the industry practice for paying performers. Thus, he received a "draw" of $100.00 at the time of the event and a "talent event fee", or an allocation of the gross revenues of an event to an individual based on his position on the "card", according to industry practice. The balance between these amounts and Charging Party's contractual compensation was paid on a bi-weekly basis. This system of payment is not typical of payments to employees who are generally paid the same amount on a regular schedule.

c. See Exhibit A.

d. See Exhibit C. Such taxes were not withheld.

e. No benefits were provided.

f. Charging Party was covered under a separate policy applicable only to wrestlers.

g. Charging Party was told his contract was expiring and that WCW was not interested in a new agreement.

h. The agreement did not restrict Charging Party's freedom to work elsewhere.

i. Charging Party could not delegate his wrestling duties.

j. Respondent does not understand this question; however, Charging Party supplied his own costumes and makeup.

## IV. Conclusion

As fully set forth above, Charging Party's Charge is completely without merit for two reasons. First, he was an independent contractor not covered by Title VII. Charging Party assented to and never challenged this arrangement, which is followed throughout the professional wrestling industry. He should not be able to claim now that he was an employee.

Second, even assuming for purposes of argument only that Charging Party was an employee, Respondent chose not to enter a new contract with Charging Party due to business reasons having to do with his failure to achieve a satisfactory level of success as a wrestler and not at all with race. A number of white wrestlers met the same fate during the summer of 1991. Other black wrestlers have continued to perform for WCW. While working for Respondent, Charging Party suffered no discrimination in compensation. Compensation was a subject of individual negotiation and depended on a number of factors, none of them related to race.

-5-

WCW 102088

Charging Party's Charge is without merit. Respondent requests that the Commission promptly issue a finding of no reasonable cause.

Sincerely,

Ginger S. McRae

Ginger S. McRae
Assistant General Counsel

GSM:lwt

\mcrae\letters\madison.rsp/lwt

-6-

WCW 102089

## World Championship Wrestling, Inc. Freelance Wrestler/Independent Contractor Agreement

1.  I, Robert Ross, Jr.          (Ranger Ross),
            Name                   Ring Name

agree to perform services for World Championship Wrestling, Inc. ("WCW") as requested by WCW at the rate of $1,500.00 per week for the period of January 15, 1991 through July 14, 1991. I understand that I shall be entitled to such compensation only if I appear and complete the services requested by WCW for such event and in the manner requested by WCW.

2.  I understand and agree that I perform such services as an independent contractor and not as an employee of WCW. I agree that I shall be fully responsible for taxation of the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibility for such taxation. I agree that I am not entitled to the benefits provided by WCW to its employees. I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

3.  I understand that if I am injured inside the ring and within the crowd barriers at an event while performing services for WCW pursuant hereto, as determined by the schedule of physicians provided by WCW, WCW shall assume responsibility for medical expenses directly related to such injury through and according to its respective insurance program. I understand that I will be paid only for events for which I was scheduled at the time I was injured and only if WCW's doctor certifies that the injury prevents me from wrestling and I appear at the event for interviews and other tasks as requested by WCW (unless I am unable to appear as certified by WCW's doctor); provided, however, that such payment shall be reduced by payments other than those for medical treatment to which I may be entitled under WCW's insurance or otherwise. I understand I will not be paid for events for which I might have been scheduled while I am injured.

4.  I agree that all programs, recordings and work product in connection with which I perform services and my contributions thereto (the "Works") shall belong solely and exclusively to WCW. To the extent that such Works are considered contributions to collective works and/or parts or components of audio-visual works, I agree that the Works shall be considered "works made for hire" under the U.S. Copyright Act of 1976, as amended. To the extent that such Works are deemed otherwise, I assign to WCW all rights, title and interest in and to the copyright of such Works.

5. I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3. I have read this Agreement and understand its terms. I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
            Signature

_____
            Date

Independent Contractor

_____
            Signature

_____
            Date

-2-

| NAME | RING NAME | DATE RELEASED | RACE |
|---|---|---|---|
| Carline, Gary | Rip Morgan | August 1991 | White |
| Colley, Randy | Moon Dog | August 1991 | White |
| Gibson, Robert | Reuben Cain | August 1991 | White |
| Gray, George | One Man Gang | September 1991 | White |
| Haynes, William | Black Blood Bill Jack Haynes | August 1991 | White |
| Humperdink, Oliver | John Sutton | August 1991 | White |
| Jones, Rick | Black Bart | August 1991 | White |
| Keown, Wayne | Dutch Mantell | August 1991 | White |
| Murdock, Richard | Dick Murdock | August 1991 | White |
| Reininghaus, Kenny | Jack Victory Russian Assassin | August 1991 | White |
| Ross, Robert | Ranger Ross | July 1991 | Black |
| Slater, Richard | Dick Slater | August 1991 | White |
| Smith, Mike | Sam Houston | August 1991 | White |
| Spivey, Danny | Danny Spivey | June 1991 | White |

**EXHIBIT C**

WORLD CHAMPIONSHIP WRESTLING, INC.
TALENT PAY SUMMARY
1991

NAME: ROSS.JR.          , ROBERT

| EVENT DATE | CITY | STATE | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 1/30/91 | GAINESVILLE | GA | DRAW | (100.00) |
| 1/30/91 | GAINESVILLE | GA | TALENT EVENT FEE | 200.00 |
| 2/10/91 | ATLANTA | GA | AS PER CONTRACT | 2,800.00 |
| 2/24/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 2/26/91 | ATLANTA | GA | AS PER CONTRACT | 2,775.00 |
| 2/26/91 | ATLANTA | GA | TALENT EVENT FEE | 225.00 |
| 3/12/91 | ATLANTA | GA | AS PER CONTRACT | 2,850.00 |
| 3/12/91 | ATLANTA | GA | TALENT EVENT FEE | 150.00 |
| 4/07/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 4/21/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 4/24/91 | DOTHAN | AL | AS PER CONTRACT | 450.00 |
| 4/24/91 | DOTHAN | AL | DRAW | 0.00 |
| 4/24/91 | DOTHAN | AL | TALENT EVENT FEE | 150.00 |
| 4/25/91 | PANAMA CITY | FL | AS PER CONTRACT | 450.00 |
| 4/25/91 | PANAMA CITY | FL | DRAW | 0.00 |
| 4/25/91 | PANAMA CITY | FL | TALENT EVENT FEE | 150.00 |
| 4/26/91 | VALDOSTA | GA | DRAW | (100.00) |
| 4/26/91 | VALDOSTA | GA | TALENT EVENT FEE | 150.00 |
| 4/27/91 | JEKYLL ISLAND | GA | AS PER CONTRACT | 900.00 |
| 4/27/91 | JEKYLL ISLAND | GA | DRAW | 0.00 |
| 4/27/91 | JEKYLL ISLAND | GA | TALENT EVENT FEE | 150.00 |
| 4/28/91 | COLUMBIA | SC | AS PER CONTRACT | 450.00 |
| 4/28/91 | COLUMBIA | SC | TALENT EVENT FEE | 150.00 |
| 5/16/91 | RICHMOND | VA | AS PER CONTRACT | 1,350.00 |
| 5/16/91 | RICHMOND | VA | DRAW | (100.00) |
| 5/16/91 | RICHMOND | VA | TALENT EVENT FEE | 150.00 |
| 5/17/91 | WASHINGTON | DC | AS PER CONTRACT | 1,350.00 |
| 5/17/91 | WASHINGTON | DC | LICENSE FEE | (20.00) |
| 5/17/91 | WASHINGTON | DC | TALENT EVENT FEE | 150.00 |
| 6/02/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/16/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/30/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 7/14/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 9/05/91 | AUGUSTA | GA | DRAW | (100.00) |
| 9/05/91 | AUGUSTA | GA | TALENT EVENT FEE | 250.00 |

TOTAL PAY 1991     35,830.00
                   ==========

*Add Back Draws*          420.00

0 - *

35,830 - 00 +
   420 - 00 +
36,250 - 00 *

*9-5-91 Payment*     < 250.00 >

                     36,000.00

9-5-91  \ 36,250 - 00 +
        → 250 - 00 -

*Vic 7/.*

WCW 102002

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1990

| | | REFLEX AMOUNT | EVENTS WORKED |
|---|---|---|---|
| 18–Dec–89 | 31–Dec–89 | 2,000.00 | 7 |
| 01–Jan–90 | 14–Jan–90 | 2,000.00 | 9 |
| 15–Jan–90 | 28–Jan–90 | 2,275.00 | 11 |
| 29–Jan–90 | 11–Feb–90 | 2,000.00 | 3 |
| 12–Feb–90 | 25–Feb–90 | 2,000.00 | 9 |
| 26–Feb–90 | 11–Mar–90 | 2,000.00 | 9 |
| 12–Mar–90 | 25–Mar–90 | 2,000.00 | 4 |
| 26–Mar–90 | 08–Apr–90 | 2,000.00 | 7 |
| 09–Apr–90 | 22–Apr–90 | 2,000.00 | 2 |
| | | 3.63 WRESTLERS RIGHTS | |
| | | 0.84 WRESTLERS RIGHTS | |
| | | $18,275.00 | 61 |

0 • x

1990   18.275.00+
1989   43.003.46+
       61.278.46x

WCW 102094

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1989

| | | REFLEX AMOUNT | | EVENTS WORKED |
|---|---|---|---|---|
| 27-Feb-89 | 12-Mar-89 | 450.00 | | 3 |
| 13-Mar-89 | 26-Mar-89 | 1,850.00 | | 13 |
| 27-Mar-89 | 09-Apr-89 | 2,000.00 | | 12 |
| 10-Apr-89 | 23-Apr-89 | 2,000.00 | | 2 |
| 24-Apr-89 | 07-May-89 | 2,000.00 | | 5 |
| 08-May-89 | 21-May-89 | 2,000.00 | | 3 |
| 22-May-89 | 04-Jun-89 | 2,775.00 | | 14 |
| 05-Jun-89 | 18-Jun-89 | 2,752.00 | | 5 |
| 19-Jun-89 | 02-Jul-89 | 2,000.00 | | 3 |
| 03-Jul-89 | 16-Jul-89 | 2,400.00 | | 11 |
| | | 0.46 | MDSE SALES | |
| 17-Jul-89 | 30-Jul-89 | 2,000.00 | | 6 |
| 31-Jul-89 | 13-Aug-89 | 2,000.00 | | 6 |
| 14-Aug-89 | 27-Aug-89 | 2,000.00 | | 5 |
| | | 1.00 | MDSE SALES | |
| 28-Aug-89 | 10-Sep-89 | 2,000.00 | | 7 |
| 11-Sep-89 | 24-Sep-89 | 2,000.00 | | 3 |
| 25-Sep-89 | 08-Oct-89 | 2,000.00 | | 2 |
| 09-Oct-89 | 22-Oct-89 | 2,000.00 | | 1 |
| 23-Oct-89 | 05-Nov-89 | 2,000.00 | | 5 |
| 06-Nov-89 | 19-Nov-89 | 2,000.00 | | 4 |
| 20-Nov-89 | 03-Dec-89 | 2,775.00 | | 14 |
| 04-Dec-89 | 17-Dec-89 | 2,000.00 | | 7 |
| | | $43,003.46 | | 131 |

WCW 102095



# EXHIBIT / ATTACHMENT

## I

(To be scanned in place of tab)

## DECLARATION OF BRENDA SMITH

STATE OF GEORGIA
COUNTY OF_____

Brenda Smith gives the following declaration under penalty
of perjury and states as follows:

1.

I was employed by WCW as the Power Plant Training
Coordinator. Although I worked primarily at the Power Plant, I
had many job duties and responsibilities at WCW.

2.

In the course of performing my duties, and in the course of
interacting with my co-employees, I had personal knowledge of
the racial identities of the WCW employees. Specifically, I was
aware of all of the African-American employees at WCW and their
respective positions.

3.

I have been asked to review the document entitled "Employee
Job Profiles," in order to provide the racial identities of the
WCW employees.

4.

After reviewing the employee job profiles, I conclude that
some of the individuals were not actually employed by WCW.
Also, I note that some of the employees listed may not have even
been employed as of March 28, 2000 or may have not been a full
time employee. Nevertheless, I have been asked to include all
individuals listed except for those who did not actually work
for WCW, but World Travel Partners.

5.

Excluding those individuals who did not work for WCW (Julie
Hill-Atkins, Cynthia Perry, Randy Cox, and Fala Ndiaye), I count
158 total employees based on the list of employees in the
Employee Job Profiles.

6.

Out of the 154 employees, I can confirm that 19 of the individuals listed in the employee profiles list were African-American.

7.

The following individuals listed on the Employee Job Profiles were African-American:

1. Reid, Octavia
2. McDade, Felicia
3. Wormsby, Greg
4. Cuthbert-Borders, Juliet
5. Richardson, Kinnette
6. Jennings, Monica
7. Smith, Pie
8. Avery-Neal, Catherine
9. Clifton, Robert
10. Nichols, William
11. Collins, Pamela
12. Hester, Frankesha
13. Haynes, Timothy
14. Williams, Jimmy
15. Green, Elliot
16. Miller, Darrell
17. Blackwell, Katrina
18. Smith, Brenda
19. Gary, Alto

8.

I can also confirm that WCW never had an African-American in senior management or in any executive position.

I declare under penalty of perjury that the foregoing is true and correct.

_Brenda Smith_
Brenda Smith

_09/24/02_
Executed on (Date)



# EXHIBIT / ATTACHMENT



J

(To be scanned in place of tab)

## DECLARATION OF PAMELA COLLINS

STATE OF GEORGIA ·
COUNTY OF _Cobb_

    Pamela Collins gives the following declaration under penalty of perjury and states as follows:

1.

    I worked for World Championship Wrestling Organization ("WCW") in the call center. My official position was the call center coordinator.

2.

    I recall WCW submitting a written request for each employee to write a job description. This description was later to be used for WCW's Employee Job Profiles.

3.

    In filling out the questionnaire, I correctly indicated that I "supervised" four to six customer service representatives. Although I was actually supervising four to six customer service representatives, I was never made a supervisor at WCW.

4.

    Until the time that WCW ceased operating, I continued to work as the call center coordinator. I was never paid as a supervisor, and was only paid for being the "call center coordinator."

5.

    Throughout my employment with WCW, I often heard various rumors about discrimination. I could not help but notice that Caucasians dominated WCW, and we had few minorities. I became aware that there were specific complaints of discrimination filed by some of the wrestlers at WCW. I am certain that I was aware of these claims of discrimination before July 9, 2000.

6.

On July 9, 2000, Booker T was made the world champion. Because I routinely watched various videotapes of WCW's events, I watched the videotape of Booker T. I am confident that I was aware of the claims regarding discrimination prior to the time in which Booker T became champion.

7.

As I watched the numerous videotapes of the WCW wrestlers, I often wondered why there was not more diversity among the wrestlers. The successful wrestlers were predominately Caucasian. With the exception of Booker T and a few other wrestlers, WCW was dominated by successful Caucasian wrestlers.

I declare under penalty of perjury that the foregoing is true and correct.

Pamela Collins

1-7-2003

Executed on (Date)



# EXHIBIT / ATTACHMENT

## K

(To be scanned in place of tab)

## DECLARATION OF KATHERINE A. NEAL

STATE OF GEORGIA
COUNTY OF Fulton

Katherine A. Neal gives the following declaration under penalty of perjury and states as follows:

1.

I was hired by the World Championship Wrestling Organization ("WCW") in ____. I worked in the warehouse where WCW received, stored, and shipped out its merchandising items.

2.

At one time, my supervisor was Mr. Pie Smith. Mr. Smith was African-American, and was a very good manager. Mr. Smith wanted me to learn more about the merchandising process and sent me to Florida for training. Specifically, he sent me to Florida so that I could receive ICS MAX System computer training. Based on this computer training, I was able to learn how to track merchandise with the computer.

3.

In addition, Mr. Smith told me that he was impressed by my abilities, and wanted to train me to be his assistant and work in a supervisory capacity. I was very enthused about this opportunity to advance at WCW.

4.

Mr. Smith, however, left WCW. He was replaced by Ms. Leslie Cameron. Ms. Cameron was Caucasian.

5.

From the time that Ms. Cameron became the supervisor of the warehouse, myself and other African-Americans realized that she was treating us differently than the only Caucasian at the warehouse, Ralph Jensen

6.

As for myself, even though I had the specific computer training, and even though I had more experience than Ralph, Ms. Cameron assigned Ralph more meaningful work assignments. Although Ralph was able to receive better assignments, I was forced to perform menial tasks and do trivial things for Ms. Cameron. My skills were not being utilized. Also, my training was not being utilized. Lastly, although Mr. Smith had indicated that I would be an assistant supervisor, Ms. Cameron treated me as if I was not capable of performing any tasks other than basic tasks.

7.

Another example of Ms. Cameron's different treatment of African-Americans is that she asked the security personnel to check the personal belongings of myself, Mr. William Nichols, and Jason Brown all of whom were African-Americans. Although she had the security personnel check the African-American, she did not have the security personnel check Mr. Ralph. The purpose for her requesting the security to check our belongings, including any bags, was to make sure we were not stealing from the company. I found this not only insulting as it showed a lack of trust, but blatant discrimination because she only had the security personnel check the bags of African-American employees.

8.

Another example of Ms. Cameron's different treatment of the Caucasian employee was that Ralph was allowed to get as much over time as he wanted. Although myself and the two other African-American employees also wanted over time, we were not allowed to receive the over time to the extent that Ralph received it.

9.

Although Ralph was able to take lunch breaks, additional breaks, and come and go as he pleased, Ms. Cameron scrutinized the attendance of myself and the other African-American employees. At times, Ralph did not even use the Sign-In and Out sheet that was required of the other employees. Whenever an African-American employee did not use the Sign-In and Out sheet, Ms. Cameron would speak very harshly with us.

10.

Another example of the different treatment is that Ralph was able to use the telephone during work hours. Although the African-American employees were denied ample access to the telephone, Ralph was able to use the phone whenever he needed.

*And I had children that might need me at a point in time and I didn't not*

11.

Because I believed that Ms. Cameron was blatantly discriminating against myself and other African-Americans because of our race, I approached Mr. Tim Goodly, the Human Resources person at WCW. At this time, Mr. Goodly told me that he was in a transition out of his previous position and that I should speak to Ms. Paula _____.

*Ms. Shop Ralph that they called.*

12.

At Mr. Goodly's direction, myself and Mr. Brown and Mr. Nichols spoke with Ms. Paula, the Human Resources representative for WCW. During this meeting, we explained to her each of the above-mentioned ways in which Ms. Cameron was discriminating against African-American people.

13.

Although Ms. Paula took notes, I was not convinced that she was going to take a strong enough action.

14.

The only action that Ms. Paula took was that she set up a meeting with Ms. Cameron. During this meeting Ms. Cameron merely gave her side of the story. I felt that Paula believed Ms. Cameron over the African-American employees who were being discriminated against.

15.

I was completely unsatisfied with the way in which Paula handled this case. Although we had very legitimate complaints of discrimination, nothing was done to stop Ms. Cameron's ongoing discrimination of us. Indeed, Ms. Cameron continued to do the exact same things she did before.

16.

I do not believe that Paula disciplined or took any other steps to correct the discrimination that we endured. Thus, the discrimination continued until ~~we quit.~~ *Myself* & *Mr. Nichol*

I declare under penalty of perjury that the foregoing is true and correct.

*Catherine A Neal*
Catherine A. Neal

*5-21-02.*
Executed on (Date)

*I have document ~~data~~ showing proof of the behavior and statement, Notes*

P005292



# EXHIBIT / ATTACHMENT

## L

_(To be scanned in place of tab)_

## DECLARATION OF SERGEANT STEVE HICKS

Sergeant Steve Hicks gives the following declaration under penalty of perjury and states as follows:

1.

I am a full time law enforcement officer with the Haleyville, Alabama Police Department. I have been in law enforcement for approximately ten (10) years.

2.

I have followed wrestling my entire adult life and am the publisher of a wrestling industry publication entitled *DragonKing Update Report*, which has been in publication since 1999 and has a circulation base of approximately 5,000 readers, both domestically and internationally.

3.

Prior to publishing the *DragonKing Update Report*, I published a similar wrestling newsletter, the *Global Pro-wrestling News* from 1994-1996.

4.

I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists, Vols. I and II.*

5.

I have maintained records that reflect the content and outcome of professional wrestling matches and events for the various professional wrestling organizations that date back to the early to mid-1990s.

6.

I have records that document who participated in, won and lost every WCW Pay-Per-View Event since WCW's inception. I also have records of this data for every Nitro and Thunder event since 1997.

7.

I maintain a library of wrestling reference books, including every edition of the annual *Wrestling Almanac* (a Pro Wrestling Illustrated publication).

8.

Professional wrestling is a staged event.  The outcome of these events are predetermined by writers, who create various stories and storylines for wrestling programs and events.

9.

A wrestler's success in professional wrestling is largely determined by the amount of time and effort a wrestling entity, such as World Championship Wreslting, Inc. ("WCW"), expends to develop and "push" the wrestler's character.

10.

WCW "pushes" a wrestler by giving him or her the opportunity to wrestle on more popular television programs, such as Nitro, Thunder and Pay-Per-View events.  This gives wrestling fans the opportunity to become familiar with a wrestler's character, which is essential to establishing a fan-base.

11.

WCW also "pushes" a wrestler by having more-experienced bookers, agents and wrestlers work to develop a new wrestler's charisma, uniqueness of character, crowd appeal, stage presence, microphone skills and wrestling moves.

12.

I have had the opportunity to observe Bobby "Hardwork" Walker wrestle for WCW.

13.

Bobby Walker had as much excitement, charisma, uniqueness, crowd appeal and stage presence as many Caucasian wrestlers who received a significantly greater push from WCW.  Unlike Bobby Walker, WCW regularly utilized these wrestlers in its popular television programs.

14.

For example, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Chris Kanyon, even though WCW spent greater time and energy developing Chris Kanyon's character and provided Chris Kanyon with more air-time on popular television programs.

15.

Similarly, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Alex Wright and Prince Akeia even though WCW spent greater time and energy developing Alex Wright's and Prince Akeia's characters and provided each of them with more air-time on popular television programs.

16.

The times that I witnessed Bobby Walker perform his signature move "walking the ropes," he successfully completed the move. I never witnessed Bobby Walker have any trouble completing this move.

17.

By way of contrast, on at least one occasion, I witnessed Billy Kidman miss his signature move, the "shooting star press," during a televised event. From time-to-time, I witnessed Billy Kidman miss other wrestling moves during televised events.

18.

I declare under penalty of perjury that the foregoing is true and correct.

Sergeant Steve Hicks

1-9-03

Executed on (Date)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

| | |
|---|---|
| . rom: | Dillon, JJ |
| Sent: | Friday, December 01, 2000 2:52 PM |
| To: | Orndorff, Paul |
| Cc: | Smith, Brenda (TBS); Bartlett, Dee; Myers, Diana ; Davidson, Georgia |
| Subject: | Power Plant Tryouts |

Dear Paul:

Terry Taylor called me this morning and told me that he wants to have a tryout the first week of January for about eight people.   The dates are January 3/4/5 (Wednesday through Friday).    There will probably be six guys and two girls. These are people that have already submitted tapes     According to Terry, WCW is not contemplating giving out any new deals other than as dailies.    One of the guys will likely be Rick Fuller, who creative wants to team with someone we are already booking.    I guess we will fly in the talent and only pay for room and car.    Terry knew that you were out following your surgery, and I told him that I would share my conversation with you to make sure there were no problems from your end.     I've already spoken to Mike Graham so that he can work on a daily schedule during the tryout period and I will help Mike observe and evaluate.

Hope your recovery is preceding nicely, and give me a call if you have any suggestions.    Thanks.

"J.J."



**WCW 006999
CONFIDENTIAL**

1



# EXHIBIT / ATTACHMENT

## N

(To be scanned in place of tab)

**Smith, Brenda (TBS)**

| | |
|---|---|
| From: | Dillon, JJ |
| Sent: | Friday, December 01, 2000 1:52 PM |
| To: | Orndorff, Paul |
| Cc: | Smith, Brenda (TBS); Bartlett, Dee, Myers, Diana ; Davidson, Georgia |
| Subject: | Power Plant Tryouts |

Dear Paul:

Terry Taylor called me this morning and told me that he wants to have a tryout the first week of January for about eight people. The dates are January 3/4/5 (Wednesday through Friday). There will probably be six guys and two girls. These are people that have already submitted tapes. According to Terry, WCW is not contemplating giving out any new deals other than as dailies. One of the guys will likely be Rick Fuller, who creative wants to team with someone we are already booking. I guess we will fly in the talent and only pay for room and car. Terry knew that you were out following your surgery, and I told him that I would share my conversation with you to make sure there were no problems from your end. I've already spoken to Mike Graham so that he can work on a daily schedule during the tryout period and I will help Mike observe and evaluate.

Hope your recovery is preceding nicely, and give me a call if you have any suggestions. Thanks.

"J.J."

*Sent 12/1/00*
*By FAX*

*Fly Them in*
*Pay For Room*
*And Car*

*Guess We Found Some Money!*
*Somewhere*
*From:*
*Brenda*

PLAINTIFF'S EXHIBIT 33

WCW 018752 CONFIDENTIAL

1

## DECLARATION OF SERGEANT STEVE HICKS

Sergeant Steve Hicks gives the following declaration under penalty of perjury and states as follows:

1.

I am a full time law enforcement officer with the Haleyville, Alabama Police Department. I have been in law enforcement for approximately ten (10) years.

2.

I have followed wrestling my entire adult life and am the publisher of a wrestling industry publication entitled *DragonKing Update Report*, which has been in publication since 1999 and has a circulation base of approximately 5,000 readers, both domestically and internationally.

3.

Prior to publishing the *DragonKing Update Report*, I published a similar wrestling newsletter, the *Global Pro-wrestling News* from 1994-1996.

4.

I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists*, *Vols. I and II*.

5.

I have maintained records that reflect the content and outcome of professional wrestling matches and events for the various professional wrestling organizations that date back to the early to mid-1990s.

6.

I have records that document who participated in, won and lost every WCW Pay-Per-View Event since WCW's inception. I also have records of this data for every Nitro and Thunder event since 1997.

7.

I maintain a library of wrestling reference books, including every edition of the annual *Wrestling Almanac* (a Pro Wrestling Illustrated publication).

8.

Professional wrestling is a staged event. The outcome of these events are predetermined by writers, who create various stories and storylines for wrestling programs and events.

9.

A wrestler's success in professional wrestling is largely determined by the amount of time and effort a wrestling entity, such as World Championship Wreslting, Inc. ("WCW"), expends to develop and "push" the wrestler's character.

10.

WCW "pushes" a wrestler by giving him or her the opportunity to wrestle on more popular television programs, such as Nitro, Thunder and Pay-Per-View events. This gives wrestling fans the opportunity to become familiar with a wrestler's character, which is essential to establishing a fan-base.

11.

WCW also "pushes" a wrestler by having more-experienced bookers, agents and wrestlers work to develop a new wrestler's charisma, uniqueness of character, crowd appeal, stage presence, microphone skills and wrestling moves.

12.

I have had the opportunity to observe Bobby "Hardwork" Walker wrestle for WCW.

13.

Bobby Walker had as much excitement, charisma, uniqueness, crowd appeal and stage presence as many Caucasian wrestlers who received a significantly greater push from WCW. Unlike Bobby Walker, WCW regularly utilized these wrestlers in its popular television programs.

14.

For example, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Chris Kanyon, even though WCW spent greater time and energy developing Chris Kanyon's character and provided Chris Kanyon with more air-time on popular television programs.

15.

Similarly, Bobby Walker was equal in excitement, charisma, uniqueness, crowd appeal, stage presence and athleticism to Alex Wright and Prince Akeia even though WCW spent greater time and energy developing Alex Wright's and Prince Akeia's characters and provided each of them with more air-time on popular television programs.

16.

The times that I witnessed Bobby Walker perform his signature move "walking the ropes," he successfully completed the move. I never witnessed Bobby Walker have any trouble completing this move.

17.

By way of contrast, on at least one occasion, I witnessed Billy Kidman miss his signature move, the "shooting star press," during a televised event. From time-to-time, I witnessed Billy Kidman miss other wrestling moves during televised events.

18.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Sergeant Steve Hicks

_____
Executed on (Date)

$( - 9 - 03$



# EXHIBIT / ATTACHMENT

_O_

(To be scanned in place of tab)

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 25 1994

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )     CIVIL ACTION
                                    )     FILE NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP                  )
WRESTLING, INC.                     )
                                    )
            Defendant.              )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WORLD CHAMPIONSHIP WRESTLING, INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW World Championship Wrestling, Inc. ("WCW"),
Defendant in the above-styled action, and pursuant to Rule 56(c)
of the Federal Rules of Civil Procedure and Rule 220-5 of the
Local Rules to the United States District Court, Northern
District Court of Georgia, timely files this Memorandum of Law in
support of its Motion for Summary Judgment.

### I.   INTRODUCTION

On June 1, 1993, Plaintiff Robert L. Ross, Jr. ("Plaintiff")
filed the instant lawsuit against WCW.  In his Complaint,
Plaintiff alleged that WCW: (1) paid him less than similarly
situated white wrestlers, (2) failed to promote him to
heavyweight champion, (3) denied him promotion and/or endorsement
opportunities with other companies, and (4) "terminated" him on
the basis of his race (black), in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000(e).  WCW
timely filed an Answer to Plaintiff's Complaint, denying its

material allegations and asserting several affirmative defenses.
The discovery period as established by this Court's local rules
has ended, and pursuant to this Court's Order, dated December 31,
1993, WCW now moves for summary judgment on Plaintiff's claims on
the following grounds:

1. The undisputed facts establish that Plaintiff was never
   an employee of WCW, but was an independent contractor
   as a matter of law, and therefore, this Court lacks
   subject matter jurisdiction over Plaintiff's claim;

2. The undisputed facts establish that Plaintiff cannot
   present a prima facie case of race discrimination as a
   matter of law; and

3. The undisputed facts establish that at all times WCW
   acted with respect to Plaintiff on the basis of
   legitimate, non-discriminatory reasons unrelated to
   Plaintiff's race.

Because the undisputed facts show that Plaintiff cannot  meet the
burden of proving his claims at trial, WCW's Motion for Summary
Judgment should be granted and Plaintiff's Complaint should be
dismissed.

## II.   STATEMENT OF FACTS

### A.   Plaintiff's Background

Plaintiff graduated from North Cobb High School in 1977, and
immediately entered the Army.  (Deposition of Plaintiff Robert L.
Ross, Jr. (hereinafter "Ross Dep."), pp. 9-10)).  While in the
Army, Plaintiff rose to the rank of Platoon Sergeant in the Army
Rangers, and was honorably discharged in 1986.  (Ross Dep., p.
10)  Prior to his discharge, Plaintiff determined that he wanted
to pursue a career as a professional wrestler.[1]

---

[1]    Plaintiff had previously wrestled in high school and in
the Army.  (Ross. Dep., p. 21)

In pursuit of this goal, Plaintiff took an extended vacation from the Army in October 1985 and attended well-known wrestler Thunderbolt Patterson's wrestling school in Atlanta, Georgia. (Ross Dep., pp. 20-24) Thunderbolt Patterson trained Plaintiff approximately two to three (2-3) hours per night, three to four (3-4) times per week for a period of three months. (Ross Dep., p. 20) For his training, Plaintiff paid Thunderbolt Patterson the sum of twelve hundred dollars ($1200) from his savings.

Upon his discharge from the Army, Plaintiff adopted the ring name "Ranger Ross," and the "gimmick" of portraying himself as a war hero. (Ross Dep., p. 19) Plaintiff purchased a costume and equipment with his own money, and began wrestling for Deep South Championship Wrestling ("DSCW"). (Ross Dep., pp. 12-16) Plaintiff testified that his relationship with DSCW was typical of the relationship between wrestlers and wrestling companies throughout the industry. Plaintiff wrestled three or four times weekly, under the terms of an oral independent contractor agreement, and was subject to minimal supervision. (Ross Dep., pp. 13-16)

Plaintiff's boss at DSCW, Jody Hamilton, would contact Plaintiff, provide him with the schedule of events and their locations, instruct Plaintiff as to the outcome of his matches, and pay him the agreed upon amount. (Ross Dep., pp. 13-16) Although the wrestlers were told where, when and whom to wrestle, as well as who was to win the match, the details of each match were left to Plaintiff and his opponent. During the entire year

3

WCW 102108

and a half that Plaintiff wrestled for DSCW, DSCW did not
withhold social security tax or payroll tax from Plaintiff's pay,
and DSCW did not provide Plaintiff with any vacation, pension,
insurance or medical benefits.  (Ross Dep., pp. 14-16)

While wrestling for DSCW, Plaintiff also held a full-time
position (40 hours per week) as a press operator at a local
textile company, Coates & Clarke, at a salary of $250.00 per
week.  (Ross Dep., p. 16)  Plaintiff testified that nothing in
his agreement with DSCW precluded him from holding other jobs
with other employers.  (Ross Dep., p. 16)

By January 1988, it was apparent to Plaintiff that DSCW was
not drawing large enough crowds and was in financial trouble.  So
Plaintiff went to work for Southern Championship Wrestling
("SCW") under an oral agreement almost identical to his deal with
DSCW.[2]  (Ross Dep., p. 18)  Plaintiff wrestled for SCW
approximately three days per week, was paid by the match, and
also was paid a percentage of the gate.  (Ross Dep., pp. 18-19)
Plaintiff's pay averaged between two hundred to three hundred
dollars ($200-$300) per week.  Plaintiff continued to wrestle
under the name "Ranger Ross."  Like DSCW, SCW did not reimburse
Plaintiff for the cost of his costumes or equipment, did not
withhold social security or payroll taxes, and did not provide
Plaintiff with any vacation, pension, insurance, or medical
benefits.  Plaintiff wrestled for SCW for approximately one year,

_____

    [2]    DSCW went bankrupt shortly after Plaintiff left in
1988.  (Ross Dep., p. 17)

4

C.  **May 1990 and Subsequent Events.**

     After leaving WCW, in May of 1990, Plaintiff went to Japan
and wrestled for one month.  (Ross Dep., pp. 58-60)  In July
1990, upon his return from Japan, Plaintiff began wrestling for
North Atlantic Championship Wrestling ("NACW").  (Ross Dep., p.
61)  Plaintiff wrestled for NACW under the terms of an oral
independent contractor agreement, three or four nights per week,
and was paid $100 per night.  (Ross Dep., pp. 50, 61-62)  As is
standard practice with wrestling companies, NACW did not withhold
social security tax, federal or state payroll tax from these
payments, and provided Plaintiff with no pension, medical,
insurance or vacation benefits.  (Ross Dep., p. 62)  Further,
Plaintiff, who was still wrestling as "Ranger Ross," paid for all
of his costumes and equipment.  (Ross Dep., p. 46)

D.  **Plaintiff's Second Stint With WCW.**

     In January of 1991, WCW President Jim Herd telephoned
Plaintiff and asked him if he wanted to wrestle for WCW again.
Plaintiff accepted immediately and met with Jim Herd to negotiate
a contract.  (Ross Dep., pp. 65, 72)  Herd and Plaintiff agreed
on a six month contract under which Plaintiff would earn $1500.00
per week for his services.  (Ross Dep., pp. 68, 72)  Plaintiff
testified that he agreed to these terms and signed a "WCW
Freelance Wrestler/Independent Contractor Agreement" (the
"Agreement") on January 9, 1991.  (Ross Dep., pp. 70-71;
Defendant's Exhibit 2 (attached hereto as Exhibit "A"))

6

WCW 102111

The Agreement itself is in plain language and is simple to read. As Plaintiff testified, he read the Agreement prior to signing it and understood it in its entirety. (Ross Dep., pp. 71-72) Paragraph 2 of the Agreement states:

> I understand and agree that I perform such services as an independent contractor and not as an employee of WCW. I agree that I shall be fully responsible for taxation on the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibilities for such taxation. I agree that I am not entitled to the benefits provided by WCW to its employees. I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

(See Exhibit "A" hereto) As this language makes clear, Plaintiff was not an employee of WCW, but was an independent contractor. In fact, Plaintiff testified that he understood that he was not an employee of WCW. (Ross Dep., pp. 72-73)

During his service with WCW from January, 1991 through July, 1991, WCW communicated with Plaintiff primarily through booking sheets which contained pertinent scheduling information. (Ross Dep., pp. 79-80) The booking sheets sent to Plaintiff specified which wrestlers would wrestle whom, and the location and dates of the matches. The booking sheets announced matches anywhere from two weeks to thirty days in advance. (Ross Dep., pp. 79-81) Plaintiff and the other WCW wrestlers were responsible for buying plane tickets and getting to the matches. Once at the venue, the wrestlers would go to the dressing room, get dressed in their costumes, and wait for further instructions. (Ross Dep., pp. 81-82)

7

WCW 102112

Then, a representative of WCW, usually the road agent, or sometimes the referee, would make sure that all wrestlers scheduled to wrestle were present, specify which wrestler was supposed to win or lose the various matches, and tell the wrestlers how to finish the match. (Ross Dep., p. 82) The wrestlers themselves were free to choreograph the remainder of the match up to the finish. Plaintiff testified that beyond specifying who was to win or lose, and ensuring that the wrestlers were ready to wrestle, WCW did not supervise him further. (Ross Dep., pp. 83-84)

During the January 1991-July 1991 time period, Plaintiff's primary contact at WCW was Dusty Rhodes. Mr. Rhodes was responsible for: (a) arranging or booking WCW's professional wrestling matches at various venues throughout the country, (b) determining which wrestlers would wrestle at the events (including which wrestlers would wrestle against each other), (c) determining the final outcome of the wrestling matches, (d) evaluating and recruiting talent, and (e) deciding which wrestler(s) would progress or be "pushed" to the rank of heavyweight champion. (Affidavit of Virgil Runnels, a/k/a Dusty Rhodes (hereinafter "Rhodes Aff."), ¶ 3)

During the January 1991 through July 1991 time period, it became apparent to WCW that Plaintiff lacked the talent, skills and, most importantly, the audience appeal necessary to be considered to be WCW's heavyweight champion. (Rhodes Aff., ¶ 6) Professional wrestlers must be capable of whipping the crowd into

8

a frenzy. Crowds who are vocal and involved in a match enjoy themselves and return to other wrestling events, which ensures the continued financial viability of companies like WCW. (Rhodes Aff., ¶ 6) According to Dusty Rhodes, Plaintiff was unable to generate sufficient excitement and interest among the crowd. (Rhodes Aff., ¶ 6) His performances simply were not sufficiently entertaining. (Rhodes Aff., ¶ 6)

While Plaintiff's gimmick of portraying himself as war hero "Ranger Ross" generated some interest among the crowd (particularly during 1991's Operation Desert Storm), Plaintiff failed to sustain and build upon that interest. (Rhodes Aff., ¶ 6) In short, Plaintiff was one of the hundreds of professional wrestlers who could not sell tickets and could not draw crowds.[3] (Rhodes Aff., ¶ 6) He simply did not stand out. Accordingly, Plaintiff was not qualified to be named WCW's heavyweight champion. (Rhodes Aff., ¶ 6) Conversely, Rick Flair (white), Ron Simmons (black), and Lex Lugar (white), all of whom were heavyweight champions for WCW, each had an appealing gimmick and the charisma and audience appeal to generate massive and unmistakable reactions from the audience. (Rhodes Aff., ¶ 6)

Plaintiff testified that Rhodes approached him in early 1991 and enlisted Plaintiff's help in pushing Ron Simmons, a black wrestler, to the position of WCW's heavyweight champion. (Ross Dep., pp. 77-79, 93) Specifically, Plaintiff testified that

---

[3]     WCW used the services of approximately 334 male wrestlers in 1991. (Holman Aff., ¶ 5)

9

Rhodes hoped to make Simmons the heavyweight champion, and further that Rhodes enlisted Plaintiff's assistance by asking Plaintiff to serve as Simmons' "trainer." (Ross Dep., pp. 77-79) The idea was to highlight Plaintiff's military background and to portray Plaintiff as putting Simmons through military style training in preparation for an "assault" on the heavyweight title. (Ross Dep., pp. 77-79) It is undisputed that Rhodes initiated Simmons' push to heavyweight champion, and asked for Plaintiff's help in that process, before the expiration of Plaintiff's Agreement in July of 1991. (Ross Dep., pp. 77-79) Further, it is undisputed that Ron Simmons, a black male, thereafter became WCW's heavyweight champion. (Ross Dep., pp. 122-123)

In mid-1991, due to the declining popularity of professional wrestling, WCW was forced to cut its budget. (Herd Aff., ¶ 6) As part of the measures taken to cut the budget, WCW did not renew the independent contractor agreements of several wrestlers, including Plaintiff's. (Herd Aff., ¶ 6) It is, however, undisputed that Plaintiff was not terminated or fired by WCW. Rather, his Agreement simply was not renewed. (Ross Dep., p. 73)

Plaintiff was one of fourteen professional wrestlers whose agreements were not renewed by WCW during the summer of 1991. (Rhodes Aff., ¶ 8; Affidavit of WCW's James Herd (hereinafter "Herd Aff.") ¶ 6) Significantly, Plaintiff was the only black among the fourteen wrestlers released by WCW in the summer of 1991. (Rhodes Aff., ¶ 8) Moreover, Plaintiff earned more than

10

WCW 102115

ten of the fourteen wrestlers that were released with him in the summer of 1991.  Pertinent data on the fourteen (14) wrestlers released by WCW in the Summer of 1991 (i.e. their names, their 1991 earnings, the length of time they were active, and their race) is as follows:

| NAME | 1991 EARNINGS/TIME ACTIVE | | RACE |
| --- | --- | --- | --- |
| Ranger Ross | $36,250.00 | (6 MOS.) | Black |
| Rip Morgan | $29,622.00 | (7.5 MOS.) | White |
| Randy Colley | $29,925.00 | (6.0 MOS.) | White |
| Robert Gibson | $00.00 | (inactive) | White |
| George Gray | * $74,000.00 | (8.5 MOS.) | White[4] |
| Billy Jack Haynes | $16,500.00 | (4.0 MOS.) | White |
| Oliver Humperdink | $00.00 | (inactive) | White |
| Black Bart | $26,350.00 | (7.5 MOS.) | White |
| Dutch Mantel | * $58,240.00 | (9.5 MOS.) | White |
| Dick Murdoch | $16,750.00 | (4.5 MOS.) | White |
| Jack Victory | $32,200.00 | (6.0 MOS.) | White |
| Dick Slater | $16,750.00 | (4.0 MOS.) | White |
| Sam Houston | $19,150.00 | (5.0 MOS.) | White |
| Danny Spivey | * $57,000.00 | (5.5 MOS.) | White |

(Rhodes Aff., ¶ 8; Holman Aff., ¶ 9)

Upon expiration of Plaintiff's Agreement, Plaintiff was informed that his Agreement would not be renewed.  (Ross Dep., pp. 92-93)  After Plaintiff's release, however, WCW contacted him once to ask him to wrestle at a special event.  (Ross Dep., p. 111)  Plaintiff agreed to do so and in fact wrestled at a WCW event in August 1991.  (Ross Dep., p. 111)  WCW paid Plaintiff a flat fee for that one match.  (Ross Dep., p. 111)  Plaintiff later filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  After receipt from the EEOC of

---

[4]     The three wrestlers who earned more than Plaintiff's $1500.00 weekly salary are marked with an asterisk (*).

11

his Right-to-Sue Notice, Plaintiff filed the instant action on June 1, 1989.

## E. Events Since Plaintiff's Lawsuit was filed.

Plaintiff's discovery efforts in this case highlight the fact that (a) Plaintiff cannot prove the requisite elements of his claims and (b) that Plaintiff intends to distort the facts in an attempt to confuse and mislead the Court. Of the thousands of documents that WCW made available for Plaintiff's inspection, Plaintiff chose to copy only a handful of documents. Instead of copying all of the documents relating to payments made by WCW to hundreds of WCW wrestlers, Plaintiff copied only the largest paycheck stubs of a handful of top white[5] WCW wrestlers from selected pay periods. Undoubtedly, Plaintiff will attempt to distort this limited information and make incorrect extrapolations about how much certain WCW wrestlers were paid. Because Plaintiff did not look at all of the documents and because Plaintiff did not analyze all of the pertinent data, Plaintiff has no idea of how much other WCW wrestlers were paid,

---

[5]     Plaintiff ignored the files of Ron Simmons and Teddy Long, black wrestlers who rank among the highest paid at WCW.

12

and Plaintiff admitted as much during his deposition.[6] (Ross Dep., pp. 117-118)

Plaintiff took no depositions during discovery in the case. Moreover, throughout his deposition Plaintiff conceded that on every point crucial to his case, his claims rest on nothing but his opinions and conjectures. Plaintiff admitted that he does not know (a) who at WCW made the decisions about which he complains, or (b) what factors the individuals who did make the decisions relied upon. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139) In such circumstances, WCW is entitled to summary judgment because Plaintiff can produce no evidence whatsoever to support his claims beyond baseless accusations that fly in the face of the voluminous, unrebutted facts.

### III. ARGUMENT AND CITATION OF AUTHORITY

In his Complaint, Plaintiff alleges that WCW: (1) paid him less than similarly situated white wrestlers, (2) failed to promote him to heavyweight champion, (3) denied him promotion and/or endorsement opportunities, and (4) "terminated" him on the basis of his race in violation of Title VII of the Civil Rights

---

[6] Amazingly, during his deposition Plaintiff requested the 1099s that show each independent contractors annual earnings, but as of the date of this filing, Plaintiff has not come to Defendant's counsel's office to inspect them. The 1099s, and other records produced, conclusively establish that there were approximately two hundred and seventy-eight (278) WCW wrestlers, the vast majority of whom were white, who in 1991 were paid less than Plaintiff. (Holman Aff., ¶ 5-6)

13

WCW 102118

Act of 1964 ("Title VII"), 42 U.S.C. §2000(e). Plaintiff's claims are meritless for several reasons.

First, Plaintiff readily admitted during his deposition that he was never an employee of WCW. Rather, at all times relevant to this action, Plaintiff was an independent contractor, who wrestled under the terms and conditions of a written agreement that clearly and unambiguously provided that he was an independent contractor. As an independent contractor, Plaintiff is not entitled to the protections of Title VII of the Civil Rights Act of 1964. Accordingly, this Court lacks subject matter jurisdiction over Plaintiff's claims, and Plaintiff's Complaint should be dismissed.

Second, Plaintiff cannot establish a _prima facie_ case of discrimination. Plaintiff cannot show: (1) that he was the victim of any adverse employment action whatsoever, (2) that he was qualified to be "pushed" to the rank of heavyweight champion, or, alternatively, that he was even satisfying the legitimate expectations of WCW, or (3) that he was replaced, much less by someone outside the protected classification.

Third, assuming _arguendo_ that Plaintiff can establish a _prima facie_ case of discrimination, WCW has articulated nondiscriminatory, legitimate business reasons for each action about which Plaintiff complains. Plaintiff has produced no evidence whatsoever to meet his burden of rebutting WCW's non-discriminatory, legitimate business reasons for its actions. For

14

these reasons, Plaintiff's claims all fail and are subject to summary judgment.

## A. Standard of Review.

Under Rule 56(c) of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate where there is no genuine issue of material fact." Earley v. Champion International Corporation, 907 F.2d 1077, 1080 (11th Cir. 1990); Fed. R. Civ. P. 56(c). As held by the U.S. Supreme Court: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986). Consequently:

> Rule 56 must be construed with due regard not only for the rights of persons of asserting claims and defenses . . . but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2555; Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir. 1987). Also, "a court must bear in mind the actual quantum and quality of proof necessary to support liability" in a given case. Barnes, 814 F.2d at 609 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2513 (1986)). "The mere existence of a scintilla of evidence in support of the Plaintiff's position

15

WCW 102120

will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the Plaintiff . . . If the evidence is _merely colorable_ or is _not significantly prohibitive_ summary judgment may be granted."  _Earley_, 907 F.2d at 1080 (quoting _Anderson_, 477 U.S. at 249-250, 106 S. Ct. at 2511) (emphasis in _Earley_).  While, under Rule 56, a court considering a motion for summary judgment must consider all the evidence in the light most favorable for the non-moving party," _Rollins v. Techsouth, Inc._, 833 F.2d 1525, 1528 (11th Cir. 1987); "[a] trial court is not required to resolve _all_ doubts in such a manner."  _Earley_, 907 F.2d at 1080 (quoting _Barnes_, 814 F.2d at 609) (emphasis in original).

In an employment discrimination case, summary judgment is appropriate where "the Plaintiff fails to raise any issue of fact indicative of . . . discriminatory conduct by the Defendant."  _Beard v. Annis_, 730 F.2d 741, 743-744 (11th Cir. 1984).  Where there is a "complete failure of proof concerning an essential element of the non-moving parties case . . . summary judgment is appropriate."  _Celotex Corp._, 477 U.S. at 327, 106 S.Ct. at 2552-53.

**B.  Plaintiff Was An Independent Contractor And As Such Does Not Fall Within The Ambit Of Title VII's Protections.**

Section 703(a) of Title VII prohibits discrimination against "any individual" with respect to "compensation, terms, conditions, or privileges of employment."  This Court has held that Title VII does not apply to independent contractor relationships, as the requisite employment setting is lacking.

16

WCW 102121

See <u>Mathis v. Standard Brands Chemical Industries, Inc.</u>, 10 FEP
295 (N.D.Ga. 1975)(Title VII does not extend to cover attempts to
enter into independent contract relationships). In the instant
case, Plaintiff admits that he was never an employee of WCW.
(Ross Dep., pp. 72-73) Thus, the requisite employment setting is
wholly absent. Moreover, the plain language of Plaintiff's
Agreement states that Plaintiff is an independent contractor, not
an employee. (<u>See</u> Exhibit "A" hereto) In such circumstances,
Plaintiff plainly does not fall within the ambit of Title VII's
protection.

In this circuit, "general common law concepts" are used to
determine whether an individual is an independent contractor or
employee. <u>Cobb v. Sun Papers, Inc.</u>, 673 F.2d 337 (1982). In
fact, in the <u>Cobb</u> case the Eleventh Circuit Court of Appeals
adopted an eleven-part test which found its origins in general
principles of the law of agency. <u>Cobb</u>, 637 F.2d at 340-341. The
eleven factors enunciated in <u>Cobb</u> are as follows: (1) the
intention of the parties, (2) whether the worker accumulates
retirement benefits, (3) whether the "employer" pays social
security taxes, (4) whether annual leave is afforded, (5) the
length of time during which the individual has worked, (6) the
kind of occupation, with reference to whether the work usually is
done under the direction of a supervisor or is done by a
specialist without supervision, (7) the skill required in the
particular occupation, (8) the manner in which the work
relationship is terminated; <i>i.e.</i>, by one or both parties, with or

17

WCW 102122

without notice and explanation, (9) whether the "employer" or the individual in question furnishes the equipment used and the place of work, (10) whether the work is an integral part of the business of the "employer", and (11) the method of payment, by time or by the job. Id. at 340. While Cobb advocates an analysis using the above listed factors, the Court cautioned that "no one factor is determinative."[7] Id. at 340 (citing, Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979)).

In the instant case, no fewer than ten of the eleven factors point to the inescapable conclusion that Plaintiff was an independent contractor, not an employee of WCW. Paragraph 2 of Plaintiff's Agreement itself addresses the first four elements of the test. That language provides:

> **I understand and agree that I perform such services as an independent contractor and not as an employee of WCW.** I agree that I shall be fully responsible for taxation on the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibilities for such taxation. I agree that I am not entitled to the benefits provided by WCW to its employees. I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

(Exhibit "A" hereto)(emphasis added) Plaintiff bargained for, read, and signed the Agreement fully knowing and understanding that it contained the above-quoted language. (Ross Dep., pp. 72-75) More importantly, Plaintiff testified that he understood the

---

[7] Indeed, review of Cobb reveals that the Court ignored several of the above-listed factors, and affirmed the district court's determination that the appellant was an independent contractor because most of the evidence supported the lower court's reasoning.

18

WCW 102123

entire agreement. (Ross Dep., pp. 72-78) In fact, Plaintiff testified that he was well aware that he was not an employee of WCW. (Ross Dep., pp. 72-73) Thus, the intention of the parties was clear and unmistakable: Plaintiff was to be an independent contractor and not an employee.

The second factor, whether the individual accumulates retirement benefits, is also addressed in Paragraph 2, which states, "I agree that I am not entitled to the benefits provided by WCW to its employees." (Exhibit "A" hereto) Plaintiff accumulated no benefits whatsoever beyond the $1500 weekly compensation required under the Agreement. (Ross Dep., pp. 73-75) Plaintiff was provided no retirement, medical, or insurance benefits. (Ross Dep., pp. 73-75) Moreover, Plaintiff admitted that WCW paid no social security or payroll taxes on his behalf. (Ross Dep., p. 73)

The next factor, whether annual leave is provided, also leads to the conclusion that Plaintiff was not an employee. Again, Paragraph 2 states that Plaintiff would receive no benefits usually accorded WCW employees, and Plaintiff testified that WCW provided him with no annual leave. (Ross Dep., p. 74; see also, Exhibit "A" hereto) The next element of the test pertains to the length of time during which the individual worked. Plaintiff's set six month tenure is inconsistent with an employment relationship. An employment relationship is not usually of a set duration, but is continuous.

19

Next, Plaintiff's testimony establishes that the level of supervision that he and other WCW wrestlers were subjected to was negligible at best. Plaintiff was instructed where to wrestle, whom to wrestle against, and the finish of the match. (Ross Dep., pp. 81, 83) The match itself, up to the finish, was choreographed by the wrestlers themselves. (Ross Dep., pp. 76, 83-84) Such a minimal level of supervisory involvement is not consistent with an employment relationship. Instead, as in the typical independent contractor arrangement, WCW specified little else but what the finished product should look like, and left the details up to the wrestlers. Further, Plaintiff admitted that WCW did nothing to change his gimmick.[*] Plaintiff chose his own costume, and performed his own techniques while in the ring, without direct supervision.

The next element requires analysis of the level of skill involved in the endeavor. Professional wrestlers are specialists. The wrestling techniques and moves Plaintiff employed were developed through years of training. Plaintiff wrestled throughout high school, continued to wrestle competitively while in the army, and planned to wrestle in the 1980 Olympics, but the U.S. boycott prevented his participation. (Ross Dep., pp. 21, 23-24) Moreover, Plaintiff attended two professional wrestling schools to receive the necessary training. (Ross Dep., pp. 21, 23-24) In fact, David Crockett of the NWA,

---

[*]     WCW only required a costume change if there was a conflict between two costumes, such as two wrestlers with the same color shorts. (Ross Dep., pp. 84-85)

WCW 102125

WCW's predecessor, would not hire Plaintiff until he attended Nelson Royal's wrestling school in Mooresville, North Carolina, where his skills could be evaluated. There can be no question, then, that Plaintiff, was a highly trained specialist, which supports the conclusion that Plaintiff was an independent contractor.

The next factor, the manner in which the work relationship terminated, also weighs heavily in favor of the conclusion that the Plaintiff was an independent contractor. Although Plaintiff alleged that he was "terminated," Plaintiff readily admitted during his deposition that he was not terminated. (Ross Dep., pp. 92-93) Instead, the parties' relationship in this case just expired when Plaintiff's Agreement expired. Such an arrangement is wholly inconsistent with a finding that Plaintiff was an employee. Additionally, Plaintiff knew when he signed the Agreement that his Agreement expired in six months. Thus, Plaintiff had notice at the very start of his contract that he would be subject to a release in July 1991. Such notice is consistent with an independent contractor arrangement, not an employment relationship.

Although WCW provided "the place of work," this factor still supports the conclusion that Plaintiff was not an employee. WCW only provided the place of work to the extent that it booked the particular arena where the matches took place. The nature of the business itself dictated that WCW, of necessity, provided the place of work. Also, Plaintiff testified that during his entire

21

WCW 102126

professional wrestling career (including his time with WCW), he provided his own costume and equipment.[9] (Ross Dep., pp. 18, 85) Without exception, Plaintiff paid for his costumes from his own money, and was not reimbursed. (Ross Dep., p. 85)

Next, the work in question was not an integral part of the business of the employer. While WCW staged, promoted, and televised professional wrestling matches, Plaintiff's involvement in those matches was not essential to that business. Plaintiff was not one of the top wrestlers, and was relatively fungible.[10]

Thus, application of the Cobb test to the facts in this case leads to the inescapable conclusion that Plaintiff was an independent contractor. As such he is not entitled to Title VII's protections. Thus, Plaintiff's Complaint should be dismissed, as this Court lacks subject matter jurisdiction over Plaintiff's claims.

_____

[9]    Plaintiff testified that on one occasion, WCW provided him with a rope from which he rappelled from the ceiling of an arena. (Ross Dep., p. 46)

[10]    While not a factor listed in Cobb, some weight must be given to the practice in the wrestling business. As stated by Dusty Rhodes, who has over twenty (20) years of experience as a professional wrestler, "[i]t is, and always has been, standard industry-wide practice for wrestling promotion companies (like WCW) to retain the services of all professional wrestlers as independent contractors, and not employees." (Rhodes Aff., ¶¶ 11-13) Moreover, Plaintiff admitted that he was treated as an independent contractor in all of his prior wrestling work. (Ross Dep., pp. 13-16, 18-24, 50, and 61-62)

22

WCW 102127

## C. Plaintiff's Claims Pertaining To His Work For WCW From January 1989 through May 1990 Are Untimely.

Plaintiff testified in his deposition that WCW discriminated against him during his first stint at WCW (from January, 1989 through May, 1990). (Ross Dep., pp. 49-50) But Plaintiff admitted that after he was released by WCW in May, 1990, he did not file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Ross Dep., p. 49)

Under Title VII, an individual wishing to bring suit must satisfy several administrative requirements. See 42 U.S.C. §2000e-5(b)-(k); Tolbert v. U.S., 916 F.2d 245, 247 (5th Cir. 1990); Law v. Hercules, Inc., 713 F.2d 691, 692-93 (11th Cir. 1983). One of those requirements is that any "charge under [Title VII] must be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred...." 42 U.S.C. §2000e-5(e). Thus, by its plain language, Title VII requires any prospective plaintiff to notify the EEOC (through the filing a charge of discrimination) of an alleged discriminatory act no later than one hundred and eighty (180) days after the last discriminatory act took place. Id.

In Plaintiff's case, the last discriminatory act during his first stint with WCW could not have occurred later than Plaintiff's May, 1990 release. Accordingly, Plaintiff needed to file an EEOC charge by no later than November 1, 1990 (assuming a May 30, 1990 release date) in order to make a timely claim under Title VII. Plaintiff testified, however, that he never filed a charge of discrimination pertaining to his work for WCW during

23

WCW 102128

the January 1989 through May 1990 time period. (Ross Dep., pp. 50) Therefore, any and all allegations of discrimination regarding Plaintiff's work for WCW during the January 1989 through May 1990 time period are untimely and should not be considered by the Court. <u>United Airlines, Inc. v. Evans</u>, 431 U.S. 533, 97 S.Ct., 1855 (1977).

D. <u>Plaintiff's Claims Pertaining To His Work For WCW From January 15, 1991 Through July 14, 1991 Are Subject To Summary Judgment</u>.

As noted in Section III(B) of this Brief, as an independent contractor, Plaintiff does not even fall within the ambit of Title VII's protections. Moreover, even if this Court were to find that Plaintiff might fall within the ambit of Title VII, Plaintiff's claims still are subject to summary judgment for two reasons. First, Plaintiff has failed to establish a prima facie case of race discrimination. Second, even if he could establish a prima facie case, Plaintiff has not rebutted (and cannot rebut) WCW's articulated legitimate, non-discriminatory reasons for its actions involving Plaintiff. For these reasons, Plaintiff's claims are subject to summary judgment.

1. **Plaintiff's Burden Of Proof**

In a Title VII discrimination case, Plaintiff bears the fundamental burden of proving that an adverse employment decision taken against him/her was based upon an unlawful factor. In this action, **Plaintiff is alleging disparate treatment under Title VII. Accordingly, Plaintiff is required to prove that WCW acted towards him with discriminatory intent.** <u>International</u>

24

Brotherhood of Teamsters v. United States, 431 U.S. 324, 355
n.15, 97 S. Ct. 1843, 1854 n.15 (1977); Pace, 701 F.2d at 1387.
Absent direct evidence, the establishment of discriminatory
motive is governed by the burden of proof and order of proof
requirements set forth in McDonnell-Douglas Corp. v. Green, 411
U.S. 792, 802-804, 93 S. Ct. 1817, 1824 (1973). Archambault v.
United Computing Systems, Inc., 786 F.2d 1507, 1512 (11th Cir.
1986).

　　　　Under McDonnell-Douglas, Plaintiff first has the burden of
establishing a prima facie case of illegal discrimination.
McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Second, if
Plaintiff succeeds in establishing the prima facie case, the
burden shifts to the Defendant to "articulate some legitimate,
non-discriminatory reason" for the adverse employment action. If
the Defendant carries this burden, the Plaintiff must prove by a
preponderance of the evidence that the legitimate reason offered
by the Defendant was merely a pretext for discrimination. Id. at
804; 93 S.Ct. at 1825; Perryman v. Johnson Products Co., 698 F.2d
1138, 1142 (11th Cir. 1983). However, the Defendant's burden of
rebuttal is merely one of production, not proof. Lee v. Russell
County Board of Education, 684 F.2d 769, 773 (11th Cir. 1982).
At all times, the "ultimate burden of persuading the trier of
fact that defendant intentionally discriminated . . . remains
with the Plaintiff." Texas Department of Community Affairs v.
Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981).

WCW 102130

In evaluating whether a Plaintiff has satisfied the initial burden of establishing a prima facie case, the central inquiry is whether the circumstantial evidence presented is sufficient to create an inference, i.e., a rebuttable presumption, that the employer's personnel decision was based upon an illegal factor. Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949 (1978).

In light of these standards, Plaintiff's own deposition testimony is fatal to his Title VII claim. During his deposition, Plaintiff admitted that his claims of discrimination rest on nothing other than his opinion. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-128, 132-137, 139) Plaintiff repeatedly admitted that he has absolutely no idea of who made any of the decisions of which he complains, the reasons they made them, or the factors they considered. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-124, 126, 128, 132-134, 136-137, 139) Therefore, Plaintiff has no evidence to carry his burden. The law is clear that when an employment discrimination Plaintiff does no more than state his conclusion that alleged actions were discriminatory, a prima facie case of discrimination is not established and summary judgment must be granted as a matter of law. Locke v. Commercial Union Insurance Co., etc., 676 F.2d 205, 206 (6th Cir. 1982); Mason v. Continental Illinois National Bank, 704 F.2d 361, 367 (7th Cir. 1983); Patterson v. General Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980), cert. den., 451 U.S. 914, 101 S. Ct. 1988 (1988). In this case, because

26

Plaintiff has come forward with no evidence of any discrimination, Plaintiff's claims are subject to summary judgment.

### 2. Plaintiff Has Failed To Establish A Prima Facie Case Of Race Discrimination.

In a race discrimination case, a Plaintiff can establish a prima facie case in one of three ways; 1) through direct evidence of discriminatory intent; 2) by demonstrating a pattern of discrimination through the introduction of statistics; or 3) by satisfying the elements of McDonnell-Douglas. Early, 907 F.2d at 1081.

Plaintiff testified during his deposition that no one at WCW made comments to him that were directly attributable to his race. (Ross Dep., p. 148-150) Thus, it is apparent that Plaintiff cannot prove his prima facie case through direct evidence. See Early, 907 F.2d at 1081-82. Likewise, Plaintiff has not attempted to prove his prima facie case through the use of statistics. Indeed, as detailed hereinbelow, the statistical evidence in this case refutes each of Plaintiff's assertions. Accordingly, Plaintiff must meet the standard enunciated in McDonnell Douglas to establish a prima facie case.

To establish a prima facie case under McDonnell-Douglas, Plaintiff must show that he was: (1) a member of the protected classification, (2) was qualified for the promotion, or at least was performing up to the legitimate expectations of his employer, and (3) was subjected to an adverse employment action. Flanagan v. McKesson Corp., 48 F.E.P. Cases 343, 344 (N.D. Ga. 1988);

27

WCW 102132

<u>Goldstein v. Manhattan Industries, Inc.</u>, 758 F.2d 1435, 1442-43
(11th Cir. 1985); <u>Hawkins v. CECO Corp.</u>, 883 F.2d 977, 982 (11th
Cir. 1989), <u>cert.</u> <u>denied</u>, 110 S.Ct. 2180 (1990). While there is
no dispute that Plaintiff satisfies the first element of the
<u>prima</u> <u>facie</u> case under Title VII, Plaintiff cannot satisfy the
remaining elements.

### a. Plaintiff Cannot Show That He Was A Victim Of An Adverse Employment Action.

#### (i) <u>Plaintiff was not "terminated."</u>

To establish a <u>prima</u> <u>facie</u> case under Title VII, Plaintiff
must show that he was the victim of an adverse employment action.
In his Complaint, Plaintiff alleges that he was "terminated" on
July 14, 1991. (Complaint, ¶ 3). However, "[t]he discharge that
is proscribed by Title VII is either an actual or constructive
discharge." <u>Frazer v. KFC National Management Company</u>, 491 F.
Supp 1099 (M.D. Ga. 1980), aff'd 636 F.2d 313 (5th Cir. 1981).

"An actual discharge occurs when an employer fires,
dismisses, releases, ousts, lets go, terminates, sacks, gets rid
of, gives the gate to, cans, axes, bounces, or give walking
papers to an employee . . ." <u>Id</u>. The undisputed facts establish
that no such "termination" occurred in this case. In fact,
Plaintiff admitted during his deposition that he was not
terminated. (Ross Dep., p. 73) On the contrary, Plaintiff
testified that WCW fulfilled each and every one of its
obligations under the Agreement. (Ross Dep., p. 87) The
Agreement simply expired on July 14, 1991. Therefore, Plaintiff

28

WCW 102133

cannot establish a prima facie case by claiming that he was terminated.

> ## (ii) Black wrestlers were not paid less than white wrestlers.

In his Complaint, Plaintiff alleges that WCW "[c]reated a practice and/or unwritten policy of putting nonwhite employees **and independent contractors** into the role of subsidiary employment or other position, and without concomitant salary, commission, bonus . . ." (Complaint, ¶ 6)(emphasis supplied) This claim is not supported by the facts. In 1991, Plaintiff earned $1500.00 per week, and $36,250.00 through the term of his contract. As reported on the 1099's, and other accounting records produced to Plaintiff, **Plaintiff earned more money than approximately 278 of the 334 male independent contractor wrestlers who wrestled for WCW in 1991.** (Holman Aff., ¶ 5-6) Further, Plaintiff earned more than ten of the thirteen wrestlers who also were released by WCW during the Summer of 1991, all of whom were white. (Holman Aff., ¶ 9)

Additionally, six black wrestlers were paid more than Plaintiff. (Holman Aff., ¶ 7-8) In fact, Ron Simmons, a black male, was one of the highest paid WCW wrestlers, and earned $190,442.26 in 1991 (not including $26,592.07 in endorsements paid to him by companies that retained Mr. Simmons to endorse their products and/or services). (Holman Aff., ¶ 7-8) Thus, the unrefuted facts in this case show that WCW paid many white wrestlers less than Plaintiff and several black wrestlers more than Plaintiff. Thus, Plaintiff's allegation that WCW

29

discriminated against him through disparate compensation has no basis in fact. Accordingly, Plaintiff cannot rely upon this claim to satisfy the second element of the <u>prima facie</u> case, <u>i.e.</u>, that he suffered an adverse employment decision.

> (iii) WCW was not the decisionmaker responsible for determining which wrestlers received endorsement and/or promotion opportunities.

Plaintiff, likewise, cannot claim that his failure to garner endorsement and/or promotion opportunities supports his <u>prima facie</u> case. While several WCW wrestlers, both black and white, have endorsement and/or promotion deals with companies that hire them to promote their products or services, the vast majority of professional wrestlers, including Plaintiff, <u>never</u> receive such opportunities. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Nevertheless, Plaintiff alleges that WCW prevented him from getting a wrestling doll contract or other endorsement deals. (Ross Dep., p. 57)

Plaintiff admits that he has no evidence to support his claim. Indeed, while Plaintiff makes bald allegations about alleged endorsement deals that he was denied, Plaintiff testified that he has no idea who makes the decisions about which wrestlers are retained to endorse products or services. (Ross Dep., pp. 58, 139) Likewise, Plaintiff testified that he has no idea what factors such unidentified decisionmakers rely upon. (Ross Dep., p. 139) The undisputed facts in this case reveal that the decisions regarding which wrestlers are selected to endorse and/or promote particular products or services are made by the

30

WCW 102135

companies who retain the wrestlers, not WCW. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) In short, WCW does not decide which wrestlers endorse the products or services of other companies.

Even if Plaintiff could establish that WCW had some role in the decisions on endorsements (which Plaintiff cannot), Plaintiff's claim still would fail since it is undisputed that several black WCW wrestlers in the January-July 1991 time period (including Ron Simmons and Teddy Long), did receive such opportunities from companies.[11] (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Further, the fact that Mr. Ross did not receive any such opportunities to endorse or promote products should not be surprising, as hundreds of WCW's other wrestlers, both white and black, never received such opportunities either. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Therefore, Plaintiff cannot claim that his failure to garner endorsement opportunities from other companies supports a prima facie case that WCW somehow discriminated against him.

> (iv) Plaintiff Was Not Qualified To Be WCW's Heavyweight Champion.

In his deposition, Plaintiff alleged that he was discriminated against because WCW did not make him its heavyweight champion. (Ross Dep., p. 54) In order to establish a prima facie case as to this claim, Plaintiff must prove by a preponderance of the evidence that he was more qualified to be the heavyweight champion than those selected, or alternatively

---

[11]    Ron Simmons made $26,592.07 from endorsements and promotions in 1991 alone. (Holman Aff. ¶ 8)

31

WCW 102136

that he satisfied WCW's legitimate expectations of performance. Hamalinen, 54 F.E.P. Cases at 70; Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 290 (8th Cir. 1982); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 239 (4th Cir. 1982); Bauer v. Bailar, 647 F.2d 1047 (10th Cir. 1981). Plaintiff can make no such showing.

Plaintiff has come forward with no evidence whatsoever that he was as qualified as those eventually chosen to be champion, or even that he was satisfying WCW's performance expectations. Instead, Plaintiff relies upon his opinion that he was as good a wrestler as any of WCW's other wrestlers. Even if true, Plaintiff misses the point. The object of professional wrestling is for wrestlers to excite the crowd to a level where they want to return to events again and again. Plaintiff was not arousing sufficient interest or selling tickets. (Rhodes Aff., ¶ 6) He was not sufficiently entertaining to justify pushing him to champion, or even renewing his Agreement. (Rhodes Aff., ¶ 6)

Plaintiff ignores the fact that only one person at a time can be the WCW heavyweight champion. In WCW's opinion, Plaintiff was unqualified to be heavyweight champion. (Rhodes Aff., ¶ 6) Plaintiff's assertions to the contrary are entirely irrelevant.

> An [individuals] self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability. (citations omitted). Such statements may create a material dispute about [their] ability, but do nothing to create a dispute about the employer's honesty - [they] do nothing, in other words, to establish that the proffered reason is a pretext for discrimination.

Gustovich v. AT&T Communications, Inc., 972 F.2d at 849.

WCW 102137

Always, it is the supervisor's perception of Plaintiff's ability (not Plaintiff's perception) which is relevant to a determination of the employers' motive. Smith v. Flax, 618 F.2d at 1057; See, Newton v. W. R. Grace & Co., Slip Op. No. 87-8961 (11th Cir. 1989); Moore v. Sears Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982); Green v. Martin Marietta Data Systems, 42 F.E.P. 1695 (D.D.C. 1987); see, Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985). Indeed:

> While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is whether the given reason [for not renewing the Agreement] was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or juror, would act or approve on.

Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979).

Plaintiff has wholly failed to demonstrate that he was qualified to be champion, or that he even met the legitimate performance expectations of WCW. Plaintiff's opinion about his qualifications is not evidence, and is irrelevant to the issue of his qualifications. Gustovich v. WCW Communications, Inc., 972 F.2d 845, 849 (7th Cir. 1992). Moreover, it is unrefuted that WCW did not think that Plaintiff was qualified to be its heavyweight champion. (Rhodes Aff., ¶ 6) Indeed, WCW did not believe that Ross was even meeting WCW's expectations. (Rhodes Aff., ¶ 6; Herd Aff., ¶ 6)

Plaintiff undoubtedly will argue that WCW's views about his qualifications are subjective, not objective. Plaintiff again misses the point, as even if it is determined that WCW relied

33

WCW 102138

solely upon subjective criteria in assessing Plaintiff's performance, the law is clear that the use of subjective criteria does not violate Title VII. Hester v. Southern Railway Co., 497 F.2d 1374 (5th Cir. 1975). This is especially true here, since WCW used the same criteria to justify promoting another black wrestler, Ron Simmons, to heavyweight champion. There simply is no evidence that any discriminatory motive was part of WCW's evaluation of Plaintiff. "[W]hatever motives [WCW] may have had in choosing between two people [in the protected classification] discrimination cannot be one of them." De Volld v. Bailar, 568 F.2d 1162 (5th Cir. 1978).

For the foregoing reasons, Plaintiff has not established a prima facie case of discrimination on any grounds. EEOC v. Western Electric Co., 713, F.2d 1011, 1014, (4th Cir. 1983). Having failed to establish several of the essential elements of a prima facie case, summary judgment should be granted in favor of WCW. Celotex, 474 U.S. 921, 106 S.Ct. at 253.

### 3. Plaintiff Has Not Rebutted WCW's Legitimate, Nondiscriminatory Reasons for Its Actions

Assuming arguendo that Plaintiff could establish a prima facie case of discrimination, WCW has the burden of articulating a legitimate, non-discriminatory reasons for the complained of actions. Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir. 1984); Conner v. Ft. Gordon Bus Company, 761 F.2d 1495, 1499 (11th Cir. 1985). This burden of rebuttal is "exceedingly light." Id. To satisfy this burden, WCW need only

34

WCW 102139

"articulate" legitimate reasons without being required to prove its motivation. Burdine, 450 U.S. at 254-55, 101 S.Ct. at 1094.

WCW refused to renew Plaintiff's Agreement for a legitimate business reason: budgetary constraints. (Herd Aff., ¶ 6) Moreover, Plaintiff's performances were not sufficiently productive to justify renewing his contract. (Herd Aff., ¶ 6; Rhodes Aff., ¶ 6) It must be remembered that in this Court, "[a] statement that Plaintiff was less productive than others in her department, without more, constitutes a sufficient articulation of reasons to carry the employers burden." Evans, 35 F.E.P. Cases at 1200; Heffernan v. Western Electric Co., 510 F. Supp. 712, 715 (N.D. Ga. 1981).

In this case, Plaintiff testified that he has no evidence to rebut WCW's explanation for its actions. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139) Plaintiff not only has no idea of who made the decision not to renew his contract, but he does not know the reason the decision was made, or the factors considered by the decisionmaker. (Ross Dep., p. 97)

Next, the evidence shows that Plaintiff was not paid less than less qualified white wrestlers. On the contrary, Plaintiff earned more than two hundred and seventy eight (278) WCW wrestlers in 1991, the overwhelming majority of whom were white. (Holman Aff., ¶¶ 5-8) Again, Plaintiff has admitted that he has no evidence to rebut these facts. (Ross Dep., pp. 117-119, 135-139) Plaintiff has no idea what amounts other wrestlers were

35

WCW 102140

paid, who decided what each wrestler was paid, or what factors were considered in making those decisions. (Ross Dep., pp. 117-119, 135-139)

On Plaintiff's claim that he should have become WCW's heavyweight champion, Plaintiff has not offered evidence to overcome WCW's legitimate non-discriminatory reasons for not making him its champion, i.e., he lacked the charisma and audience appeal and just was not that entertaining. (Rhodes Aff., ¶ 6) As detailed in Section III D.2(iv) of this Brief, supra, all Plaintiff offers to refute WCW's rationale is Plaintiff's subjective opinion that he was a good wrestler and should have been WCW's champion. Such allegations are simply legally insufficient. Gustovich v. WCW Communications, Inc., 972 F.2d 845, 849 (7th Cir. 1992).

Finally, WCW was not responsible for Plaintiff's lack of endorsement and\or promotion opportunities. Since WCW was not the decisionmaker, WCW cannot responsible for those decisions. Moreover, the undisputed facts show that several black wrestlers received significant endorsement and/or promotion opportunities, while hundreds of white WCW wrestlers did not. (Rhodes Aff., ¶ 16-17; Holman Aff., ¶ 8) Thus, Plaintiff's claim that he was discriminatorily denied the chance at endorsement deals flies in the face of the undisputed facts.[12]

_____

[12]    Naturally, Plaintiff readily admitted he has no idea of who made these decisions either, or what factors were considered. (Ross Dep., pp. 124-126, 135-139)

WCW 102141

Once the Defendant has rebutted Plaintiff's prima facie
case, the Plaintiff must satisfy his ultimate burden of
establishing by a preponderance of the evidence that a
discriminatory intent motivated the Defendant's actions.
McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Nix, 738
F.2d at 1184.  Thus, to succeed on the dispositive issue of
motivation, Plaintiff must prove that WCW acted with
discriminatory intent.

Plaintiff cannot produce any cognizable evidence of
discriminatory intent to establish a genuine issue of whether
WCW's reasons for its decisions are pretextual.  Plaintiff's
"subjective belief, however genuine cannot be the basis for
judicial relief" [in a Title VII or ADEA case].  Elliott v. Group
Medical and Surgical Service, 714 F.2d 556, 567 (5th Cir. 1983),
cert. den., 467 U.S. 1215, 104 S.Ct. 2658 (1984); Houser v. Sears
Roebuck & Co., 627 F.2d 756, 759 (5th Cir. 1980).  In the
Eleventh Circuit, Plaintiff must controvert WCW's legitimate
reasons "by setting forth specific facts . . . showing [an
illegal factor] was a substantial factor in [the] decision."
Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987).
Plaintiff has failed to do so, and the result is that his claims
must fail.

### IV.  CONCLUSION

For the above and foregoing reasons, Defendant's Motion for
Summary Judgment should be granted on all Plaintiff's claims.

37

WCW 102142

This ___25th___ day of March, 1994.

Respectfully submitted,

_Stephen W. Riddell_

Stephen W. Riddell, Esq.
Georgia State Bar No. 604810

_Kip P. Roth (by SWR)_

Kip P. Roth
Georgia State Bar No. 615615

Attorneys for Defendant
World Championship Wrestling,
Inc.

TROUTMAN SANDERS
5200 NationsBank Building
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000

(coopcjc)w-pdocs\kip\rose\msj.now

38

WCW 102143

## World Championship Wrestling, Inc. Freelance
## Wrestler/Independent Contractor Agreement

1.  I, <u>Robert Ross, Jr.</u>        (<u>Ranger Ross</u>),
            Name                        Ring Name

agree to perform services for World Championship Wrestling, Inc.
("WCW") as requested by WCW at the rate of $1,500.00 per week
for the period of January 15, 1991 through July 14, 1991.   I
understand that I shall be entitled to such compensation only if
I appear and complete the services requested by WCW for such
event and in the manner requested by WCW.

2.  I understand and agree that I perform such services as
an independent contractor and not as an employee of WCW.  I
agree that I shall be fully responsible for taxation of the
amounts paid to me by WCW as compensation for my services and
that WCW shall bear no responsibility for such taxation.  I
agree that I am not entitled to the benefits provided by WCW to
its employees.  I understand that WCW makes no commitment to use
my services and makes no guarantee of any number of events or
amount of compensation.

3.  I understand that if I am injured inside the ring and
within the crowd barriers at an event while performing services
for WCW pursuant hereto, as determined by the schedule of
physicians provided by WCW, WCW shall assume responsibility for
medical expenses directly related to such injury through and
according to its respective insurance program.  I understand
that I will be paid only for events for which I was scheduled at
the time I was injured and only if WCW's doctor certifies that
the injury prevents me from wrestling and I appear at the event
for interviews and other tasks as requested by WCW (unless I am
unable to appear as certified by WCW's doctor); provided,
however, that such payment shall be reduced by payments other
than those for medical treatment to which I may be entitled
under WCW's insurance or otherwise.  I understand I will not be
paid for events for which I might have been scheduled while I am
injured.

4.  I agree that all programs, recordings and work product
in connection with which I perform services and my contributions
thereto (the "Works") shall belong solely and exclusively to
WCW.  To the extent that such Works are considered contributions
to collective works and/or parts or components of audio-visual
works, I agree that the Works shall be considered "works made
for hire" under the U.S. Copyright Act of 1976, as amended.  To
the extent that such Works are deemed otherwise, I assign to WCW
all rights, title and interest in and to the copyright of such
Works.

EXHIBIT "A"

WCW 102144

5. I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3. I have read this Agreement and understand its terms. I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
         Signature

_____
1 - 9 - 91
         Date

Independent Contractor

_____
         Signature

_____
9 Jan 1991
         Date

-2-

WCW 102145

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.,                )
                                 )
        Plaintiff,               )
                                 )        CIVIL ACTION FILE
v.                               )
                                 )        NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP               )
WRESTLING, INC.,                 )
                                 )
        Defendant.               )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WORLD CHAMPIONSHIP WRESTLING, INC.'S MOTION FOR SUMMARY JUDGMENT upon opposing counsel by depositing a copy in the United States Mail with sufficient postage thereon addressed to:

            Gary J. Pernice, Esq.
            Pernice & Associates, P.C.
            110 Hammond Drive, N.E.
            Atlanta, Georgia 30328-4806

This 25th day of March, 1994.

                              _Stephen W. Riddell_
                              Stephen W. Riddell
                              Georgia State Bar No. 604810

                              Attorney for Defendant
                              World Championship Wrestling, Inc.

TROUTMAN SANDERS
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000

WCW 102146



# EXHIBIT / ATTACHMENT

P

---

(To be scanned in place of tab)

## DECLARATION OF BOBBY WALKER

STATE OF GEORGIA
COUNTY OF FULTON

Before the undersigned officer appeared Bobby Walker, who, after being placed under oath, says and deposes as follows:

1.

My name is Bobby Walker. I am over eighteen (18) years of age, and I am otherwise competent to make this affidavit.

2.

I trained at WCW's Power Plant intermittently from about 1993 until 1999. [2000] During this time, I had the opportunity to [B.W.] observe Willy Worthen train at the Power Plant.

3.

Willy worked very hard at his training. He was disciplined and committed to learning the skills necessary to become a wrestler and to succeed at WCW.

4.

To the best of my knowledge, Willy performed every task asked of him without complaint.

5.

Willy worked harder and showed more commitment to his training than many Caucasian trainees who received contracts from WCW.

6.

Many Caucasian trainees did not train at the Power Plant full time and still received a contract from WCW.

7.

I remember times when Caucasian trainees refused to attend the Power Plant, explaining that they needed to seek out employment to support themselves. WCW still offered some of these trainees contracts.

8.

I remember a Caucasian wrestler named Joey Maggs. He was provided with opportunities although he did not have very good wrestling skills. I occasionally saw him arrive at the Power Plant, but he never really trained for any significant period of times. Also, there were many times that he came by the Power Plant, but did not even train or wrestle.

9.

I also observed Rick Reeves wrestle. Rick Reeves had much better wrestling skills and abilities than Joey Maggs.

10.

In "squash" matches, a "jobber" or "enhancement talent" is scripted to lose the match and is used to make another wrestler look good. Squash matches do not provide a jobber with a meaningful opportunity to showcase his talents or progress.

11.

2

I declare under penalty of perjury that the foregoing is

true and correct.

Bobby Walker

Executed on (Date)

3



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## DECLARATION OF GEORGE GRACE

STATE OF GEORGIA
COUNTY OF _____

George Grace gives the following declaration under penalty
of perjury and states as follows:

1.

I am over eighteen years of age and competent to give this
testimony, which is based upon my personal knowledge.

2.

I am the President of Grace Market Research, Inc. ("Grace
Market") and served in this position in March, 2000.

3.

In March, 2000, Grace Market conducted an online survey for
World Championship Wrestling, Inc.

4.

In this survey, respondents were asked to rate a number of
wrestling performers on a number of factors, including the
familiarity and likeability. A true and correct copy of this
survey is attached hereto as Exhibit "A."

5.

Respondents were also asked to provide some information
about themselves, including their ethnicity. Specifically,
Question No. 152 asked each respondent to provide his or her
ethnicity. The survey provided the following options as
possible responses to this question: (1) African/American/Black;
(2) Asian; (3) Caucasian/White; (4) Hispanic/Latino; and (5)
Other.

6.

According to the information provided by the respondents,
the ethic make-up of the respondent group was as follows
(percentages rounded to the nearest whole number):

Base/ Total Number of Respondents          1379
Percentage of Total                        100%

African/American/Black: Total Number        51
Percentage of Total                          4%

Asian: Total Number                         32
Percentage of Total                          2%

Caucasian/White: Total Number             1173
Percentage of Total                         85%

Hispanic/Latino: Total Number               66
Percentage of Total                          5%

Other: Total Number                         57
Percentage of Total                          4%

7.

This information was provided to WCW at some point during the spring or summer of 2000.

8.

Grace Market maintains this information on a database in electronic format. The information is no longer maintained by Grace Market in hard-copy form.

I declare under penalty of perjury that the foregoing is true and correct.

_George Grace_
George Grace

_12 - 18 - 2002_
Executed on (Date)



# EXHIBIT / ATTACHMENT

$$R$$

(To be scanned in place of tab)



# MEMORANDUM

**TO:** Brad Siegel
**FROM:** Meredith Young
**DATE:** December 14, 2000
**RE:** WCW Audience Composition
**CC:** Aaron Blitzstein, Gary Juster, Craig Leathers, Rob Garner, Sharon Sidello, Annette Yother, Alan Sharp, Ken Leiker, Diana Myers, Kelley Komminsk, Kathy Shelley, Chelsea Reeves, Lisa Sturgis

Detailed below are audience composition figures for WCW's cable programming. The percentages represent combined averages of NITRO and THUNDER produced during September, 2000.

Let me know if you have any questions or require further information.

| TERRITORIES | | EDUCATION | |
|---|---|---|---|
| Northeast | 25% | No College | 40% |
| East Central | 18% | Some College | 24% |
| West Central | 10% | 4+ years of College | 11% |
| Southeast | 26% | **OCCUPATION** | |
| Southwest | 11% | White Collar | 27% |
| Pacific | 9% | Blue Collar | 42% |
| **COUNTY SIZE** | | Not Working | 32% |
| A | 28% | **PRESENCE OF CHILDREN** | |
| B | 33% | Any less than 18 | 52% |
| C & D | 39% | Any less than 12 | 37% |
| **HOUSEHOLD SIZE** | | Any less than 6 | 17% |
| 1 Person | 11% | Children 6-11 | 26% |
| 2 Persons | 27% | Children 12-17 | 32% |
| 3+ Persons | 23% | **ADULTS** | **78%** |
| 4+ Persons | 39% | **FEMALES** | |
| **HOH AGE** | | 18+ | 26% |
| Less than 34 | 28% | 18-34 | 11% |
| 35-54 | 50% | 18-49 | 17% |
| 55-64 | 11% | 25-54 | 15% |
| 65+ | 11% | 55+ | 7% |
| **HOUSEHOLD INCOME** | | **MALES** | |
| $20K-$30K | 15% | 18+ | 52% |
| $30K-$40K | 10% | 18-34 | 21% |
| $40K-$60K | 24% | 18-49 | 38% |
| $60K+ | 20% | 25-54 | 35% |
| **RACE** | | 55+ | 11% |
| White | 79% | **NON-ADULTS** | |
| Non-White | 21% | Kids 2-11 | 12% |
| | | Teens 12-17 | 10% |

*Source: Nielsen Media Research, PNFII 9/00*

PLAINTIFF'S
EXHIBIT
72

WCW 019288
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

I SEP 23 I 2002

LUTHER D. THOMAS, Clerk
By $\int \cdot \eta_{\sigma} \tau_{Z}$
Deputy Clerk

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

## PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF
## EXPERT TESTIMONY OF J. STEVE HICKS

Pursuant to Federal Rule of Civil Procedure 26(a)(2),

Plaintiffs hereby identify the expert testimony of J. Steve

Hicks as follows:

**A.  Opinions, Basis and Reasons:**

Professional wrestling is a staged event.  The outcome of

these events are predetermined by writers, who create various

stories and storylines for wrestling programs and events.

One measure of success in wrestling is whether an

individual is scripted to hold a championship title.  The most

prestigious title for WCW is the World Heavyweight title, which is an individually held title.

From the date that WCW first had a Heavyweight Champion, July 14, 1991, through the date on which the first of these lawsuits was filed, February 11, 2000, 3,286 days, WCW had only one African-American Heavyweight Champion, Ron Simmons. Mr. Simmons held the title for 150 days, from August 2, 1992 until December 30, 1992, i.e., that is 4.56 percent of the total possible days. WCW has never had an Asian or Hispanic Heavyweight Champion.

As for other titles, I conducted an evaluation of the racial composition of various WCW titles. I found the following with regard to titles:

**WCW World Tag Team Title**: Caucasian (86.4%), Black (6.2%) and Asian (0%).
**WCW United States Title**: Caucasian (86.1%), Black (0%) and Asian (2.8%).
**WCW World TV Title**: Caucasian (77.1%), Black (5.7%) and Asian (5.7%).

Another measure of success in professional wrestling is appearing in pay-per-view (PPV) events. PPV events are the cable broadcast events in which viewers pay cable providers fees for viewing the offered programming. Wrestling organizations typically feature and showcase the wrestlers they are pushing,

i.e., promoting, in PPV events. Wrestlers are often paid additional amounts for the PPV appearances.

During the period of its existence, WCW produced a significant number of PPV events. In the vast majority of those events, and in the aggregate, minorities, specifically African-Americans and Asians were grossly underrepresented in those events.

I have attached hereto a series of summaries of WCW PPV events. I have also calculated the aggregate representation of minority wrestlers in PPV events. My findings are as follows:

| Event | Percentage Blacks | Percentage Asian |
|-------|-------------------|------------------|
| Bash at the Beach | 7.66 | 1.44 |
| Fall Brawl | 7.92 | 1.49 |
| World War III | 2.36 | 3.94 |
| Uncensored | 10.26 | 1.28 |
| Superbrawl | 9.13 | 2.88 |
| Starcade | 8.07 | 7.45 |
| Spring Stampede | 8.40 | 4.20 |
| Souled Out | 3.16 | 1.05 |
| Slamboree | 7.39 | 3.98 |
| Road Wild | 6.30 | 1.57 |
| Mayhem | 5.36 | 3.57 |
| Great American Bash | 7.46 | 1.49 |
| Miscellaneous PPVs | 6.67 | 5.56 |
| Total (1987 total) | 6.99 | 3.02 |

Based upon my viewing nearly every WCW televised match that has occurred in the past seven (7) years or more, and based upon

the statistical data I have accumulated over the years, it is my opinion that racism is prevalent in professional wrestling and in the WCW in particular.

**B. Data Considered:**

My opinions in this case are based upon my experience as a reporter in the wrestling industry and my review of relevant data. I have followed professional wrestling my entire adult life and am the publisher of a wrestling industry publication entitled *DragonKing Update Report*. I have been publishing *DragonKing Update Report* since 1999. It has a circulation base of approximately 5,000 readers and is read in the United States and internationally. As the writer and publisher of *DragonKing Update Report*, I use the pen name Karl Stern. Prior to publishing the *DragonKing Update Report* I published a similar wrestling newsletter called the *Global Pro-wrestling News* from 1994-1996. I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists, Vols. I and II.*

As a consequence of my affiliation with *DragonKing Update Report*, I have maintained records that reflect the content and outcome of professional wrestling matches and events for various professional wrestling organizations, including the WCW, that date back to the early to mid-1990s. I have records that document who participated in, won, and lost every WCW PPV Event

since WCW's inception.  I have similar records for every WCW

Nitro and Thunder event since 1997.  I maintain a library of

wrestling reference books, including every edition of the annual

*Wrestling Almanac* (a Pro Wrestling Illustrated publication).

My opinions in this case are based upon my experience as a

reporter in the wrestling industry, the records I have

maintained and my library of wrestling reference books.

**C.   Exhibits to be Used:**

At this time, I have not identified any exhibits that I

plan to utilize at trial.

Plaintiffs reserve the right to have Sgt. Hicks utilize

exhibits at trial.  Plaintiffs will supplement this response as

necessary.

**D.   Qualifications:**

I am a full time law enforcement officer with the

Haleyville, Alabama Police Department.  I have been in law

enforcement for approximately ten (10) years.

As noted above, I have followed wrestling my entire adult

life and am the publisher of a wrestling industry publication

entitled *DragonKing Update Report*, which has been in publication

since 1999 and has a circulation base of approximately 5,000

readers, both domestically and internationally.  Prior to

publishing the *DragonKing Update Report*, I published a similar

wrestling newsletter, the *Global Pro-wrestling News* from 1994-

1996. I am also the publisher of *The Ultimate History of Pro Wrestling* (2000) and *The Ultimate Pro Wrestling Book of Lists, Vols. I and II.*

I have maintained records that reflect the content and outcome of professional wrestling matches and events for the various professional wrestling organizations that date back to the early to mid-1990s. I have records that document who participated in, won and lost every WCW Pay-Per-View Event since WCW's inception. I also have records of this data for every Nitro and Thunder event since 1997.

I maintain a library of wrestling reference books, including every edition of the annual *Wrestling Almanac* (a Pro Wrestling Illustrated publication).

**E. Compensation:**

None.

**F. Other cases in which I have testified as an Expert at Trial or by Deposition within the Preceding Four (4) Years:**

None.

_J. Steve Hull_
Steve Hicks

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This \_\_\_\_ day of September, 2002.

_[signature]_

Cary Ichter
Georgia Bar No. 382515
Kelly Jean Beard
Georgia Bar No. 044380
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rotheneberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
Telephone:   (404) 261-6020
Telecopy:    (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel to this action with the foregoing **PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF EXPERT TESTIMONY OF J. STEVE HICKS** via hand delivery addressed as follows:

> John J. Dalton
> James Lamberth
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___20th___ day of September, 2002.

_Michelle M. Rothenberg-Williams_
Michelle M. Rothenberg-Williams

MEADOWS, ICHTER & BOWERS, P.C
Eight Piedmont Center, Suite 300
3525 Piedmont Road, N.E.
Atlanta, Georgia  30305
(404) 261-6020

 W BASH AT THE BEACH
(PPV)


| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 17-Jul-94 | 20 | 0 | 0.00% | 0 | 0.00% |
| 16-Jul-95 | 25 | 3 | 12.00% | 0 | 0.00% |
| 7-Jul-96 | 40 | 4 | 10.00% | 0 | 0.00% |
| 13-Jul-97 | 30 | 1 | 3.33% | 3 | 10.00% |
| 12-Jul-98 | 26 | 4 | 15.38% | 0 | 0.00% |
| 11-Jul-99 | 43 | 2 | 4.65% | 0 | 0.00% |
| 9-Jul-00 | 25 | 2 | 8.00% | 0 | 0.00% |
| | | | | | |
| TOTALS | 209 | 16 | 7.66% | 3 | 1.44% |



# WCW FALL BRAWL
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 18-Sep-94 | 27 | 0 | 0.00% | 0 | 0.00% |
| 17-Sep-95 | 30 | 4 | 13.33% | 0 | 0.00% |
| 15-Sep-96 | 24 | 3 | 12.50% | 0 | 0.00% |
| 14-Sep-97 | 28 | 2 | 7.14% | 1 | 3.57% |
| 13-Sep-98 | 27 | 3 | 11.11% | 0 | 0.00% |
| 12-Sep-99 | 26 | 2 | 7.69% | 1 | 3.85% |
| 17-Sep-00 | 40 | 2 | 5.00% | 1 | 2.50% |
| | | | | | |
| TOTALS | 202 | 16 | 7.92% | 3 | 1.49% |

 **WCW WORLD WAR III**
**(PPV)** 

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 26-Nov-95 | 63 | 1 | 1.59% | 5 | 7.94% |
| 24-Nov-96 | 66 | 2 | 3.03% | 1 | 1.52% |
| 23-Nov-97 | 61 | 1 | 1.64% | 2 | 3.28% |
| 22-Nov-98 | 64 | 2 | 3.13% | 2 | 3.13% |
| | | | | | |
| TOTAL | 254 | 6 | 2.36% | 10 | 3.94% |

 WCW UNCENSORED 
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 19-Mar-95 | 24 | 3 | 12.50% | 0 | 0.00% |
| 24-Mar-96 | 33 | 2 | 6.06% | 0 | 0.00% |
| 16-Mar-97 | 27 | 2 | 7.41% | 1 | 3.70% |
| 15-Mar-98 | 19 | 1 | 5.26% | 0 | 0.00% |
| 14-Mar-99 | 22 | 4 | 18.18% | 1 | 4.55% |
| 19-Mar-00 | 31 | 4 | 12.90% | 0 | 0.00% |
| | | | | | |
| TOTALS | 156 | 16 | 10.26% | 2 | 1.28% |



# WCW SUPERBRAWL
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 20-Feb-94 | 24 | 3 | 12.50% | 0 | 0.00% |
| 19-Feb-95 | 26 | 3 | 11.54% | 0 | 0.00% |
| 11-Feb-96 | 34 | 4 | 11.76% | 0 | 0.00% |
| 23-Feb-97 | 29 | 2 | 6.90% | 2 | 6.90% |
| 22-Feb-98 | 21 | 2 | 9.52% | 2 | 9.52% |
| 21-Feb-99 | 22 | 1 | 4.55% | 0 | 0.00% |
| 20-Feb-00 | 27 | 3 | 11.11% | 0 | 0.00% |
| 19-Feb-01 | 25 | 1 | 4.00% | 2 | 8.00% |
| | | | | | |
| TOTAL | 208 | 19 | 9.13% | 6 | 2.88% |
| | | | | | |
| | | | | | |
| | | | | | |



# WCW STARCADE
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 27-Dec-94 | 20 | 4 | 20.00% | 0 | 0.00% |
| 27-Dec-95 | 17 | 1 | 5.88% | 7 | 41.18% |
| 29-Dec-96 | 18 | 0 | 0.00% | 3 | 16.67% |
| 28-Dec-97 | 21 | 1 | 4.76% | 0 | 0.00% |
| 27-Dec-98 | 18 | 2 | 11.11% | 0 | 0.00% |
| 18-Dec-99 | 36 | 4 | 11.11% | 0 | 0.00% |
| 17-Dec-00 | 31 | 1 | 3.23% | 2 | 6.45% |
| | | | | | |
| TOTAL | 161 | 13 | 8.07% | 12 | 7.45% |



# W SPRING STAMPEDE
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 17-Apr-94 | 24 | 1 | 4.17% | 2 | 8.33% |
| 6-Apr-97 | 18 | 2 | 11.11% | 2 | 11.11% |
| 19-Apr-98 | 24 | 1 | 4.17% | 1 | 4.17% |
| 11-Apr-99 | 23 | 1 | 4.35% | 0 | 0.00% |
| 16-Apr-00 | 30 | 5 | 16.67% | 0 | 0.00% |
| | | | | | |
| TOTAL | 119 | 10 | 8.40% | 5 | 4.20% |

 **WCW SOULED OUT**
**(PPV)**

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 25-Jan-97 | 18 | 0 | 0.00% | 1 | 5.56% |
| 24-Jan-98 | 28 | 1 | 3.57% | 0 | 0.00% |
| 17-Jan-99 | 22 | 0 | 0.00% | 0 | 0.00% |
| 16-Jan-00 | 27 | 2 | 7.41% | 0 | 0.00% |
| | | | | | |
| TOTAL | 95 | 3 | 3.16% | 1 | 1.05% |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



## WCW SLAMBOREE
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 22-May-94 | 20 | 1 | 5.00% | 0 | 0.00% |
| 21-May-95 | 30 | 3 | 10.00% | 1 | 3.33% |
| 19-May-96 | 42 | 3 | 7.14% | 1 | 2.38% |
| 18-May-97 | 24 | 3 | 12.50% | 4 | 16.67% |
| 17-May-98 | 16 | 0 | 0.00% | 1 | 6.25% |
| 9-May-99 | 22 | 2 | 9.09% | 0 | 0.00% |
| 7-May-00 | 22 | 1 | 4.55% | 0 | 0.00% |
| | | | | | |
| TOTAL | 176 | 13 | 7.39% | 7 | 3.98% |



# WCW ROAD WILD
## (PPV)
### (a/k/a Hogg Wild)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|------|---------------------------|-----------------|-------------|-----------------|-------------|
| 10-Aug-96 | 44 | 1 | 2.27% | 2 | 4.55% |
| 9-Aug-97 | 24 | 2 | 8.33% | 0 | 0.00% |
| 8-Aug-98 | 31 | 1 | 3.23% | 0 | 0.00% |
| 14-Aug-99 | 28 | 4 | 14.29% | 0 | 0.00% |
| | | | | | |
| TOTAL | 127 | 8 | 6.30% | 2 | 1.57% |



# WCW MAYHEM
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 21-Nov-99 | 23 | 1 | 4.35% | 0 | 0.00% |
| 26-Nov-00 | 33 | 2 | 6.06% | 2 | 6.06% |
| | | | | | |
| TOTAL | 56 | 3 | 5.36% | 2 | 3.57% |

 **GREAT AMERICAN BASH**
## (PPV)

| DATE | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|
| 18-Jun-95 | 25 | 3 | 12.00% | 0 | 0.00% |
| 16-Jun-96 | 22 | 1 | 4.55% | 0 | 0.00% |
| 15-Jun-97 | 22 | 2 | 9.09% | 2 | 9.09% |
| 14-Jun-98 | 19 | 2 | 10.53% | 0 | 0.00% |
| 13-Jun-99 | 22 | 1 | 4.55% | 0 | 0.00% |
| 11-Jun-00 | 24 | 1 | 4.17% | 0 | 0.00% |
| | | | | | |
| TOTALS | 134 | 10 | 7.46% | 2 | 1.49% |



ELANEOUS WCW PPVS

| DATE | TITLE OF PPV | TOTAL NUMBER OF WRESTLERS | BLACK WRESTLERS | BLACKS AS % | ASIAN WRESTLERS | ASIANS AS % |
|---|---|---|---|---|---|---|
| 13-Aug-00 | New Blood Rising | 28 | 1 | 3.57% | 3 | 10.71% |
| 14-Jan-01 | Sin | 34 | 2 | 5.88% | 2 | 5.88% |
| 18-Mar-01 | Greed | 28 | 3 | 10.71% | 0 | 0.00% |
| TOTALS | | 90 | 6 | 6.67% | 5 | 5.56% |



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

<u>Davis v. World Championship Wrestling, Inc. and Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1-00-CV-1716-CC;
<u>Saengsiphan v. World Championship Wrestling, Inc. and</u>
<u>Turner Sports, Inc.</u>, Civ. File No. 1-00-CV-1719-CC;
<u>Speight v. World Championship Wrestling, Inc. and Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1-00-CV-1718-CC;
<u>Worthen v. World Championship Wrestling, Inc. and Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1-00-CV-1717-CC;
<u>Reeves v. World Championship Wrestling, Inc. and Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1-00-CV-1720-CC;
<u>Easterling v. World Championship Wrestling, Inc. and Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1-00-CV-1715-CC
<u>Onoo v. World Championship Wrestling, Inc., Turner Sports,</u>
<u>Inc.</u>, Civ. File No. 1:00-CV-0368-CC
<u>Norris v. World Championship Wrestling, Inc., Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1:00-CV-0369-CC
<u>Walker v. World Championship Wrestling, Inc., Turner</u>
<u>Sports, Inc.</u>, Civ. File No. 1:00-CV-0367-CC; <u>Patterson v.</u>
<u>World Championship Wrestling, Inc., Turner Sports, Inc.,</u>
<u>Turner Entertainment Group, Inc.</u> Civ. File No. Civ. File
No. 1:01-CV-1152-CC

### PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF
### EXPERT TESTIMONY OF DR. DAVID W. RASMUSSEN

Pursuant to Federal Rule of Civil Procedure 26(a)(2),

Plaintiffs hereby identify the expert testimony of their

statistician, Dr. David W. Rasmussen, who is the James H.

Gapinski Professor of Economics at Florida State University, as

follows:

**A.    Opinions, Basis and Reasons:**

<u>Introduction</u>

This report evaluates the contention that the World

Championship Wrestling (WCW) denied equal treatment to African-

American wrestlers in terms of employment, salary and other contract terms. The statistical evidence presented here sheds light on this question in two ways. First, evidence is presented that shows African-Americans are under-represented among WCW wrestler positions. These data are consistent with the contention that African-American wrestlers did not encounter an equal opportunity employer when dealing with WCW. Second, the salary and other compensation of African-American wrestlers are explored. The fact that African-Americans are significantly underrepresented among wrestlers hinders formal statistical analysis of their salaries relative to other wrestlers, but the available evidence strongly indicates that African-Americans performers did not receive compensation that is commensurate with other wrestlers.

## Hiring

*Methodology.* The following statistical analysis uses the methodology that is generally accepted in Title VII litigation. At issue is whether the WCW hired African-Americans in proportion to their representation in the qualified applicant pool. The crucial question to be answered is how far the proportion of African-Americans among total paid wrestlers stray from the expected proportion and still be regarded as "racially neutral." This is a straightforward statistical problem, and the prevailing legal doctrine is in accord with the standard

methods used in social science: discrimination is revealed when
the employer's actual behavior results in the number of African-
Americans hired to be more than two standard deviations below
the number expected based on their availability in the
workforce.[1] Statistical analysis allows the analyst to make
probability statements. When actual number of African-Americans
hired is two standard deviations below the expected number, it
reveals that there is only one chance in twenty (five percent)
that an equal opportunity employer by chance would have the
racial distribution of retention decisions that is observed.

This statistical calculation is driven by three numbers:
the actual number of African-Americans hired, the total number
of persons hired, and the expected proportion of African-
Americans among these hires. Generally, the actual numbers of
African-Americans and total hires are relatively free of
controversy. More contentious is the proportion of hires that
are expected to be African-American, the "benchmark" by which
actual hiring performance is evaluated. This controversy is
minimized when there is a good record of all persons who applied
for employment together with identification of those who are
African-American. For obvious reasons, these data are not

---

[1] Statistical formula for calculating the number of standard deviations is the actual number of African-Americans hired minus the expected number divided by the standard deviation which is the square root of $np(1-p)$ where n is the total number of hires and p is the benchmark measuring the percent African-Americans that are available. It should be noted that social scientists recognize that important differences may occur even when customary significance levels are not realized.

generally available.  However, even excellent applicant flow data may be compromised if qualified African-Americans are reluctant to apply because they believe that the employer will discriminate against them.[2]  Thus when good applicant flow data that identifies African-Americans are not available, as in this case, it is customary to use labor market statistics to approximate the expected proportion of African-Americans among qualified applicants.

*Wrestlers*

Data are available to examine the number of African-American wrestlers under contract with WCW between 1996 and 2000.[3]  The evidence available at this time suggests that there are 228 wrestlers, 17 (7.5 percent) of whom were African-American.[4]  The crucial question is: by what benchmark are we to evaluate this hiring performance?

One possible starting point is to get information about the relative number of African-Americans who are interested in becoming professional wrestlers.  WCW has a school, the Power Plant, to train wrestlers.  The proportion of African-Americans among qualified persons who desire to attend this school would

---

[2] This "chilling" effect that potentially lowers the percent African-American among applicants is analogous to the "discouraged worker" classification used by the U.S. Department of Labor.  Discouraged workers are those that would look for work if they believed they could find a job somewhere in the economy.  The chilling effect represents firm specific discouraged workers: individuals do not apply because they believe the employer is not an equal opportunity employer.

[3] Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3., Exhibit A.

- 4 -

provide an expression of interest in this line of work. Unfortunately, Universal Wrestling Corporation has stated that it does not have this information.[5]   There is, however, testimony from five individuals who report their personal impressions of the representation of African Americans among school participants.

Five individuals have testified as to their impressions of the representation of African-Americans among persons at the Power Plant.[6]  These are recorded in Table 1.  As is clear in the Table, three of these individuals provide an estimated range and two provide a specific figure.  Estimates of the percent African-American range from 10 to 40 percent.  Column 1 counts each estimate as an independent observation, so Carr, Hamilton, and Snakovsky, in effect, get two votes.  The mean of these eight estimates is 23.5 percent African-American, the median (the mid-point of the range of estimates) is 27.5 percent, and the mode (the most frequent estimate) is 40 percent.

One could reasonably object to counting any individual's estimate twice, so column two provides the mid-point of the ranges provided by Carr, Hamilton, and Snakovsky.  The resulting

_____

[4] I have been provided with a copy of Exhibit A that identifies persons who are African-American and persons whose presence on the list is disputed. These data have been supplemented by Plaintiffs' counsel and a draft Affidavit by Bobby Walker.
[5] Defendant Universal Wrestling Corporation's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to Defendants World Championship Wrestling, Inc. and Turner Sports, p. 4

mean is 26.4 percent African-American and the median is 32.5

percent.

## TABLE 1

### ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN-AMERICAN | |
| --- | --- | --- |
| | ESTIMATES | AVERAGE |
| T.B. Carr | | 32.5 |
|   Low | 25 | |
|   High | 40 | |
| J.N. Hamilton | | 12.5 |
|   Low | 10 | |
|   High | 15 | |
| J.P. Snakovsky | | 35 |
|   Low | 30 | |
|   High | 40 | |
| B.F. Smith | 12 | 12 |
| M. Williams | 40 | 40 |
| | | |
| Mean | 23.5 | 26.4 |
| Median | 27.5 | 32.5 |
| Mode | 40 | n.a. |

Even if collectively these approximations of applicant flow

give an accurate picture of African-American representation at

the Power Plant, this estimate of interest  among qualified

African-Americans could be biased downward if African-American

applicants are discouraged from applying because they believe

---

[6] This information is given in depositions, the date of which is following the person's name: Tony Byron Carr (January 28, 2002); Joseph N. Hamilton (March 22, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); and Moses Williams (May 28, 2002)

WCW is not an equal opportunity employer. This is the chilling effect described above.

Another source of information about the availability of African-Americans as wrestlers is a list by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996-2000 period.[7] Of 82 persons on this list, 11 (13.4) have been identified as African-American. This is obviously a flawed benchmark since it can obviously be a product of discrimination if the Defendant has a bias against choosing African-Americans as trainees. Nevertheless, the 13.4 percent figure is useful as a lower bound estimate of African-American interest and availability in a wrestling career since WCW in fact achieved this level of representation at the Power Plant.

One way to approximate what an estimate applicant flow in the absence of a chilling effect is to consider the representation of African-Americans in activities that require attributes similar to those of professional wrestling: a list that would include excellent athletic ability, physical strength and size, and to be able follow a highly scripted sequence of events. These attributes are obviously found in professional football. African-Americans are much more highly represented in professional football than they are in the general population: blacks account for 67 percent of the players in the National

Football League.[8]    These data indicate African-American participation that is far in excess of any of the estimates provided in Table 1, which suggests these estimates may be downward biased estimates of a true measure of the availability of African-Americans who are interested in and qualified to be professional wrestlers.

Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period.  First consider Table 2. The first column shows the number of contract wrestlers listed in Exhibit A.[9] Column two shows a variety of benchmarks, the percent African-American expected among these wrestlers, which are drawn from Table 1.   Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in Exhibit A, and column five reports the difference actual and expected number of African-Americans.   The last column shows the number of standard deviations.   Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

Five benchmarks are used.  First, is the African-American representation among trainees at the Power Plant, 13.4 percent.

---

[7] *Supra*, note 3, Exhibit B.
[8] John Simons, U.S. News and World Report (March 24, 1997, pp. 46-48).  The same source indicates that blacks account for 80 percent of the players in the National Basketball Association.

WCW hired 228 persons during 1996-2000, and had they hired African-Americans at a rate of 13.4 percent the expected number of African-American hires would be 30.6. Instead, only 17 were hired; -2.63 standard deviations from the expected number. This is statistically significant. In probability terms this could happen by chance alone only one time in 100.

Subsequent benchmarks come from Table 1. The statistical analysis in row two uses the average (mean) availability from column one (23.5 percent); row three is the median estimate from column one (27.5 percent); row four is the median value of column 2 (32.5) and row five is the most frequently cited estimate in column one (40 percent).

The number of standard deviations range from -2.63 to -10.03, far beyond the standard of -2.00 standard that indicates that chance does not account for the under-representation of African-Americans at WCW. To put these statistics in perspective, there is only 1 chance in 1,000 that WCW is an equal opportunity employer when the number of actual African-American wrestlers is 3.00 standard deviations below the expected number. When the shortfall of African-American wrestlers is -6.00 standard deviations, as in row two of Table 2, this result is expected by chance in less than 1 chance out of 100,000.

_____

[9] *Supra* note 3.

TABLE 2

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
REPRESENTATION AMONG WRESTLERS (1996-2000)

A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 228 | 13.4 | 30.6 | 17 | -13.6 | -2.63 |
| 228 | 23.5 | 53.4 | 17 | -36.4 | -7.71 |
| 228 | 27.5 | 62.7 | 17 | -45.7 | -6.78 |
| 228 | 32.5 | 74.1 | 17 | -57.1 | -8.07 |
| 228 | 40.0 | 91.2 | 17 | -74.2 | -10.03 |

B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 232 | 13.4 | 31.1 | 20 | -11.1 | -2.14 |
| 232 | 23.5 | 54.5 | 20 | -34.5 | -5.35 |
| 232 | 27.5 | 63.8 | 20 | -43.8 | -6.44 |
| 232 | 32.5 | 75.4 | 20 | -55.4 | -7.77 |
| 232 | 40.0 | 92.8 | 20 | -72.8 | -9.76 |

Panel B of Table 2 is identical to Panel A except that the
four disputed wrestlers are included in the analysis. Three of
the disputed persons are African-American, so the total number
of wrestlers rises to 232 and the actual number of African-
Americans hired rises to 20. The results do not change: the
number of standard deviations range from -2.14 to -9.76, once
again indicating statistically significant under-representation
of African- Americans. The number of African-American wrestlers
will be 2.14 standard deviations below the expected number by
chance alone three times in 100. Recall that -6.00 standard

- 10 -

deviations will occur by chance in less than once in 100,000 cases.

The analysis is Table 2 is flawed in that it considers the number of persons in Exhibit A but does not account for the actual frequency of employment. As an illustration, suppose an employer hired two persons, a Caucasian and an African American, over a 10-year period. Using the method employed in Table 2, African-American representation would be 50 percent. But suppose that the Caucasian worked in each of the 10 years and the African-American worked in only one. By looking at African-American representation by salary years a very different picture emerges: instead of 50 percent, African-American representation is only 1 out of 11, or 9.1 percent.

Table 3 investigates African-American representation among WCW wrestlers using salary years as the unit of observations. In Exhibit A, there are 681 cells in which a person is reported to have received a salary. Of these cells, 51 (7.5 percent) represent salaries earned by African-Americans. The benchmarks that measure African-American availability are identical to those in Table 2. When the benchmark is 13.4 percent, the lowest in the Table, the shortfall of African-American wrestlers is -4.53 standard deviations from the expected number. As in Table 2, the number of standard deviations rises with the benchmark: when the benchmark is 40 percent, the shortfall is

-17.32 standard deviations.  There is less than one chance in a

million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 681 | 13.4 | 91.3 | 51 | -40.3 | -4.53 |
| 681 | 23.5 | 160.0 | 51 | -109.0 | -9.85 |
| 681 | 27.5 | 187.3 | 51 | -136.3 | -11.70 |
| 681 | 32.5 | 221.3 | 51 | -170.3 | -13.94 |
| 681 | 40.0 | 272.4 | 51 | -221.4 | -17.32 |

This analysis strongly suggests that African-Americans are

significantly under-represented among wrestlers at WCW.  Even

when African American representation at the Power Plant is used

as the benchmark, African Americans are significantly under-

represented.  Even the highest benchmark in Tables 2 and 3 may

under estimate the true availability of qualified African-

Americans since it is possible that if WCW was a truly equal

opportunity employer it would confront an applicant pool of

interested and qualified persons that mirrored that of

professional basketball or professional football.

Salary

Salaries of wrestlers within any year vary greatly.  For

example, in 1999 annual compensation varies from under $10,000

to $4.65 million. The average wrestler's salary was $237,933 that year. Of the 160 wrestlers receiving compensation that year, 54 (33.1%) received under $50,000 and another 33 (20.6%) received a salary between $50,000 to $99,999. This concentration of salaries at the lower end of the overall salary range is reflected in the median (50 percent of the distribution lie on both sides of the median) income compared to the mean income: the median is $87,000 while the mean is about $238,000. At the other end of the spectrum, only 14 wrestlers received salaries in excess of $500,000 and only 9 earned more the $750,000 in 1999. This dispersion of salaries limits the possibilities to statistically evaluate the compensation of African-Americans relative to other wrestlers.

The structure of WCW wrestling salaries, then, appears to be one in which most wrestlers make a relatively modest salary and a few do very well. Therefore the statistical analysis focuses on the opportunities for African-Americans to enter the ranks of the most successful wrestlers or what we will call the salary elite. Discrimination, of course, can take many forms. Therefore we also investigate the possibility that African-Americans who are relatively successful at WCW in terms of compensation may have suffered from unequal employment practices because it took them longer to achieve high standing than comparable Caucasian wrestlers.

*Defining the Salary Elite*

Table 3 shows the salary distribution for wrestlers in 1999, which clearly reveals that there is a break in the distribution at $500,000. Only 8.7 percent of the wrestlers in that year earned over one-half million dollars and only 5.6 percent earned over $750,000. The $750,000 figure is the most appropriate definition of elite salary status for two reasons. First, most wrestlers who reached this salary figure eventually earned an annual salary in excess of $1 million. This is not the case for those whose top salary was in the $500,000 to $750,000 range. Second, licensing income as a percent of salary makes a sharp jump when salaries are in excess on $750,000. In 1999, licensing income as a percent of salary was 14.71 for the 9 wrestlers making over $750,000 but only 4.03 percent for the five wrestlers making between $500,000 and $749,999. In absolute figures the former group had an expected licensing income of $83,584 more than the lower income group. This is just slightly lower than the median wrestlers annual salary. Thus, it seems appropriate to define the salary elite to be the top five percent of the salary distribution, or those that make in excess of $750,000.

TABLE 4

SALARY DISTRIBUTION OF WRESTLERS, 1999

| SALARY | NUMBER | PERCENT |
|---|---|---|
| 0 – 49,999 | 53 | 33.1 |
| 50,000 – 99,999 | 33 | 20.6 |
| 100,000 – 199,999 | 38 | 23.8 |
| 200,000 – 499,999 | 22 | 13.8 |
| 500,000 – 749,999 | 5 | 3.1 |
| 750,000 – 999,990 | 1 | .6 |
| 1,000,000 – 2,000,000 | 5 | 3.1 |
| Over 2,000,000 | 3 | 1.9 |
| TOTAL | 160 | 100.0 |

*African American Wrestlers Among the Salary Elite*

During the 1996-2000 period, 10 wrestlers earned $750,000 or more. Combined they account for 29 years earning an "elite" salary. These elite salary earners are shown in Table 5.  Since African-Americans account for 7.5 percent of all salary years during this time period, we expect that they should receive about that portion of these elite salary years.  The expected number of African-Americans is 2.18, but in fact there are none achieving elite status.  This shortfall in the expected number of African-Americans is –1.18 standard deviations from the actual number; this is not statistically significant at customary test levels.  However, it is worth noting that this

test statistic means that there is about .13 percent chance of observing this result due to chance.[10] This means that there is less than 1 chance in 7 that there would be no African-Americans in the elite status due to chance.

TABLE 5

WRESTLERS WITH ELITE SALARIES AND YEARS IN SERVICE
BEFORE MAKING $600,000 OR MORE

| NAME | NUMBER OF SALARY YEARS | | | TIME TO |
|------|------|-----------|-----------|---------|
| | $1M | $750-$1M | $600-$750 | $600+ |
| ABBOT | 0 | 0 | 1 | 1 |
| BOLLEA, T | 4 | 0 | 0 | na |
| BORDEN | 2 | 2 | 0 | 1 |
| EUDY | 0 | 1 | 1 | 0 |
| FALKENBERG | 2 | 0 | 0 | 1 |
| FLIEHR | 0 | 0 | 1 | 2 |
| GOLDBERG | 2 | 0 | 0 | 3 |
| HALL | 1 | 2 | 1 | 1 |
| HART | 3 | 0 | 0 | 1 |
| NASH | 3 | 1 | 0 | 1 |
| PFOHL | 2 | 1 | 1 | 1 |
| POFFO, R. | 3 | 0 | 1 | na |
| RECHSTEINER | 0 | 0 | 2 | 3 |
| TOOMBS | 0 | 0 | 3 | 1 |
| HUFFMAN, B[A] | 0 | 0 | 2 | 3 |
| HUFFMAN, L[A] | 0 | 0 | 1 | 3 |
| TOTAL | 22 | 7 | 14 | |

[A]African-American


*Putting in Your Time: Are African-American Wrestlers Treated Equally?*

---

[10] This is using a one-tail test that assumes that there is an *a priori* reason to expect that African-Americans will be under-represented among those with elite salary status. Given the extreme under-representation of African-Americans in employment among wrestlers, this expectation is warranted. If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

It is impossible to test whether African-Americans spend more time than Caucasians waiting to achieve elite status since none have reached this status when it is defined as an annual salary of $750,000. Time waiting in this context cannot be defined. To facilitate this analysis of waiting time, the definition of elite status is lowered to $600,000 so two African-Americans are included among the elite.[11]

Waiting time to elite status is defined as the number of years that a wrestler receives a salary before achieving elite salary status.[12] For example, S. Borden received $72,205 in 1996 and achieved elite status a year later with a salary of $913,304. His waiting time is therefore recorded as one year. Waiting time is defined for wrestlers who reached a salary exceeding $600,000 after 1996 in Exhibit A.[13] The sign test provides a way to investigate whether African-American wrestlers spent more time waiting to achieve their elite status. If African-Americans are treated equally it is expected that the number of times they spend more time waiting for elite salary status than Caucasians should be about equal to the number of times they reach this status faster. In a sign test ties, i.e.,

Americans in employment among wrestlers, this expectation is warranted. If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

[11] They are B. Huffman and L. Huffman.

[12] The salary data are found in Defendant's Exhibit A. Two wrestlers (T. Bollea and R. Poffo) have elite status in the first year recorded in Exhibit A and are not included in this analysis because waiting time is unknown.

[13] The status of seven wrestlers is disputed in this case and they are not included. In four of these seven cases, no salary statistics are shown in the Exhibit.

an equal number of years waiting, are excluded from the analysis.

Table 5 shows all the wrestlers who earned at least $600,000 after 1996, notes whether they are African-American, and gives the number of years they received a salary before reaching elite status. The African-Americans, B. Huffman and L. Huffman, each waited three years before achieving $600,000 salary status. Among the 14 Caucasians reaching this salary status, only Goldberg and Rechsteiner waited that long. Comparing each Huffman with every Caucasian (eliminating ties) shows that the Caucasians achieved this salary faster than the African-Americans: subtracting the years African-Americans waited from that of Caucasians yields 10 comparisons. The sign is negative (i.e., African Americans waited longer) in each case. This is statistically significant with less than one chance in 100 that this outcome could occur by chance alone.

**B.    Data Considered:**

The data I considered is outlined in the prior section of this report. I have also considered racial identification data that was provided to me by Plaintiffs' counsel.

**C.    Exhibits to be Used:**

> (1)    Defendant Universal Wrestling Corporation's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to Defendants World Championship Wrestling, Inc. and Turner Sports, Inc.;

(2)  Demonstrative exhibits created with the data and
     opinions referenced herein.

## D.  Qualifications:

A copy of my resume was attached as Exhibit (B)(2)(a) to
Plaintiffs' Amended Supplemental Responses to Initial
Disclosures Providing Expert Disclosures Pursuant to Federal
Rule of Civil Procedure 26(a)(2).

## E.  Compensation:

I will bill Plaintiffs $200.00 per hour for my time, and
$300.00 per hour for any time testifying at deposition or at
trial.

## F.  Other cases in which I have testified as an Expert at Trial or by Deposition within the Preceding Four (4) Years:

Curtis Major et al. v. Eller Media Company
S.D. of Fla. (Miami Division)
Case No.: 00-3870-CIV-MORENO (pending)
(Report and deposition).

Lemuel Middleton et all., v. Publix Super Markets
U.S.D.C. M.D. of Fla. (Tampa Division)
Case No.: 97-760-CIV-T-25E
(Report and deposition).

Linden Adams et al., v. BellSouth Telecommunications, Inc.
U.S.D.C. S.D. of Fla.
Case No.: 96-2473-CIV-ZLOCH
(Report).

Zaidy Gantt, et al. v. The Martin Brower Company
U.S.D.C. S.D. of Fla.
Case No.: 97-6233-CIV-ZLOCH
(Testified).

Additional Cases:

Dixon v. Coca Cola Bottling Co., et al., N.D. of Fla.

Newton, et al. v. The Sherwin Williams Co., W.D. of Kentucky

Walker v. Smith, TCA 79-895, N.D. of Fla.

Forehand v. Florida State Hospital, TCA 83-7107-WS, N.D. of Fla.

Pollocks v. Sunland, TCA 87-40103, N.D. of Fla.

Worlds v. Sunland, TCA 77-0741, N.D. of Fla.

Winfield v. St. Joe Paper Co., MCA 76-28, N.D. of Fla.

Griffin v. Wainright, TCA 79-1016, N.D. of Fla.

Nickyson v. City of Tallahassee, TCA 76-118, N.D. of Fla.

*Dr. David W. Rasmussen*

Plaintiffs specifically reserve the right to supplement this disclosure in any manner permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court or any other applicable law.

This 12th day of November, 2002.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road

Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all
parties in the foregoing matter with the foregoing
**Plaintiffs' Third Amended Supplemental Responses to Initial
Disclosures Providing Expert Disclosures Pursuant to
Federal Rule of Civil Procedure 26 (a)(2)(B)** via hand
delivery properly addressed as follows:

> John J. Dalton
> James Lamberth
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This ___12th___ day of November, 2002.

_____
Michelle M. Rothenberg-Williams



# EXHIBIT / ATTACHMENT

U

(To be scanned in place of tab)



As per your request.:

In March of 2001 is the time when Booker T won back the title back from Steiner. This was the last TV under Russo and Taylor's control and believe this was the time that Moses and Johnny is talking about. Russo and Taylor wanted to put the belt back on Booker in order to make it appear that they were not being discriminating against the minority talent in WCW.

## WCW World Heavyweight Title History

| Name | Date | Location | Notes |
|------|------|----------|-------|
| Ric Flair | January 11, 1991 | East Rutherford, New Jersey | 1 |
| Lex Luger | July 14, 1991 | Baltimore, Maryland | 2 |
| Sting | February 29, 1992 | Milwaukee, Winsconsin | |
| Big Van Vader | July 12, 1992 | Albany, Georgia | |
| Ron Simmons | August 2, 1992 | Baltimore, Maryland | |
| Big Van Vader (2) | December 20, 1992 | Baltimore, Maryland | |
| Sting (2) | March 11, 1993 | London, England | |
| Big Van Vader (3) | March 17, 1993 | Dublin, Ireland | |
| Ric Flair (2) | December 27, 1993 | Charlotte, North Carolina | 3 |
| Ric Flair (3) | April 24, 1994 | Atlanta, Georgia | 4 |
| Hulk Hogan | July 17, 1994 | Orlando, Florida | |
| The Giant | October 29, 1995 | Detroit, Michigan | 5 |
| Randy Savage | November 26, 1995 | Norfolk, Virginia | 6 |
| Ric Flair (4) | December 27, 1995 | Nashville, Tennessee | |
| Randy Savage (2) | January 22, 1996 | Las Vegas, Nevada | |
| Ric Flair (5) | February 11, 1996 | Saint Petersburg, Florida | |
| The Giant (2) | April 22, 1996 | Albany, Georgia | |
| Hulk Hogan (2) | August 10, 1996 | Sturgis, South Dakota | |
| Lex Luger (2) | August 4, 1997 | Auburn Hills, Michigan | |
| Hulk Hogan (3) | August 9, 1997 | Sturgis, South Dakota | |
| Sting (3) | December 28, 1997 | Washington, D.C. | 7 |
| Sting (4) | February 22, 1998 | San Francisco, California | 8 |
| Randy Savage (3) | April 19, 1998 | Denver, Colorado | |
| Hulk Hogan (4) | April 20, 1998 | Colorado Springs, Colorado | |

| | | | |
|---|---|---|---|
| Bill Goldberg | July 6, 1998 | Atlanta, Georgia | |
| Kevin Nash | December 27, 1998 | Washington, D.C. | |
| Hulk Hogan (5) | January 4, 1999 | Atlanta, Georgia | |
| Ric Flair (6) | March 14, 1999 | Louisville, Kentucky | |
| Diamond Dallas Page | April 11, 1999 | Tacoma, Washington | 9 |
| Sting (5) | April 26, 1999 | Fargo, North Dakota | |
| Diamond Dallas Page (2) | April 26, 1999 | Fargo, North Dakota | 10 |
| Kevin Nash (2) | May 9, 1999 | Saint Louis, Missouri | |
| Randy Savage (4) | July 11, 1999 | Fort Lauderdale, Florida | 11 |
| Hulk Hogan (6) | July 12, 1999 | Jacksonville, Florida | |
| Sting (7) | September 12, 1999 | Winston-Salem, North Carolina | |
| Bret Hart | November 21, 1999 | Toronto, Ontario, Canada | 12 |
| Bret Hart (2) | December 20, 1999 | Baltimore, Maryland | 13 |
| Chris Benoit | January 16, 2000 | Cincinatti, Ohio | 14 |
| Sid Vicious | January 24, 2000 | Los Angeles, California | 15 |
| Kevin Nash (3) | January 25, 2000 | Las Vegas, Nevada | 16 |
| Sid Vicious (2) | January 25, 2000 | Las Vegas, Nevada | 17 |
| Jeff Jarrett | April 16, 2000 | Chicago, Illinois | 18 |
| Diamond Dallas Page (3) | April 24, 2000 | Rochester, New York | |
| David Arquette | April 25, 2000 | Syracuse, New York | 19 |
| Jeff Jarrett (2) | May 7, 2000 | Kansas City, Missouri | 20 |
| Ric Flair (7) | May 15, 2000 | Biloxi, Mississippi | |
| Jeff Jarrett (3) | May 22, 2000 | Grand Rapids, Michigan | 21 |
| Kevin Nash (4) | May 23, 2000 | Saginaw, Michigan | 22 |
| Ric Flair (8) | May 29, 2000 | Salt Lake City, Utah | 23 |
| Jeff Jarrett (4) | May 29, 2000 | Salt Lake City, Utah | |
| Booker T. | July 9, 2000 | Daytona Beach, Florida | 24 |
| Kevin Nash (5) | August 28, 2000 | Las Cruces, New Mexico | |
| Booker T. (2) | September 17, 2000 | Buffalo, New York | |
| Vince Russo | September 25, 2000 | Uniondale, New York | 25 |
| Booker T. (3) | October 2, 2000 | San Francisco, California | 26 |


12. Bret Hart defeated Chris Benoit in a 32-man tournament final to win the title.

13. Bret Hart vacated the title on "NITRO" in the show and defeated Bill Goldberg for the title in the main event.

14. Title was vacated on January 15, 2000 due to Bret Hart's injury. Chris Benoit defeated Sid Vicious for the title. Title was then vacated on January 17, 2000 due to a dispute with WCW.

15. Sid Vicious defeated Kevin Nash for the title. Was stripped of the title a day later by "commissioner" Nash.

16. Kevin Nash awards himself the title after stripping it from Sid Vicious.

17. Sid Vicious defeated Kevin Nash and Ron Harris to win the title.

18. Vince Russo vacated the title on April 10, 2000 in Denver, Colorado. Jeff Jarrett defeated Diamond Dallas Page in a tournament final.

19. David Arquette pins Eric Bischoff in a tag team match to win the title in a stipulation tag team match between Diamond Dallas Page and David Arquette vs. Jeff Jarrett and Eric Bischoff. Vacated the title on May 1, 2000.

20. Jeff Jarrett defeated David Arquette and Diamond Dallas Page in a triple cage match to win the title.

21. Ric Flair was stripped of the title, the title was then awarded by Vince Russo.

22. Kevin Nash defeated Jeff Jarrett and Scott Steiner in a three way to win the title.

23. Kevin Nash hands the title over to Ric Flair.

24. Hulk Hogan pinned Jeff Jarrett to win the World Heavyweight Title. But, Vince Russo comes back out and explains to the crowd that he has been dealing with Hogan's politics all day and gives Hogan "his" WCW World title belt as the Hulk Hogan Memorial Belt because it doesn't mean squat anymore; Russo claims Jarrett is still the WCW Champion but with a new belt and will defend his title against Booker T, a man who has been "held back by Hogan for 14 years". Booker then pinned Jarrett to win the title.

25. This was a steel cage match. Title vacated by Russo on October 2, 2000.

26. Booker T. defeated Jeff Jarrett in a "San Francisco 49er box" match.

27. This is the first time the WCW World Heavyweight Title changed hands on WWF television.

28. Chris Jericho unifies the WCW World Heavyweight Title with the WWF World Heavyweight Title on December 9, 2001 when he defeated Steve Austin.

---

Get your FREE download of MSN Explorer at http://explorer.msn.com.



# EXHIBIT / ATTACHMENT

V

(To be scanned in place of tab)

# WCW Diversity Training
## 6/12/99
## Baltimore, MD

## 7:00 PM

1. Brian Adams
2. Steve B.
3. Brian Kniss
4. Hulk Hogan
5. Kevin Nash
6. Scott Hall is at the Bar
7.
8. Chris Benoit
9. Scott Haas
10.
11. Hulk Johnson
12. Rodney King
13. Malcolm X
14. David Duke
15. A. Sharpton
16. Jesse Jackson
17. Rush Limbaugh
18. Jimmy the Greek
19. Howard Cosell
20. OJ Simpson



PLAINTIFF'S
EXHIBIT
18
3/19

CONFIDENTIAL
X 001561

# WCW Diversity Training
## 6/12/99
### Baltimore, MD

## 7:00 PM

1. Mickie Jay
2. Jerry Flynn
3. Michael Boilea
4. Curt Hennig
5. Mike Enos
6. _illegible_
7. _illegible_
8. Ross Forman
9. Randy Thornton
10. K. Bogg
11. Steve Arden
12. _illegible_
13. Scott Stince
14. _illegible_
15. Chris _illegible_
16. _illegible_
17. _illegible_
18. Stephanie "G. George"
19. Nora Greenwald
20.

CONFIDENTIAL
X 001566

# WCW Diversity Training
## 6/12/99
### Baltimore, MD

## 7:00 PM

1. Kenneth M. *(illegible)* ?
2. *(illegible)*
3. Elizabeth *(illegible)* ?
4. Eric *(illegible)* ?
5. *(illegible)*
6. *(illegible)* ?
7. Dusty *(illegible)*
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.

CONFIDENTIA
X 001567



# EXHIBIT / ATTACHMENT

W

(To be scanned in place of tab)



How can WingspanBank.com save me ... ? CLICK HERE

COME GET SOME!



WCW · WWF · ECW · Indies · Int'l

**Miller Time**

Home

WrestleManiacs

ScoopThis

Bombshells

Toys

Rankings

Photos

Audio

Schedules

Columns

Almanac

Forums

Chat

Store

WOW Mag

Email Us

**Federations**

WCW

WWF

ECW

Indies

Int'l

# Exclusive interview with WWF's head writer Vince Russo

September 30, 1999

PLAINTIFF'S EXHIBIT

#2

## By Ben Miller
### WrestleLine/WrestleManiacs

**BEN:** The people you closed the door on, I don't want to ask for names, have they ended up showing up on ECW or WCW, or do they end up staying on the fringe of the business for the same reason you didn't want them?

**RUSSO:** No, they wind up showing in ECW and WCW. I think that's why you have such chaos, especially in WCW's locker room. When there is a free agent out there, one of the first things we look at is that there is such peace and harmony and a family feeling in our locker room, if we bring this guy in, how is it going to affect that? If it's going to affect that in a negative way, we don't bring them in. These guys definitely get picked up in ECW and WCW. Like I said, I think that's part of the reason why you have so many problems in WCW.

**BEN:** Two guys that have been critical of you at various times are **Dave Meltzer** who obviously writes the *Wrestling Observer* and **Bruce**

**Mitchell**. Do you have any opinion on those guys?

**RUSSO:** Well yean, it just really bothers me. First of all, you've got to understand something, I never in my life claimed to be a great journalist, because the way I write ... I don't try to write to impress people. I don't try to write in a style like look at me, I'm smarter than you. I try to write in a style that people ... the common guy - the wrestling fan will understand. That's how I try to write, and that's the most important thing to me - that I write in a way that our fan is going to understand. I am not above anybody, and another thing too, every one of my columns, even if it is pro-WWF, I write what I truly believe in my heart. Nobody tells me to write my column, if I write it positive, or negative, whatever the case may be, **Vince McMahon** lets it go, then I write about what I truly, truly feel. And I try to write the truth.

The thing that just bothers me, primarily about Dave Meltzer, I just feel he thinks he's better than everybody else. I think he tries to talk down on people like he knows everything, and the reality of the situation is that Dave Meltzer doesn't know shit. Because all Dave Meltzer's information is second hand information, and whoever is giving him that information is putting their little spin



Though there are some things Russo can't talk about, like the Owen Hart lawsuit, he believes in telling readers as much as possible. (WOW)

on it, and whereas you know - me - I'm there! I know what's going on. I'm behind the scenes. I talk to these guys on a daily basis. I know what's true. I know what's bullshit, and I tell the reader as much as I possible can.

Of course there are some things I can't talk about. I even mentioned to you like the Owen situation - anything involving a lawsuit, I can't talk about, you know. But it just really bothers me when you have a guy who feels that he's above it all, when the reality is he's getting the information second hand, and some of it right, and some of it is absolutely bullshit, and he doesn't have a clue as to what's right and what's bullshit. And that's what bothers me. They can be as critical as they want to be, but I would much rather have a job and be in a position where I know what I'm talking about rather than have to rely on gossip.

**BEN:** I see where you're coming from. Obviously those guys have to know someone in the company. If you ever found out that someone was a mole for one of these newsletters or something like that, would you get mad at them?

**RUSSO:** I don't necessarily know if they do know someone in the company, and the only reason I say that is because on so many occasions, the information is wrong. It's just flat wrong. I remember one time Dave Meltzer had something in there about me, a couple of years ago, it was rumored that one of the WCW wrestlers died in a car crash ... that black guy ... that Pit guy ---

**BEN:** Oh yeah. **Craig "Pitbull" Pittman.**

**RUSSO:** Yeah, the next thing I know I'm reading in Meltzer's newsletter that Russo was on the phone spreading this rumor. Just stuff like that. I can't fathom that they know somebody on the inside with credibility, because as I said, yeah half of their stuff is right on the money, and the other half is totally bullshit.

**BEN:** I see where you're coming from, but wrestling is a business obviously, where in the past, more than in the present, it's tough to get the truth. In my defense, because I'm someone who reads those newsletters, you don't know where the truth is coming from. It's hard to tell sometimes.

**RUSSO:** I don't necessarily agree with you on that, because why is it tough to get the truth? If Dave Meltzer ever called me, or a **Wade Keller** ever called me, or if any of those guys ever called me, I'm going to tell them the truth, and I'm going to tell them what I know. I have nothing to hide. If they ask me a question, I'm going to tell them the answer to the question. But the difference is, if they ask you a question, and you honestly don't know the answer to it, then you're a liar. Like you asked me about the IPO. I honestly don't know anything about that, and quite frankly, I really don't care. My plate is so full with writing television, I don't know about that. But to a Meltzer or a Keller, if they ask me that same question, and I answer it the same way, well I'm lying, and they're not getting the truth from me.

**BEN:** I understand, but to the average fan, it's not like you can get the entire truth like on the some of the uglier side of the business, like with deaths and stuff like that. It's not like you can

go to WWF.com and create a detailed itinerary of what was at **Brian Pillman**'s bedside. So sometimes you have to go to outside sources to find the truth.

**RUSSO:** Right.

**BEN:** This is something I've always wanted to see in American professional wrestling, have you guys, the TV writing team, ever thought of having the title like All Japan Pro Wrestling where there's no gimmick matches, no run-ins, no count outs, it's just two guys in a wrestling match. And not every match to be like that, because I know how it can get boring and monotonous, but just one title ---

**RUSSO:** I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this - it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American, and I don't want to sound like a big bigot or a racist or anything like that, but I'm an American ... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

**BEN:** Yeah, I really like All Japan.

**RUSSO:** Which is cool, but the reality of it is, that's a small minority of our audience.

**BEN:** But I'm not talking so much about the fact

that you would have to use the guys from Japan, I'm just saying, two guys who I think are good wrestlers, maybe **D'Lo Brown** and **Jeff Jarrett**, who maybe don't have the interview skills or the charisma of a **Rock** or **Steve Austin**, but if you put them out there in longer matches where they could show their in ring talent ---

**RUSSO:** What do you call a longer match?

**BEN:** I don't know, maybe 12 minutes?

**RUSSO:** There is no way on television ---

**BEN:** Not on television. I mean more PPV, and on television it would 6-8 minutes. I don't think matches on television outside of the main event should go more than 8 minutes.

**RUSSO:** But the thing you don't understand is, and I can tell you first hand, the way television is, and how short the matches are on TV - what we've done now basically is we've basically trained the audience. It's crash TV. It's in and out. What's the finish? Let's get to the next thing.

**BEN:** Absolutely.

**RUSSO:** That's the way we've trained the fan, and I've got to tell you, I don't know how many PPVs you go to, but a couple of years ago when I wasn't writing the PPVs, and we just really started this trend with the way the business is now, we would have 15, 20, 25 minute matches, because it was the PPV, 5 minutes in, people were sitting on their hands.

**BEN:** That's true -

**RUSSO:** The house was silent. The reason being, we've trained these people a certain way, and now that's why I'm writing the PPVs, because basically, the PPVs need to be written the same way as television, because that's what the fans expect.

**BEN:** That is true, but you have to recognize that WCW does a lot of short matches too, but when you go on their PPV and see a really good "wrestling match" where the workrate is high, with like ... I can remember **Raven** and **Saturn** v. **Malenko** and **Benoit** on PPV, and it went like 12 or 13 minutes and the crowd was hot the entire time. You don't think that type of thing would work in the WWF?

**RUSSO:** I think that's a rarity. I watch everything that I can. I've never watched Mexican or Japan, because I don't give a shit. I live here, that's all I care about. But one thing I got to tell you, I was watching ECW last week, **Van Dam** and who--?

**BEN:** I won't even go into that.

**RUSSO:** No, but who's the other guy?

**BEN: Jerry Lynn.**



Stone Cold Jersey!
· WWF Attitude Tee
· NWO Bucket Cap
· Sable Attitude Bear
· Hogan Flag
· Goldberg T-Shirt

**RUSSO:** Ok Jerry Lynn. Now I got to tell you something, seriously, I was sitting here really enjoying the hell out of the match, but it got to the point even with me where it was like, OK end this. The thing is, you've got to understand, in this day and age, there are so many things for people to do that their attention span is so

short. Why do you think when there is a commercial people change the channel? You know what I'm saying?

**BEN:** I agree, but are you saying that something that I thought was just as incredible, I don't know if you saw the last ECW PPV, but **Mike Awesome** versus **Masato Tanaka** and they went out there for a good 13-15 minutes and they had what people would call a **** or a **** ½ match, is that going to be obsolete in the WWF? In that match where they basically stayed around the ringside area, and there's a clean finish - even though I know they used table and chairs - but there is no in the crowd brawling, is kind of thing going to become obsolete in the WWF you think?

**RUSSO:** I don't want to say obsolete, but I don't see it going back in that direction. The only reason I tell you that, I'm at every show, I'm there, you put Rock and Mick in that ring with microphones, the people will sit there for a half an hour and be entertained. You put a wrestling in that ring for over ten minutes, they want to know, let's get to the finish, and let's go on to the next thing. And you gotta understand from a writing point of view, I am not dictating to these fans. I am basically in the arena every Monday and Tuesday night, I am in the arena, I am listening to the fans. All that I am trying to do from a television-writing standpoint is give the masses what they want. Now, I'm not saying give the smart wrestling fan what they want, I'm saying give the masses, and that's my job.

**BEN:** I see that, and I don't want to beleaguer it, but some would argue that it's true, that WWF fans mainly sit on their hands for matches that go more than 10 minutes, but some would

argue that it's because the quality of the in-ring wrestling isn't as good. Don't you think that if you put two good wrestlers in the ring, and I know we had talked about the Van Dam - Lynn thing, but I don't consider Van Dam to be that great of a wrestler, I look more to the Masato Tanaka - Mike Awesome example. Don't you think if you put two good wrestlers in there, who had a match which could stir the fans emotions, that that would ... look at what happened with **Sting** and Benoit? I know they still got killed by Raw when Raw opened, but they kept a much larger percentage than they had been by starting off their show with interviews. Do you think there's any validity to that?

**RUSSO:** No. I think they kept a much bigger number than they did, because that was really a well-booked match where you couldn't call the outcome. Benoit isn't going to beat Sting in the middle of the ring, and Sting isn't going to beat Benoit, so what are they gonna do? That was the appeal to the match.

**BEN:** OK.

**RUSSO:** Don't get me wrong, I love to see a good wrestling match, but my job is ... I get paid to give the people what they want, and whether I agree or disagree with them is not my job. I'm not writing television to please Vince Russo. I'm writing television to please the masses, and like I say, when I go out in a crowd, and I see the response from a Mick - Rock promo, and response to a wrestling match, I know what they want to see. And again, it's not Vince Russo writing TV for Vince Russo, I'm just trying to give the people what they want.

**Part 1 · Part 2 · Part 3**

**E-mail Ben Miller | Miller Time archive**



**WCW · WWF · ECW · Indies · Int'l**

Copyright © 1999 SportsLine USA, Inc. All rights reserved.

This website is not sponsored or endorsed by the WWF, WCW or ECW. This is not an official site.



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



## IV. Employee Job Profiles



CONFIDENTIA

# VICE PRESIDENT

Title: <u>Executive Vice President</u>
Department: <u>General Administration</u>
Extension: 3-1087

Name: **Cobb, Rita**
Title: <u>Executive Assistant</u>
Department: <u>General Administration</u>
Extension: 3-5200
I assist the Executive Vice President of WCW. I manage his calendar, coordinate meetings, and arrange travel and all other general administrative duties. People can come to me if they need help locating or getting a message to the Executive Vice President.

Name: **Chandler, Galen**
Title: <u>Manager Live Programming</u>
Department: <u>General Administration</u>
Extension: 3-1076



# STRATEGIC PLANNING

Name: **Edwards, Don**
Title: Director of Strategic Planning
Department: Strategic Planning
Extension: 3-3631
I am responsible for business planning and analysis group including preparing annual revenue budgets, monthly forecasts, and strategic long-range plans for various WCW networks. I participate in the development of the strategic direction of the division- identifying and analyzing issues of strategic significance. I analyze the impact of market trends on current and projected network distribution and profitability. I provide financial and analytical consultation support to the WCW sales and marketing teams as well as executive management. I prepare financial analyses of contractual terms and sales proposals to be used in deal negotiations. I develop and maintain client specific models to be used in long-range forecasting. I also perform general ad-hoc business/financial projects including analyzing new business concepts and developing pro formas as needed.

Name: **Reid, Octavia**
Title: Administration Assistant of Strategic Planning
Department: Strategic Planning
Extension: 3-1016
I assist the Director (Don Edwards) and other department managers of the WCW Strategic Planning Group. I manage schedules, calendars, and answer incoming calls. I am the contact for all departmental supplies and maintenance, and I perform all other administrative duties as requested.

Name: **Holman, Eric**
Title: Manager of Strategic Planning
Department: Administration- Strategic Planning
Extension: 3-3624
I am responsible for the financial analysis for TV production areas of WCW. I also deal with financial and/or business strategy projects related to new business opportunities or current operational issues. People can come to me for help with WCW business strategy and financial issues. I am not responsible for accounting issues for WCW.

Name: **McDade, Felicia**
Title: Senior Financial Manager
Department: Strategic Planning
Extension: 3-1073
I am responsible for strategic planning which incorporates the budget for WCW and budget distribution for each department. People can come to me for help with finance and planning.

Name: **Wormsby, Greg**
Title: Financial Analyst
Department: Strategic Planning
Extension: 3-5223
I am responsible for assisting the merchandise and magazine departments with monthly reporting of financial activity, forecasting the impact of projects on the department bottom line, audit of procedures and policy for compliance. I do Audit project work for Bill Busch and Don Edwards as needed. I am a liaison between accounting and assigned departments. People can come to me for help with inventory related information (stock levels, sales, comps, per caps, etc.), magazine invoice information and financial monthly reports. It is often mistaken that I am responsible for purchase orders, comp/merchandise requests and invoice coding.

CONFIDENTIA




# FACILITY

Name: **Feagle, Karen**
Title: <u>Office Manager</u>
Department: <u>General Administration</u>
Extension: 3-1012
I am responsible for the WCW Log Cabin facility; which includes construction, outside grounds and any internal office needs. I can help with office space, construction questions, new hire/office moves, mailroom issues, heat/air questions or concerns, office parties and phone issues. I am not responsible for Human Resource issues such as benefits.

Name: **Williams, Allison**
Title: <u>Office Coordinator</u>
Department: <u>General Administrator</u>
Extension: 3-1033
I am responsible for new hire and office move coordination, request for services, stationary orders, new construction, mailroom issues, furniture needs, party planning, miscellaneous office projects and backup for Karen Feagle. People can come to me if they need help with services or repairs (ex: artwork, lights, heat/air problems, plumbing), stationary orders (business cards, letterhead, or notepads), plant issues, office depot questions, etc. My duties are often confused with those of Juliet Cuthbert-Borders, such as toner orders and vending machine refunds.

Name: **Cuthbert-Borders, Juliet**
Title: <u>Office Assistant</u>
Department: <u>General Administration</u>
Extension: 3-1072
I am responsible for pagers, cell phones, housekeeping, ID badges, keys, security card readers, telephone/detail master lists, break-room, copiers, fax machines, parking lot and landscaping, Airborne/Fed Ex supplies, and land-line phone extensions and problems. My duties are often confused with those of Allison Williams, such as heating and air.

Name: **Richardson, Kinnette**
Title: <u>Receptionist</u>
Department: <u>General Administration</u>
Extension: 3-1075
I answer incoming calls via the WCW switchboard and I greet and assist WCW guests and visitors. I also provide assistance to employees with MLQ/CS packages, conference room bookings, timesheets, and CNN parking access. People can come to me if they need help with locating a person, a package or a room, etc.

CONFIDENTIA



*Revised March 28, 2000*

## LEGAL

Name: **Myers, Diane**
Title: Director of Legal and Business Affairs
Department: Legal
Extension: 3-1010
My job responsibilities include drafting and reviewing all contracts, the negotiation of legal issues in contracts, and the management of talent contracts and related issues. I oversee the Worker's Compensation Department, manage Intellectual Property and answer general legal questions. People can come to for help with general legal issues and contract drafting on review. It is often mistaken that I am responsible for negotiating business deals.

Name: **Wilkinson, Scott**
Title: Senior Counsel
Department: Legal
Extension: 3-3160
I provide legal counsel on all issues for all departments within WCW. People can come to me for help with talent contracts/releases, sponsorship contracts, independent contractor agreements and appearance contracts. I can assist with clip license agreements, employment issues, litigation, music rights, ad copy reviews, licensing/merchandise legal issues, CAA/business development (movies) and parody/copyright/trademark issues for on-air production.

Name: **Garwood, Andrea**
Title: Paralegal
Department: Legal
Extension: 3-2559
I draft customized form agreements- such as clip license agreements, music license agreements, trademark license agreements and merchandise license agreements. I handle all trademark and piracy issues. I register domain names for WCW and manage the litigation files. People can come to me for help with clip license agreements, registration of domain names, trademark and piracy issues, or if Scott and Diana are unavailable. It is often mistaken that I am responsible for talent contracts or talent related issues (Georgia Davidson).

Name: **Davidson, Georgia**
Title: Talent Business Manager
Department: Legal
Extension: 3-3626
I am responsible for contracts for wrestlers, contract files, immigration issues for talent and drug testing. I can help with talent issues. It is often mistaken that I work with TV Syndication (Susan Bowling).

Name: **Henderson, Debbie**
Title: Risk Management Coordinator
Department: Legal
Extension: 3-3118
I handle all of the Workers' Compensation Claims for WCW. I take care of the medical information, doctor's appointments, and insurance related information for work related injuries. I can help with any work-related injury or questions regarding them. I am not responsible for travel or personal medical needs.

CONFIDENTIAL

# ARENA BOOKING

Name: **Juster, Gary**
Title: <u>VP Wrestling Operations</u>
Department: <u>Arena Booking</u>
Extension: 3-5217
I am responsible for booking, scheduling, and routing (overall planning) of the WCW Event Schedule. I work with Awesome Promotions regarding the promotion of WCW live events. I work with arena managers and their professional association (IAAM) re: WCW's position in the industry. People can come to for help with any matter concerning arenas- this could include move-in issues, contract terms, union issues, ticketing matters and routing concerns. It is often mistaken that I am responsible for certain production issues, wrestler appearances, ring crew and catering.

Name: **Ellis, Keila**
Title: <u>Arena Assistant</u>
Department: <u>Arena Booking</u>
Extension: 3-5215
I am responsible for comp ticket requests and television promotions. I am the assistant to Gary Juster, Vice President of Wrestling Operations. I am also an Awesome Promotions contact person. People can come to me if they need help with tickets or anything concerning the Arena department.

Name: **Burnham, Chip**
Title: <u>Director of Arena Operations</u>
Department: <u>Arena Booking</u>
Extension: 3-5225
I am responsible for the booking of WCW events at all U.S and Canada arenas. I oversee WCW compliance with state athletic commissions. I am also responsible for event coordination of WCW arena shows. People can come to me for any questions regarding arena events.

Name: **Barry, Laci**
Title: <u>Events Booking Assistant</u>
Department: <u>Arena Booking</u>
Extension: 3-5218
I am responsible for processing contracts. I am the main contact for arenas. I work with athletic commissions and I coordinate IAAM conferences. I can help with athletic commissions and arena information. I am not responsible for tickets.

# MERCHANDISE

**Name: Komminsk, Kelley**
Title: Director of Merchandising
Department: Merchandise
Extension: 3-5221
I develop all products that are sold in arenas, via catalog, direct response and over the internet. My department handles premiums, comps and corporate logo requests for other internal departments. We also work on promotional products for sponsored programs including lotteries, Slim-Jim, and licensed tie-ins. It is often mistaken that I am responsible for licensing (products sold in retail stores) which is handled by Casey Collins, charity donations which are handled by Brett McLain, and fulfillment which is handled by Leslie Cameron.

**Name: Johns, Cindy**
Title: Administrative Assistant
Department: Merchandise
Extension: 3-5220
I assist Kelly Komminsk in answering phones, fax, fed-ex, file, vending relations, coding, copying, filing invoices, follow up on late payments of invoices, receiving reports summary, etc. I order merchandise for catalog, arena, internet- analyze reports/order accordingly. I set up new products in mass, Excel Quick-books- maintain master product list. I maintain photo library of current images of wrestlers for artwork. I maintain disk library of catalog images/internet images, process comp forms, catalog photoshoots, and line ups- type for inserts into programs for arena sales and order supplies via internet. People can come to me for any of the above mentioned. If I do not handle it, I will direct them to the proper individual. I do not handle personal purchases of WCW merchandise i.e. people who want to purchase a T-shirt for themselves or relatives.

**Name: Jennings, Monica**
Title: Merchandise Coordinator
Department: Merchandise
Extension: 3-5222
I am responsible for any special merchandise promotions for all departments. (Ex: Premiums for PPV such as T-shirts, stuffed animals, mugs, screen savers etc). I handle all changes, updates, etc. on our wcwgear.com site. I order corporate merchandise for all departments within WCW. I proof all catalogs for mail-outs/submit corrections to proper people. I do a special sales flyer & a four-page merchandise spread in the WCW magazine. I give the weekly update of merchandise commercials we would like to air. I also provide the number of times the commercial will air and which product we would like to advertise.

Title: Warehouse Supervisor
Department: Merchandising
Extension: 3-1026
I maintain inventory control over catalog and arena merchandise. I supervise the staff responsible for filling and shipping catalog orders. I fill and pull requests for goods to be shipped to arena events and I make sure the warehouse procedures are adhered to. I can help with moving items/merchandise to their departments, CSR item inquiries (catalog descriptions, measurements, etc.), getting goods shipped to their locations, and office comp orders.

**Name: Smith, Pie**
Title: Inventory Control
Department: Merchandise
Extension: 3-5239
I receive all merchandise into department count for accuracy for merchandise to be stored in warehouse. I ship merchandise to arenas, and count and receive merchandise from arenas. People can come to me for help with anything concerning merchandise, supplies, fed-ex, packaging, security and morale of the warehouse staff. It is often mistaken that I am responsible for Call Center merchandise.

CONFIDENTIAL

Names: **Avery-Neal, Catherine** (3-5239)
 **Clifton, Robert** (3-1070)
 **Nichols, William** (3-5239)
 **Jensen, Ralph** (3-1070)

Title: <u>Warehouse Clerk</u>

Department: <u>Merchandise</u>

Warehouse Clerks are responsible for fulfilling catalog merchandise orders: shipping, receiving, and pulling. They can process office comp orders and merchandise returns. They can also Fed Ex domestic, international, and Priority mail orders; and they order the supplies for Catalog use (boxes and Paks for Fed Ex and Priority mail). People can come to Warehouse Clerks if they need help with anything regarding Catalog merchandising and orders.

CONFIDENTIAL

# CALL CENTER

**Name: Cameron, Leslie**
Title: Senior Catalog Operations Fulfillment Manager
Department: Merchandise and Catalog
Extension: 3-5219
I oversee the catalog operation; which includes Call Center, Warehouse for arena and catalog, and MACS software maintenance. I am responsible for all catalog and arena merchandise in and out of the warehouse. People can come to me for help with MACS software, catalog promotions or questions, merchandise shipments, lottery fulfillment, catalog system data extracts, and catalog reports.

**Name: Collins, Pamela**
Title: Call Center Coordinator
Department: Merchandising
Extension: 3-1026
I supervise four to six customer service representatives. This includes motivating, developing their skills and encouraging them to achieve their highest potential through effective communication, assigning job responsibilities, controlling employee conflict and treating employees fairly and consistently. Additional responsibilities include ensuring production jobs are run in a timely manner for our catalog business, responding to customer calls, running and analyzing the call center phone and production reports, offering suggestions on improving productivity, quality and morale for the call center operation- plus any additional assigned duties as needed. People can come to for help with placing personal merchandise orders, or if a fed-ex catalog order is returned undeliverable- any misdirected customer service orders or complaints.

**Names: Bonhomme, Kadija** (3-1026)
        **McAdoo, Frank** (3-1026)
        **Hester, Frankesha** (3-1093)
Titles: Call Center Rep
Department: Call Center
The call center reps are responsible for calls pertaining to WCW merchandise orders. They deal with customer service questions concerning previously made orders.

# INTERNATIONAL DEVELOPMENT

Name: **Sidello, Sharon**
Title: <u>VP International Development</u>
Department: <u>International Development</u>
Extension: 3-4054
I direct the strategic presence of WCW internationally via distribution television shows, setting up live tours, coordinating PR, marketing and promotions, and interfacing with worldwide licensees. People can come to me for help with any matters relating to WCW business outside of the US.

Name: **Johnson, Taisheka**
Title: <u>Administrative Assistant</u>
Department: <u>International Development</u>
Extension: 3-2577
I am responsible for all our international affiliate requests, such as marketing materials and Dubs, are filled and shipped out. I also have typical responsibilities such as filing, faxing, and typing letters and e-mails. My job is to be a productive support for the Vice President and Coordinator of the department. People can come to me if they would like to know the international companies we distribute the shows to. I also I have the knowledge of our international tours, such as talent list and itineraries. I am not responsible for tickets for international shows.

Name: **Sherman, Emily**
Title: <u>International Coordinator</u>
Department: <u>International Development</u>
Extension: 3-1014
I am responsible for all international affairs: productions of international shows, international production orders, international public relations and coordinating tours, etc. People can come to me for help with any international issues, but calls should not be forwarded to me just because the person has an accent.

Name: **Pearl, Lisa**
Title: <u>Photo Editor</u>
Department: <u>Photo (Transition)</u>
Extension: 3-3172
I am responsible for determining and re-vamping the "look" of WCW photography. I assign and direct photographers. I work closely with all departments to strategically plan and execute photographic campaigns to support WCW. I create promotional awareness of WCW through conceptual imagery. I manage the editing, cataloging and researching of photography for all internal departments and outside requests. I provide creative directions, production and consulting services regarding photography. It is often mistaken that I am responsible for logos or autograph sheets.

Name: **Franklin, Rene**
Title: <u>Administrative Assistant</u>
Department: <u>Photo (Transition)</u>
Extension: 3-1049
I am a liaison with PR, Merchandising, Licensing, Internet, Magazine, Production and all other divisions within WCW (such as photographers, clients, and external vendors). I make travel arrangements. I receive and return portfolios. I process and distribute expense reports, contracts and other documents. I coordinate FedEx and departmental shipping. I can assist people with the administrative needs regarding photography. It is often mistaken that I am responsible for locating film within the library.

CONFIDENTIAL

## SYNDICATION AND AD SALES

Name: **Garner, Rob**
Title: <u>VP Ad Sales/Syndication</u>
Department: <u>Advertising Sales and Syndication</u>
Extension: 3-3629

I report to Bill Busch. I am responsible for all ad sales in WCW television network stations and for the selling of WCW Worldwide Wrestling program to over the air broadcast stations in all markets. I interface with Turner Broadcasting Sales in New York for ad sales and Telepictures for the selling of the Worldwide program. I break new advertisers and promotional programs into WCW's vast brand extension programs. People can come to for help with promotional advertising related questions or leads pertaining to WCW, questions regarding WCW television stations or advertisers, and WCW advertising target strategy. It is often mistaken that I am responsible for the buying of ad schedules to promote WCW arena events.

Name: **Bowling, Susan**
Title: <u>Syndication Coordinator</u>
Department: <u>Domestic Syndication</u>
Extension: 3-3630

I support the VP of Syndication and Advertising Sales for WCW (Rob Garner) and aid in the execution of duties associated with that position. I maintain and update the syndication database and process the daily Nielsen reports. I function as "customer service support" to our TBS and Telepictures sales office in New York, Chicago, Los Angeles and Detroit and supply them with merchandise, show videotapes and event tickets. People can come to for help with obtaining information regarding clearance reports, ad buys and sweeps amounts, station start and end dates, etc. It is often mistaken that I am responsible for handling PPV customer service issued and billing.

Name: **Wofford, Darrell**
Title: <u>Traffic Coordinator</u>
Department: <u>Syndication and Ad Sales</u>
Extension: 3-3636

I am responsible for the acquisition and organization of commercial spots, and commercial related materials that are to be included in all WCW programming. This includes, but is not limited to the creative elements for billboards, Vignettes, special sponsorships, promotional considerations and standard commercial spots. I prepare and issue reports listing all items of a commercial or promotional nature to be included in each week's WCW programming. I also prepare and issue the formats for the syndicated program. In addition, I maintain a database of current local stations that carry the WCW program and issue reports for the Shipping Department detailing those destinations and the items to be shipped, plus the paperwork necessary to complete the shipping process. This also includes an accurate accounting of our international clients and the programming they have contracted for. Additionally, I am responsible for overseeing the completion of the PAL Conversion of International programming and directing those dubs to the proper clients. People can come to for help with any of the above, particularly formats for WCW. It is often mistaken that I am responsible for parking.

CONFIDENTIAL

## RESEARCH

Name: **Williams, Matt**
Title: Senior Research Manager
Department: Research
Extension: 3-1015
I am responsible for consumer marketing research. People can come to for help with questions regarding WCW's consumer markets.

Name: **Young, Meredith**
Title: Research Analyst
Department: Research
Extension: 3-1029
I am responsible for research concerning WCW ratings.

CONFIDENTIA



## PPV/MARKETING

*Revised March 28, 2000*

Name: **Shelley, Kathleen**
Title: Senior Business Manager
Department: Pay Per View
Extension: 3-1042
I manage the account coordinator staff in garnering increased marketing participation from our cable affiliates. I am the main liaison for promotion with our distributors and between the TVKO affiliate relations staff and the WCW staff. I also participate in cable industry conventions, meetings, and functions. People can come to me for help with PPV department questions or cable affiliate information.

Name: **Menlen-Wilson, Markie**
Title: Pay Per View Account Coordinator
Department: Pay Per View
Extension: 3-1013
I build and maintain relationships with cable affiliates. I also facilitate marketing and promotional projects for the Pay Per Views each month. I can help with Pay Per View issues. I am not responsible for merchandise.

Name: **Samson, Mike**
Title: Account Coordinator
Department: PPV/ Marketing
Extension: 3-1068
I am responsible for soliciting as much PPV marketing/promotional participation as possible in local markets and I coordinate different aspects of affiliate's marketing/promotional tactics. People can come to me for help with issues concerning the marketing and promotion of our PPV's in local markets (particularly in the West) or with general PPV questions.

Name: **Thurmond, Jenna**
Title: Marketing Coordinator
Department: Pay Per View
Extension: 3-1043
I coordinate print and media advertising for Pay Per View. People can come to me for help with PPV logos and deadlines regarding PPV marketing.

Name: **Koelbel, Kathryn**
Title: Manager Data Base/Marketing
Department: PPV/Marketing
Extension: 3-1046

Name: **Dumbauld, Susan**
Title: Temp
Department: Pay Per View
Extension: 3-1045
I am responsible for the radio, generic, event specific spots and infomercials for cable affiliates on a monthly basis; as well as ticket distribution in the PPV department for each event. I coordinate and update the 1-800-Affiliate Hotline, handle marketing reimbursements, check requests and distribution for each PPV event. I also coordinate the hospitality suites for various PPV"S, distribute promotional T-shirts and assist in the upcoming promotions with satellite. I can help with questions relating to the PPV department, checks issued for PPV events, information on cable or satellite and inquiries on the upcoming PPV events.

CONFIDENTIAL

# LICENSING

**Name: Collins, Casey**
Title: Director of Licensing
Department: Licensing
Extension: 3-2554

I manage the day to day operation of WCW's Licensing Program. I review and approve all licensing deals that are submitted by LCI. I assist LCI's sales force with selling the WCW license to potential licensees. I provide licensees with any and all information that they need. I approve all artwork and product samples. I am also responsible for the WCW Nitro Grill, WCW Lottery, WCW Master Card Program and WCW Nascar Program (if we race in 2000). I work with retailers to ensure WCW Licensees the best possible shelf space. I educate WCW Licensees and Retailers about WCW. I track and review all royalty reports. I work with talent to obtain voice. Photos, filming of commercials, etc. for Licensees. I work hand in hand with Pace Motorsports on the creation of the new USHRA/WCW Monster Machines license (monster trucks). People can come to me for help with licensing and Motorsports questions, or licensed product samples. It is often mistaken that I am responsible for the merchandise department, or State License Contracts for our wrestlers to perform in various states.

**Name: Reeves, Chelsea**
Title: Licensing Manager
Department: Licensing
Extension: 3-2555

I am responsible for the day to day management of the Licensing Program which includes: communicating with potential and existing licensees, handling the daily needs of our licensees and/or LCI our licensing Agency and the receiving of deal memos. I am responsible for the review and approval of all artwork and submitted product samples so as to insure the integrity of the WCW property. In addition, will assist in the development and design of any and all new logos. I respond to various inquiries and provide information on an as needed basis to internal and external parties for the WCW property. I do the Draft Merchandising Licensing Agreements for all licensees and incorporate any needed changes for the WCW motorsport properties. I help coordinate details on special projects for the WCW property. I manage the following projects: WCW Lottery (currently 6 States), WCW's monthly QVC show, variety of Trade Shows, annual Licensee Summit, WCW Master Card program. I maintain a database of all WCW Licensees, as well as preparing a monthly status report for the Director of Licensing. I work with WCW talent & WCW Production Department to obtain voices, photos, filming of commercials, etc. for Licensees. I also assist the Director with educating and updating retailers and licensees about WCW and help to ensure that retailers provide WCW with prime retail space in all departments.

**Name: Messner, Kristen**
Title: Licensing Coordinator
Department: Licensing
Extension: 3-3130

I am responsible for the Nitro Grill, the Fan Club, and Cyberaction Virtual Trading Cards. I also assist with all licenses on projects, travel for appearances and product needs. People can come to for help with the Nitro Grill, the Fan Club, the Cyberaction Cards, and licensing related questions or assistance on the road. It is often mistaken that I am responsible for all Kimberly Ware's prior duties or that I am Casey Collins' assistant.

**Name: Gillen, Flossie**
Title: Licensing Assistant
Department: Licensing
Extension: 3-2548

I provide daily assistance to the Director of Licensing (Casey Collins). My duties include scheduling appointments, arranging travel, screening phone calls, filling, faxing, writing memos and fed-exing. I open mail and packages, and circulate artwork approvals. I maintain and update files, licensee lists and licensing status report . I keep up and update the photo library and send artwork to our licensing agency as needed. I forward all bootleg tips to our investigator. I also maintain the sample room and forward new licensed samples to talent as they are received.

CONFIDENTIA

Name: **Sturgis, Lisa**
Title: <u>Motorsports Manager</u>
Department: <u>Licensing</u>
Extension: 3-2556

I manage all aspects of WCW's motorsports program: Nascar, Busch and Winston Cup teams, and Monster Trucks. This includes operations, appearances and licensing ventures. People can come to me to proof and edit copy, as a former editor of WCW Magazine I am always happy to help.

CONFIDENTIA



# NEW MEDIA

Title: <u>VP WCW Enterprises</u>
Department: <u>New Media</u>
Extension: 3-1040

Name: **Thomas, Brooke**
Title: <u>Administrative Assistant</u>
Department: <u>Enterprises</u>
Extension: 3-1041
I provide administrative support to the VP of Enterprises and departmental invoices and secondary support to other areas that fall under Enterprises. I also coordinate hospitality suites for PPV and other special events. People can come to for help in scheduling appointments, invoices (paid and unpaid) for the Enterprises Department, and if they need to contact members of the department. It is often mistaken that I am responsible for PPV tape (radio and TV) distribution and PPV tickets.

Name: **Brent, Cameron**
Title: <u>Home Video & Special Projects Administrator</u>
Department: <u>WCW Enterprises</u>
Extension: 3-1044
I am responsible for WCW Home Videos, WCW Hotline and *Ring Side Rap* (monthly newsletter sent to media, licensees and cable operators. It is often mistaken that I work for the Legal Department.

CONFIDENTIAL

# INTERNET

Name: **Hulmes, Gary**
Title: Senior Webmaster
Department: Internet
Extension: 3-2562
I am the chief technical person, and sometimes editorial, for WCW.com. I am responsible for in office and remote operations, day to day operations, presentation of content, and I am a liaison to Turner Online Technical Group. People can come to me for help with the website: operations, advertising, content, etc.

Name: **Haynes, Timothy**
Title: Webmaster
Department: Internet
Extension: 3-2564
I am responsible for the daily updating of WCW websites, including new content development. I produce live internet broadcasts. I develop new relationships with agencies and vendors to keep WCW at the forefront of new technology. I also maintain a positive relationship with wrestling fans on the internet. It is often mistaken that I am responsible for finding/scanning photos for other departments.

Name: **Nowitzky, Jennifer**
Title: Internet Coordinator
Department: Internet
Extension: 3-2561
I am the content editor for the website. I am responsible for the PR/Marketing/Promotions/etc. for the site in terms of updating appearances or events. And I concern myself with almost anything related to the Nitro Girls site. People can come to for assistance pertaining to the website other than technical questions. It is often mistaken that I am responsible for scanning in pictures, sending pictures/logos to freelancers/press for other departments, and technical questions.

Name: **Sites, Brian**
Title: Internet Video Coordinator
Department: Internet
Extension: 3-3115
I am responsible for maintaining and creating multimedia content for WCW.com. I also do the daily updating of WCW websites including new content development. People can come to me for help with internet related issues, such as promotion and development. It is often mistaken that I am responsible for scanning photos for other departments.

CONFIDENTIAL

# PUBLIC RELATIONS

Name: **Sharp, Alan**
Title: <u>Director of Public Relations</u>
Department: <u>Public Relations</u>
Extension: 3-2550
I direct and handle all media coverage involving WCW events, talent and products. I communicate WCW positions and policies to media outlets that further the company's image. I coordinate activities that relate to charitable or community service projects. People can come to me for help with media and/or charities. It is often mistaken that I am responsible for promotions.

Name: **Seeman, Donna**
Title: <u>Junior Publicist</u>
Department: <u>Public Relations</u>
Extension: 3-2551
I publicize all WCW events that occur Tuesday through Friday, which includes all WCW Thunder and WCW Saturday night tapings. I travel to Nitro, Thunder and PPV events to handle media activity. I creatively produce wrestler bios, press releases and pitch letters; and I also work on other special projects for WCW. People can come to me for help with wrestler/talent bios and press releases, information about upcoming special projects, and if they have media questions or need a contact at a WCW event. I am not responsible for promotional pictures (color).

Name: **Glast, Jason**
Title: <u>Publicist</u>
Department: <u>Public Relations</u>
Extension: 3-2553
I am responsible for Goldberg's publicity and publicity for Nitro and Pay Per Views. People can come to me if they need help with Goldberg, Nitro, PPV's or general publicity or media relation's questions. I am not responsible for promotional appearances at on sales or meet-and-greet appearances at shows.

Name: **McLain, Brett**
Title: <u>Temp- Public Relation's Assistant</u>
Department: <u>Public Relations</u>
Extension: 3-3827
I arrange wish meetings for sick/dying children with Make-a-Wish, Kids Wish Network, etc. I fulfill charitable requests for auctions and donations. I maintain, submit and send out dub, ticket and media credential requests for the PR department. I maintain merchandise closet and send out merchandise for PR department. I maintain black-and-white promotional pictures (storage, requests for more, and disbursement). I send out press kits to media and assist the PR department in general. I can help with black-and-white promotional pictures, press kits, media credentials and charitable donations. I am not responsible for color promotional pictures and I cannot supply WCW employees, friends and families with autographed pictures or merchandise.

CONFIDENTIAl



# WCW MAGAZINE

**Name: Leiker, Ken**
Title: Publisher/Editor-in-Chief
Department: WCW Magazine
Extension: 3-3171
I manage the business and technical aspects of WCW Magazine: printer, pre-press, subscription, subscription fulfillment, newsstand contractors, and advertising sales. I also guide the editorial direction and look of the magazine. I can provide help with obtaining data and photos that have been published in the magazine.

**Name: Leson, Elliot**
Title: Print Production Coordinator
Department: WCW Magazine
Extension: 3-3177
I am responsible for trafficking and managing all editorial, advertising and insert materials for the magazine. I am the magazine's liaison between the pre-press facility and the printer. I am proficient with desktop publishing software; including Adobe Photoshop, Adobe Illustrator, Quark Express and Microsoft Word. I also have knowledge of imposition software, web offset printing, digital and analog pre-press, and production planning. I can help with questions concerning magazine editorials, advertising, insert materials and photographs. I do not work with the photo department.

**Name: Bell, Amy**
Title: Administrative Assistant
Department: Magazine
Extension: 3-3174
I assist the publisher (Ken Leiker). I also write and edit articles for the magazine, interview talent for articles, read the letters to the editor, oversee the processing of magazine invoices, assist clients and subscribers with problems and questions. I serve as magazine advertising coordinator and I serve as a liaison between the magazine and other WCW departments. I can help with the magazine by giving clients a complimentary subscription, coordinating ads, finding back-issues, getting magazine copies, or questions about the magazine's invoices. I cannot get pictures or merchandise for clients or employees, and I am not responsible for fan's questions about the shows.

**Name: Schlottman, Jim**
Title: Art Director
Department: WCW Magazine
Extension: 3-3173
I am responsible for the design of WCW Magazine and all related materials. I direct photoshoots of talent for the magazine and I approve/select all photography for publication. I can help with any design or creative related questions, photography, logos, illustration, pre-press or printing. I am not responsible for editorial content in the magazine and art used in merchandising.

**Name: Murphy, Joe**
Title: Photo Editor
Department: Magazine
Extension: 3-3175
I am responsible for coordinating all photo shoots for the magazine, editing all film from events and shoots, and selecting art for the magazine (working on layouts and choices with the art director). I also am responsible for all photo related tasks that require photo labs and I license images to other wrestling magazines. People can come to me for help if they have questions concerning photography or if they want to obtain photographs from the magazine. It is often mistaken that I am responsible for all photo needs (PR, Licensing, Merchandising, etc.).

**Name: Boain, Graham**
Title: Associate Editor
Department: WCW Magazine
Extension: 3-3716

CONFIDENTIAL

I am responsible for edit copy for WCW Magazine, writing stories and producing story ideas. People can come to me if they need help identifying wrestlers, if they have questions on stories or if they want to propose story ideas. I am not the photo editor of the magazine.

Name: **Eck, Kevin**
Title: Editor
Department: WCW Magazine
Extension: 3-3178
My job responsibilities include writing, editing and helping plan the editorial content of WCW Magazine. People can come to me with questions concerning the editorial content, or any general questions regarding WCW story lines or history.

CONFIDENTIAL

# PROMOTIONS

Name: **Hunt, Tom**
Title: Director of Promotions
Department: Promotions
Extension: 3-2574

I am responsible for effectively concepting and executing WCW promotions that will reinforce the brand and key initiatives. I maximize communication with AD sales and licensed promotion sales to help them drive incremental revenue to Turner and WCW. I create promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air. I fully concept and develop customized Fantasy Prize Promotions (with maximum lead-time) to AD sales and licensed promotion sales to fit client's needs. I work with legal dept. to research promotional concepts and feasibility. I clear all concepts, spots, prizes etc. I develop promotion presentations/documents/one-sheets to Sales. I work with Creative Services to develop presentation boards for client pitches. I oversee project managers who communicate and liaise with client on all levels of promotional activity, including identifying and securing necessary client materials, production timeline, approvals, contracts, etc. I oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc. I work closely with Ad Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time. I set up and manage entry mechanism for on-air contest, i.e. 800#, PO boxes, on-line and off channel entry. I create local extensions to WCW's national on-air promotions. I develop customized prizes to award contest winners and/or secure prizes from client (when appropriate). I manage the fulfillment and distribution of prizes. I handle fulfillment for winners when necessary. I maintain and manage budget that pertains to Promotion projects. I provide recap packages of promotions/contest to internal divisions and client. And I also provide all necessary information pertaining to promotions to be included in sales collateral materials.

Name: **Stern, Suzanne**
Title: Promotions Manager
Department: Promotions
Extension: 3-2549

Name: **Wengerd, Andrew**
Title: Promotions Coordinator
Department: Promotions
Extension: 3-2563

I promote WCW through talent appearances, talent status, sponsor/contract fulfillment, and I work with outside clientele to establish promotional opportunities. People can come to me for help with promotional ideas and requests. It is often mistaken that I am responsible for Public Relations duties.

Name: **Woodyard, Amy**
Title: Promotions Assistant
Department: Promotions
Extension: 3-3820

I am responsible for wrestler appearances. I arrange travel for the talent and stay in contact with the sponsors so I can arrange and set up the appearance itinerary. I work with PPV sponsors to make sure all stipulations in the contract between PPV sponsors and WCW are executed. I also help Andrew Wengerd with on-sale appearances; which includes arranging travel for talent, typing up an itinerary and traveling to the on-sale location with the talent. People can come to for help with talent appearances or on-sale appearances, talent pictures or autograph sheets, and sponsors of WCW PPV's. It is often mistaken that I am responsible for public relations.

Name: **Sokol-Stewart, Marlene**
Title: Promotion Appearance Coordinator
Department: Promotions
Extension: 3-4077

I am the initial contact for all talent appearances. Basically, all departments that request for talent appearances, paid or otherwise, come to me first. I then contact talent and confirm they can do the event. I either execute the appearance myself, or turn it over to the specific department for them to

CONFIDENTIAL

execute. I also update all appearance calendars, talent appearance data base and escort talent on many of the appearances. People can come to me for help with questions about the talent and whether they can do an appearance. It is often mistaken that I am responsible for other promotions that employees are working on.

CONFIDENTIAI
X 000688

# ACCOUNTING

Name: **Prince, Greg**
Title: Controller, CPA
Department: Accounting
Extension: 3-3148

Name: **Henry, Jennifer**
Title: Accounting Manager
Department: Accounting
Extension: 3-3150
I manage the accounting staff for monthly, quarterly and annual reporting. I am the company liaison for payroll, human resource and Turner Group Services. People can come to for help with anything accounting related. It is often mistaken that I am responsible for licensing accounting (Jennifer Hudson). I also do not actually do the payroll; I am just the middleman.

Name: **Lipscomb, Dee**
Title: Financial Analyst
Department: Accounting
Extension: 3-3153
I work on special accounting and financial projects, and I have some budgeting and forecasting responsibilities for WCW. I am not responsible for Wrestling Operations, payroll, accounts payable or other routine accounting functions.

Name: **Gerlach, Tom**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3154
I am responsible for production and magazine accounting, recording arena settlement information, tracking project information and creating invoices. I am also responsible for monthly closing, wire transfers and foreign checks. People can come to more for help with creating an invoice, arena settlement information, general accounting questions or if they need help with project set up.

Name: **Williams, Jimmy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3155
I assist in tracking Pay Per View carrier payments to WCW. I report, track and identify various property, plant, and equipment issues for 6010 (WCW-Arenas) and 6020 (WCW-Call Center/Mail Order). I serve as a tax liaison for Ernst & Young and local accounting group. I perform accounting related inventory functions for 6010, assist with 6020 inventory, and identify inventory obsolescence exposure for both. I support 6020/MACS (Merchandising and Catalog System) accounting functions. I analyze fixed asset and depreciation expenses. I perform month-end close, quarterly, and year-end close functions pertaining to previous mentioned responsibilities, reconcile accounts previously mentioned, and code monthly cash receipts. I can help with fixed assets, cash coding and inventory issues. I am not solely responsible for making deposits- Klippel, invoicing- Gerlach, or 6020 (Mail Order) Accounts Payable- Viberg.

Name: **Barlow, Celia**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3151
I am responsible for all aspects of Accounts Payable (Vendor Invoices); which includes coding invoices, allocating department and General Ledger code, and preparing coding ticket for Turner Group Services. I also am responsible for new vendor and independent contractor set-up; which includes contacting new vendors, sending W-9's, facilitating Independent Contractor Checklist for Human Resources and preparing new vendor forms for Turner Group Services. I can help with procedures for getting an invoice paid and for setting up a new vendor. I am not responsible for expense reports, credit applications for new vendors, or finding out the status of payment on an invoice (call 8-1200 or 1-800-646-7683 option 4).

CONFIDENTIA
X 000689

Name: **Carson-Hudson, Jennifer**
Title: Staff Accountant III
Department: Accounting
Extension: 3-3158
I am responsible for royalty accounting- calculating and distributing the royalties entitled to the talent, wrestler payroll- review function of wrestler payroll, and closing- reporting the revenue for the 900 telephone number, TMC, Syndicate, Ad Buys and Sweeps. People can come to me for help with talent royalty issues. It is often mistaken that I am responsible for Accounts Payable.

Name: **Klippel, Melissa**
Title: Staff Accountant I
Department: Accounting
Extension: 3-1025
I am responsible for expense reports, helping with closing and assisting Denise Velgouse with Sales and Use Taxes. Currently, people can come to me for help with expense reports. I am not responsible for Accounts Payable.

Name: **Velgouse, Denise**
Title: Tax Manager
Department: Accounting
Extension: 3-1007
I handle most tax and business license related matters (local, state, federal, international), other than income tax which is handled by E&Y downtown. These matters include compliance, audit defense and registrations. I have regular contact with taxing authorities, as well as arenas in which we perform, to ensure that proper procedures are being utilized. I can help with just about any tax matter (except income) or I can help through contacts and research. I do not handle wrestler's licensing matters and athletic commission taxes; they are concerns of the Arenas Department.

Name: **Viberg, Erik**
Title: Staff Accountant
Department: Accounting
Extension: 3-3156
I am responsible for inter-company accounts for 6010 and 6020, Accounts Payable for 6020 and MACS (Merchandising and Catalog System) Close.

Name: **Davidson, Amy**
Title: Staff Accountant II
Department: Accounting
Extension: 3-3152
I am responsible for talent payroll (independent contractors), talent expenses and various other accounting duties, such as month end, quarter end, and year-end functions. I can help with talent paychecks and talent expense reports. I am not responsible for employee payroll.

Name: **Gladney, Allison**
Title: Accounting Assistant III
Department: Accounting
Extension: 3-3149
My job responsibilities are accounts payable and expense reports. People can come to me if they need help with expense reports.

CONFIDENTIAL

# ON-AIR PRODUCTION

Name: **Leathers, Craig**
Title: <u>VP/Executive Producer</u>
Department: <u>On-Air Production</u>
Extension: 3-3823
As Vice President of the company, I oversee special projects such as the Warner Brothers movie "Ready to Rumble", outside music sources (TommyBoy Music), internet ventures (WCW Power Site), and any other projects that fall outside the realm of everyday WCW programming. People can come to me for help with any aspects of live television or post production.

Name: **Sparks, Gail**
Title: <u>Administrative Assistant</u>
Department: <u>On-Air Production</u>
Extension: 3-1036
My job responsibilities are to handle the day to day administrative duties for the Vice President- Craig Leathers. It is my responsibility to ensure that he has the most current and accurate information available to him daily, to keep up with his calendar and email, as well as answer his phone. I also handle production issues to include music, outside talent hires (extras), etc. People can come to me if they need help with reaching the Vice President, getting on his schedule, or obtaining information regarding production. I am not responsible for items related to the programming department.

Name: **Yother, Annette**
Title: <u>Director of Programming</u>
Department: <u>On-Air Production</u>
Extension: 3-3825
I work with the Creative Members/Writers in developing, gathering, and compiling program elements and information. I am the liaison between WCW & Network Operation/Programming for TNT & TBS. I also take the Program elements and oversee the creation of a workable program script and format. I oversee all distribution of the information to Production and other necessary WCW departments. People can come to for questions concerning program elements.

Name: **Turner, Wendy**
Title: <u>Programming Information Assistant</u>
Department: <u>Programming</u>
Extension: 3-3826
I am responsible for Format Production and distribution on show days. I put all show formats on the WCW shared computer databases. I send out all show information regarding what can be promoted and announced. I also give the announce team any announcements to be read on air. I can help people with where to find the specific show formats, and with what matches have been releases for the PPV's or other shows. I can assist with research of a specific match, person, first appearance or other general information regarding a wrestler. You can ask me about the specific spelling or some biographical information regarding a specific wrestler. It is often mistaken that I am responsible for anything related to talent issues- travel, talent lists, parking lists, booking sheets, etc.

Name: **Parent, Angela**
Title: <u>Program Information Assistant</u>
Department: <u>Programming</u>
Extension: 3-3836
I am responsible for show information distribution from week to week (Nitro/Thunder/Saturday Night). I also am responsible for preparation of shot sheets for the shows, and I am involved in the approval process for props, extras and shoots for Nitro, Thunder and Saturday Night. People can come to for help with show content information, prop information, logged shows and anything associated with programming of Nitro, Thunder and Saturday Night. It is often mistaken that I am responsible for providing copies of past Nitro, Thunder, Saturday Night, and World Wide VHS copies for viewing.

CONFIDENTIAL



# CREATIVE SERVICES

*Revised March 28, 2000*

Name: **Mussari, Lorry**
Title: <u>Creative Services Manager</u>
Department: <u>Creative services</u>
Extension: 3-2552
I produce commercials, sales reels, or any video/audio needs that any department has a use for- this includes pre-production through post-production stages. I also manage and oversee all projects done by others in my department and freelance producers. People can come to me for help with their requests for raw footage, spots, sales reels, conference reels, audio bites, commercials, etc. If you need to have a commercial produced for a new product, event or promotion, we will produce the spot from writing to final post-production stages. It is often mistaken that I am responsible for merchandise just because I produce merchandise spots.

Name: **Velazco, Kris**
Title: <u>Production Assistant</u>
Department: <u>Creative Services</u>
Extension: 3-2542
I assist producers for Creative Services in every aspect of the pre-production, production and post-production. I make sure each producers has every piece of information, footage, or duty taken care of so as to make their time more beneficial to the creative services department of WCW. People can come to me if they need help assembling footage for companies that deals with WCW. I research and log footage that could become useful for future projects and share that information with all of production, as well as assisting on shoots in everything from catering to props. I am not responsible for producing.

Name: **Dovjak, Diane**
Title: <u>Producer</u>
Department: <u>Creative Services</u>
Extension: 3-4093
I produce whatever project I am assigned within Creative Services (T-shirt promo, PSA, PPV home video, infomercials, pre-game show, etc.). People can come to me with help on a Creative Service issue. It has been wrongly assumed that I am responsible for producing any and all PPV/home video projects. People also think that I am still involved with WCW Worldwide, but I have not been since September 99.

Name: **Juvinall, Nate**
Title: <u>Production Assistant</u>
Department: <u>Creative Services</u>
Extension: 3-4080
It is my responsibility to help the producers form a high quality product. This can mean working on projects independently from start to finish, or helping the producer research the footage, make location scouts, log tapes, etc. People can come to for help with anything in Creative Services, or if we are working on something for them they can come to me if they can't locate their producer. It is often mistaken that I am responsible for dubs. I no longer work in the tape room.

CONFIDENTIAL



## PRODUCTION

Name: **Tony Shiavone**
Title: Announcer/Supervising Producer
Department: Production
Extension: 3-4100

Name: **Mitchell, Keith**
Title: Supervising Producer
Department: Production
Extension: 3-4097
I am the supervising producer for all live programs produced by WCW including Nitro, Thunder, PPV's and international programs. I am the interim supervisor of the creative service personnel. People can come to me for help with live program/international programming/creative services questions.

Names: *Bissell, Kip (3-4091)*
        **Pruitt, Neal (3-4099)**
        **Johnson, Christine (3-4094)**
Title: Senior Producer
Department: Production
NP-I Produce video packages that are between :30 and 3:00 that help develop new wrestling characters and recap story lines to entice viewers to watch our television product. People can come to for help with finding out where you might find a video package that I have produced. It is often mistaken that I am responsible for the library. Although I have been at WCW for a long time, I am not able to physically put my hands on a lot of the videos or raw footage that I have been involved with in the past.

Name: **Douglas, Jason**
Title: Feature Producer
Department: WCW Production
Extension: 3-4092
I am responsible for Pay Per View graphics, packages and PPV show production. I can help with PPV graphics, PPV music and feature packages.

Name: **Kearce, Woody**
Title: Saturday Night Producer
Department: Production
Extension: 3-4095

Name: **Larson, Chris**
Title: International Producer
Department: Production
Extension: 3-4096
I am the producer of the syndicated Worldwide show. I also assist the supervising producer in overseeing the international program production currently being done by the associate producer-Michele Bayens. I can help people with questions concerning the Worldwide show or the international shows (Int'l Worldwide and Int'l Nitro).

Name: **Bayens, Michelle**
Title: Associate Producer
Department: Production
Extension: 3-4090

Name: **Chochol, Michael**
Title: Production Assistant
Department: Production
Extension: 3-5230
My primary job responsibilities include, but are not limited to- all Pre/Post/Live production involving the PPV. My duties include producing monitor walls, assisting the producer and producing packages. I help

CONFIDENTIA
X 000697

with digitizing of elements during the sessions. I assist with the building of the Op reels for each PPV. I coordinate tapes for our projects. My Live production duties include, but are not limited to- Truck AP. When we are on the road I produce b/roll and still packages. I also assist during the live pre-tapes by acting as a liaison between the producer and talent. I also do a lot of music selecting each month for our individual packages, and log shows and file music cue sheets. I am involved with Live Field Production when available. People can come to for help with Field Production work, assistance with video involving wrestlers, producing and general production work.

**Name: Marshall, Darryl**
Title: <u>Production Assistant</u>
Department: <u>Production</u>
Extension: 3-4098

**Name: Bill Hartley**
Title: <u>Saturday Night Production Assistant</u>
Department: <u>Production</u>
Extension: 3-2544
I help Woody Kearce with all aspects of pre-production, production and post-production. I help organize and coordinate Traffic sessions so that all the WCW shows have their billboards, promotional considerations, graphics and merchandising spots. At the Sat. night taping I help round up talent, take notes for editing purposes, and help Woody whenever possible. People can come to me for questions or comments concerning Traffic sessions, Saturday Nights or information dealing with wrestler appearances.

CONFIDENTIAL

# PRODUCTION (TECH)

**Name: Shaw, Robin**
Title: Director of Post Production Facilities
Department: Production (Tech)
Extension: 3-4075
The WCW Production department is responsible for an array of things regarding our product. Within the production department I am responsible for the following areas and employees:
*Duplication:* This area is responsible for making dubs of our shows. Currently we have a list of clients that require copies of our shows. We have a variety of international clients that air our show in their country. We have licensees that use our shows as models to create games and toys for WCW. There are cable affiliates that help promote our shows. When wrestlers make public appearances on other television shows and require highlight footage or clips they call the Duplication department. And of course, the duplication department works with Producers to insure they have the right footage in order to build their promos, spots and feature packages.
*Maintenance Engineers:* We have two maintenance engineers on staff to keep the technical operations of the duplication machines running efficiently and properly. When the machines fail, it causes us to lose a great deal of revenue. Also, the maintenance engineers help WCW remain on the cutting edge of technology by researching new equipment
*WCW Studio Operations:* WCW has a studio in which we shoot leads for our shows, wrestler interviews, and product shots such as t-shirts and photo shoots. We also have the capabilities to do a shoot in the studio and feed it to the remote site in order to air it as part of the live telecast.
*WCW Library:* WCW has its own library which consist of over 19,000 videotapes which includes show masters, camera originals, graphics, music, and highlight packages. This is a huge asset for WCW. We have two Tape Librarians that keep track of the footage so we can use it more effectively.
*Shipping & Recycle:* We ship our product all over the globe, domestically and internationally. Our Production shipper handles all videotape shipments that leave Log Cabin and will trace packages if they are misrouted. Additionally, since we use over $200,000 of videotape per year, we recycle our stock for multiple use.
*Music:* I oversee the Music Coordinator to insure that the music WCW uses on all of its telecasts is reported correctly. Any misrepresentation of the music usage could lead to severe penalties for WCW.
*Scheduling:* WCW used to have its own production edit suites; however, our equipment was relocated to the new Turner Studios technical building. When Producers have edit suites needs we must schedule edit time through Turner Studios. I oversee this as well to insure the Producers have what they need to do their promo.
There are 12 employees divided amongst the above mentioned areas. I manage each and am responsible for the entire facility operations and logistics. I should be able to answer questions pertaining to the 2nd floor of Log Cabin.

**Name: Hinton, Todd**
Title: Maintenance Engineer
Department: Production
Extension: 34071
I am responsible for maintaining and overseeing all technical aspects of the production facility. I also maintain and administrate the house RF system. People can come to for help with any technical problems in the production area or any issue with the house RF system. It is often mistaken that I am a member of the computer department.

**Name: Tinsley, Bill**
Title: Senior Camera Operator
Department: Production (Tech)
Extension: 3-4083

**Name: Rogers, Kemper**
Title: Senior Editor/Producer
Department: Production (Tech)
Extension: 3-4074

CONFIDENTIA
X 000695




Name: **Edwards, Joel**
Title: Editor
Department: Production (Tech)
Extension: 3-4082

Name: **Arbon, Ed**
Title: Senior Videotape Operator
Department: Operations
Extension: 3-4065
I am responsible for compiling an Archives File of all past WCW Shows in our library. I also assist in Tape Room Operations. People can come to me for help with past match information and information about past or current wrestlers. It is often mistaken that I am responsible for commercial traffic and production dub requests.

Name: **Bonds, Cliff**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4067
I am responsible for duplicate and offline edit tapes of shows for syndication and international, and requests as provided by the supervisor. People should go to the supervisor of Post Production for requests and information. It is often mistaken that I am responsible for research.

Name: **Davis, Jonathan**
Title: Tape Operator
Department: Post Production
Extension: 3-4068
I am responsible for prepping and executing the dubbing of standing orders as well as performing dubbing, off-line editing and other duties of per-need orders (production dub requests). Other duties include degaussing and maintaining recycled tape stock, black and coding new stock for editors and producers, rolling tape for audio or video and audio studio sessions. Also, quality checking my work (either spot checking or 100% Q.C.) to watch for audio/video drop out, time base corrector "hits", tape damage (creasing, etc.), and spelling and continuity errors. People can come to for help with setting up viewing rooms for remote viewing, finding sources, getting stock (usually recycled), creating/printing labels, technical questions/advise about how to set up a job, etc.

Name: **Green, Elliot**
Title: Tape Operator
Department: Production (Tech)
Extension: 3-4070

Name: **McKay, Stephen**
Title: Tape Operator
Department: Production
Extension: 3-4072
I work as part of a team to maintain weekly standard workbooks (Nitro, Thunder, International dubs. etc.) and non-standard work books, such as production dub request and special projects. People can come to me for help with anything.

Name: **Delaine, Christopher**
Title: Edit Assistant
Department: WCW Productions
Extension: 3-4079
I accompany Nitro and Thunder Field Production crew and provide Avid services for producers in the field. I also provide Avid services for WCW motorsports and any other Producer or WCW client, as needed. I can help with building promos and packages, dubbing and logging, repairs to finished spots, digitizing and Avid maintenance.

CONFIDENTIAL
X 000696

Name: **Bresler, Robert (Breeze)**
Title: <u>Tape Librarian</u>
Department: <u>Production (Tech)</u>
Extension: 3-4066
It is my responsibility to keep track of and distribute the show tapes, spot reels and features/packages that are generated on a weekly basis; as well as, maintain and categorize the substantial archival video/audiotape library. People can come to for help with locating and confirming the existence of the tapes for viewing or duplication purposes if Robin Shaw has given approval. It is often mistaken that I am responsible for having knowledge of the participants, outcome, and event date of every match ever wrestled in the entire history of WCW.

Name: **Miller, Darrell**
Title: <u>Videotape Librarian</u>
Department: <u>Post Production</u>
Extension: 3-4078
I assist all employees with footage tapes of all our PPV shows, TV tapings, and promotional appearances of our wrestlers. I then ship the tapes to our international and domestic clients. On Wednesdays I stage manage for our weekly taping of Worldwide and I order the Raw Stock (VHS, 1", beta, etc.) for our company.

CONFIDENTIA
X 000697

# REMOTE PRODUCTION

Name: **Crockett, David**
Title: Vice President Production
Department: Production
Extension: 3-3627
I supervise the coordination and hiring of television crews. I oversee the acquisition of technical support equipment and staff. This includes lighting, audio, pyro, security, rings, scenic and catering. I also manage the Production Travel Department. People can come to me for help with ENG Production, live remote production, arena/location sight coordination, special effects, event management, on sight coordination of phones and uplink, and catering. It is often mistaken that I am responsible for the Travel Department and Arena Booking.

Name: **Nordahl, Linda**
Title: Production Office Coordinator
Department: Remote Production
Extension: 3-3628

Name: **Atkinson, Joyce**
Title: Director of TV Production
Department: Remote Production
Extension: 3-3634
My job responsibilities are to apply direction and supervise a group of people coordinating the technical production for all live and taped events. This would include hiring the mobile units for the telecast, hiring the best qualified crew members, overseeing the travel issues for the technical crew, renting equipment, timesheets, production invoices, etc. I work on the day to day operations and needs of the vendors, crew members, co-workers, etc. I keep an open line of communication to all aspects of production. People can come to me for help with Remote Production, production work that is done off site.

Name: **Barrett, Steve**
Title: Production Manager
Department: WCW Production
Extension: 3-3632
I oversee the arena production for Nitro/Thunder/PPV's and Saturday Night shows. This includes lighting, audio, staging, transportation, catering, crew and all other logistics that go into live and taped television shows.

Name: **Small, Steve** (3-3637)
Title: Arena Production Manager
Department: Remote Production
Extension: 3-3637
I am responsible for every element of a televised wrestling show in a remote location i.e. taking an empty arena, filling it for our show, turning it over to the director and producer, and then removing it. People can come to me for help with building problems, logistics, personnel problems between departments or local stagehands, safety issues, and audience issues. I am not responsible for Publicity, Promotions or Comp tickets.

Names: **Blackwell, Katrina** (3-3625)
      **Piccolo, Jason** (3-3639)
      **Holscher, Ragan** (3-3117)
      **Dailey, Daniel** (3-3116)
Title: Production Coordinator
Department: Remote Production
Production Coordinators are responsible for various duties such as finding cost-effective flights for the crews, arranging taxi service, and assembling information in production books for each show. People can come to them for help with questions concerning logistics (what crew is booked, flight schedules, cab services, etc.).

CONFIDENTIA
x 000600

Name: **Callloway, Kerri**
Title: <u>Site Coordinator</u>
Department: <u>Production</u>
Extension: 3-3126
I perform show advances at arenas throughout the country, establish seat kits needed for production use, and compile arena info/photos/diagrams for use by the Production Managers, TV Crew, Promoters and Website. I distribute database information and arena diagrams to the Production department and establish positive public relations with arenas. I can help with arena information, diagrams, photos and contacts. I am not responsible for promotional duties such as advertising.

Name: **Hamilton, Joseph**
Title: <u>Director of Ring Transportation</u>
Department: <u>Production</u>
Extension: 3-1031
I am responsible for building new rings, maintaining current rings, and ordering parts, materials and equipment for all rings. I schedule and route all the ring crews and their trucks. People can come to for help with anything pertaining to wrestling, wrestling rings or ring transportation.

CONFIDENTIA

# POWER PLANT

Name: **Orndorff, Paul**
Title: Training Center Staffing
Department: Power Plant
Extension: 3-3831

Name: **Smith, Brenda**
Title: Training Center Coordinator
Department: Power Plant
Extension: 3-1030

I assist Paul Orndorff with daily office procedures, such as directing phone calls to proper persons, etc. I update incoming calls in reference to new trainees. I update waivers of liability for trainees. I issue waivers for WCW power plant full-time employees. I open mail, sort videotapes for viewing of new applicants. I request tapes for our present contract staff to view past matches. I make sure all talent in the ring signs a liability waiver. I direct traffic to Paul Orndorff's office by appointment. I keep our front office clear of employees who want to view the talent during training hours. Advise Power Plant staff of all office information. Prepare sign-in sheet for 10-12 Power Plant students. I file, order supplies, and I check the gym before departing each evening. People can come to me if with question concerning the Power Plant or appointments, workman's compensation questions, vendor questions due to non-payment, and all past and present try-out questions from 1994-July 1998. I am not responsible for admitting guests to the Power Plant. Or if employees leave their ID badge and mistakenly think I am supposed to use the entrance buzzer for admitting and departing. The WCW Ring Crew is not a part of the Power Plant and vendors constantly call for accounts payable.

Names: **Young, Danny** (3-1032)
      **Bruce, Dewayne "Sarge"** (3-2570)
      **Wenner, Mike** (3-1071)
Title: Trainer
Department: Power Plant

CONFIDENTIAl
X 000700

# TALENT MANAGEMENT

Name: **Dillon, JJ**
Title: <u>Director of Talent Management</u>
Department: <u>Talent Management</u>
Extension: 3-3832
I am responsible for most talent management issues; which include some contract negotiations, overseeing the talent booking process, overseeing the talent travel process and being involved in the coordination of talent appearances. People can come to me for help with anything involving WCW talent.

Name: **Bartlett, Dee**
Title: <u>Administrative Assistant</u>
Department: <u>Talent Management</u>
Extension: 3-3835
I am responsible for secretarial duties for JJ, tracking all talent for all departments, and updating talent contact information. I fill out/track expense reports for all talent, and I track payroll/accounting issues for talent, department, vendors and other employees. I arrange delivery of correspondence/packages for talent, set-up yearly physicals for talent and track licensing status for the talent. I assist in the creation of our talent database, order office supplies for the department, and I am a liaison between staff on the road and those here. I troubleshoot office equipment for the department, assist with publishing booking sheets and updates/TV lists and updates/travel issues. I also assist in communications with Spanish speaking talent. I am not responsible for publishing the booking sheets and TV lists (Bowden).

Name: **Engle, Janie**
Title: <u>Talent Relations Manager</u>
Department: <u>Talent Relations/Wrestling Operations</u>
Extension: 3-3822
Talent Travel- I oversee the booking and booking agents travel, hotels, rental cars, limos, charter planes, etc. I work with the Talent Travel Department. Talent Database- I maintain all input of information for database including number of days worked at all events, PR appearances, absences, injuries, address/contact information, Farm System tracking, Productivity Reports, and travel information. Wardrobe management- I oversee travel schedule and supplies. I am also a contact for the new Japan Pro Wrestling- coordinating meetings and bookings, and dealing with travel requests regarding talent and management. People can come to for help with talent travel or database. It is often mistaken that I am responsible for booking information and the VP's schedule.

Name: **Bowden, David**
Title: <u>Talent Management Coordinator</u>
Department: <u>Talent Management</u>
Extension: 3-2540
I help coordinate the creation of the House show lineup including talent, referees and agents, and I manage distribution and upkeep of the House show booking sheets and information. I manage weekly Nitro, Thunder, Sat. Night and PPV talent list acting as a link between creative team and other departments within company. I provide the creative team with updated talent information and availability with regards to injury status, approved days off, etc. I also provide the creative team with ratings information. I provide an on site resource of Nitro, Thunder and PPV shows available to creative team and talent for a range of duties. I manage weekly tracking/accounting of talent with creation and implementation of sign in sheets with security to processing of information to accounting. I also manage tracking of talent. I coordinate a wide range of special projects and assignments with the talent management department. People can come to me for information regarding talent, in particular with bookings and accounting. It is often mistaken that I am working with the travel department and programming.

Name: **Taylor, Terry**
Title: <u>Director of Live Events</u>
Department: <u>Booking & Talent Relations</u>
Extension: 3-3630

CONFIDENTIAL

Revised March 28, 2000

I am responsible for booking all house shows or live events; which is done six weeks ahead of time so Awesome Promotions and our publicity department can properly promote said events. The nature of our industry dictates constant monitoring because of changing story lines and unforeseen injuries. I am also an agent at Nitro and Thunder events, choreographing matches and ensuring the segments correspond with the writers' vision. Therefore, I need to make sure the talent understands and appreciates what is expected of them. I am also a member of the booking committee that writes all television shows and PPV's, developing story lines and characters. At a lesser degree I try to help find, groom and sign new talent. People can come to me for help with training, character issues or story line development. It is often mistaken that I am responsible for hiring/firing talent, the final say on booking decisions, or talent travel arrangements.

Names: **Russo, Vince** (3-2566)
      **Ferrara, Ed** (3-2567)
      **Banks, Bill** (3-1088)
Title: Writer
Department: Talent Management
BB-I am responsible for TV writing (on the road) under Vince Russo. I also head up the internet department supplying creative direction for wcw.com. People can come to me for help with creative direction/story lines for WCW, or anything to do with our internet site. It is often mistaken that I am responsible for ad sales for WCW.

Name: **Gary, Alto**
Title: Nitro Girl Manager
Department: Talent Management
Extension: 3-2565
I arrange travel for Nitro Girls to TV shows and performances. I choreograph and arrange dance routines, book Nitro Girls for WCW Promos, design and purchase costumes, and hire or fire Nitro Girls. I provide DJ and truck with music, and I edit the music. I also consult with celebrity placement services to book Nitro Girls for paid appearances. People can come to for help with locating or booking a Nitro Girl. It is often mistaken that I am responsible for all female talent.

# TALENT TRAVEL

Name: **Bowen, Elena**
Title: <u>Talent Travel Coordinator</u>
Department: <u>Talent Travel</u>
Extension: 3-3824

I coordinate all the talent travel arrangements for TV shows, house shows, personal appearances and doctor appointments. I am responsible for all talent related travel emergencies after-hours and on weekends. I can help with arranging any travel for talent of finding out what talent is where at what time. I am not responsible for knowing what talent is supposed to be doing at the events and I do not always know the reason for travel.

Names: **Theys, Noreen** (3-3828)
       **Gray, Pamela** (3-3121)
Title: <u>WTP Travel Agent</u>
Department: <u>Talent Travel</u>

CONFIDENTIAL

# PRODUCTION TRAVEL

Name: **Davis, Penny**
Title: Travel Coordinator
Department: Production and Office Travel
Extension: 3-1035
I book all travel for office personnel, oversee the Production Travel Department, book all hotels for televised events, and I am on-call for emergencies after-hours. I can help with travel needs, hotels and rental cars. It is often mistaken that I am responsible for talent travel.

Names: **Hill-Atkins, Julie** (3-3119)
      **Perry, Cynthia** (3-3128)
      **Cox, Randy** (3-3120)
Title: WTP Lead Agent
Department: Production Travel

Name: **Ndiaye, Falla**
Title: WTP Ticket Processor
Department: Production Travel
Extension: 3-3140

CONFIDENTIAL

# TECHNICAL SUPPORT

**Name: Upshaw, Doug**
Title: Technology Coordinator
Department: General Administration
Extension: 3-1011
My job responsibilities include network administrator/manager, desktop computer support manager, and computer specification and acquisition. People can come to me if they need help with network and e-mail account management, desktop computer support, requests for computers and/or peripherals (with department head approval), computer related project support (new server or equipment specification and integration), office moves (computer and phone/fax only) and telephone moves or number changes. It is often mistaken that I am responsible for malfunctioning copy machines, power outages, furniture moves, cable TV and VCR hookups.

**Name: Edwards, Jimmy**
Title: Technology Analyst
Department: General Administration
Extension: 3-1074
I am responsible for setting up new desktop computers, printers and phones. I also am responsible for trouble shooting computer, printers and phones. I can help with computer, printer and phone related issues. I am not responsible for copiers and fax machines.

CONFIDENTIAL



The purpose of this form is to assist New Hires in becoming acquainted with the mission of WCW and the distribution of work within the company. After each employee completes the forms they will be combined in a handbook that is to be given to each New Hire. This is necessary so those new employees are better informed of the various positions we have and what each department is responsible for at WCW. This is also a means to better inform existing employees of the work allocation and to identify where changes need to be made. Job descriptions and employee titles will undoubtedly change, so the handbook will be regularly updated. Please complete the form in detail and accuracy.

Name:  <u>Suzanne Stern</u>

Title:  <u>Senior Promotions Manager</u>

Department: <u>Promotions</u>

Reports to:      <u>Director of Promotions, Tom Hunt</u>

**Job Description**
Responsible for effectively executing WCW promotions that will reinforce the brand and key initiatives. Maximize communication with Ad Sales and Licensed Promotion Sales to help them drive incremental revenue to Turner and WCW.

• Work with Director of Promotions on the ideation of promotional concepts that reinforce WCW initiatives and can be strategically and creatively executed on-air.
• Fully concept and develop customized Fantasy Prize Promotions (with maximum lead time). Provide and customize these Fantasy Prize Promotions to Ad Sales and Licensed Promotion Sales to fit client's needs.
• Work with Legal Department to research promotional concepts and feasibility. Clear all concepts from any FCC violations before concept is presented externally.
• Work with Research Department to coordinate focus groups (when necessary) to test concepts, spots, prizes etc.
• Develop promotion presentations/documents/one-sheets to Sales. Work with Creative Services to develop presentation boards for client pitches
• Communicate and act as client liaison on all levels of promotion activity, including identifying and securing necessary client materials, production timeline, approvals, contracts etc.
• Oversee the production of all versions of promotional spots, including timeline, budget, client approvals, legal parameters, sponsor tags, etc.
• Work closely with Ad Sales, Sales Operations and Master Control on scheduling of all promotional spots in either commercial inventory or promo time
• Set up and manage entry mechanisms for on-air contests, i.e. 800#, PO Boxes, on-line and off channel entry
• Work with Director of PPV Marketing on any local extensions to WCW's national on-air promotions

CONFIDENTIAL
V 000706



- Develop customized prizes to award contest winners and/or secure prizes from client (when appropriate). Manage the fulfillment and distribution of prizes. Handle travel for winners when necessary.
- Maintain and manage budget that pertains to Promotion projects. Intercompany bill Ad Sales for sales-driven promotion expenses.
- Provide recap packages of promotions/contests to internal divisions and client.
- Provide all necessary information pertaining to promotions to be included in sales collateral materials.

People can come to me if they need help with...

- Anything that is advertising/promotions related.

It is often mistaken that I am responsible for...

- Media buys to promote WCW shows.

CONFIDENTIAL



# EXHIBIT / ATTACHMENT

Y

(To be scanned in place of tab)



**Privacy Policy**
Terms Of Use for this site
TM & © 2000 World Championship Wrestling, Inc.
A Time Warner Company. All rights reserved.



PLAINTIFF'S
EXHIBIT
41

CONFIDENTIAL
X 001119



I want to **hook(up)** with:

A [guy ▼] who is [18 ▼] and listens to [alternative ▼]

[go]

Are you ready?

# Are YOU Ready For The Power Plant?

As the New Blood continues to push toward the main event, more than just the Eric Bischoff, Vince Russo and the locker room are celebrating the change. Paul "Mr. Wonderful" Orndorff might be an alumnus of the Millionaires' Club, but his current passion is training this sport's next generation of Goldbergs, Stings and Hogans at the Power Plant. Chad Damiani spoke with professional wrestling's most respected instructor.

CD: Paul, thanks for sitting down with WCW.com.

**PO: It's my pleasure.**

CD: Before we talk about your boys, let's discuss the unhealthy phenomenon of backyard wrestling schools.

**PO: Don't get me started on that. First of all, you need proper training. A perfect example is pee wee football. Growing up, I played high school, sandlot and professional ball. Nothing gets me**

CONFIDENTIAL
X 001120

more frustrated than watching some father who has never played trying to teach these kids. There are correct techniques for blocking, catching and tackling. If you're not doing it the right way, you are doing it the wrong way. You're going to get hurt.

There are some so-called wrestling instructors out there who are simply trying to emulate what they see on television. I've spent 25 years in this business. I've taken every move, and I know all the ways that a wrestler can protect himself. These kids think hurting themselves in somebody's backyard is going to get them a career. It's sad, and very dangerous.

CD: In your opinion, what's the greatest misconception concerning professional wrestling?

**PO: The idea that anybody can do what we do.**

CD: A lot of these kids are focused on fighting hardcore matches. How do you feel about WCW's hardcore division? Are you training wrestlers at the Power Plant to wrestle that style of match?.

**PO: Absolutely not. There's no wrestling involved in those type of matches. I think it's absurd. What kind of talent does it take to hit somebody with a trash can? We condition our guys like pro boxers, and sports involving physical contact. The focus is heavy conditioning. When I watch these hardcore bouts, all I think about is the possibility of injury. You can break a shoulder, neck or arm so easily. I think these guys just do it for the money.**

CD: Critics of wrestling feel these types of matches are pushing kids to endanger themselves.

**PO: It's absurd. It all boils down to the parents. You have to control and monitor your children, instead of just placing them in front of a television.**

CD: You spoke a little about how you train athletes at the Power Plant. What qualities do you when you review candidates?

**PO: Young people, big people, special people -- we are always recruiting. It's hard, because the talent pool is limited. I used to run three-day**

CONFIDENTIAL
X 001121

open tryouts, but we've stopped. We would test these young men for their heart and guts. Within 45 minutes to an hour, most of the candidates would quit. Honestly, we weren't trying to run anyone off. If you're not in shape and you take a bump, you open yourself up to serious injury.

Now, we review tapes that people send into WCW. Please, don't send in backyard tapes. I throw them out *without even looking at them.*

What we are looking for are people that look the part, and have a certain manner about them. We prefer athletes who have a history in professional sports, because they always prove to be more disciplined. I know, because we have a lot of TV, you need to have cruiserweight matches, but people still come to see the heavyweights. We do take on smaller athletes occasionally. There's always a chance that you will run into a De La Hoya, Hagler or maybe a Hearns. But that athlete only comes around every 50 years.

I like larger athletes, 240-60 pounds, that can really move.

CD: You like larger athletes, yet the Power Plant has trained quite a few cruiserweights and smaller athletes.

PO: Yes, we do. There is just so much TV right now. You need to have the lighter matches to keep the energy up, but I still believe that people come to see the heavyweights. That's not to say some of the smaller guys don't have a lot of potential. Take boxing for example. Oscar De La Hoya, Marvin Hagler, Thomas Hearns. There are special guys, every 50 years or so, who can really pull their weight, despite their size.

CD: When you have trained cruiserweights like Crowbar and Kid Romeo, how do you teach them to do all those crazy aerials?

PO: I don't. I'm not a supporter of goofy, crazy moves. That's not what wrestling is about. Those moves may take a great deal of athleticism, but they end up desensitizing the crowd. Everything gets old, and these guys have to take more and more risks. Moves are meaningless without match

CONFIDENTIAL
X 001122

more risks. Moves are meaningless without match **psychology.**

CD: ...

**PO: Absolutely not. I'm very happy. I've been able to find kids that are hungry, news faces that aren't overexposed. I've worked them aggressively, and now my boys are 2-3 times more conditioned than most of our current athletes. I'm very proud of what I've accomplished.**

CD: Both wrestlers and promoters have commended you on more than just the athletic acumen of your boys. People have also been very impressed with their attitudes.

**PO: Thank you. All of my boys from the Power Plant are under my authority. We teach them to be pros, true pros, and to leave their egos at home. When they work an event, whether it's a Nitro or with one of the independent promotions we have agreements with, they know that these families have spent their hard-earned money to see a show. My boys work to give them every penny's worth.**

CD: Thanks for your time, Paul.

If you'd like to send a demo tape to the Power Plant, you can use the following address.

# WCW Power Plant
# C/o Paul Orndorf
# One CNN Center, Box 105366
# Atlanta, GA 30348-5366

**Privacy Policy**
Terms Of Use for this site
TM & © 2000 World Championship Wrestling, Inc.
A Time Warner Company  All rights reserved

7/26/00

CONFIDENTIAL
X 001123



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF GEORGIA

3    ATLANTA DIVISION

4

5    TONY BYRON CARR,                    )
                                         )
6            Plaintiff,                  ) Civil Action File No.
     vs.                                 ) 1-00-CV-1721 (CC)
7                                        )
     WORLD CHAMPIONSHIP WRESTLING,       )
8    INC., and TURNER SPORTS, INC.,      )
                                         )
9            Defendants.                 )

10   ─────────────────────────────────────────────
             DEPOSITION OF TONY BYRON CARR
11                JANUARY 28, 2002
                    10:00 a.m.
12   ─────────────────────────────────────────────

13

14

15

16

17

18

19

20

21

22

23

24

25        CERTIFIED COURT REPORTERS

1          And I said, well, let me go put my outfit on, so I

2     put it on, and he looked at it and he shook his head.  He

3     was like, I hope you didn't spend too much money on that.  I

4     was like, what do you mean?  He's like, we can't use that.

5     And I was like, why not?

6          He said, well, it's not realistic, you know, and

7     like I said, that kind of hit me for a blow because also

8     they look for realistic characters now, but yet, you've got

9     this guy Glacier, he comes in the building and makes it

10    snow.

11         So I'm like, well, that's not very realistic, you

12    know.  That's what he told me.  And then later on Rocky King

13    told me that, you know, they weren't looking for no blacks.

14    That's what he said.

15         Q.    We'll get to that in a little bit.  So you tried a

16    genie outfit?

17         A.    Right.

18         Q.    And you said Terry didn't like it because he said

19    it was unrealistic?

20         A.    Right.  Jimmy Hart loved it, though.  Jimmy Hart

21    said, oh, that's good.  We can use that.  We can do that,

22    but Terry was the head booker and he shot it down.

23         Q.    Okay.  When was this?  Do you recall?

24         A.    I don't remember.

25         Q.    Do you remember it was early?

1    a truck driver.  First time he said, I don't know who's

2    blowing smoke up your ass, kid, but they ain't hiring no

3    niggers.

4         Q.   This is what Jody Hamilton said?

5         A.   This is what Jody Hamilton said.

6         Q.   When did he say that?

7         A.   He said it right before we left Carol Drive.  Then

8    we got up here, when he hired me back as a truck driver, you

9    know, I told him I still want to wrestle.  I still brought

10   my wrestling gear.  I still talked to the bookers.  Hey, you

11   know, if you all need somebody, I want to wrestle.  I didn't

12   come here to be a truck driver.  I want to wrestle.  So I

13   was trying to network any way I could to get back in, you

14   know, so --

15        Q.   Okay.  And how did that conversation go when you

16   talked to him about that?

17        A.   Well, that's when he said, he said -- this time he

18   cleaned up.  He said, we're not hiring any blacks, you know.

19        Q.   Did he refer to anyone in particular.

20        A.   No, he just said --

21        Q.   Did he give you a name as to who's making this

22   decision?

23        A.   He just said the higher-ups.

24        Q.   Okay.  But you don't know who actually made the

25   decision not to give you a wrestling contract?

1    A.    Well, I had been hearing the whole time that Jody

2    Hamilton was a racist.  His brother was in the Ku Klux Klan,

3    all this stuff here.  Jody would say certain things but I

4    didn't hear that stuff.  All I know, I wanted to be a

5    wrestler, you know.  I heard the stuff.  I didn't hear it.

6    I heard the jokes.  I heard the comments.

7    Q.    What kind of jokes or comments did you hear

8    personally?

9    A.    Okay.  Well, Sarge, if we call people -- he

10   referred to this Asian guy as -- who was in the ring,

11   playing the ring, wrestling around, he's like, there's soul

12   food and oriental food in the ring or something like that,

13   you know, stuff like that.

14   Q.    Okay.  What else do you remember hearing that you

15   thought was a racial comment?

16   A.    Taylor Terry would come by and say stuff like

17   there was a time when the air conditioner broke and he said,

18   well, you'd better turn the air conditioner on because you

19   know, these niggers, they can't take this cold weather.

20   Q.    Did you hear that?

21   A.    Yes.

22   Q.    When was this?

23   A.    This was -- can't remember the dates on it.

24   Q.    How long had you been at the Power Plant when that

25   occurred?

1     A.    I'd been there for a long time.

2     Q.    Okay.  Can you give me an idea of when you thought

3     it was year-wise, what time of year it was?  Was it

4     summertime?

5     A.    It was cold, because it was real cold and nobody

6     wanted to do anything because it was cold down there.

7     Q.    So you think it was wintertime?

8     A.    I'm pretty sure it was wintertime.

9     Q.    You don't remember which year?

10    A.    I don't remember what year.

11    Q.    Okay.  You said some comments about Sarge and a

12    comment about Terry Taylor.  What else do you recall

13    occurring down at the Power Plant that you think was a

14    racial comment?

15    A.    Like I said, the comments were all, the whole --

16    even when I came back people were making comments.

17    Q.    Well, I need to know, Mr. Carr, what those

18    comments were, who said them.  I can't just have --

19    A.    Pick a time.  Pick a time.

20    Q.    You tell me.  I need to know everything that you

21    recall --

22    A.    Okay.

23    Q.    -- about comments and who said them and what they

24    said.

25    A.    Okay.  I'll get a little bit recent on you then.

1    A.    Paul said they're not hiring any blacks.  This was

2    down at the new school, because what happened, went through

3    tryouts and Jody told me that -- made the comment or

4    whatever, but I hadn't talked to Paul Orndorff yet.

5    Q.    Okay.  So when was this conversation with Paul?

6    A.    This was sometime late '99.

7    Q.    Okay.  And what did he say to you?

8    A.    He said they ain't hiring no niggers.

9    Q.    And did he use the word "nigger"?

10   A.    Yes, he did.

11   Q.    Okay.  And do you know who he was referring to?

12   A.    Well, I was the only one in the room and I was

13   trying to get a job.

14   Q.    No, no.  When he said "they", do you know who he

15   meant by "they"?

16   A.    I assume he meant WCW.

17   Q.    But you don't know in particular who he --

18   A.    No.

19   Q.    Did Paul Orndorff ever say anything else that you

20   thought was racially discriminatory?

21   A.    No, I didn't see Paul a whole lot after that.

22   Q.    Tell me someone else that you believe down at the

23   Power Plant, said something that you believe was racially

24   discriminatory.

25   A.    Okay.  At the Power Plant.  Like I said, Jody

1    Q.    Okay.

2    A.    You know, and then I didn't hear from him for a

3    while, and then about a month later he called me and asked

4    me if I wanted to get back on the ring truck, and I said

5    yes.

6    Q.    So he offered you a job on the ring crew?

7    A.    Yeah, you know.

8    Q.    Any other conversations with Jody Hamilton you

9    think were discriminatory?

10    A.    Okay.  All right.  What happened, on the days

11    where I was off, Jody would have me come down there and move

12    a lot of stuff, you know, rings, you know, just shift stuff

13    around in the new building here on Log Cabin.

14              I'd unload trucks by myself, move rails, and then

15    I come back and sit down, I take a lunch break or whatever,

16    and he had these stories and they start talking about the

17    problems with the black community.

18              He made this thing about Martin Luther King.  He

19    was like, well, Martin Luther King started all this problem

20    and that's why black people are having so much trouble now.

21    He started segregation and a lot of black people got, you

22    know, sucked up in it because they weren't smart enough to

23    keep up with the white people, so it's bringing down the

24    society.

25              That's the kind of comments he was making, you

1          Well, David Crockett, he was Jody's boss, he came

2    out there and he said, tape those ropes up.  We've got to

3    get it ready.  And I told him, it's going to take 45 minutes

4    to tape those ropes.

5          And he said, get your black ass in there and tape

6    those ropes, and there was people around, too.  Steve Smalls

7    was one of them.  He said, get your black ass back in there

8    and tape those ropes.

9          And I left after that and I went in the back.  I

10   mean, I was hot.  I was really hot after that.  This is in

11   front of -- you know, the whole crowd was there.  It was

12   right by the ringside.

13      Q.   Okay.

14      A.   You know, I mean, like I say, he just treated me

15   bad the whole time after that.

16          We had a show out in California, and the way they

17   did things, I mean, everybody walking around back stage.  If

18   you knew somebody, everybody came around back stage.  Just

19   if you know somebody.  I mean, it was ridiculous.  All the

20   people back stage shouldn't have been back there.

21          Well, I've got a friend that's a cop out in

22   California now and we was going out there and I wanted to

23   get him, you know, back stage to come back there while I was

24   working there, you know.

25          Now, just the night before everybody was back

1    on the basis of your race and comments or jokes or things

2    like that?

3         A.    I mean, Terry Taylor would say stuff so much, I

4    just disregarded him.

5         Q.    What do you remember Terry saying?

6         A.    Well, he was referring to something about -- I had

7    a BWA shirt on right there at one of the shows.  That's

8    Rocky's company.

9         Q.    Okay.

10        A.    All right.  And I'm wearing the BWA shirt.  I

11   didn't even think about it.  I just had a T-shirt over it

12   because you wear anything when you get on the ring stuff,

13   and he said something about, wrestling for the Black

14   Wrestling Association.  That was the big joke.  He's like,

15   oh, you're working for the nigger company, you know.

16        Q.    Did he say those words?

17        A.    Yes.

18        Q.    How did you respond?

19        A.    Nothing.  I mean, Terry was the boss at the time.

20   You know, I could have went off, but I'm still, even though

21   I see the environment is messed up, I'm like, well, maybe if

22   I can get a foothold in there I can, like, get by.  I tried

23   to work around this.  I mean, I heard it a lot.

24        Q.    Okay.  Who else did you hear use words that you

25   found discriminatory?

1    A.    Jamaica.  They could be to Canada, you know.

2    Q.    Okay.  And you said -- were there some weeks you

3    didn't work at all and then you said you were very busy in

4    the beginning, but did it get to the point where there were

5    some weeks --

6    A.    Well, towards the end when the company was

7    shutting down, like the last few months, you know, we didn't

8    work a whole lot then.  Like the last couple of months

9    there.

10         But at the same time, when I went back to work on

11   the ring, I even tried to work with security because

12   security was getting a lot of time on TV, too, and you know,

13   I approached Doug Dillinger several times and first he kept

14   giving me the runaround that -- first he'd say, well, you've

15   got to be a police officer or you've got to, you know, have

16   had some law enforcement experience.

17         I was like, well, I used to be in the Marine

18   Corps.  I had top secret clearance or whatever.  That

19   doesn't count, you know.  And I keep -- I said, Doug, let me

20   get out there.  Let me get some TV time.  You guys are

21   getting all the TV time and you're not even wrestlers, you

22   know, and at the end he said, you know, same thing, you

23   know, he'd say, you know we don't hire no blacks, just like

24   that.

25   Q.    Doug Dillinger said that?

1        They wanted me to put a shirt -- Terry Taylor came

2   up with this idea, put a shirt on and put like, you know,

3   "Tank Abbott Sucks" or something like that on the shirt and

4   start something out of it.  I would sit in the audience like

5   a fan.

6        Well, that was earlier that day.  Later on that

7   day Terry came by and said, they ain't going to believe no

8   niggers are in Montana.  It's going to look like a plant.

9   He said, I'll pay, you know, but we're not going to use it.

10       Q.   Did he pay you for it?

11       A.   He paid me for it, but he said, you know, it was

12  because they ain't going to believe no nigger's in Montana.

13       Q.   Did he use those words?

14       A.   Yes.

15       Q.   You remember him saying that?

16       A.   Yes.  Like I said, Terry used it a lot.  It was

17  open forum, you know.

18       Q.   Did you ever say to him, Terry, don't use that

19  word?

20       A.   I mean, what are you going to tell him?  You see

21  how things work.  I mean, these guys can make you or break

22  you, you know.  What are you going to tell them, you know.

23       Q.   You never said Terry, look, I wish you wouldn't

24  call me that?

25       A.   No.  I just said, Terry, that was messed up and,



# EXHIBIT / ATTACHMENT

# AA

(To be scanned in place of tab)

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2             ATLANTA DIVISION

3

WILLIAM BOULWARE, JR.,     )
4  et al.,              )
                     )
5        Plaintiffs,    )
                     )
6    vs.              ) CIVIL ACTION FILE
                     ) NO. 1:01-CV-0915-CC
7  WORLD CHAMPIONSHIP WRESTLING, )
   INC.,              )
8                    )
         Defendant.     )
9                    )

10

11

12  ──────────────────────────────────────────────

         DEPOSITION OF WILLIAM BOULWARE, JR.
13           NOVEMBER 16, 2001
             10:09 A.M.
14

15  ──────────────────────────────────────────────

16

17

18

19

20

21

22

23

24

25         CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia 30326 • www.premierrptg.com
404-237-1990
800-317-5773

1 wrestlers.
2 Q   Do they tape it, or do they broadcast it
3 live?
4 A   Tape it.  And then I get it -- I pay to get
5 it put on TV.
6 Q   Well, let me go back.  Can you tell me the
7 name of some of the production companies, the
8 television companies you've used?
9 A   I use who I named.  Lot of people I know
10 directly.  I use a guy out of -- out of Griffin,
11 Georgia.  His name is Murrill.  I can't think of
12 Murrill's last name, but most of the people own a
13 little small company.  You probably know --
14 Q   Do they provide all the equipment and all
15 the people to help?
16 A   Yes.  No.  No.  They just come in and film
17 the show.  I have most of my guys helping with setup,
18 and, you know, I could tape the show.
19 Q   Now, when you pay all these individuals do
20 you withhold Social Security and employment taxes on
21 them, or do you pay them as independent contractors?
22 A   I pay them independent contractors, but I
23 also -- I mean, I pay all -- I pay tax on them.
24 Q   So you withhold taxes on them?
25 A   No.  I don't withhold taxes on them.

1 Q   So they're responsible for paying their own
2 tax?
3 A   Right.
4 Q   Is that true for everybody that you pay?
5 A   Oh, yes.  Yes.  They sign a waiver saying
6 that they responsible for their own taxes.
7 Q   So everybody you hire through Boulware
8 Enterprises is an independent contractor --
9 A   Yes.
10 Q   -- of Boulware Enterprises?
11 A   Yes.
12 Q   Do you keep records on the different people
13 you hire?
14 A   Oh, yes.
15 Q   So you have all the pay records of everyone
16 you pay?
17 A   I got everything.
18 Q   Every -- every event you've ever had?
19 Everybody --
20        (Whereupon, a discussion ensued off the
21 record.)
22 BY MR. PONTZ:
23 Q   It's hard, Mr. Boulware.  If you will just
24 -- and it's my fault as bad as you, when we got into
25 kind of a conversational back and forth.  Normal

1 people talk over each other a little bit because we
2 can hear fine, but when he's trying to write, I'll try
3 to pause after your answers, and if you try to just
4 pause after my question and make sure I'm done.
5 A   Yes.
6 Q   Let me go back.  So you think you have all
7 the records on all the shows that Boulware Enterprises
8 has ever put on?
9 A   Yes.  I know between my wife and my
10 accountant, yes, they have them.
11 Q   What is your accountant's name?
12 A   James Brown.
13 Q   The same gentleman?
14 A   Yes.
15 Q   Do you know if he's a certified public
16 accountant?
17 A   Yes, he is.
18 Q   And does your wife work for Boulware
19 Enterprises, Inc.?
20 A   Yes.  I guess.
21 Q   Does she get paid?
22 A   No.
23 Q   So she helps you, but she's not getting
24 paid?
25 A   I mean, we both don't get paid.  We just run

1 the company.
2 Q   You say you put the television shows that
3 you tape, the wrestling shows, on television?
4 A   Yes.
5 Q   Where have you had those put on television?
6 A   I just basically, I been running a little
7 small -- like in Columbus, Georgia, basically a little
8 cable station that I -- anywhere that I could get it
9 on.
10 Q   Do you know what cable station in Columbus,
11 Georgia?
12 A   Channel 16.  I run that for two years.
13 Q   Do they pay you for that?
14 A   No, no.  Pay them for that.
15 Q   Do you know where the Channel 16 -- is that
16 on cable?
17 A   It's -- it's on cable.
18 Q   Is it a public access station?
19 A   It's a little small station.
20 Q   Do you know the call letters or anything
21 like that?
22 A   No.  I have to look it up.
23 Q   Who do you deal with when you deal with the
24 Channel 16?
25 A   Where I previously took my show off there,

1   A   Yes.
2   Q   And how long were you with that group?
3   A   About six months.
4   Q   And did you continue wrestling through the
5   '80s?
6   A   Yes. All through the '80s.
7   Q   Were you just wrestling at that time, or
8   were you doing anything else in the wrestling
9   business?
10  A   Basically I was doing wrestling.
11  Q   When did you first make contact with WCW?
12  A   WCW -- it was not WCW then. It was -- I was
13  with NWA. When they -- when Turner Broadcasting
14  bought WCW from the Crockett family out of Charlotte,
15  North Carolina, I was already working with the
16  Crockett family. So when they bought them, I was one
17  of the first people that came over.
18  Q   What were you doing with the Crocketts?
19  A   Wrestling.
20  Q   So you were wrestler when then it was NWA?
21  A   I was. Yes. I was on one of the first
22  pay-per-view TV that they had.
23  Q   Did you wrestle under the name Rocky King?
24  A   Yes. I wrestled under the name Rocky King,
25  and I also wrestled under the name Little Richard

1   Marley.
2   Q   M-A-R-L-E-Y?
3   A   Yes. Richard Marley. Yes. Marley, yes.
4   Q   And so were you still wrestling when the
5   company became WCW?
6   A   Yes.
7   Q   How many years did you -- well, let me,
8   back up from that. Do you remember what year that
9   was?
10  A   If it was, like, the -- if I'm not
11  mistaken, it was, like, the first of the '90s.
12  When -- 1990s.
13  Q   First couple years in the '90s?
14  A   Yes. Like '91, if I'm not mistaken.
15  Q   And did you continue wrestling with WCW?
16  A   Yes.
17  Q   Were you ever signed to a contract?
18  A   No.
19  Q   You got paid each time you appeared?
20  A   Yes.
21  Q   Was it a set fee?
22  A   Well, in some cases. Back then, the thing
23  what they call they pay you by the match. Like, for
24  example, you get some money for your first match,
25  depending on where you wrestling. If I'm wrestling in

1   the Omni, where you're going to have probably 18,000
2   people, your pay will go up. You wrestle in a little
3   place, say like a club in Georgia and you got 4,000
4   people, you get a little percentage of that.
5   Q   And this is the way most of the wrestlers
6   were paid?
7   A   Yes.
8   Q   They would be paid for each match?
9   A   Lot of white guys under contract at the
10  time. I remember they first started giving contracts
11  out when I was there. I remember some guys when they
12  first walked in the door.
13  Q   But there were a lot of white guys also like
14  you just getting paid by appearances?
15  A   Well, nothing but white guys.
16  Q   So most of the -- most of the white guys
17  were getting paid by appearances like you; right?
18  A   Yes. Some of them were, yes. Some of them
19  were.
20  Q   Do you know how much were you making at the
21  time for the different appearances? Do you recall?
22  A   It varied. Anywhere from like we would do
23  TV, morning TV at Turner Broadcasting, Channel 17 back
24  then. And you'd get like $75. 65, $75 and you would
25  go to a house show. It would be a place people pay to

1   get in. It would go anywhere from $100 to, I'd make
2   up to $500 a night.
3   Q   And that's what a lot of the wrestlers were
4   making? Same amount of money?
5   A   Yes.
6   Q   And this was the early '90s?
7   A   Yes. Real early '90s, yes.
8   Q   And did you continue wrestling with WCW as
9   the years went on into the mid-'90s?
10  A   Yes.
11  Q   Were you still just wrestling in, let's say,
12  1994, 1995?
13  A   No. A couple of times I got -- I had a
14  couple altercations, and basically they just quit
15  using me.
16  Q   You had altercations?
17  A   Yes.
18  Q   Who did you have altercations with?
19  A   Well, a guy -- I was -- one time they call
20  -- they changed my name to Little Richard Marley,
21  painted me up, put paint on my face.
22  Q   What kind of paint?
23  A   Wall paint. There was a joke going around.
24  You know, they painted me up, like they say the nigger
25  that was standing out in the yard. And, you know, for

1    me it hurt me, but I needed to work. There was only
2    -- it was only -- only player in town, so you had to
3    put up with it, so Michael one time called me nigger
4    in front of the boys.
5    Q    Who?
6    A    Michael Hayes.
7    Q    Is that another wrestler?
8    A    Yes. He's still working. Now he's working
9    for the Federation now.
10   Q    Mr. Boulware, hang on a second. Do you know
11   his real name?
12   A    Michael Hayes. Half of them I didn't deal
13   with them on, you know, personal.
14   Q    When was this?
15   A    It was, like, 1991 or '92.
16   Q    Whose idea was it to put paint on your face?
17   A    Arn Anderson. I never forget that. They
18   was setting in the office, and that they talking about
19   paint the nigger up, and it was a joke.
20   Q    Did you hear them say --
21   A    Yes.
22   Q    This was back in '90, '91?
23   A    Yes.
24   Q    Let's move forward then into the mid-'90s.
25   In '94, '95 were you still wrestling with WCW, or had

1    you stopped wrestling by then?
2    A    I was in and out, because we had territory
3    back then. You had places like Florida Championship
4    Wrestling. You had Kansas City Champion where NWA and
5    World Championship Wrestling kind of like a
6    partnership because NWA was the signal name before WCW
7    came in, so they had all these places you could go
8    wrestle back then, so they might -- you know, I'd
9    get -- like I find the time, I think I went to Kansas
10   City and wrestled for a while.
11   Q    Was it a different organization?
12   A    Well, they still NWA. They was still NWA
13   partnership.
14   Q    But that wasn't WCW? You wrestled with NWA?
15   A    It was NWA was there before -- it was NWA
16   before it was WCW.
17   Q    I understand. But were you wrestling for
18   WCW, or were you wrestling for some other
19   organization?
20   A    I worked for a different organization also.
21   That's the question you asked.
22   Q    Other than wrestling services, did you ever
23   provide other services to WCW?
24   A    Yes, I did.
25   Q    What other services did you provide?

1    A    I was -- I was in production.
2    Q    Let's go one at a time. Tell me when you
3    were in production with WCW?
4    A    I was in production from '90 -- I think
5    last of '96 until -- until -- until -- basically
6    until I left.
7    Q    When did you leave?
8    A    I really didn't -- never did leave. Never
9    left. I had a contract until the time they was
10   closed.
11   Q    What kind of work -- when you say you were
12   in production, what were you doing?
13   A    Ring crew. You know, ring.
14   Q    What were you doing on the ring crew?
15   A    Driving the ring back and forth to a city.
16   Q    Did you do that in 1996?
17   A    During '97-'98.
18   Q    Did you do it after 1998?
19   A    No.
20   Q    When you drove the truck, who did you drive
21   it with?
22   A    Oh, God.
23   Q    Do you remember any of the names of the
24   people?
25   A    Gordon Nelson.

1    Q    Just Gordon Nelson?
2    A    Yes.
3    Q    And were you paid for each time you drove
4    the truck?
5    A    Yes. All -- well, I was an independent
6    contractor.
7    Q    Each time you drove the truck and provided
8    services, you'd receive a set amount of pay?
9    A    Yes. I was independent contractor, and the
10   white guy with me was an employee.
11   Q    Did you work every day doing truck driving?
12   A    Yes. I was home three or four times a
13   month.
14   Q    Three or four times a month you were home?
15   A    Yes.
16   Q    So the rest of the time you were on the
17   road?
18   A    Home.
19   Q    Did you sign a contract to do these
20   services?
21   A    No.
22   Q    But you were an independent contractor?
23   A    Yes. At that time.
24   Q    And you didn't drive the truck anytime after
25   '98?

**Page 58**

1   A   Every day. Well, once they let me become a
2 referee that I begged for so long, I did it every
3 night that I was at the show. They would let me --
4 they made a joke. They give me the dog matches.
5   Q   Let me back up. Who let you become a
6 referee?
7   A   Who let me become a referee? Well, it
8 started with, I asked Eric Bischoff, the president,
9 and he told me I wasn't qualified, and I told him I
10 was -- I was wrestling before he got in the business.
11 How could he tell me that I wasn't qualified?
12   Q   But you'd never refereed before?
13   A   Yes. I'd referee plenty of times.
14   Q   With WCW?
15   A   No.
16   Q   Where did you referee?
17   A   Just different shows.
18   Q   Little small, local shows?
19   A   Yes. But it's the same thing. Once you
20 know how to do it, just like minor league baseball.
21 Play pros.
22   Q   Were those on live television?
23   A   Some of them was on TV.
24   Q   Were they on live TV?
25   A   No. Not live TV.

**Page 59**

1   Q   Were some of the WCW matches on live TV?
2   A   Yes.
3   Q   So Eric said he didn't think you were
4 qualified?
5   A   And I told him I thought he was being
6 racist, and he finally said, no.
7      I said, well, if you say no, you ain't
8 racist, they got shows in Disney.
9      He'd say, fine. Go stay away from me.
10   Q   So he let you go referee down there?
11   A   Yes.
12   Q   At the tapings in Universal Studios?
13   A   Yes.
14   Q   Did you ask anybody else to be a referee?
15   A   Yes. I begged Jody Hamilton.
16   Q   Did Jody select referees?
17   A   Jody was head of the referees.
18   Q   When was this?
19   A   The whole time until, basically, they --
20 about a year before they left.
21   Q   How do you know he was head of referees?
22   A   He wrote the schedule. You go in the
23 office, he hired referees. He told you who he's going
24 to hire and who going to work here and there.
25   Q   So you're saying he scheduled where the

**Page 60**

1 referee goes. How do you know he hired referees?
2   A   I know. I can tell.
3   Q   Did you see him hire referees?
4   A   He hired his son.
5   Q   Mr. Boulware, how do you know he made the
6 decision to hire the referees?
7   A   I seen him hire people.
8   Q   Did you see him hire people?
9   A   Like, for example, everyone that was
10 refereeing from where I left, came in after I started
11 wrestling. I saw guys, I could think, like, Nick
12 Patrick one of them, his son. I know all of them
13 names. I can't think of them now.
14   Q   Who else were the referees that were there
15 at the time?
16   A   Nick Patrick. I can't think of their names.
17 I can't think of the name, but I got picture with all
18 of them.
19   Q   You think Jody Hamilton hired them?
20   A   I know Jody Hamilton hired them.
21   Q   How do you know that?
22   A   Because I seen -- I mean --
23   Q   Did Jody ever say, I hired the referees?
24   A   Yes.
25   Q   When did he say that?

**Page 61**

1   A   He told me that several times. As a matter
2 of fact, he got mad when I -- he saw me refereeing on
3 TV, and he got mad, and I came to his school. He say,
4 you know that no black person go over me and become no
5 referee.
6      I told him what Eric Bischoff said. He
7 said, I don't give a hoot who told you. Then he cut
8 my booking down -- I had four booking a month that
9 time -- because Jody didn't like the -- the fact that
10 I became a referee.
11   Q   This was back in 1996?
12   A   No. This was 1997; '96-'97. I can't recall
13 the exact year.
14   Q   It was still in the '96, '98 time?
15   A   Yes.
16   Q   So you got opportunities to referee, and we
17 were trying to figure out how many times you think you
18 refereed in '96 or '97 or '98. Do you have some
19 estimate of how many times that was?
20   A   Well, I was at three to four shows a week,
21 and I referee all the dog matches.
22   Q   What do you mean by dog matches?
23   A   The dog matches, it's a match that they film
24 but they don't put on TV. And, quote, from Doug
25 Dellenger, who was the security guard, that is the job

1  the nigger do. He said that to me.
2    Q  When did he say that to you?
3    A  He said that to me, I can't remember the
4  exact date, but I report -- I got it all written
5  down. I got a document all of it.
6    Q  Do you have those documents?
7    A  I got them. My mother got them. Yes. I
8  got a document. As a matter of fact, he stopped me
9  one time. I was out putting up the ring, and
10  Dellenger is head of security. I was putting up the
11  ring and stuff. We was coming in. He told people,
12  cut the music. I saw him walk to me. He said, you
13  know, he ain't having that nigger stuff around here.
14       I lay my head, and I said, Doug, I know
15  you a long time. Why would you say that in front of
16  white people? He just walked off.
17    Q  When was this?
18    A  I can't remember the year. It had to be
19  about '98.
20    Q  Where was it?
21    A  I can't remember the time. I got a
22  document.
23    Q  Was it in the arena?
24    A  It was in the arena, because as a matter of
25  fact, I called Time Warner at the time and told them

1  exactly what he said to me.
2    Q  What arena was it?
3    A  I can't remember exactly. I got the
4  document.
5       MR. PONTZ: Mr. Breedlove, if I may, has
6  Mr. Boulware provided you with these document?
7       MR. BREEDLOVE: It's his deposition.
8       MR. PONTZ: I understand. I'd like to
9  ask you, if I could, has he provided you with the
10  documents he's talking about?
11       MR. BREEDLOVE: You've asked him about a
12  number of documents. I'll be more than happy to
13  discuss what he has provided me with if it's
14  properly --
15       MR. PONTZ: You filed some initial
16  disclosures in this case, and those require you to
17  provide at least a listing, if not a copy, of the
18  documents you think are relevant to your client's
19  claims.
20       MR. BREEDLOVE: Right.
21       MR. PONTZ: Do you think those documents
22  are relevant to your client's claims?
23       MR. BREEDLOVE: They're post -- they're
24  prediscovery, and the things that I have to supplement
25  the initial disclosures with versus the things that

1  we've come up with subsequent to that submission of
2  those. Based upon what questions were asked in the
3  initial disclosures, I'm not sure they're covered by
4  what we have or what he gave me, but I'll check.
5       MR. PONTZ: Are --
6       MR. BREEDLOVE: We're not withholding
7  anything, is what I'm saying.
8       MR. PONTZ: I understand.
9       MR. BREEDLOVE: I've just never been
10  asked for all them.
11       MR. PONTZ: Are all your claims from
12  1990 forward? Excuse me, '99 forward?
13       MR. BREEDLOVE: Yes.
14       MR. PONTZ: He's not pursuing any claims
15  from pre1999?
16       MR. BREEDLOVE: No.
17  BY MR. PONTZ:
18    Q  Mr. Boulware, do you understand you're not
19  pursuing any claims pre1999?
20    A  No.
21    Q  You're not?
22    A  Wait a minute.
23    Q  You're not pursuing any claims for anything
24  that happened before 1999?
25    A  No. No. Everything happened --

1    Q  Everything after '99?
2    A  Right. You asked me questions about stuff
3  that happened before.
4    Q  I'm just trying to make it clear. That's
5  fine. Okay. So we talked a little bit about
6  referees?
7    A  Yes.
8    Q  And you refereed, you said, in 1996 and 1997
9  and a little bit in 1998?
10    A  Yes, sir.
11    Q  What other services did you provide to WCW?
12  You talked about wrestling with them in the '90s for a
13  period of time. You talked about working on the ring
14  crew. You talked about refereeing with them. Did you
15  provide any other services to WCW?
16    A  Yes, I did.
17    Q  What else did you provide?
18    A  One of them was, I was involved in an
19  investigation.
20    Q  Other than that, did you provide any other
21  services to WCW? Is that a no?
22    A  A no. Not as far as I remember. But I
23  dealt with a lot of people through WCW since then.
24    Q  But you didn't provide any services to WCW?
25    A  They told me, don't do nothing.

1  18 years in the career. You got to understand, most
2  of these guys we used to have a circle, and you see
3  these guys all the time. And like you might -- you
4  -- well, you at arena or not, you see them. You-all
5  go to the same places. I go to places looking for
6  talent. I see Nick Patrick. I'd see JJ Dillon. I'd
7  see Arn Anderson. I'd maybe see them once or twice a
8  week.
9      Q   My question, though, about the referees.
10     A   Yes.
11     Q   You'd remembered Nick Patrick's name, but
12  you said you couldn't remember the names of other
13  *referees?*
14     A   The name Nick Patrick -- give me a minute.
15     Q   Please?
16     A   I'll give it to you. Nick Patrick? It's
17  just too far. I mean, I know -- they right in front
18  of me, but I can't --
19     Q   Well, if you do remember, if you will just
20  *let me know, or let your lawyer know if it's not*
21  *during the course of the day.*
22     A   Okay.
23     Q   How do you know that -- you said a minute
24  ago that you thought they were employees. How do you
25  know they were employees?

1      A   Well, Terry Taylor told me.
2      Q   What did Terry tell you?
3      A   Well, it was a guy came in by the name of
4  Chip Crockett. His family used to own the wrestling,
5  and we all -- Pez, myself, everybody was sitting there
6  and he became an employee.
7      Q   Was he a referee?
8      A   No. He was an employee. So I went to Terry
9  and, I'm saying, how did this guy, white, come on and
10  ain't had no experience in the business and become an
11  employee?
12         He said, to me, this is the way we
13  operate. *Turner told us we don't need to use you-all*
14  *niggers. Just like that.* Something about survey or
15  whatever.
16         And I kept saying, why?
17         He said, we got it from the big office.
18  They told us we don't have to use you-all.
19         And I asked Terry. I said, well, why?
20         He said, *we make employee to people, white*
21  *people, not black people.*
22     Q   When did he say this to you?
23     A   Terry told me this in -- I had this
24  conversation with a few of them in the last few months
25  before they closed.

1      Q   Well, back up for a second. You had that
2  conversation with --
3      A   Terry Taylor --
4      Q   -- Terry Taylor. When was that?
5      A   That was, like, it had to have been in '98
6  or '99.
7      Q   Where did that happen?
8      A   At one of the arena.
9      Q   Was anybody else around?
10     A   No. Not at the time.
11     Q   And you said you've had a similar
12  conversation with other people?
13     A   Yes, I have.
14     Q   Who have you had that conversation with?
15     A   Well, I had a conversation with Arn
16  Anderson.
17     Q   When was this?
18     A   Shoot, probably -- about a month or two
19  months before you-all closed, before Turner closed. I
20  guess most of the guys was -- I thought they was
21  coming down off their bigotry they had been with us,
22  but they were mad at Turner because they figured they
23  had no job no more. I don't know what it was.
24         I run into JJ. I run into Paul Orndorff.
25  Paul called me about using the kid in my wrestling

1  organization, and I replied to Paul, I said, why now
2  you-all want to work with me when I been trying to be
3  a referee, I been trying to put my company out there?
4         And Paul basically told me that they had
5  got some word from Turner Sports that black people
6  *don't buy tickets; they don't use no niggers.*
7      Q   Paul said that to you?
8      A   Yes. Paul said that to me. I was Paul
9  partner one time, so I been knowing him for over the
10  period of time, and the word nigger, buckwheat,
11  crackhead, you got to understand, was something they
12  used. I mean, it wasn't --
13     Q   When you say they, who are they?
14     A   Well, Jody Hamilton, JJ Dillon, Paul
15  Orndorff, Mike Wenners. All employees. Doug
16  Dellenger.
17     Q   Let me get back to your point. We'll talk
18  about that a little more, but let me get back to your
19  point. You said that you believed referees were
20  employees, and what I want to know is, what evidence
21  do you have --
22     A   Nick told me.
23     Q   -- that they were employees?
24     A   Me and Nick was going down the road one day,
25  and Nick, I would say, about, I need some insurance

1   for my daughter.
2       And Nick said, you don't have no
3   insurance?
4       I said, well, could I have insurance?
5       He said, well, you know, we all employee.
6   We got insurance.
7   Q   Who?
8   A   Nick Patrick. That was Jody Hamilton's
9   son.
10  Q   Did he say who the "we" was?
11  A   The "we," that's the referees. That's what
12  he was saying to me.
13  Q   Did he say referees?
14  A   He said referees, we have insurance.
15  Q   Did he say the referees have insurance?
16  A   Yes. He said he had insurance, and we all
17  have insurance. I took that to be that he was talking
18  about the referees.
19  Q   That's what you believed he was talking
20  about?
21  A   Right.
22  Q   But he didn't specifically say —
23  A   He said he had insurance.
24  Q   But he didn't say the referees have
25  insurance?

1   A   He said, I got insurance, and we have
2   insurance. So the we, I took —
3   Q   Is that all the evidence that supports your
4   belief that they were employees?
5   A   Well, like I say, Chip Crockett, he was on
6   the production crew, and he had never did no
7   production, and he came right in and made insurance.
8   Q   My question, though, Mr. Boulware, has to do
9   with referees, and you said Chip Crockett was not a
10  referee?
11  A   No. He wasn't.
12  Q   So is the evidence that you believe the
13  referees were employees, that conversation you just
14  mentioned with Nick Patrick?
15  A   Yes. And lot more stuff that was going on
16  around the time.
17  Q   What else?
18  A   Like I just said, the Crockett, those
19  events. Guy would sit at home and wouldn't get — I
20  mean, didn't come to work and was getting paid. I
21  mean, it was just — it was a racist atmosphere. You
22  got to be there to know about it.
23  Q   Again, Mr. Boulware, you need to listen to
24  my question carefully. What I'm asking you for is all
25  the evidence that you believe supports the statement

1   that you made that the referees were employees? And
2   you told me about Nick Patrick. You told me about
3   Chip Crockett. Is there any other evidence that you
4   have that you believe supports your statement —
5   A   Yes.
6   Q   — that the referees were employees?
7   A   Some of the conversation I had with guys
8   like Kevin Sullivan.
9   Q   What conversation did you have with Kevin?
10  A   Kevin basically told me that — you want to
11  know what he told me, or just about the employee?
12  Q   I want to know what he told you.
13  A   Well, he told me basically I was getting
14  screwed. He told me that I put in for the minor
15  league program, that they had two more white groups,
16  out of — one out Nashville, one out of Ohio. Gave
17  them $100,000 apiece and the truck and gave them rings
18  and stuff like that.
19  Q   Why does that make you believe that the
20  referees were employees?
21  A   Because they did everything else like that.
22  I mean, that was — that was their policy, treating
23  blacks bad and whites — I mean the good old boy
24  system.
25  Q   So are you basically telling me the reason

1   you feel like the other referees were employees was
2   because there was discrimination going on?
3   A   And Nick told me. Yes. And then Arn
4   admitted — well, Terry admitted to me that they was,
5   like, employees around there that had came on, white
6   guys, since I'd been there all them years and wasn't
7   no employee.
8   Q   Not specifically referees? Just other
9   people?
10  A   Referee and other people. Nick Patrick, for
11  example. Because I asked him about — I was a
12  production and referee, so the job was basically about
13  the same. I mean, it was different, but everybody was
14  on that same — it was employees, and, you know, you
15  be independent contractor.
16  Q   Was Nick — do you know, was he providing
17  any other services?
18  A   No. He didn't have to. His daddy was boss.
19  Q   Do you know what Nick Patrick did for WCW?
20  A   Referee.
21  Q   Do you know if he did anything else?
22  A   Well, they made him — also later on they
23  made him road agent.
24  Q   So he was providing road agent services?
25  A   Yes. But wasn't no black road agent either.

1    Q   Let me finish, please. I know it's hard. I
2  know it's hard. Did you approach WCW and say to the
3  WCW folks, I have a wrestling promotion, and I'd like
4  you to send your talent to wrestle with my promotion?
5    A   Yes.
6    Q   Who did you talk to about that?
7    A   Down the line --
8    Q   Give me one at a time?
9    A   You want Time Warner?
10    Q   At WCW?
11    A   JJ. I --
12    Q   When did you talk to JJ about it?
13    A   I talked to JJ on several occasions.
14    Q   Do you remember what years these were?
15    A   It was the last few months of the thing I
16  kept, because I just didn't want to sue this. I
17  wanted to come back to work and, you know --
18    Q   What did JJ say?
19    A   Well, he basically told me -- a couple times
20  he gave me the -- he'd talked to the big people, and
21  then he kind of, like he said to me a couple time that
22  they just -- they didn't want to fool with me.
23    Q   So JJ said that wasn't his decision to make?
24    A   Well, he said that he had to talk to the
25  other people at Turner. But he was in charge.

1    Q   Who is the next person other than JJ that
2  you talked to?
3    A   Talked to Terry Taylor.
4    Q   What did you ask Terry about?
5    A   I asked -- I showed Terry what I had. We
6  sat down and ate lunch. I showed him about, you know,
7  the group of guys I'd put together. My ring. I was
8  insured. I show him my charity groups that I was
9  doing right here in Atlanta.
10    Q   And what did he indicate about --
11    A   He told me it was real good. He told me it
12  was real good.
13    Q   Did he say he was in a position to hire --
14    A   Yes.
15    Q   -- your company?
16    A   He told me yes, he was going to go to JJ.
17  He thought this was a great idea. Give it a little
18  time. I kept calling him back.
19    Q   Was this during the few months before WCW
20  closed down?
21    A   I talked to him, yes.
22    Q   Is that when you talked to him? That period
23  of time?
24    A   Yes. I talked to him over the period of
25  time for two years, the last one from '99 to probably

1  I have records most of them, records of calling and
2  talking to them. Yes. I run into him all the time,
3  like we go to -- I go places and scout for talent,
4  and I would see Terry. I'd see Arn and guys like
5  that, and we knew each other.
6        We was sitting there talking, and at the
7  end they just basically -- would most of them
8  basically told me the truth. That they wouldn't --
9  when they call, that Turner told them they did a
10  survey, whatever, and black people weren't coming to
11  the matches, and they weren't using all the blacks.
12    Q   But you weren't talking about wrestling now.
13  You're talking about using wrestlers from WCW to --
14    A   I talked to all of them. All the wrestling
15  too. I still could wrestle.
16    Q   Is your claim on behalf of Boulware
17  Enterprises, just the claim that they didn't use you
18  and sign a contract with you to provide training and
19  wrestling opportunities?
20    A   Not only that. I was shut out. I was shut
21  out of the arena. I went to Channel 34 one time. I
22  got pay-per-view there too also, and a few small
23  wrestling organizations. I tried to get -- to buy a
24  spot on TV. They looked at my tape, and they came
25  back -- basically I sit there and told them that we

1  got Turner stuff coming out here, legal problem with
2  Turner, like I haven't sued nobody. We can't deal
3  with you.
4    Q   Who told you that?
5    A   There are people at Hot Atlanta. That was,
6  like, a year, year and a half ago. I went to, like,
7  for example, Jody Hamilton to sell a lot of rings that
8  he got from WCW, and I try to buy rings and stuff, but
9  they triple the price on me.
10    Q   How do you know that?
11    A   Because I get people that bought rings.
12    Q   Like who?
13    A   I got a list of them. I got of list of
14  people that Jody had sold rings they had made, and if
15  you want to know the truth, they overcharged WCW for
16  the charge of the ring. They had to get the ring, and
17  they'll sell it to -- I mean, I had people -- several
18  people approach me about rings. I had went to shows
19  and seen people with WCW logos on the ring, and I
20  went, like, where you-all get that from?
21        Jody Hamilton.
22    Q   You have this list in your possession?
23    A   I got it somewhere. I don't know where. I
24  kept a lot of documents on all the stuff that went on.
25    Q   We need you to find that documentation.

1 We're going to make a request of your attorney for the
2 appropriate documentation.
3    A    I got enough of it.
4    Q    Anything else that you believe that we
5 haven't talked about that you were discriminated
6 against on the basis of your race in placement with
7 WCW?
8    A    Yes. Oh, yes. Few things. You showed me
9 that policy there. I think if you look under there,
10 that they have a policy, no touch. You put your hands
11 on someone, you get fired. I had a guy by the name of
12 Steve Barry, who was the head of the production crew
13 for all the setup, walked up one day mad and pushed
14 me. I had four different witnesses. Nobody --
15 people that seen it. They walked to me and said, why
16 did he do that to you? And I called Turner. I called
17 Time Warner, everybody.
18    Q    When was this, Mr. Boulware?
19    A    It was, like, it was -- it was '90 -- it
20 was actually before '99, but I'm going to continue the
21 story. He pushed me, and I called everybody and made
22 a complaint about it. He was still working there to
23 the day they closed, but I saw this gentleman in the
24 year of -- I saw him a couple of times, but I saw him
25 one time at the Good Old Day. Good Old Day was a

1 place we go, all WCW, talented young guy would go and
2 wrestle outside. They do it on Friday night.
3          So I run into Steve one time. I was
4 really mad at him. He called me to the side. He
5 apologized to me about it, and he said to me -- and I
6 asked him, I said, well, you know, my whole thing is,
7 why would they do that? They know this is against the
8 law.
9          He said, you know Buff slap the cameraman.
10 They don't do nothing to us for doing that to you-all.
11 He just walked off.
12    Q    And you said this incident with Mr. Barry
13 was before 1999?
14    A    No. No. He slapped me. He pushed me
15 before '99, but he told me in 2001 why he did it, and
16 wasn't nobody going to bother him about it.
17    Q    Why did he push you?
18    A    He said because nobody going to do nothing.
19 He was upset. Something happened to his family life,
20 and he just at the time, anybody ran into him, he
21 didn't care. He pushed me. I had evidence he did it,
22 and he made the statement to me about Buff slapping
23 the cameraman. He said, you see what they did to
24 Buff? They didn't do nothing to Buff. He slapped the
25 guy. Steve Barry said this.

1          I went, like, what? It was unbelievable.
2    Q    Now I'm asking you -- again, I appreciate
3 you telling me about that, but again, what I was
4 asking you about is opportunities in placement that
5 you didn't get with WCW. Okay. You've told me about
6 a few of them. Are there any other opportunities for
7 placement that you believe you didn't get with WCW?
8    A    Yes. Yes.
9    Q    What would that be?
10    A    I still wrestle on a regular basis. I could
11 have wrestled. I apply for that job, but like I say,
12 referee; thousand dollar made in referee. Promotion.
13 The minor league program, the way I understood from
14 three of the bookers, that they pay three
15 organizations, miles away, $100,000 apiece, and that
16 100,000, I probably could have made a lot of money on
17 that. And I was ready in Atlanta, and I was an
18 employee.
19    Q    Mr. Boulware, let me ask you about that.
20 How do you know that? Who told you that?
21    A    I got it from the bookers.
22    Q    Who?
23    A    Terry told me. Kevin Sullivan told me. I
24 can name the list.
25    Q    Well, I'd ask you, if you would, Mr.

1 Boulware, tell me who told you that, and I'm going to
2 ask you what they told you.
3    A    Okay. I will.
4    Q    Terry -- you said Terry Taylor?
5    A    Yes.
6    Q    What did Terry tell you?
7    A    Terry told me finally, after they gave one
8 of the guys, Birch Prentice -- I think he was in
9 Nashville.
10    Q    What was his name?
11    A    Birch Prentice.
12    Q    And who was Mr. Prentice?
13    A    Prentice was a guy that run organization
14 like I was running.
15    Q    Out of where?
16    A    Nashville.
17    Q    What did Terry tell you about Mr. Prentice?
18    A    He told me that Mr. Prentice was a friend of
19 his, and he said, I got to get a contract to him. No.
20 He talked to -- after he'd gave a contract. When I
21 called him up, I said, Terry, why? I said, I'm here.
22 Turner don't have to pay no money to fly nobody out.
23          And they always said, it's not our money;
24 it's their money. We don't care.
25          I asked him, I said, because I'm black?

1          He asked me, what do you think? What do
2    you think? Yes, it's because you're black
3        Q    So he didn't say that? You asked him if it
4    was because of your race, and he said, what do you
5    think?
6        A    Yes. Because you're black; what do you
7    think?
8        Q    Did Mr. Taylor say it was because you were
9    black?
10       A    Yes.
11       Q    When did he say that?
12       A    When did Terry tell me this? It was after
13   Birch got the minor league program.
14       Q    Do you remember when that was?
15       A    I can't tell you the exact date, but I can
16   look it up.
17       Q    You don't know whether Mr. Taylor made the
18   decision to sign that contract with Birch Prentice, do
19   you?
20       A    He said he did.
21       Q    But you don't actually know whether or not
22   he did?
23       A    I'm telling you what he said.
24       Q    I understand you say Mr. Taylor said he did,
25   but you don't actually know that? You weren't in the

1    room? You didn't see him sign the contract?
2        A    Because more people told me.
3        Q    Who else told you that?
4        A    Kevin Sullivan.
5        Q    Told you what?
6        A    That Terry Taylor, they was discussing who
7    to give the minor league program to? And Birch
8    Prentice was an old friend of Terry Taylor, and Terry
9    stood up and say he'll say he'll vouch for him and,
10   you know, they should give him the money and the ring.
11       Q    Do you know how long Mr. Prentice had this
12   program?
13       A    I know a lot about Prentice, though.
14       Q    Answer my question. That's fine. Do you
15   know how long Mr. Prentice had this program?
16       A    No.
17       Q    Do you know how many people he'd trained in
18   this program or how many opportunities or how many
19   shows he had each year?
20       A    I know that a lot of stuff that he had
21   claimed that he had did, he hadn't did.
22       Q    Do you know what he told WCW about his
23   qualifications and his experiences and his background
24   and his skills? You don't know that, do you?
25       A    No. I know what I told him about mine. He

1    didn't call me back and say yes or no or nothing.
2        Q    So you don't know what went into the
3    decision WCW made to give Mr. Prentice this contract?
4        A    No. But—
5        Q    That's fine. Now, was there another
6    organization besides Mr. Prentice's organization?
7        A    Yes. There was a guy in Cleveland, Ohio.
8    Cincinnati, Ohio.
9        Q    Where in Ohio?
10       A    Cincinnati, Ohio. And this guy name— he
11   used to wrestle with me. His name is — I can't think
12   of his name right now, but you have it on your record.
13   I'm pretty sure you do.
14       Q    You don't remember the name?
15       A    I got his name in my file, but I can't
16   remember right offhand.
17       Q    Do you know how long he'd had this wrestling
18   business?
19       A    No, I don't.
20       Q    And do you know anything about the wrestling
21   — that business in terms of what his qualifications
22   were to run it or what he told WCW he was capable of
23   doing?
24       A    No. I have no —
25       Q    And you don't know exactly how much they

1    paid him, do you?
2        A    I know what they told me.
3        Q    What did they tell you?
4        A    They give him $100,000.
5        Q    This was — Terry told you that?
6        A    Terry told me that, and Kevin Sullivan told
7    me. It was a known fact when they put everything on
8    the Internet, once they do it.
9        Q    And other than what Terry Taylor told you
10   about who made the decisions, you don't have any other
11   evidence about who made these decisions to hire these
12   companies or do contracts with these companies, do
13   you?
14       A    No.
15       Q    Did anybody else besides Terry Taylor and
16   Kevin Sullivan tell you anything about these minor
17   league contract deals?
18       A    Yes. Paul Orndorff.
19       Q    What did Paul tell you?
20       A    Paul basically told me they gave Birch, I
21   think $100,000. They gave him a truck. And he was
22   kind of mad at him because he figured that they were
23   throwing away a lot of money because you got — after
24   all, you got to fly guys up there. You got to get
25   guys there to the show where we had — knowing that I

1  make -- he would take his place, but the other guy
2  would come back and work again.
3     Q   Do you know what qualifications this company
4  here in Atlanta that was doing work with WCW had to
5  provide those services?
6     A   It wasn't better than mine, I guarantee you
7  that.
8     Q   Do you know what their qualifications were?
9     A   Just a little wrestling organization that --
10 just like mine, out there working, and it was white
11 also.
12    Q   Do you know what services they provided to
13 WCW?
14    A   All I know is that they took guys from the
15 training power plant and they used them on live shows,
16 same show -- type of show that I had.
17    Q   Do you know what else they might have done
18 with WCW?
19    A   No. I have no idea.
20    Q   And you don't know how much they got paid to
21 do that, do you?
22    A   No.
23    Q   And you don't know what the terms and
24 conditions of the deal was, do you?
25    A   I'm pretty sure the record would tell it,

1  though.
2     Q   But you don't know that?
3     A   I don't know.
4     Q   And you don't know who made the decision to
5  pick them?
6     A   I just know what I was told. I have no way
7  of knowing -- I wasn't there when they say, here is
8  the job. I know they hired these people, and they
9  overlooked my company and my skills, over 20 years in
10 the business.
11    Q   As to this third company, you don't know
12 what that company's skills or background was in the
13 business, do you?
14    A   No.
15    Q   And you don't know what criteria they
16 weighed or considered in deciding to choose that
17 company, do you?
18    A   No. But what I do know is in all the past
19 stuff they went, picked their buddies and their white
20 counterparts and didn't hire anyone that was black. I
21 mean, it wasn't no black in the whole management for
22 WCW, period.
23    Q   And you don't know what other companies
24 sought to provide those kind of skills and training
25 for programs and live opportunities? You don't know

1  what other companies provided those kinds of things to
2  WCW, or -- let me rephrase that. Let me take that
3  back. Do you know if there were other companies
4  besides those three who sought to work with WCW and
5  provide the same kind of programs?
6     A   I have no idea what record they would have
7  of who applied for a job.
8     Q   I'm not asking what records they have. You
9  don't know anybody else who might have applied for
10 those opportunities, do you?
11    A   I just know what they might have said. I
12 mean -- I don't know, no.
13    Q   There might have been other folks that were
14 turned down for those opportunities? There might have
15 been other companies that came and said, I want to
16 provide you minor league wrestling services and WCW
17 said no?
18    A   There ain't that many. You talk like it's a
19 thousand of them out there. It ain't that many. It's
20 very few. It's only two large wrestling company in
21 the country, and only a handful of wrestling minor
22 companies in the country that legitimate, people that
23 been in the business, that know the business. You
24 might have somebody just like, a paralegal, your
25 lawyers, that are different, you know. Just -- it

1  just ain't that many people.
2     Q   Well, how many are there? Do you know?
3     A   I'd say ten at the most, probably.
4     Q   And so you know about ten or so?
5     A   I been in the business 21 years.
6     Q   You don't know if any of those other ten
7  that we haven't talked about came to WCW and said, I
8  want to provide services and WCW said, no thanks?
9     A   Well, they didn't tell me no thanks. They
10 just didn't call me.
11    Q   So you don't know?
12    A   I don't know.
13    Q   Talking about your claims of compensation
14 discrimination, pay discrimination, tell me what you
15 believe -- what evidence you have that you were paid
16 differently than others because of your race?
17    A   Okay. For example -- I'll use Terry Taylor,
18 for example. Me and Terry Taylor basically broke into
19 the business at the same time. He had no more
20 knowledge of the business than what I have. He
21 probably made 200, $300,000 for the last four or five
22 years, or more.
23        I could name a guy like Jimmy Hart, for
24 example. These guys I broke in the business with. I
25 wrestled with. When I refereed with, they just passed

1 them over. They had young guys come like I mentioned
2 the guy, a distant friend. This kid come in, white
3 guy. I mean, basically couldn't even wrestle. They
4 made -- from wrestle, they know he was a booker. He
5 had no prior qualifications of that. I mean, I'd been
6 wrestling ten years before he even got in the
7 business.
8 Q So, Mr. Boulware, is it your complaint that
9 you didn't get these job opportunities? It's not
10 really that you didn't get paid the same as them?
11 It's --
12 A I didn't get the paid same also.
13 Q Because you weren't doing the job; right?
14 You said you couldn't get the job?
15 A Well, for example, when I was ring -- the
16 ring guy, where they call ring boy, or ring guy, they
17 have a guy that was over here making $50,000.
18 Q Who?
19 A Gordon Nelson.
20 Q Was Pez Whatley making $50,000?
21 A Not at that time. Not at that time.
22 Q Did he make $50,000 on the ring crew? Do
23 you know?
24 A I don't know exactly what he made, but he
25 got a raise after I complained so much to Time Warner

1 and the Turner people, then they gave him --
2 Q How do you know how much Mr. Nelson was
3 making?
4 A He told me several times. We rode the truck
5 together. He laughed about it. He laughed about it.
6 He made a joke about it. It was out in your face. It
7 wasn't like they here behind your back and you hear
8 them whispering. They would say it to your face.
9 They have no problem with saying it.
10 Q Other than Mr. Nelson telling you what he
11 made, do you have any other evidence as to what he --
12 A Him, Klondike -- Bill Klondike, Chip
13 Crockett. I mean, the list go on.
14 Q I need you to listen to my question, Mr.
15 Boulware. My question was, other than Mr. Nelson
16 telling you how much Mr. Nelson made, do you have any
17 other evidence how much Mr. Nelson was paid?
18 A Yes.
19 Q What's your evidence?
20 A I have -- Terry told me. We talk about it
21 all the time.
22 Q What did Terry tell you?
23 A Terry basically told me -- I asked why my
24 pay different from theirs, and it always basically
25 come back, the color of your skin, and you're not in

1 the clique.
2 Q Did Terry Taylor say the reason you were
3 paid differently than Mr. Nelson was the color of your
4 skin?
5 A Yes. He said that.
6 Q Did he say those words?
7 A He said that, oh, yes.
8 Q What words did he use?
9 A He use several different -- I talked to him
10 several different times.
11 Q What do you remember him saying?
12 A I remember him basically telling me -- do
13 you want me to use a good example?
14 Q What I'd like you to do is tell me what he
15 said. Not basically what he said, but --
16 A I can't remember the exact words he said.
17 Q Tell me what you remember him saying.
18 A I remember him telling me about that I knew
19 how -- what was going on. Why would I keep bothering
20 him, because things wasn't going to change. And I
21 asked him a couple times, why? And that when I --
22 finally everybody started telling me -- everybody,
23 meaning JJ, Dusty -- I even talked to Dusty about it
24 also. He was in management. That the Turner people
25 basically told them, when no black people come to the

1 show, then they didn't have to use no black, period.
2 I don't know if it was true. I know they told me.
3 Q This is Terry Taylor?
4 A Terry. JJ told me the same thing. Arn
5 Anderson. The list go on. Each one of them sit down
6 basically when we was away from all the record and
7 stuff going on and look me in the eye and told me that
8 was the reason I wasn't getting no promotion and why I
9 wasn't going to be nothing but the worst job that they
10 could give me. And they basically told me that.
11 Q What other evidence do you have that
12 supports your claim that you were paid differently
13 because of your race?
14 A Well, okay. Chip Crockett back again. We
15 was in Philadelphia, and I had just received my
16 paycheck, and I had my check, and Chip telling me, he
17 said, well, I got direct deposit. Well, how you get
18 direct deposit? You're not no employee.
19 He said, you, you didn't know? I'm an
20 employee, and I can get paid more than you. And even
21 I showed him my check. He said no, I got a guaranteed
22 salary. I don't get paid by the low end.
23 I'm, like, how can you do that and you
24 came here probably 16 years after I been in the
25 business?

1    Q    What kind of job was Chip Crockett doing?
2    A    Ring crew.
3    Q    Was he driving the truck?
4    A    Yes.
5    Q    What else was he doing?
6    A    That's it.
7    Q    Do you know if he was doing anything else,
8    or that's all you saw him do?
9    A    That's all he was doing.
10   Q    Did you see him do anything else?
11   A    That's all he was doing.
12   Q    How do you know he wasn't doing anything
13   else?
14   A    Wasn't doing anything else. I hung around
15   with him.
16   Q    Every day?
17   A    Basically, every day. Because we was on the
18   road together most of the time.
19   Q    But he wasn't in your truck with you?
20   A    No, but we was all the time. He live at the
21   Ramada. I live in Riverdale. He call me for favors,
22   like pick him up -- he didn't have a car -- from the
23   airport.
24   Q    When you were on the road for three or four
25   days driving the truck, you wouldn't be around Chip

1    Crockett?
2    A    Somehow, the crew always hook together.
3    Sometimes we do two shows. We do shows together,
4    like, for example, one show might be in some one part
5    of the Pennsylvania. We'd be in Pittsburgh. So when
6    they get through there, they come there. Now, and we
7    all meet there. I've seen them about -- I would say
8    once to three times a month, four times a month.
9    Q    Other than what you now told me about Chip
10   Crockett and what you told me about Gordon Nelson and
11   the statements that other people made about them, what
12   else do you believe supports your claim that you were
13   paid differently because of your race?
14   A    Because I was told by the management, Terry
15   Taylor, JJ Dillon, all of them, they told me.
16   Q    What role were you in when you were talking
17   with them about your pay? Was this when you were on
18   the ring crew?
19   A    That was on the ring crew. When I got off
20   the ring crew, I talked to them about coming back to
21   work.
22   Q    So that's not really a claim that you
23   weren't paid? That's a claim that they wouldn't bring
24   you back to work?
25   A    That was two claims, though. You asked me.

1    Q    But you're not saying you were paid less
2    than somebody because you weren't actually working to
3    get paid; right?
4    A    Which time are you talking about?
5    Q    Well, you tell me.
6    A    I don't know. You ask me the question.
7    Q    It's your claim, Mr. Boulware. What I'm
8    asking you to tell me is why you believe you were paid
9    less because of your race? Tell me all the instances,
10   all the situations in which you believe you were paid
11   less because of your race and why you believe that?
12   A    Well, I believe that because I got it from
13   people that were credibility people, I assume at the
14   time, and they was in charge of WCW.
15   Q    And I'm asking you, Mr. Boulware, give me --
16   I'll give you an example. Okay? If I'm working and I
17   have a lawyer working next to me --
18   A    Yes.
19   Q    -- and I feel like we're doing the same work
20   and I feel like he's making a different amount of
21   money than me, then maybe I wonder why. Okay? Does
22   that make some sense to you?
23   A    Yes.
24   Q    Are there similar situations that you have
25   like that?

1    A    I can't remember right now.
2    Q    You can't remember at all?
3    A    I can't remember right now.
4    Q    So is there anything else besides what we've
5    talked about already that supports your claims of
6    being paid differently?
7    A    I can't remember right now. It's a whole
8    bunch of stuff you asked me.
9    Q    I mean, that's what you're here for.
10   A    I'm sorry. I can't make my mind remember
11   stuff I can't.
12   Q    That's fine. And that's all I'm asking you
13   is everything you can tell me sitting here today.
14   A    I tell you the truth what I know, and if I
15   can't remember, I say I don't remember.
16   Q    So we've talked about everything that you
17   can remember that supports your claim for compensation
18   discrimination, pay discrimination?
19   A    Have we talked about everything?
20   Q    Is there anything you can think of that we
21   haven't talked about that supports your claim of --
22   A    Pay discrimination? Oh, yes. That I can
23   remember.
24   Q    That's a yes?
25   A    Yes. That I can remember.

1  crew?
2   A   Well, I was -- Terry Taylor. I'm sorry.
3  Terry Taylor.
4   Q   How do you know Terry made that decision?
5   A   He told me.
6   Q   Did he tell you why he made that decision?
7   A   He just told me that the only job they'd let
8  me have.
9   Q   When did he tell you this?
10  A   That was '96, '97.
11  Q   Did you think about going to try to wrestle
12  someplace else?
13  A   Ain't nowhere to go.
14  Q   Did you call WWF?
15  A   WCW and WWF is -- is competitive.
16  Q   Right.
17  A   If they don't give you a chance to do
18  nothing here, ain't nobody else going to give you a
19  chance.
20  Q   Did you call WWF to ask?
21  A   No, not really.
22  Q   You didn't say, hey, I'm a wrestler here at
23  WCW; they're not letting me wrestle anymore; let me go
24  talk to somebody else about wrestling?
25  A   No. I kept staying where I was here. I

1  been here all the time.
2   Q   But you could have left Atlanta or could
3  have left WCW and tried to get a job with WWF, right,
4  and you didn't?
5   A   No, I didn't.
6   Q   And then you talked about -- well, let me
7  make sure I got it right. Referee contract, who
8  denied you a contract as a referee?
9   A   Well, basically the whole wrestling office
10  people that were in promotion.
11  Q   Do you know who made the decision not to
12  make you a referee?
13  A   Well, I became a referee, but I didn't get
14  the pay, and the last time I talked to JJ about it,
15  and JJ -- actually I asked him about a contract. I
16  kept asking him every week about a contract. He
17  finally pulled me off and he told me, Eric Bischoff
18  wasn't going to give me a contract. I asked him why.
19       He said, because I'm black, but he told me
20  what he would do for me was give me $200 a night just
21  to keep quiet and stay out of his way.
22       And I told him, that still ain't fair.
23       He said, that's the only thing I can do
24  for you. Take it or leave it.
25  Q   Do you know how much the other referees were

1  making a night?
2   A   A lot of them make a thousand dollars,
3  $1,500 a week.
4   Q   How do you know that?
5   A   I seen some of the checks.
6   Q   And they were making $1,000 a week?
7   A   A week. Right.
8   Q   How many nights a week were they working?
9   A   Three, four.
10  Q   And --
11  A   But they had a contract, and that's what was
12  different.
13  Q   Did you see any of the contracts?
14  A   I seen guys with contracts. Never did sit
15  down and read their contract.
16  Q   How do you know they had a contract?
17  A   I mean, I seen them. I mean, they would be
18  sitting around reading the contract before they sign
19  them. We'd be on the plane or something, or I'm in a
20  Marriott or something. You sit there like Nick. I
21  knew Nick 15, 18 years.
22  Q   Did Nick have a contract?
23  A   Yes. Nick had a contract.
24  Q   Did you see Nick's contract?
25  A   Yes.

1   Q   Anybody else's contract you saw?
2   A   No. Just what guy told me they had, either
3  contract or a deal. Lot of times the deal was that
4  you guaranteed a certain amount of money, every week.
5   Q   Who told you that they had a deal? Anybody
6  else besides Nick or -- that you can remember?
7   A   Basically, everyone that was in the
8  business.
9   Q   And you can't remember who those folks were?
10  A   I mean, I can start naming peoples. I mean,
11  Terry. I saw him when he left and went to New York,
12  and he came back after all the racist stuff that was
13  made. He got a job there. I saw him there tell me
14  about contract. He told me he had a 90-day probation
15  period on it.
16  Q   But he wasn't a referee?
17  A   No.
18  Q   He was a booker. Are there any referees
19  that you can think of who had a contract?
20  A   Well, all of them had a contract.
21  Q   Can you tell me any of their names?
22  A   I can't remember the guy's name. I just
23  can't remember the name. I remember their faces.
24  Q   This was back in '96, '97 '98?
25  A   Yes. And if I'm not mistaken, what I was

1  told by Terry Taylor and JJ, everybody there had a
2  contract, or agreement they'll make so much money each
3  week, and they all were white.
4  Q   This is what Terry Taylor told you?
5  A   Terry, JJ.
6  Q   Anybody else besides JJ or Terry tell you
7  this?
8  A   It was basically a known fact because we all
9  basically ate and slept together. I mean, you at the
10  same place. You're at the same time. You be there
11  all day long when you have a show, so you'd sit down
12  and talk to people.
13  Q   Is there anything else that you think was
14  discipline that was taken against you or discipline
15  that was done in discrimination because of your race?
16  Other than what we've already talked about?
17  A   Yes. Lots of stuff. Like, for example, my
18  wives are white. It was known fact, and they told
19  you, don't bring no white woman around the matches.
20  Q   Who told you that?
21  A   Terry Taylor told me that. JJ done told me
22  that. I mean, several people told me that.
23  Q   When was this?
24  A   I mean, told me my whole career.
25  Q   So this was all the way through 1998?

1  A   Yes. All the way up. My wife and I are
2  married three years. We been together 18 years.
3  She's never been to a wrestling match, because she
4  knew if she goes to that match, I would have no job.
5  And I have had white female come up and talk to me,
6  and they'll call you off to the side and tell you, no.
7  Q   This was during the time you were at WCW?
8  A   Yes. Yes.
9  Q   Anything else that you believe was
10  discriminatory discipline? What else is there? Is
11  there anything else?
12  A   Well, by not even considering me for a job.
13  I mean, I got all the qualifications. I had never did
14  nothing. I have never, like I say, no discipline or
15  none of that. I had a clean record with them, and I
16  applied for a job through every phase of it, and then
17  you got -- I'm qualified for five or six different
18  things, and I've got 20 years' experience, and you
19  can't find nothing for me to do? That's hard to
20  believe.
21  Q   Anything else, Mr. Boulware, other than what
22  we've already talked about?
23  A   Not that I can -- not that I can think of
24  right now.
25  Q   You have a claim in your complaint that you

1  were discriminated against in training. Is there
2  training that you believe you were supposed to receive
3  or should have received that you didn't get?
4  A   Training where? In what?
5  Q   Well, that's what I'm asking you. Is it --
6  A   You got to tell me what training you're
7  talking about. Training in wrestling?
8  Q   It's your complaint, Mr. Boulware. I'm
9  asking you, is there training you believe that you
10  didn't receive from WCW because of your race?
11  A   Training? Training I received? Training
12  that I received? I can't remember.
13  Q   You can't think of any instance where there
14  was some training that you think you should have
15  received but you didn't receive it because of your
16  race?
17  A   I don't remember.
18  Q   Now, you also have a complaint saying that
19  you were subjected to a hostile work environment at
20  WCW, and do you know what that means? What do you
21  think it means to be subjected to a hostile work
22  environment?
23  A   Well, you can't go to work and perform your
24  job the way you should be able to without someone
25  making racist crack about you. And I will use a

1  couple example.
2  Q   Hang on a second. So this is the time
3  period when you were on the ring crew, or a referee,
4  or a wrestler with WCW? Is that what we're talking
5  about here?
6  A   Well, but that was the one time -- that was
7  the time when they did it to me in my face.
8  Q   When did somebody do it to you in your face?
9  Tell me about the instances. Give me one at a time if
10  there were more than one?
11  A   Well, I got a record of them.
12  Q   Tell me what you remember.
13  A   I remember standing in the parking lot in
14  1998. A lady just come in. She was a truck driver.
15  I had to buy new tennis shoes, and she walked up to me
16  in front of a bunch of people, fans, and I'll just
17  tell you, Turner employees. Bunch of Turner employee.
18  She said, what nigger did you chase down to get them
19  tennis shoes? I reported it, wrote it down, got a
20  record of it.
21  Q   Who was she?
22  A   Just -- it got so bad that people that were
23  just employed outside the wrestling thing would do it.
24  She was this truck driver employed by Turner Sports.
25  Q   Do you know her name?



# EXHIBIT / ATTACHMENT

## BB

(To be scanned in place of tab)

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION

3

PEZAVAN WHATLEY,          )
4                    )
        Plaintiff,     )
5                    )
    vs.             )  CIVIL ACTION FILE
6                    )  NO. 1:01-CV-0916-CC
WORLD CHAMPIONSHIP WRESTLING, )
7 INC.,                )
                    )
8        Defendant.    )

9

10

11      _____

12        DEPOSITION OF PEZAVAN WHATLEY
             NOVEMBER 14, 2001
13            10:09 A.M.

14      _____

15

16

17

18

19

20

21

22

23

24

25        CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia 30326 • www.premierrptg.com
404-237-1990
800-317-5773

1  conversation, that he would confer with JJ Dillon.

2      Q      What was Mr. Bush's race?

3      A      White.

4      Q      And what was Mr. Goodley's race?

5      A      Black.

6      Q      Do you know what happened after that meeting

7  with Mr. Bush?

8      A      Yes --  only guesswork, but --  what

9  happened, but --

10     Q      What do you believe happened?

11     A      We talked to Mr. JJ Dillon, who stopped all

12 of the black people from being  -- moving up in

13 positions, and I was stuck.

14     Q      Why do you believe that?

15     A      Because Mr. JJ Dillon is as racist as they

16 come.

17     Q      Why do you believe that?

18     A      Because I've known Mr. Dillon for the

19 longest time.

20     Q      What has he done to make you believe he's

21 racist?

22     A      Well, I worked with him at a time when we

23 were in a bathroom listening to country and western

24 music, and the country and western music involved a

25 song and the word "nigger."  He thought that was

1       great.

2       Q       Anything other than that?

3       A       Mr. JJ Dillon worked with me at times, with

4    Mr. James Crockett, and we were also given positions

5    to move up, but every time that I had to participate

6    in -- me, myself had to participate in any activity in

7    which I was under Mr. Dillon's hand -- it was always

8    racist, nigger.

9       Q       Let me back up for a minute.  When was this

10   incident with you and Mr. Dillon and country western

11   music in the bathroom?  Do you recall when that was?

12      A       That was in the '80s.

13      Q       In the '80s?

14      A       Yes.

15      Q       And you just said as far as working in

16   positions involving Mr. Dillon, it was always racist?

17      A       With me.

18      Q       What did he do?  Did he say anything racist?

19      A       He just stopped your opportunity to go

20   forward on your position.

21      Q       What evidence, Mr. Whatley, do you have that

22   JJ Dillon was responsible for stopping you from going

23   to any position?

24      A       I think he gave the talk to him.  He got --

25      Q       I don't want to know, Mr. Whatley  -- I want

1    assisting with Keith on editing and passing out

2    papers.

3        Q    Do you know who made the decision to let

4    them do this work as assistant booker?

5        A    No, I don't.  I don't know.  I could only

6    speculate.  I don't know for sure.

7        Q    Now, you talked about earlier who you talked

8    with in terms of wanting to be a booker?

9        A    Yes.

10       Q    You mentioned Mr. Hamilton.  We talked about

11   that.

12       A    Yes.

13       Q    You mentioned Tim Goodley --

14       A    Yes.

15       Q    -- and a meeting that you had with Tim.  Was

16   that the only time you talked with Mr. Goodley about

17   being a booker?

18       A    No.

19       Q    Were there other times?

20       A    Yes.

21       Q    What did you say to Mr. Goodley?  Those --

22       A    Same thing I told him at the beginning.

23       Q    Which --

24       A    That we have --  we have and --  we have not

25   had any black bookers in the main events of the major

1    Mr. Bruce were assigned trips in which that he could

2    make it back in time for his family or just one or two

3    days at different times.  But because of the fact that

4    my availability of being able to drive, after my

5    first-proven shot that I could drive a truck -- look

6    how this case is going --  that I could drive --  that

7    I could go then to be trusted to drive their truck and

8    their equipment from one designated point to another.

9         Q     Anything beyond what you've just told me as

10   far as the assignments of trucks that you believe was

11   discriminatory, or is that everything?

12        A     Yes.

13        Q     That's everything, or there's more?

14        A     No.  I mean, there's more.

15        Q     What else is there?  Please tell me.

16        A     In our --  Mr. Hamilton, part of his job was

17   to go at the television --  with the television, when

18   the television went out and --  at the beginning, and

19   our assignment was to take the people that applied to

20   --  that wanted to be wrestlers, into the training

21   facility both at Jonesboro and at Carroll Drive, and

22   at this time there was a man employed also with us,

23   because of Mr. Hamilton's absence sometimes, was

24   Blackjack Mulligan, and during the time we accepted as

25   trainers the people that applied into our jobs, and

when Mr. Hamilton arrived back and he first saw the new recruits, his first comment was, oh, a different color.

Q All right. When was this?

A When we were in the training facility in Jonesboro.

Q So this is before you moved to Carroll Drive?

A Before we moved to Carroll Drive.

Q Do you know what he was referring to?

A Yes.

Q What was he referring to?

A Before there was never any -- maybe one, two Afro-Americans or nonCaucasian people there. The applications that we received when he was there, happened to include more than that, and which we accepted, and they were in the facility when he came and turned the corner. This was not something that he expected.

Q Did he do anything about it other than to say the comment that you just said?

A What was done a little later is that they were trimming the fat, multimillions of dollars. They were trimming the fat by cutting four of the black guys that were down there and let two of the white

1    guys go, because the white guys were not talented.

2    The black guys were very, very, very talented, and

3    they said we had too many down there.  Too many, I

4    mean too many people of different color.

5    Q    Did someone say that to you?

6    A    We knew it, and they said it.

7    Q    Who said that?

8    A    Mr. Mulligan told us as a repeat of what Mr.

9    Hamilton had said.

10   Q    So in other words, Mr. Mulligan told you

11   that Mr. Hamilton had said something about the color

12   of the trainees?

13   A    Mr. Hamilton had spoken about the color of

14   the trainees before that period of time, but this

15   particular instance, what we're speaking of, that's

16   the way it went.

17   Q    Do you remember who it was who was cut?

18   A    Troy Hamilton.  I can't remember his tag

19   team partner.  Very, very highly talented young man.

20   Mr. --  I can't remember his name.  I can't remember

21   his name.  Very well built, muscular bodybuilding

22   phenomena that was in town that wanted to become a

23   wrestler.  And other individuals, I can't remember

24   their names, but they made it very difficult for them

25   to stay at the facility and still wrestle.

1    A     It was as -- it was true for us to train

2    everybody really hard, but the emphasis was exactly on

3    the -- on the black individuals that they knew that

4    they could really pound on at the same time as you

5    would be -- white individuals would be given a

6    routine, whereas the black was to be given the

7    routine.

8         Now, if a white individual doing the

9    routine faltered, slumbered, could not get it done, he

10   was given extra opportunity to get hisself together so

11   that he could be able to -- to keep going on.  If a

12   black individual stumbled, faltered, or -- he didn't

13   want to be there; he had a bad attitude; they couldn't

14   teach him; he couldn't learn it.

15   Q     Who was in control of this?  Wasn't it the

16   trainers who were in control of this, including

17   yourself?

18   A     Including myself.

19   Q     So you took part in the process of what

20   you're claiming?

21   A     My process was that you were wrong.  He can

22   do this.  They're great talents sitting right here.

23   Q     Mr. Whatley, let me interrupt you, because I

24   want you to try to make yourself clear.  I'll let you

25   finish, but I don't understand what it is you're

1   wrestle, which would provide me with more money.

2       Q       Who told you that?

3       A       From Mr. Sullivan himself.

4       Q       He came to you and told you that?

5       A       Yes.

6       Q       Did he tell Mr. Bruce and Mr. Wenner that

7   too?

8       A       No.  Mr. Sullivan told me.

9       Q       Just you?

10      A       Whether he told Mr. Bruce and Mr. Wenner, I

11  can't remember, but I know what he told me.

12      Q       So he came to you and said, I'm going to

13  give you more chances to wrestle?

14      A       Now you're going to get chances to wrestle.

15  He and Mr. Mike Graham both, who were in the booking

16  position and assisted booking.

17      Q       Why is that discriminatory discipline?

18      A       Well, because of the fact that they -- that

19  Mr. Bischoff -- during this period of time we wrestled

20  in a place called Atlanta, Georgia, the Omni, and Mr.

21  Bischoff showed expressively his desire about

22  discrimination, because he took not only myself but

23  every black off the card, and he was quoted as saying,

24  this is white night.

25      Q       When was this?

1     A     In the Omni, when Mr. Shuler was in charge
2  and at our first big Omni show.

3     Q     Who else did he take off the card, according
4  to you, besides you?  Who else?

5     A     Jacqueline --  the female, Jacqueline, who
6  was Mr. Sullivan's walk-in.

7     Q     His valet?

8     A     His valet.  The Harlem Heat, Harold Hogue.
9  That was all, because that --  that wasn't any other
10 blacks on the card.  Any other blacks on the card that
11 had been wrestling previously.

12    Q     Did Mr. Bischoff make this comment to you?

13    A     Mr. Bischoff made that comment to Mr.
14 Sullivan.

15    Q     Were you there when he made that comment?

16    A     No.

17    Q     How did you hear about that comment?

18    A     Mr. Sullivan came out and told us why we
19 weren't going to be able to work.

20    Q     What did he say?

21    A     He said that this is going to be --  he took
22 off Jacqueline.  He took off the Heat.  He took off
23 Harold Hogue.  He took off any other persons except
24 for the --  what he wanted, and he told us, just
25 before he left, told us, turned around and say, Eric,

1    said this is white night.  In Atlanta, Georgia.

2        Q     Any other discipline beyond that, Mr.

3    Whatley?

4        A     That's all of them that I can remember right

5    now, sir.

6        Q     Is there anything you think that would help

7    you remember other instances?

8        A     I'm trying to, but that's all I can

9    remember.

10       Q     Why don't you take a minute and see if you

11   can remember anything more?

12       A     I spoke up to Mr. -- Mr. Randy Savage, who

13   was one of the prominent wrestlers at the time, about

14   having the opportunity to wrestle and to book, to be

15   the booker at that time, who was Kevin Sullivan.  I

16   mean, Kevin Nash.  Who at that time, Mr. Savage was

17   one of the few people that knew the -- about

18   qualifications of being the booker and that -- and

19   that I had them.

20             He spoke to him about him -- about doing

21   it, and at that time Mr. Nash could have done it if he

22   wanted to.  And he did not do it, and when Mr. Savage

23   came back to tell me the reason why he did not do it,

24   he included the fact that they were making some

25   changes.  But also he said, but the real changes, you

1    know.  And we both pointed, and we parted.

2        Q    This was what Mr. Savage said to you?

3        A    Mr. Randy Savage.  When we discussed

4    wrestling and booking as one of the things that I

5    could continue doing on that job.  Oftentimes headline

6    wrestlers go to the booker and the --  and express,

7    this guy can do it.  This guy can do it.  Randy Savage

8    was a guy highly respected.  His opinion was highly

9    noted.  He done a lot in the business, and so -- even

10   more so than the guy that held the position in the

11   job.

12           And so when Mr. Savage came back, it was

13   told to me because they're going to make some changes,

14   but also in the conversation, we knew that changes

15   that were being made had nothing to do with my

16   request.  Changes was that they didn't want me in

17   there and that I was black.

18       Q    He didn't say that, but that's what you

19   understood him to be saying?

20       A    Well, he pointed to skin.

21       Q    Did he say that's what Mr. Nash said, or did

22   he say that's what he believed was going on?

23       A    He told me what Mr. Nash said about the

24   changes and that there were going to be those changes

25   made.  I can't remember verbatim, word for word.

1    A      Right now.

2             MR. PONTZ:  Well, I'm going to reserve

3    the right to reopen this deposition when Mr. Whatley

4    decides he can remember some other stuff, but I'm

5    taking him at his word that that's everything he knows

6    about.

7    BY MR. PONTZ:

8    Q      Mr. Whatley, you also indicated in your

9    complaint that you believe you were subjected to a

10   racially hostile work environment?

11   A      Yes.

12   Q      What do you think made your work environment

13   racially hostile?  What things happened at the

14   workplace that you think made it racially hostile?

15   Other than what we've talked about?  You don't need to

16   repeat the things we've talked about, although you can

17   point them out to me if you want.

18   A      I found it necessary to try to advance

19   knowledge or equip young black wrestlers on some of

20   the things that they were going to be facing when they

21   got into the business.  Not only was that

22   objectionable from Mr. Hamilton's point of view, but

23   it was objectionable to the assistant booker's point

24   of view, objectionable to the booker's point of view,

25   and objectionable to Mr. Bischoff's point of view.

1    Q    Well, what was racially harassing about

2  that?

3    A    Well, they would rather for those kids not

4  to know those things than to be told those things.

5  They would not --  they would rather for them not to

6  know that they weren't going to get an equal

7  opportunity and that they were going to be twice as

8  good as the white boys even to be able to look at, and

9  they didn't want them to know that even though they

10  could be twice as good as the white boys and wrestle

11  and have talent, charisma, talking and everything,

12  they still weren't going to be given the chance, even

13  though they colored it like you were going to be --

14  like they was going to give an equal opportunity to

15  them all.  Me being in that business and knowing that

16  before, knew that they were lying.

17    Q    Mr. Whatley, what I'm really asking you is,

18  what happened in your workplace --  what happened to

19  you in your efforts to do your work and provide your

20  services that you believe was racially hostile and  --

21    A    Okay.

22    Q    -- affected your ability to perform your

23  job?

24    A    During the time the four --  when they made

25  the cutbacks, when they made the cutbacks on the four

1    A    Well, being a man of the experience that I

2  had, Mr. Hamilton first of all, who was in full

3  knowledge that I was a fully capable and able person

4  to be able to do not only my job but the job that he

5  was doing and to be booker.  Well, Mr. Hamilton made

6  no effort whatsoever to promote the fact that he had

7  an individual that could help with the company

8  overall.  Mr. Hamilton rather kept his mouth shut so

9  that no fur is fluffing.

10    Q    Anything else that Mr. Hamilton did that you

11  believe made a hostile work environment for you?

12    A    The fact that when we were in Carroll Drive

13  and wrestling, we would point out the different

14  individuals who working with them day by day, that

15  were really coming along real fine.  Well, Mr.

16  Hamilton came out there, and he would look under the

17  surmise of whatever period of time he was out there;

18  an hour, two hours, or whatever, and then come back

19  and make a decision on which ones he thought that was

20  good or bad, you know.

21           And oftentimes -- oftentimes nonCaucasian

22  or off-white or African people were -- were given

23  positions of --  he could stay down there and train

24  more, but it's always a little this that was wrong or

25  a little that, that was wrong.  Everybody had

1    something wrong. You know, so it should not be just

2    one group that should have been -- that should have

3    been identified as having something wrong.

4              They just whenever the administration

5    didn't want an extra black in there, they make up a

6    reason. He don't come on time. Some didn't come at

7    all, you know, and still were welcome back. Also,

8    which was -- this is -- the terrible thing is that

9    they would bring down Keith and that young lady that I

10   can't remember her name to look at the talent, who had

11   no idea what's going on.

12             And myself, especially myself, who were

13   capable of doing a lot of things for the young men,

14   our opinions were swept under the rug. I mean, when I

15   mean our opinions, I mean my opinion on who could be

16   doing -- like you could have a black man down there,

17   six-eight, 325 pounds, undeniably, undeniably money

18   walking, and because they would bring individuals down

19   there that had no idea about what was going on or what

20   the training, all they do is looked and thought he was

21   cute or had the hair long enough or they dyed their

22   hair blond. They had enough steroids stuck in their

23   ass that they was the ones that would be chosen over

24   individuals with talent.

25        Q    Anything -- I'm sorry. Go ahead.

1    A    No.  Go ahead.

2    Q    No.  Finish what you're saying, please.

3    A    That was it.  That was it.

4    Q    Anything else that you think was done that

5    made your work environment a racially hostile work

6    environment?  Besides what you've already told me?

7    A    When I chose an individual that was --  that

8    was talented enough to go around and --  and

9    especially, you know, when I chose a black individual

10   that was good enough to be talented, useful, could

11   draw money, that was like a mark against him.

12   Q    Did you ever choose any white individuals

13   that you thought were good?

14   A    I tried to be fair.

15   Q    And what happened to the white guys that you

16   chose that were --

17   A    Quite a lot of them were chosen.

18   Q    And none of the black guys you pushed were

19   chosen?

20   A    No black guy that I endorsed was ever used

21   on a WCW main event on the assistant basis.

22   Q    Who were some of the African-American

23   trainees you endorsed?

24   A    Like, Mr. Bobby Walker is an individual I --

25   now, Mr. Bobby Walker had a talent that no other

1    hold you on the sideline, especially me, because they

2    didn't want you to -- to display the guy giving

3    talent that you could do what was actually being

4    required of you to do.

5        Q      Anything else that you believe supports your

6    claim for a hostile work environment on the basis of

7    race?

8        A      Okay.

9        Q      What else?

10       A      Because of the fact that you -- I wrestled

11   in several -- I mean, I participated in several

12   different jobs in the WCW organization, it was not

13   unusual for you to hear amongst the work place, you

14   know, the N-word, or darky, or if you went and was

15   sitting down beside another employee that was an

16   individual that was there and the employee happened to

17   be a white female, better make sure that you were not

18   sitting down there for enticement of the white female.

19   Other white males who were always looking at that,

20   would come over and sit beside you.

21             If I was in a conversation with another

22   black individual, or another couple other black

23   individuals, it was not unusual for Terry Taylor,

24   Diamond Dallas Page to come over with a joke.  Hey,

25   not more than two or three black guys in a --  at one

1    incidents with some lighting employees, is there

2    anything else?

3       A    Well, also in security, Doug Dellenger, who

4    was head of security from start to beginning, came up

5    and told one black individual they were playing the

6    music over the loudspeaker and turned it off and said,

7    we don't want to hear no more of that nigger music.

8    And when the individual turned around and got mad, he

9    said, I don't know what you got mad; we could say that

10   to Pez and it'll be all right.

11      Q    Were you there when that happened, Mr.

12   Whatley?

13      A    No.  I was just told about that after it

14   happened.

15      Q    Who told you about that?

16      A    The people that it was told to.

17      Q    Who?  Who?  Names?

18      A    The wrestle --  was Mr. William Boulware was

19   told, and he reported it to the human resources

20   department.

21      Q    How do you know he reported it to the human

22   resources department?

23      A    Because we went down there when he went down

24   there and told.

25      Q    Were you there when he went and told them?

1    Q    Did they ever say that to you?  Did you ever

2  hear them say that?

3    A    No.  Only time that I heard them say it is

4  when they thought I wasn't there.

5    Q    That's what I'm asking you, Mr. Whatley.

6  Were there times that you heard Diamond Dallas Page or

7  Chris Kanyon use the N-word about you?

8    A    When they was in dressing rooms and were

9  leaving the dressing room or coming out of the

10  dressing room and you're making suggestions about,

11  well, what can be happening in the ring, you would

12  hear them when you left saying, what that nigger

13  talking about?

14    Q    Who would you hear say that?  Chris Kanyon

15  and Diamond Dallas Page?

16    A    Different ones like that.

17    Q    Anybody else you can think of?

18    A    Not right off the bat.

19    Q    When did that happen?

20    A    During the  '98-'99 --  it continued to

21  happen all the way through, but most --  most of the

22  time, '98 and '99 sessions during the wrestling.

23    Q    And these were wrestlers who were making

24  these statements?

25    A    They were wrestlers, yes.

1    or come get security and say, hey, there's a guy in

2    the ladies' room?

3        A    Not to my knowledge.

4        Q    That's fine.  Any instance that we haven't

5    talked about -- Mr. Whatley, any instance we haven't

6    talked about involving the use of the word "nigger?

7        A    Only things that I could say is what I was

8    told after somebody said that it was said.  The

9    earshot of hearing it or up in front of your face,

10   hearing it, had been limited to just several

11   occasions.

12       Q    The ones we talked about?

13       A    Yes.

14       Q    Did anyone ever call you darky?  That was a

15   word you used a few minutes ago.

16       A    I heard the word "darky," but that was, you

17   know -- the word darky on the crew, with the people

18   that you worked with, and that because of the fact

19   that -- like I said before, that I wouldn't take

20   second citizenship to, like, for instance, a guy that

21   was -- I can't remember his name.  He was one of the

22   ones in charge of lighting.  Used in reference.  Used

23   it in reference to me, because of the fact that we

24   were all moving out our stuff at the same time.

25              He wanted us to stop doing our job so that

1    he can complete the -- completely let the -- the

2    lights down. But because of the fact that we were on

3    the move and they wanted economically to use the

4    locals to do all the things, they were trying to get

5    us out first, so therefore he was disgusted in the

6    fact that he had to wait, and now it's -- I had to

7    wait behind a darky too.

8        Q    Do you remember his name?

9        A    I can't remember -- I tried not to remember

10   his name, but I knew that he was one of the men that

11   was in charge of when the lights went up and went

12   down, and --

13       Q    Did he work for the arena, or did he work

14   for WCW?

15       A    WCW.

16       Q    So he was a lighting employee of WCW?

17       A    WCW.

18       Q    Did you complain about that?

19       A    Oh, yes.

20       Q    Who did you complain to? Do you recall?

21       A    Oh, yes. Every instance that we did, that

22   we called, you know, I knew exactly that the person

23   that you can go to in the instance was human resources

24   department.

25       Q    Do you know if human resources department



# EXHIBIT / ATTACHMENT

# CC

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

**DEFENDANT UNIVERSAL WRESTLING CORPORATION'S
SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANTS
WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS, INC.**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure,

Defendant Universal Wrestling Corporation ("UWC") (formerly known

as World Championship Wrestling, Inc. ("WCW")) supplements its

objections and responses to Plaintiffs' Consolidated First

Interrogatories And First Request For Production Of Documents To

DEFENDANT'S
EXHIBIT

#11

Defendants World Championship Wrestling, Inc. and Turner Sports, Inc. ("Plaintiffs' First Interrogatories") as follows:

## GENERAL TERMS AND CONDITIONS FOR RESPONSES

1.

The following supplemental responses are provided by UWC based upon documents and information currently available to UWC. UWC reserves the right to modify any of such responses at a later date if further factual development or analysis warrants such modifications.

2.

In responding to any of the interrogatories and document requests contained in Plaintiffs' First Interrogatories and Document Requests, UWC explicitly reserves the right to object to the admissibility at trial of any information produced in connection with such responses.

**SUPPLEMENTAL RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES**

**INTERROGATORY NO. 3.**    Please identify (following the requirements set forth in Instruction No. 8) the total number of wrestlers with whom Defendant WCW and/or Defendant Turner Sport *[sic]* have entered into wrestling contracts of any kind from January 1995 until the present. For each such wrestler, please provide the following information:
   (a)  His or her legal and professional name;
   (b)  His or her racial background, (i.e. African or African-American, Hispanic/Latino or Hispanic/Latino American, Asian or Asian-American, Caucasian or Caucasian-American, or Other (please provide additional information regarding the racial background of any individual categorized as "Other"));
   (c)  The number of matches in which he or she performed on live television;
   (d)  The outcome (e.g. win, lose or other) of each WCW Monday Nitro, Thunder and/or Pay-Per View match in

2

which he or she performed from January 1995 through the
present;
(e) His or her annual compensation for each year from
January 1995 until the present;
(f) The merchandising revenues he or she received for each
quarter from January 1995 until the present; and
(g) Whether or not he or she was terminated and/or released
during 1999.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3.

UWC hereby adopts and incorporates by reference its general
and specific objections to Interrogatory No. 3 as set forth in
UWC's Objections and Responses to Plaintiff's First
Interrogatories. Subject to and without waiving its objections,
and in accordance with the Discovery and Scheduling Order entered
in the above-referenced actions, UWC supplements its response to
Interrogatory No. 3 as follows:

Attached hereto as Exhibit A is a chart identifying each
male wrestler who entered into a wrestling contract with WCW for
the period 1996 through 2000, and providing compensation
information regarding salary, merchandising revenue and licensing
revenue for each wrestler by year, as determined from documents
and information currently available to UWC.

**INTERROGATORY NO. 7.** Please identify (following the
requirements set forth in Instruction No. 8) each and every
individual who attended a "try out" at the Power Plant (or its
predecessor) from January 1995 until the present. For each such
individual, please provide the dates of his or her "try-out" and
his or her racial background, (i.e., African or African-American,
Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-
American, Caucasian or Caucasian-American or Other (please
provide additional information regarding the racial background of
any individual categorized as "Other")).

3

## RESPONSE TO INTERROGATORY NO. 7.

UWC hereby adopts and incorporates by reference its general and specific objections to Interrogatory No. 7 as set forth in UWC's Objections and Responses to Plaintiff's First Interrogatories. Subject to and without waiving its objections, UWC supplements its response to Interrogatory No. 7 as follows:

After diligent investigation and review of information and documents reasonably available to UWC, UWC states that it does not have information or documents in its possession reflecting all of the individuals who attended a "try out" at the Power Plant from 1996 through 2000. Based upon review of documents currently available to UWC, UWC is aware of the following individuals who attended a "try out" at the Power Plant:

Matthew B. Baum, Cameron Beach, Nikola Bobic, Paulie Bykow, Joseph Bradley Cain, Tony Byron Carr, Rick Cornell, Twanta Maurice Craig, Jason Matthew Daniel, Marcial R. Davis, Joseph Fredrick Denson III, Rico Dixon, William C. Dreer, Phap Minh Duong, Darron Devon Easterling, Sean Charles Evans, Chris Ferrell, Allan Eric Funk, Edward Gatzky, Todd Griffith, Charles I. Groegler, Mark Guthrie, Bret Hamner, Theodore Harris, Jonathan Martin Hugger, Gregory John Hunke, Mark Jindrak, Trae Keller, Brian Klinge, Paul Lewis Knox, Charles M. Lee, Wondell Le Flore, J. Mark LeRoux, David Libich, Roberts S. Loewen, Michael W. Long, Jeremy Lopez, Ken Moore, Michael Brady Nimmons, Paul Neu, Stephen Oliviera, Charles R. Palumbo, Stan Patron, Craig Phillips, Cecil

4

Riley, Sam Roman, Bounthan Saengsiphan, Mike Sanders, Frank Sepe, Sonny Siaki, Elix Skipper, Kenneth M. Stasiowski, Matthew T. Sletvold, Mark Stevens, W. Chase Tatum, Courtright Thurber, James Thurber, Mark Tipton, Michael Tolbert, Michael Jerry Tuite, Scott Vick, Charles Franklin Walker, J. Bradley Walker, Sr., Chris West, Curtis L. White, Wesley Wright, and Brett Yokley.

UWC further states that, upon information and belief, most or all of the individuals who were "trainees" at the Power Plant during the period 1996 through 2000 had also previously attended a "try out." Attached hereto as Exhibit B is a chart identifying each individual who was a "trainee" at the Power Plant for the period 1996 through 2000, as determined from documents and information currently available to UWC.

**INTERROGATORY NO. 8.** Please identify (following the requirements set forth in Instruction No. 8) each and every individual who trained at the Power Plant (or its predecessor) from January 1995 until the present. For each such individual, please provide the dates he or she trained at the Power Plant, his or her racial background, (i.e. African or African-American, Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-American, Caucasian or Caucasian-American or Other (please provide additional information regarding the racial background of any individual categorized as "Other")), and whether Defendant WCW and/or Defendant Turner Sports offered a wrestling contract (whether classified as an "employment," "contractor," or "independent contractor agreement") to him or her.

**RESPONSE TO INTERROGATORY NO. 8.**

UWC hereby adopts and incorporates by reference its general and specific objections to Interrogatory No. 8 as set forth in UWC's Objections and Responses to Plaintiff's First

5

Interrogatories.  Subject to and without waiving its objections, UWC supplements its response to Interrogatory No. 8 as follows:

Attached hereto as Exhibit B is a chart identifying each individual who was a "trainee" at the Power Plant for the period 1996 through 2000, as determined from documents and information currently available to UWC.

This 10th day of October, 2002.

John J. Dalton
Georgia Bar No. 203700
James A. Lamberth
Georgia Bar No. 431851
Eric A. Richardson
Georgia Bar No. 233873
Evan H. Pontz
Georgia Bar No. 583577

Counsel for Defendant
Universal Wrestling Corporation
(formerly known as World
Championship Wrestling, Inc.)

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000



EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1994 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| s, David Lee | Tank Abbott | | | $0.00 | | | | | $0.00 | $0.00 | $180,126.99 | $0.00 | $0.00 | $124,219.51 | $0.00 | $0.00 |
| n, Chris | Chris Adams | | | $0.00 | | | | | $0.00 | $0.00 | $107,870.35 | $0.00 | $0.00 | $4,518.90 | $0.00 | $0.00 |
| n, Brian (Brian n, Inc.) | Kronik | | $20,259.99 | $0.00 | | | | $213,612.70 | $0.00 | $19,784.85 | $240,939.31 | $0.00 | $28,346.58 | $226,639.83 | | $1,883.89 |
| m, Michael | Mike Awesome | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $279,351.43 | $15.95 | $0.00 |
| , Arthur | Steve Sharpe | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $32,433.45 | $17.25 | $0.00 |
| ton, Frank | | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Samuel | Samoan Swat Team | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Scott | Scott Steel Scott Riggs | $51,133.77 | | $0.00 | | | | $150,344.34 | $0.00 | $16,380.00 | $176,269.73 | $0.00 | $29,573.27 | $7,471.73 | $0.34 | $184.90 |
| nt, David (Kids Ent, Inc.) | | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | | |
| Yoshihiro | Ultimo Dragon | | | $0.00 | $10,676.18 | | | $120,905.61 | $0.00 | $21,819.86 | $104,100.43 | $0.00 | $23,487.01 | | $0.00 | $0.00 |
| nd, Charles an International) | Konnan | $92,757.10 | | $0.00 | | | | $291,970.19 | $40.14 | $20,970.77 | $464,673.66 | $4,999.55 | $40,379.80 | $414,946.49 | $0.00 | $32.24 |
| | | | | | | | | | | | | | | | | $37,693.63 |
| ili, Marcus Ssuki, Inc. | Buff Bagwell | $135,990.15 | | $0.00 | | | | $286,140.37 | $40.14 | $20,478.00 | $315,811.76 | $11,879.22 | $23,993.07 | $341,641.37 | $3,074.05 | $42,448.93 |
| t, Aaron t, Eric Randolph | Randy Barnes | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $1500.00 | $0.00 | $0.00 |
| Arthur | The Juicer | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| d, Cesar ez | Silver King | $39,437.94 | | $0.00 | | | | $67,344.30 | $0.00 | $0.00 | $56,880.36 | $0.00 | $0.00 | $67,870.39 | $0.00 | $0.00 |
| nd, Scott gham, Tom | Scott Putski Disorderly Conduct | $9,400.00 | | $0.00 | | | | $34,241.30 $18,430.00 | $0.00 | $0.00 | $68,472.16 | $0.00 | $0.00 | | $0.00 | $0.00 |
| t, Chris orter (Spore) | | $108,412.39 | $33.94 | $0.00 | $10,676.41 | | | $157,348.40 | $43.48 | $34,662.15 | $317,748.57 | $49.31 | $35,604.04 | | $116.77 | $29,311.12 |
| r, Brian m, Marian | Jet Jaguar | | | $0.00 | | | | | $0.00 | $0.00 | $17,383.59 | $0.00 | $0.00 | $3,328.70 | $0.00 | $0.00 |

1044406_3.XLS - Active

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ow, Scott | Bam Bam Bigelow (Beast of the East) | | | | | | | $24,133.95 | $0.00 | $0.00 | $242,459.29 | $16.65 | $97.13 | $408,666.39 | | $20,978.79 |
| ...t, Adam | Jerry Matthews | | | | | $0.00 | | | $0.00 | $0.00 | $31,069.07 | $0.00 | $0.00 | $3,095.89 | $7.15 | $0.00 |
| ...chael, Tony | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...da, Marc | | $550.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...d, Jr., Richard H | Barry The Dragon Bearheart | $959.85 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | | |
| ...n, Wayne | | | | | $13,341.04 | $0.00 | | $73,208.80 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.02 | $0.00 |
| ...kvhitel, Nick | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.02 | $0.00 |
| ...t, Michael | Horace | $18,567.61 | | | $134,637.79 | $0.00 | | $130,717.12 | $0.00 | $955.15 | $311,250.94 | $0.00 | $10,615.57 | $117,042.16 | ($2.03) | $2,318.00 |
| ...t, Terry | Hulk Hogan, Hollywood Hogan | $1,930,433.95 | $20,759.30 | $17,973.82 | $230,043.74 | $52,412.82 | $94,618.24 | $1,633,948.70 | $40,146.99 | $111,945.72 | $3,734,227.74 | $20,846.16 | $832,987.84 | $1,457,933.00 | $41,915.55 | $447,905.11 |
| ...len, Steven | Sting | $72,205.46 | $3,629.82 | $11,905.01 | $913,303.50 | $29,934.61 | $17,007.36 | $936,189.59 | $43,420.02 | $85,330.51 | $1,511,829.33 | $17,573.41 | $414,494.56 | $1,467,980.06 | $16,381.47 | $504,727.48 |
| ...ford, Todd | Todd Champion | | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...d, Thomas | Johnny Ohno | $2,100.00 | | | $20,707.14 | $0.00 | | $50,271.25 | $0.00 | $0.00 | $113,576.14 | $0.00 | $0.00 | $91,633.79 | $0.00 | $0.00 |
| ...rman, William | Jerry Flynn | | | | | | | | | | | | | | | |
| ...s, Chad | | $31,677.52 | | | $28,350.64 | $0.00 | | | $0.00 | $0.00 | $39,267.54 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...m, Dewayne | Brady Lee Porter Boyds | $34,051.55 | | | $60,719.43 | $0.00 | | $67,083.11 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...n, Joseph | Inauce Chevy Pease | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | | |
| ...g, Terry | Salto | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...x, Brett | Lodi | | | | | $0.00 | | $59,993.76 | $0.00 | $18,230.00 | | $0.00 | $27,132.39 | $63,666.67 | $0.00 | $44.12 |
| ...lin, Chris | Shanghai Pierce | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...arbury, Mark | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $2,000.00 | $0.00 | |
| ...lli, Michael | Mike Modest | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ya, Gary | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

EXHIBIT

| Real Name | Reg Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...on, Lenny | Lenny Lane; Standards and Practices | | | | | | | $37,465.23 | $0.00 | $0.00 | $43,200.36 | $0.00 | $0.00 | $123,382.03 | | $0.00 |
| ...illanos, Dominic | Psychosis | $7,278.59 | | | | | | $107,292.54 | $0.00 | $16,530.00 | $149,551.07 | $0.00 | $27,994.47 | $70,044.71 | $0.00 | |
| ...er, Scott | | | | | $63,282.82 | $0.00 | | $32,140.27 | $0.00 | $0.00 | $27,442.16 | $0.00 | $0.00 | | $9.79 | $2,213.97 |
| ...o, Mike | | | | | $16,518.57 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...t, Bryan | Kronik/Wrath | $101,712.32 | | | $165,175.41 | $0.00 | | $173,235.40 | $27.41 | $4,697.18 | $314,587.52 | $30.36 | $12,441.24 | $220,801.34 | | $0.00 |
| ...th, Joel | | | | | | | | | | | | | | | $14.89 | $4,480.02 |
| ...Keith James | Keith Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Kent Durrell | Kent Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...el, Richard | Rex Conault/Remo | | | | | $0.00 | | | $0.00 | $0.00 | $16,332.72 | $0.00 | $0.00 | $19,650.59 | $0.00 | $0.00 |
| ...l, Daniel | Chris Daniels | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $44,477.58 | $0.00 | $0.00 |
| ...rylus, Max | Max Muscle | $31,035.00 | | | $21,314.20 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Nuzir, William | Bill Sullivan | $17,247.18 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ge, Barry | Buckboy Billy | | | | $40,273.34 | $0.00 | | $154,245.95 | $0.00 | $0.00 | $155,184.02 | $0.00 | $0.00 | | $10.00 | $0.00 |
| ...e, James | Bubba Lancaster | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...l, Muriel | | | | | | $0.00 | | $3235.91 | $0.00 | $0.00 | $17,468.50 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...st, Patrick | Apollo | | | | | $0.00 | | $6,031.45 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...tha, William C. | General Rection; Hugh Morris | $103,210.32 | | | $143,544.15 | $0.00 | | $145,903.34 | $0.00 | $0.00 | $194,828.00 | $0.00 | $809.39 | $245,931.43 | $0.00 | $0.00 |
| ...Mendoza, toni | Villano V | | | | $19,611.46 | $0.00 | | $50,977.63 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.24 | $44.12 |
| ...Mendoza, ... | Villano IV | $2,371.77 | | | $45,638.64 | $0.00 | | $44,454.47 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...o, Alfred | Roger The Wrestling Crew | | | | | $0.00 | | $2,600.00 | $0.00 | $0.00 | $19,930.66 | $0.00 | $0.00 | $14,465.00 | | $0.00 |

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

CONFIDENTIAL

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| n, Joseph yer Zamryana | Johnny Swinger | $1,935.00 | | | | | | | | | $35,410.04 | $0.00 | $0.00 | $37,479.90 | $0.00 | $0.00 |
| in, James Duggan | Hardcore Jim Duggan | $184,577.44 | $38.40 | | $310,301.39 | | | $181,843.81 | $0.00 | $0.00 | $180,731.44 | $0.00 | $0.00 | $173,900.90 | $0.00 | $0.00 |
| rn, Bobby | Bobby Duncum Jr | | | | | | | $46,908.40 | $0.00 | $0.00 | $158,291.00 | $0.00 | $0.00 | $18,290.41 | $0.00 | $59.20 |
| m, Michael H | Public Enemy Johnny Grunge | $81,110.85 | $23.99 | | $159,943.16 | $201.77 | | $171,513.16 | $13.41 | $907.49 | $34,949.82 | $0.04 | $37,961.04 | | ($1.00) | $2,518.00 |
| Bobby | Beautiful Bobby | $88,709.17 | | | $74,670.24 | $0.00 | | $81,249.87 | $0.00 | $0.00 | $98,113.82 | $0.00 | $0.00 | $56,396.41 | $0.00 | $0.00 |
| 4, Troy Mike | | $77,724.27 | | | $80,547.00 | $0.00 | | $104,970.34 | $0.00 | $951.35 | $32,056.35 $101,639.04 | $0.00 | $10,635.37 | $343,332.98 $13,475.31 | ($1.06) | $0.00 $2,518.00 |
| Robert R. Lance Timothy | Lance Storm | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $441.92 | $16,459.50 |
| surg, Page Page (trainee) | Diamond Dallas Page (DDP) | $149,444.93 | | | $12,047.37 | | | $200,315.88 | $15,973.34 | $49,054.69 | $1,070,534.85 | $1,138.17 | $247,708.97 | $1,176,477.77 | $191.11 | $144,731.23 |
| Randal Daniel | | | | | $0.00 | | | | $0.00 | $0.00 | $32,240.27 | $0.00 | $0.00 | 170,821.21 | $419.25 | $0.00 |
| n, Ed | The Bush | | | | $0.00 | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Jeff | NWO Sting | $34,349.76 | | | $81,498.65 | | | $139,102.06 | $0.00 | $54,145.00 | $163,009.43 | $0.00 | $11,031.62 | $103,729.36 | $0.00 | $0.00 |
| Tonga | Meng | $153,296.66 | | | $164,308.21 | | | $178,992.11 | $0.00 | $16,330.00 | $177,809.90 | $0.00 | $29,818.40 | $171,991.36 | $0.00 | $0.00 |
| , David | Ft Finlay | $17,050.00 | | | $26,600.00 | $0.00 | | $118,804.95 | $0.00 | $16,330.00 | $223,424.42 | $0.00 | $17,041.23 | $166,341.91 | $0.00 | $48.12 |
| David | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Richard (Flair | Ric Flair | $513,848.21 | | | $488,412.02 | $0.00 | | $742,054.92 | $413.29 | $37,611.06 | | $14.51 | $320,350.21 | $137,170.44 | $81.45 | $14,634.28 |
| , Arturo Michael | Spyder Chiesa Jack | | | | | | | $17,276.10 | | | $44,109.59 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Christopher d (or Storm) | Crowbar | $900.00 | | | $1,750.00 | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $123,355.21 | $0.31 | $0.00 |
| un, Ryan | | | | | | $0.00 | | | $0.00 | $0.00 | $8,718.88 | $0.00 | $0.00 | | $0.00 | $0.00 |

EXHIBIT

DENTAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| m, Chad | Bi Lou Fabuloso/ el Diablo | | | | $34,000.00 | | $0.00 | $55,913.37 | $0.00 | $0.00 | $79,060.34 | $0.00 | $0.00 | | $0.00 | $0.00 |
| na | | | | | $17,031.32 | | $0.00 | $56,232.17 | $0.00 | $0.00 | $64,495.59 | $0.00 | $0.00 | $54,255.29 | | $0.00 |
| , Rick | Rick Fuller | | | | $22,307.16 | $0.00 | $0.00 | $36,383.85 | $0.00 | $593.33 | $44,000.21 | $0.00 | $10,635.57 | $90,231.07 | $0.00 | $0.00 |
| son, James | Hak, el Hacker | | | | | $0.00 | $0.00 | $67,283.54 | $0.00 | $0.00 | $123,402.63 | $0.00 | $0.00 | $148,202.11 | $0.00 | $11,331.74 |
| Allen, Eric | Kwee-Wee | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $16,533.95 | $0.00 | $0.00 | $167,728.78 | $4.44 | $0.00 |
| , Terry | Terry Funk | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Jeff | The Cat/Ref | $32,390.00 | | | $21,200.00 | $0.00 | $0.00 | $32,404.44 | $0.00 | $0.00 | $22,697.83 | $0.00 | $0.00 | $9,400.00 | $0.00 | $0.00 |
| , Alan | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | $62,041.71 | | |
| a, James | Jamie Knoble | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $19,536.19 | $0.00 | $0.00 | | $0.00 | $0.00 |
| rt | Joey Dragons | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | | $0.00 |
| a, Robert | Robert Cat | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| s, Thomas | Bobby Gilbert | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ma, Glenn | Boogie Knights - Disco Inferno | $14,041.15 | | | $42,393.84 | $0.00 | | $87,563.63 | $0.00 | $20,970.77 | $199,331.34 | $0.00 | $30,492.99 | $316,888.07 | ($0.96) | $8,051.10 |
| sen, Bill (Inc.) | | | | | | $0.00 | | | $0.00 | $32,783.27 | $4,450,001.17 | $110,002.94 | $351,120.65 | $2,376,347.44 | $115,593.48 | $668,375.66 |
| a, Jimmy | | $20,231.34 | | | $11,000.00 | $0.00 | | $450,046.77 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| s, Joe | Bushwhacker Buck | $40,611.90 | | | $67,301.31 | $0.00 | | | $0.00 | $0.00 | $1,500.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, Jose Carreon | Durham | $4,147.43 | | | $44,016.63 | $0.00 | | $43,702.06 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $115,093.00 |
| me, Hernandez, de Anibal | Torrented Guerrero | $4,330.81 | | | $41,464.09 | $0.00 | | $111,063.11 | $0.00 | $16,330.00 | $133,648.61 | $3.31 | $27,698.47 | $99,748.74 | | $144.54 |
| nay, Jorge | El Dagosa | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.13 | $0.00 |
| , Terry | Bobby Graham | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Robert | One Man Gang | $10,000.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $84,552.04 | $0.00 | $0.00 |
| Sam | | | | | $16,028.57 | $0.00 | | $33,120.27 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Johnny | | | | | $430,000.00 | $0.00 | | $320,000.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, Kevin | Billy Kidman | $116,000.00 | | | $331,740.98 | $0.00 | | $114,113.76 | $0.00 | $16,330.00 | $269,810.13 | $100.65 | $18,062.146 | $304,520.19 | $56.71 | $122,546.75 |
| om, Eduardo | Eddie Guerrero | $19,113.36 | | | $246,419.42 | $1.11 | $10,076.18 | $357,198.77 | $31.16 | $37,094.51 | $473,818.71 | $0.31 | $35,593.34 | $231,249.66 | $56.62 | $4,331.70 |
| | | $151,822.59 | | | | | | | | | | | | | | |

5

1044604_3.XLS - Active

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Real Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| two, Balvador | Lionheart Lion/ Chavo Guerero Jr. | $40,073.06 | | | $34,760.98 | $0.00 | | $126,404.13 | $0.00 | $16,530.00 | $179,116.47 | $0.00 | $27,941.23 | $205,670.52 | ($1.00) | $2,564.12 |
| two, Oscar | Rey Mysterio, Jr. | $37,042.11 | | | $154,435.77 | $243.00 | | $205,343.82 | $303.38 | $30,157.46 | $395,537.70 | $903.71 | $31,751.66 | $354,120.49 | $31,312.41 | $7,650.78 |
| llency entario Inc.) | | | | | | $0.00 | | $2,500.00 | $0.00 | $0.00 | $52,378.18 | $0.00 | $0.00 | $47,504.25 | $0.00 | $0.00 |
| entario Inc.) | | | | | | | | | | | | | | | $0.00 | $0.00 |
| l, Sean | Seat, Otherr | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $3,246.22 | | $0.00 | | $174,084.59 | $0.00 | |
| Scott (Book Hall | Scott Hall/ Last Call Hall/ The Outsider | $379,293.49 | | $664,947.71 | $3,311.13 | $1,027.51 | $1,373,726.73 | $4,490.76 | $44,966.04 | $771,737.94 | $19.19 | $74,349.91 | $1,613,334.43 | $1,283.57 | $41,774.18 |
| lics, Troy | Aza | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| per, Bret | | | | | $0.00 | | $31,573.36 | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| ton, Kit | | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| en, Stan | | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| d, Donald | Harris Boys Creative Control | | | $0.00 | | | | | | $15,990.56 | | $0.00 | $200,401.87 | $0.00 | | $0.00 |
| r, Ronald | Harris Boys Creative Control | | | $0.00 | | | | $0.00 | | $0.00 | $15,990.56 | $0.00 | $0.00 | $200,476.67 | $3.70 | |
| r, Theodore | 4X4 | | | $0.00 | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $113,995.00 | $3.70 | $0.00 |
| Eric | | | | $0.00 | | | | $0.00 | $818.92 | $11,077.06 | $30,410.996 | $49.21 | $39,204.78 | $31,311,543.60 | $0.00 | $0.00 |
| moore, Shajt | | | $47,343.20 | $0.00 | | | | $50.00 | $0.00 | $3,760,318.028 | $50.00 | $11,444.77 | $0.00 | $52,289.90 | $100,271.18 |
| uhi, Kurohama | long Dragons | | | $0.00 | | | $40,017.79 | $955.35 | $91,494.21 | | $0.00 | $100,194.98 | $0.00 | | $0.00 |
| wr, Michael | Prince Ineloaz/ The Artist | $8,360.00 | | $44,708.66 | $0.00 | | $33,321.30 | $0.00 | $205,552.82 | | $7,899.62 | $65,560.00 | ($11.00) | $2,318.00 |
| b, David | | | | $7,200.00 | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| mud, Michael | Road Warriors Hawk | $72,051.22 | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| rig, Jim | Ultimate Warrior | | $59.19 | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | | | $0.00 | $0.00 |

1066666_XXX.8 - Active

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Stage Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| n, Gregory Shane | Gregory Shane | | | | | $0.00 | | | $0.00 | | | $0.00 | | $17,778.94 | $3.53 | $0.00 |
| a, Carl | | | | | | $0.00 | | | $40.19 | | | $0.00 | | | ($1.05) | $3,536.03 |
| rick, Mark (Van men Inc.) | Van Hammer | | | | | $0.00 | | | $0.00 | | $417,564.00 | $0.00 | $27,941.23 | $174,608.31 | | |
| | | | | | | | | | | | $119,232.66 | | $27,132.03 | $90,662.99 | | |
| phieson, Richard | Vampiro | | | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | $0.00 | $0.00 |
| n, Harold | | $73,319.52 | | | $93,408.97 | | | $41,554.78 | | | $111,215.33 | | $0.00 | $240,952.82 | $1,370.21 | $0.00 |
| | M.I. Smooth Joe Tods | | | | | $0.00 | | | $0.00 | | | $81,063.57 | | $0.00 | $118,104.16 | | |
| nvky, Barry | | | | | $15,554.14 | $0.00 | | | $0.00 | | | $0.00 | | | $53,480.00 | $0.00 | $0.00 |
| Van, Booker T (Mr. T. Inc.) | Harlem Heat Booker T | $151,623.90 | | $3,044.12 | $236,560.50 | $19.74 | $33.00 | $160,041.02 | $12.57 | | $4,814.59 | $609,550.88 | $591.17 | $30,453.70 | $72,127.49 | $27.21 | $31,391.90 |
| nex, Lash | Harlem Heat Steve Ray | $151,783.26 | | $3,644.22 | $338,480.46 | $63.42 | $33.00 | $261,222.67 | $32.59 | | $3,575.19 | $609,550.86 | $591.16 | $32,013.77 | $304,804.60 | $7.94 | $4,217.78 |
| per Jonathan (Bad Johnny "The Bull" | Johnny "The Bull" | | | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | | | $0.00 |
| rer, Jonathan | | | | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | $41,355.67 | $0.00 | $0.00 |
| nt, Craig | Big Cat | | | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 |
| n, Gregory | | | | | | $0.00 | | | $0.00 | | $16,763.85 | | $0.00 | | $0.00 | $0.00 |
| r, Chris | Chris Jericho | $50,589.87 | | | $164,493.88 | $0.00 | | $524,908.82 | $27.41 | | $56,021.68 | $143,439.34 | $232.32 | $31,468.32 | | $9.80 | $30,204.53 |
| n, Robert Brad | Buck/JD Brad Armstrong | $34,348.73 | | | $85,107.48 | $0.00 | | $103,814.53 | $0.00 | | $0.00 | $126,016.40 | $0.00 | $0.00 | $79,975.28 | $0.00 | $0.00 |
| n, Scott | Scott Armstrong | $15,440.00 | | | $33,376.53 | $0.00 | | $33,729.27 | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Steve | Steve Armstrong | $12,740.00 | | | $22,618.57 | $0.00 | | $33,633.27 | $0.00 | | $0.00 | $43,253.13 | $0.00 | $0.00 | $55,719.02 | $0.00 | $0.00 |
| rry, Frederick | Harry Jannetty | | | | $10,676.16 | $0.00 | | $117,353.34 | $0.00 | | $0.00 | $59,944.81 | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Jeff (J.J. Inc.) | The Chosen One | $42,788.24 | | | $177,717.42 | | $10,676.16 | | $0.00 | | $0.00 | $174,412.05 | $0.00 | $0.00 | $515,421.17 | $4,350.66 | $0.00 |
| n, Mark Robert | Mark Jindrak | | | | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | $77,205.85 | | $0.00 |
| ten, Mark | | | | | | $0.00 | | | $120.00 | | | $5,060.37 | | $0.00 | $519,348.72 | $0.00 | $0.00 |
| n, Alan | AJ Styles | | | | | $0.00 | | | $0.00 | | | $79,285.10 | | $0.00 | $11,300.00 | $0.00 | $0.00 |
| n, Michael | Vincent | $27,010.36 | | | $109,455.71 | $0.00 | | $112,514.58 | $40.14 | | $0.00 | $129,780.06 | $0.04 | $23,205.18 | $113,860.35 | $0.00 | $49.12 |

CONFIDENTIAL

## Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ta, Evan | 3 Count | | | | | | | $13,321.12 | $0.00 | $0.00 | $71,865.21 | $0.00 | $0.00 | $78,187.42 | $3.75 | $0.00 |
| | Steve | | | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Rob | Maestro | | | | $16,232.17 | $0.00 | | $87,439.33 | $27.41 | $0.00 | $87,104.85 | $0.00 | $0.00 | $39,061.29 | $0.00 | $0.00 |
| ...nta, Chris | Kidman/Morris | $43,181.72 | | | $104,735.00 | $0.00 | | $209,011.92 | $0.00 | $0.00 | $244,293.73 | $0.00 | $27,841.23 | $245,597.49 | $91.00 | $3,684.20 |
| ..., Rob | Bobby Eaton/ High Voltage/ Kaz | $17,115.50 | | | $77,040.00 | $0.00 | | $7,209.11 | $0.00 | $0.00 | $148,618.55 | $0.00 | $161.89 | $31,595.88 | | |
| ...Chris | Giovie Glue | | | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...eg | Gray Valentine | $5,980.00 | | | $73,445.18 | $0.00 | | $33,542.37 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Mark | Corporal Cajun/Lash LaResse | | | | | $0.00 | | $4,344.00 | $0.00 | $0.00 | $51,807.85 | $0.00 | $0.00 | $84,634.71 | | $0.00 |
| ...Ed | Disciple/Booty Man/ Zodiac | $149,819.65 | | | | $0.00 | | $115,338.00 | $0.00 | $0.00 | $196,629.06 | $0.00 | $11,444.77 | | ($1.00) | $2,318.00 |
| ...er, Paul | Terror Byrthe/Issa Paul Levesque | | | | | $0.00 | | | | $0.00 | | $0.00 | $0.00 | | $0.00 | $44.12 |
| ...Scott | Raven | $66,693.33 | | | $139,541.60 | $0.00 | | $245,127.01 | $3,235.45 | $0.00 | $20,051.69 | $0.00 | $53,431.42 | | $13.00 | $26,411.41 |
| Raymond | Glacier | | | | $150,448.97 | $0.00 | | $164,438.41 | $27.41 | $0.00 | $7,249.02 | $0.00 | $27,355.41 | $23,479.44 | | $457.38 |
| | Buzz Stern | | | | | | | | $0.00 | $0.00 | $31,443.02 | $0.00 | $0.00 | $243,861.20 | $0.00 | $0.00 |
| ...so, Vito | Big Vito | | | | | $0.00 | | | $0.00 | $0.00 | $19,336.19 | $0.00 | $0.00 | $3,608.76 | | |
| Jimmy, David | Jimmy Lopez | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...tas Carlos | Lamark, Jr. | | | | $34,504.87 | $0.00 | | $64,392.02 | $0.00 | $0.00 | $83,987.76 | $0.00 | $0.00 | $6,394.94 | | |
| Martin | Ace Anderson | $300,599.94 | | | $231,693.93 | $0.00 | | $274,178.90 | $0.00 | $0.00 | $15,434.67 | $0.00 | $11,493.16 | | ($1.00) | $3,218.00 |
| ...er, Joey | Major | $3,000.00 | | | $19,238.37 | $0.00 | | $7,000.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.00) | $0.00 |
| ..., Karl | The Maidman | | | | $20,000.00 | $0.00 | | $21,310.00 | $0.00 | $0.00 | $33,980.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., James | | $16,337.22 | | | $29,342.44 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Michael | Steve Richards | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Troy | The Franchise Shane Douglas | | | | | $0.00 | | | $0.00 | $0.00 | $172,037.49 | $0.00 | $0.00 | $232,483.51 | $41.04 | $0.00 |
| ...ink, Jason | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...rs, Darren | Steve Regal | $149,523.69 | | $10,676.18 | $216,224.47 | $0.00 | | $84,109.58 | $0.00 | $10,709.72 | $67,889.71 | $0.00 | $17,334.44 | $35,414.35 | $0.00 | $0.00 |
| ...bad, Steve | | $202,487.92 | | | $270,608.52 | $0.00 | | $218,285.48 | $27.41 | $3,551.38 | $109,496.02 | $0.00 | $14,261.44 | | ($1.00) | $4,486.24 |



Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| tal Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark | Johnny B. Badd | $46,629.14 | | $356.62 | $244.39 | $0.00 | $2,849.79 | | $0.00 | | | $0.00 | $0.00 | $1,500.00 | $0.00 | $0.00 |
| Ernest | The Cat | $33,142.84 | | | $147,042.43 | $0.00 | | $47,619.63 | $27.41 | $0.00 | $109,121.66 | $0.00 | $0.00 | $341,440.58 | ($1.06) | $12,594.12 |
| Percy | Master P | | | | | $0.00 | | | $0.00 | $0.00 | $291,000.00 | $0.00 | $110,061.40 | | $0.00 | $0.00 |
| ..Chip | ..Vanderburg | $31,190.00 | | | $40,218.57 | $0.00 | | $54,339.87 | $0.00 | $0.00 | $159,251.10 | $0.00 | $0.05 | | $0.00 | $0.00 |
| James | | | | | $18,310.34 | $0.00 | | $46,214.32 | $0.00 | $0.00 | $40,544.43 | $0.00 | $0.00 | | | $0.00 |
| ..Vade | ..Hebe | | | | | $0.00 | | $54,606.43 | $0.00 | $0.00 | $46,280.11 | $0.00 | $43,514.39 | | $0.00 | $0.00 |
| (Disorderly Conduct) | | | | | $9,700.00 | $0.00 | | $18,050.00 | $0.00 | $0.00 | $38,140.97 | $0.00 | $0.00 | $46,431.13 | $0.00 | $0.00 |
| ..Ruddy | ..La Linda | $10,680.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..Linda Sprocili | | | | | $17,452.06 | $0.00 | | $9,947.61 | $0.00 | $0.00 | | $0.00 | $0.00 | $47,843.47 | $0.00 | $0.00 |
| Great Musla | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Kenta ..Count.. / Sassy / Viana Vegas | | $356,561.31 | | | $3,310.73 | $0.00 | | $1,471,138.13 | $4,404.97 | $19,354.12 | $1,257,344.40 | $0.00 | $226,549.89 | $1,591,131.46 | | $0.00 |
| ..Jim | The Anvil | | | | | $0.00 | | $217,593.46 | $0.00 | $3,454.81 | $84,101.32 | $0.00 | $29,346.55 | | $13,547.10 | $343,343.77 |
| ..John | | | | | $40,275.95 | $0.00 | | $122,200.39 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $441.12 |
| ..Harrison | Hardbody Harrison | $1,514.76 | | | $12,475.00 | $0.00 | | $5,625.00 | $0.00 | $0.00 | $22,895.11 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..Karle | | | | | $3,400.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $29,733.43 | $0.00 | $0.00 |
| ..Scott | | $195,355.03 | | | $212,147.14 | $0.00 | | $301,143.33 | $40.14 | $4,899.67 | $155,499.40 | $0.00 | $128,974.61 | $15,342.47 | ($3.05) | $3,584.12 |
| Mass. Scott | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $14,765.74 | $0.00 | $0.00 |
| ..Michael | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Kanan (Super Sonny) | | $99,310.58 | | | $143,313.49 | $0.00 | | $219,535.98 | $0.00 | $3,107.94 | $181,869.24 | $0.00 | $14,781.49 | $13,150.99 | | $12,518.00 |
| ..J., Paul | Barry | $33,755.42 | | | $36,411.46 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.06) | $0.00 |
| ..Carl | | $45,977.38 | | | $91,953.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $1,500.00 | $0.00 | $0.00 |
| ..Charles | The Event Chuck | | | | | $0.00 | | | $0.00 | $0.00 | $26,130.69 | $0.00 | $0.00 | $111,633.84 | $0.00 | $0.00 |
| Thomas C | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..Jesus Manuel | Cyclope | | | | | $0.00 | | $2,338.79 | $0.00 | $0.00 | $58,159.41 | $0.00 | $0.00 | $10,564.40 | $0.00 | $15,090.00 |
| Adam J. | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

IDENTIAL

## Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1994 March | 1994 Payroll | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Theodore J. | Rowdy Roddy/Public Enemy | $23.91 | $41,454.94 | | $119,442.21 | $201.75 | | $174,559.16 | $13.42 | $807.49 | $59,318.59 | $8.04 | $7,901.04 | | $0.00 | $0.00 |
| Lawrence | The Total Package/Lex Luger | | $443,999.79 | | $701,373.33 | $3,131.58 | $11,501.44 | $791,298.29 | $575.44 | $39,949.82 | $3,531,706.74 | $13.43 | $30,181.77 | $1,376,056.87 | $44.54 | $34,037.26 |
| a, Brian | Flyin Brian/Pillman California Brian | | $70,382.49 | $940.83 | | $0.00 | | | $0.00 | | | $0.00 | | $0.00 | | | |
| n, Craig Alan | Sgt. Craig Pittman | $1.38 | $99,481.14 | | $370,411.08 | $29.54 | $17.92 | $1.30 | $0.95 | $0.00 | | $0.00 | $0.00 | | ($0.12) | $0.00 |
| Lanny | Lanny Poffo | | | | | $0.00 | | $4,511.23 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Randy | Randy Savage/Macho King/Macho Man | $10,379.17 | $723,613.19 | | $1,920,170.25 | $1,079.43 | $6,442.20 | $1,342,679.71 | $4,074.77 | $23,937.73 | $1,416,443.66 | $257.71 | $219,406.74 | $1,143,287.67 | $65.65 | $80,533.43 |
| steve... | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | | | $0.00 | $0.00 |
| vether, r(Rick Steiner (Varsity Club) | Rick Steiner (Varsity Club) | | $156,212.16 | | $119,774.11 | $1.40 | $10,476.18 | $133,579.59 | $27.93 | $12,616.86 | $146,202.40 | $0.04 | $33,732.62 | $397,310.21 | | $0.00 |
| ...er Brother) | Big Poppa Pump | | $154,212.84 | | $329,943.79 | $1.39 | $10,476.18 | $311,250.25 | $27.94 | $113,474.19 | $463,348.94 | $578.17 | $34,992.87 | $773,069.14 | ($1.90) | $33,493.51 |
| ...son, Scott | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | | $1,508.89 | $119,593.36 |
| Rucb | | | | | | $0.00 | | $47,379.16 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Ron | Ron Reed | | $36,150.94 | | $87,036.09 | $0.00 | | $1,780.00 | $0.00 | $0.00 | $4,490.00 | $0.00 | $114,330.00 | | $0.00 | $0.00 |
| John | Ralphus | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...on, Mark | The Worm | | | | | $0.00 | | $500,000.00 | $0.00 | $0.00 | $1,174,412.50 | $0.00 | $0.00 | $26,239.94 | $0.00 | $0.00 |
| Dean | Shark Boy | | | | | $0.00 | | | $0.00 | $0.00 | $38,143.83 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...a, Sammy Lee | Kai Romeo | | | | | $0.00 | | | $0.00 | $0.00 | $22,620.31 | $0.00 | $0.00 | $457.39 | $0.00 | $0.00 |
| | | | | | | | | | | | | | | $34,651.30 | |
| Richard | Rick Rude | | | | | $0.00 | | $296,477.28 | $0.00 | $0.00 | $13,150.48 | $0.00 | $31,209.19 | $229,258.92 | $0.00 | $44.17 |
| Jeremiah | Bling Kevin | | | | | $0.00 | | $400.00 | $0.00 | $0.00 | $63,748.10 | $0.00 | $0.00 | $3,883.78 | $0.00 | $0.00 |
| ...da, Michael | Michael Wallstreet | | $119,382.16 | | $149,568.99 | $0.00 | | $157,431.14 | $0.00 | $0.00 | $163,205.04 | $0.00 | $0.00 | $131,173.48 | $0.00 | $0.00 |
| ...h, Harold | | | $46,077.36 | | $92,537.33 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1066666_3.XLS - Andre

DENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Last Name | Reg Name | 1994 Payroll | 1994 Merch. | 1994 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| s, Darlis | Darlis Rhodes | $164,902.42 | | $949.51 | $161,683.24 | $0.00 | | $103,179.56 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| s, Virgil | Dusty Rhodes | $233,314.06 | $47.38 | $33,024.54 | $135,776.56 | $0.00 | $451.44 | | $0.39 | $0.00 | $0.00 | $16,498.46 | | | $0.00 | $0.00 |
| wich, Jerry | Jerry Saghatsky Boys | | | | $312.06 | | | | | | | $0.00 | | | | |
| iro, Brian | | $8,000.00 | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | | | $0.00 | $0.00 |
| n, Rafid Gurdui | Super Cala | | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | | | $0.00 | $0.00 |
| i, Michael E. | Above Average | | | | | $0.00 | | $3,394.00 | $0.00 | $0.00 | $25,984.95 | $0.00 | $70,941.00 | | $0.00 | $0.00 |
| r, Robert | | | | | | $0.00 | | | $0.00 | $0.00 | $1,709.59 | $0.00 | $65,543.85 | | $0.00 | $0.00 |
| Kamala | | | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Perry (Shark Saturn itos) | Saturn | | | $31,780.81 | | $0.00 | | $163,315.60 | $0.00 | $1,814.87 | $273,249.21 | $149.44 | $29,544.23 | | $0.00 | $0.00 |
| Charles | J. Carl Scorpio | | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $44.08 | $4,333.37 |
| Hector | | | | | | $0.00 | | $46,993.31 | $0.00 | $0.00 | $82,948.36 | $0.00 | $0.00 | $0.00 | $0.00 |
| David | | | | | | $0.00 | | | $0.00 | $0.00 | $19,403.81 | $0.00 | $4,012.87 | $0.00 | $0.00 |
| ony, Uida | Sonny (Rafa) | | | | | $0.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | $24,392.44 | $0.00 | $0.00 |
| Shelly Deen Alexaica Inc.) | Dean Malenko | $132,545.44 | | | $246,310.89 | $2.41 | $10,674.18 | $248,493.65 | $29.41 | $13,555.14 | $234,162.53 | $58.45 | $33,571.09 | $49,700.03 | |
| Elia | Primetime Elix | | | | | $0.00 | | $1,344.00 | $0.00 | $0.00 | $29,187.54 | $0.00 | $74,408.26 | $18.72 | $7,217.56 |
| ichard) | Dick Slater | $39,234.43 | | | | $0.00 | | | $0.00 | $0.00 | $28,330.26 | $0.00 | $0.00 | $0.00 | $0.00 |
| f, Robert | Bobby Baste | | | | $17,451.06 | $0.00 | | $44,576.72 | $0.00 | $0.00 | $63,530.24 | $0.00 | $0.00 | ($1.00) | $0.00 |
| Norman | Samanna Norma/Shaik Majde | | | | | $0.00 | | | $0.00 | $0.00 | $100,449.42 | $0.00 | $172,631.49 | | $2,511.00 |
| Mark avid (Dillant on) | Devis Boy Smith/Bitish Bulldog | | | | $31,209.94 | $0.00 | | $241,597.72 | $0.00 | $1,793.22 | $45,893.30 | $0.00 | $0.00 | $41.36 | $0.00 |
| laam | Christian York | | | | | $0.00 | | | $0.00 | $0.00 | $17,247.15 | $0.00 | $0.00 | $0.00 | $109.88 |
| lli., Charles | C.J. Beronn | | | | | $0.00 | | | $0.00 | $0.00 | $19,334.19 | $0.00 | $0.00 | $0.00 | $0.00 |

$51,095.89
$12,748.37

100000_332.1 Active

11

...IDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1994 Payroll | 1994 Licensing | 1996 Merch. | 1996 Payroll | 1997 Licensing | 1997 Payroll | 1997 Merch. | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r, Daniel R. | Dangerous Dan/Spikey | | | | | | | | | $0.00 | $0.00 | $130,543.95 | $0.00 | $0.00 | | $0.00 | $0.00 |
| wild, Kenneth | High Voltage/Kenny Kaos | $16,542.00 | | | | | $77,290.00 | | $16,948.04 | $1,443.64 | $0.00 | | $0.00 | $161.89 | $19,093.88 | $0.00 | $0.00 |
| | | | | | | | | | | | | | | | ($1.00) | | $2,511.00 |
| t, Herman | | | | | $0.00 | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $22,500.00 | $0.00 | $0.00 |
| i, Shawn | Perfectshawn | | | | $0.00 | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $111,344.74 | $0.00 | $0.00 |
| , Jacobo | Jakes | | | | $0.00 | | | | | $0.00 | $0.00 | $54,127.36 | $0.00 | $0.00 | $19,331.76 | $0.00 | $0.00 |
| er, Chaz | | | | | $0.00 | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| t, Pat | El Gato | $45,134.90 | | | $0.00 | | $41,978.07 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $500.00 | $0.00 | $0.00 |
| Born, Adolfo | LaFuria | $3,967.31 | | | $0.00 | | $45,326.60 | | $47,460.39 | $0.00 | $0.00 | $111,479.75 | $0.00 | $22,556.81 | $105,567.81 | | $2,511.70 |
| , William Chase | | | | | $0.00 | | | | $3,600.00 | $0.00 | $0.00 | $24,590.06 | $0.00 | $0.00 | | ($1.00) | |
| , Dave | | $45,910.79 | | | $0.00 | | $85,662.47 | | $36,635.16 | $0.00 | $0.00 | $116,134.33 | $0.00 | $0.00 | $11,300.37 | $0.00 | $0.00 |
| , Paul W. | Terry Taylor | $145,799.10 | | | $0.00 | | $124,055.73 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , John | Avalanche | $139,443.96 | | | $0.00 | | $130,124.97 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| son, Wayne | Thunderbolt | | | | $0.00 | | | | | $0.00 | $0.00 | $20,890.41 | $0.00 | $0.00 | | $0.00 | $0.00 |
| er, Randy | Sweat | $183,205.55 | | | $0.00 | | $41,578.12 | | $448,078.90 | $0.00 | $1,733.30 | $13,362.20 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | Kevin | | | | | | | | | $0.00 | | $466,577.16 | $0.00 | $31,424.54 | $472,894.12 | | $2,740.45 |
| r, Roderick | Rowdy Roddy Piper (Handles, Inc.) | | | | | | | | | | | | | | | | |
| , Dale | The Demon | | | | $0.00 | | $11,542.86 | | $45,180.49 | $0.00 | $0.00 | $55,941.67 | $0.00 | $0.00 | $48,314.43 | $0.00 | $0.00 |
| r, Ray | Big Bubba Rogers | $303,938.31 | | | $20.28 | $10.76 | $204,596.16 | | $224,042.61 | $3.07 | $0.00 | | $0.00 | $0.00 | | | $0.00 |
| Michael Jerry | Sgt. A-Wall / The Wall | | | | $0.00 | | | | | $0.00 | $0.00 | $27,794.91 | $0.00 | $0.00 | $125,031.12 | | $0.00 |
| Joseph | Hunter Claws Posse | | | | $0.00 | | | | | $0.00 | $0.00 | $57,212.17 | $0.00 | $0.00 | | $0.00 | $0.00 |
| i, Rene | Barbarian | $71,548.47 | | | $0.15 | | $145,548.93 | | $163,409.16 | $0.00 | $0.00 | $189,044.52 | $0.00 | $27,132.03 | $14,960.08 | $0.00 | $0.00 |
| Kharne | Iron Sheik | | | | $0.00 | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Uohn | Sky Boy | | | | $0.00 | | $54,403.05 | | $111,437.10 | $0.00 | $0.00 | $115,987.11 | $0.00 | $23,944.13 | | $0.00 | $44.12 |
| t, Richard | Rat Martel | | | | $0.00 | | $40,338.60 | | $110,247.37 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Kevin | Kevin Kelly | | | | $0.00 | | | | $144,360.87 | $0.00 | $0.00 | $102,392.01 | $0.00 | $0.00 | | $0.00 | $0.00 |

1044444_3.XLS / Active



Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| er, Bobby | Hardwick, Bobby Walker | $70,012.37 | | | $94,071.49 | $0.00 | | $33,942.63 | $0.00 | $0.00 | $99,590.00 | $0.00 | $0.00 | $95,370.42 | $0.00 | $0.00 |
| rm, Sam | Sika | $66,602.66 | | | $264,620.02 | $3,543.43 | $13,239.09 | $33,054.79 | $2,326.41 | $5,160.21 | | $0.00 | $3,476.17 | | $1.00 | $0.00 |
| on, John M. | Mikey Whipwreck | | | | | $0.00 | | | $0.00 | $0.00 | $34,993.49 | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, Erik Johnson | Erik Watts | | | | | $0.00 | | $41,310.84 | $0.00 | $0.00 | $34,047.34 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 2, Robert | Colonel Parker | $71,516.41 | | | $18,136.07 | $0.00 | | $900.00 | $0.00 | $0.00 | $28,189.91 | $0.00 | $0.00 | | $0.00 | $0.00 |
| rer, Michael | Michael Wiener | $37,466.20 | | | $23,377.86 | $0.00 | | $23,416.05 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Anthony | Tony Atlas | | | | | $0.00 | | | $0.00 | $0.00 | | | $0.00 | | $0.00 | $0.00 |
| 4, Leon | Vader or Big Van Vader | | $162.35 | | $4,701.35 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, Reggie | Barbie | | | | $209,000.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| 4, Matthew | | | | | $34,722.01 | $0.00 | | $2,374.71 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| i, Paul (Blue Ox) | Giant | $236,407.18 | | | $313,444.26 | $1,107.92 | $11,020.43 | $199,930.29 | $383.43 | $46,422.61 | $53,733.75 | $0.38 | $82,738.10 | | ($0.31) | $60,748.75 |
| rm, Steve | Steve Austin Stunning | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $19,000.00 | | $0.00 |
| m, Alex | Renegade | | | | | | | | | $10,488.41 | | | | | |
| m, Stephen | Luther | $1,700.00 | | | | $0.00 | | | $0.00 | $0.00 | $33,794.35 | $0.00 | $0.00 | $10,109.60 | | |
| am, Barry | Barry Windham | $949.45 | | | | | | $64,394.12 | $0.00 | $0.00 | $338,054.31 | $0.00 | $0.00 | $39,213.07 | | $0.00 |
| tery, Kendall | Renegade | | | | $20,136.97 | $0.00 | | $77,133.46 | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.00) | $2,518.00 |
| n, Alex | Renegade/Alex Wright | $134,293.51 | | | $149,450.38 | $48.89 | | $234,444.35 | $29.69 | $33,307.64 | $373,411.06 | $0.00 | $13,993.24 | $391,211.09 | | $0.00 |
| , Chad | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | ($0.11) | $2,543.53 |
| nkovic, Brian (Inc.) | Brian Knobs | $230,317.21 | $47.34 | $11,903.95 | $159,622.75 | $12.06 | | | $0.51 | $0.00 | $187,602.25 | $0.00 | $0.00 | $181,778.46 | | $0.00 |
| 2, Brett | | | | | | $0.00 | | | $0.00 | $0.00 | $9,377.04 | $0.00 | $0.00 | | | $0.00 |
| James | Jorg Dragoras | | | | | $0.00 | | | $0.00 | $0.00 | $3,718.88 | $0.00 | $0.00 | $7,510.02 | $10.00 | $0.00 |
| , Chris | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1066606_3.XLS - Active

## Exhibit B

# POWER PLANT TRAINEES

| REAL NAME | RING NAME |
|---|---|
| Allen, Steve | |
| Baum, Matthew B. | |
| Beach, Cameron | |
| Bernick, Brian Michael | Jet Jaguar |
| Bobic, Nikola | |
| Cain, Joseph Bradley | |
| Carr, Tony Byron | Corporal Cruel |
| Cornell, Rick | Nino, Reno |
| Craig, Twanta Maurice | |
| Daniel, Jason Matthew | J-Sin, New-sensation Jason |
| Davis, Marcial R. | Mercenary |
| Denson, Joseph (Joey) Frederick III | |
| Dixon, Rico | |
| Dorgan, Joe | Johnny Swinger |
| Dreer, William C. (Billy) | |
| Duong, Phap Minh | |
| Easterling, Darron Devon | |
| Endres, Troy | |
| Evans, Sean Charles | Shocker |
| Faqir, Rachid Daniel (Danny) | |
| Fliehr, David | David Flair |
| Forrester, Ryan | The Hearthrob |
| Fortune, Chad | |
| Funk, Allan Eric | Vytor, Triple A |
| James Gibson | |
| Greco, Sam | |
| Greene, John | Johnny Attitude |
| Groegler, Charles I. | |
| Guthrie, Mark | |
| Haire, Sean | Sean O'Haire |
| Hamner, Bret | |
| Hildreth, Mark | |
| Hogue, Harold | Ice Train |
| Hugger, Jonathan Martin | Johnny Blaze or Johnny Blade |
| Hunke, Gregory John | J T Greed |
| Jindrak, Mark | Mark Millenium |
| Jones, Allen | |
| Karagias, Evan | |
| Kellum, Rob | Artiste |
| Knapik, Robert J. | |
| Knox, Paul Lewis | Pierce Kage |
| Lee, Charles M. | |

## Exhibit B

| | |
|---|---|
| Le Flore, Wondell | The Judge |
| LeRoux, J. Mark | Lash LeRoux |
| Loewen, Robert S. | |
| Mally (O'Malley), Craig | Irish Invasion |
| Maria, David | Apache |
| Massengale, Jason | |
| Moore, Ken | |
| Nimmons, Michael Brady | Mike Nova |
| Norris, Harrison, Jr. | Hardbody Harrison |
| Northcutt, Kevin | |
| Oliveira, Stephen | |
| Palumbo, Charles (Chuck) R. | |
| Reis, Ron | |
| Roll, Dean | Shark Boy |
| Roman, Sam | Rick Romeo, Kid Romeo |
| Saengsiphan, Bounthan | |
| Sanders, Mike | |
| Sapp, Bob | |
| Siaki, Sonny | Hawaiian GQ |
| Skipper, Elix | T-Lock, Venom |
| Speight, Lester | Mighty Rasta |
| Strauss, Jacobus | Jakes |
| Tatum, W. Chase | |
| Thurber, Courtright | |
| Thurber, James | |
| Tilton, Kevin | The Engima |
| Tipton, Mark | |
| Torborg, Dale | |
| Tuite, Michael Jerry | |
| Walker, Charles Franklin | |
| Walker, J. Bradley, Sr. | |
| Watkins, Joe | Vic Violent |
| White, Curtis L. | Toad |
| Wiese, Matthew | |
| Wilson, Luther | |
| Worthen, William | William Worthy |
| Wright, Chris | C.W. |
| Wright, Wesley "Shane" | |
| Yokley, Brett | |
| Yun, James | |

1055247_3.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
      and Turner Broadcasting System, Inc., Civ. File No. 1:00-
      CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
      Sports, Inc. and Turner Broadcasting System, Inc., Civ.
      File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
      Sports, Inc. and Turner Broadcasting System, Inc., Civ.
      File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
      Inc. and Turner Broadcasting System, Inc., Civ. File No.
      1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
      Inc., Turner Entertainment Group, Inc. and Turner
      Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC


CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANT UNIVERSAL WRESTLING CORPORATION'S SUPPLEMENTAL*

*RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST INTERROGATORIES TO*

*DEFENDANTS WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS,*

*INC.* upon the interested parties by hand delivery, properly

addressed to:

1059482_1.DOC

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA 30305

This 10th day of October, 2002.

Eric A. Richardson