ORIGINAL

IN THE UNITED STATES DISCTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICK REEVES,                        )
                                    )
        Plaintiff,                  )
                                    )       CIVIL ACTION FILE
v.                                  )
                                    )       No. 1:00-CV-1720-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER      )
BROADCASTING SYSTEM, INC.,          )
                                    )
        Defendants.                 )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Comes now Plaintiff Rick Reeves ("Reeves") and respectfully submits (pursuant to Rule 56.1) his response to Defendants World Championship Wrestling, Inc. ("WCW"), Turner Sports, Inc. ("TSI"), and Turner Broadcasting System, Inc., ("TBS"), showing the Court the following:

1.    Reeves does not dispute SMF No. 1.

2.    Reeves does not dispute SMF No. 2.

3.    Reeves does not dispute SMF No. 3.

4.    Reeves disputes SMF No. 4.  Although Defendant WCW designated wrestlers and other performers to be independent contractors, as a matter of law these workers were employees of WCW.  Under the terms of the of the standard Independent Contractor Agreements ("ICA") WCW entered into with virtually

all of its contract talent, performers were not allowed to compete with WCW either during or after the term of their contracts.  Additionally, WCW's standard ICA forbid performers from doing **any kind of work** without the express permission of WCW.  This rule was reinforced by JJ Dillon on April 30, 1999, when he sent a memo to "All WCW Talent" regarding schedules "including personal appearances."  See Pl. Ex. 49, attached herewith at Tab 1[1]; Morrison Dep. at 172.  In his memo, Mr. Dillon advised all wrestlers that "all requests for days 'off' must be requested in advance and approved by JJ Dillon."  Mr. Dillon also told the wrestlers that during time "off," wrestlers could not make personal appearances unless those appearances were first approved by WCW.  Under the policy announced by Mr. Dillon, if a wrestler was approached about a personal appearance, he would be required to refer the request to Mr. Dillon.  Mr. Dillon would decide whether to approve the appearance.  WCW would then collect the appearance fee, and the wrestler would be required to share the fee with WCW.   WCW exercises complete control over wrestlers' performances --- deciding every detail of every performance --- from the specific dates and times to the consequences for being late or missing a

---

[1] All references to Tabs 1-4 refer to documents attached herewith.  All other lettered references to Tabs relate to Reeves' separate Exhibits.

scheduled performance.  Any failure to comply with this policy would be considered a breach of contract.

5.    Reeves disputes SMF No. 5.  WCW promoted Caucasians including Kevin Nash, Tank Abbott, and Joey Maggs who did not have any such experience. (Reeves Dep. at 38, 73, 92; Walker Aff. ¶¶ 8,9; Tab P).

6.    Reeves disputes SMF No. 6.  During its entire existence, WCW only made money during a brief period of time. According to John E. Kampfe, the Senior Vice President and Chief Accounting Officer for TBS, WCW lost millions of dollars on an annual basis "from the day Ted Turner bought it . . .up until roughly 1997, 1998 time frame."  See Kampfe Dep. at 14-15.  As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id.  at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72.

7.    Reeves disputes SMF No. 7.  WCW never lost any of its own money because all of it losses were financed by its parent corporation Defendant Turner Broadcasting, Inc. ("TBS").  As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id. at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72-73.  During that period, TBS financed WCW's losses because having access to WCW

- 3 -

programming allowed TBS's subsidiaries to "boast about its ratings" because the WCW program "was the highest rated cable show on television." Id. at 42. TBS financed WCW's losses for access to WCW programming. Id. at 73-74. WCW did not have to worry about the cost of talent because TBS covered that cost, **and TBS never told WCW to cut its cost of talent.** Id. at 61.

WCW was involved in significant hiring during 1999. On March 31, 1999, Diana Myers reported to Dr. Harvey Schiller, the President of Turner Sports that WCW had just entered into new contracts with two new wrestlers (costing $895,000) and had given two wrestlers raises (costing $115,000), for a net talent cost increase of $1,010,000. See Pl. Ex. 75; Tab 2. Following those increases in costs, WCW was "$1,858,000 **under budget** for 1999." See Pl. Ex. 75; Tab 2. During May 1999, WCW added 13 new talents, gave two wrestlers raises, and terminated two contracts for a net increase in talent cost of $58,714. See Pl. Ex. 76; Tab 3). In her May report, Myers reported to Schiller that "we are currently $100,000 **under budget** for 1999." See Pl. Ex. 76; Tab 3).

A memo from Myers to Bischoff and Bill Busch dated June 9, 1999, reported on New ICAs (Independent Contractor Agreements) and Trainees, listing thirty (30) new performers with WCW for the first six months of the year, representing an increase in payroll to new personnel of $2,709,514. See Pl. Ex. 64; Tab 4).

- 4 -

Finally, Defendants offer no meaningful statistics to support their claim that WCW "began to produce fewer and fewer" events in 1999. Accordingly, Plaintiff denies the assertion.

8.   Reeves does not dispute SMF No. 8.

9.   Reeves does not dispute SMF No. 9.

10.  Reeves disputes SMF No. 10. Defendants do not state what services Reeves did perform on behalf of WCW when it makes the statement that "Reeves has never performed any *other* services on behalf of WCW." (emphasis added) In addition, Reeves' claim hinges on Defendants' failure to give him the opportunity to provide any services on their behalf.

11.  Reeves does not dispute SMF No. 11.

12.  Reeves does not dispute SMF No. 12.

13.  Reeves disputes SMF No. 13. Reeves testified that Mr. Patterson told Mr. Anderson that Reeves was his "son" and that this type of introduction of a younger wrestler as the "son" of an older, more established wrestler was common practice. (Reeves Dep. at 31-32).

14.  Reeves does not dispute SMF No. 14.

15.  Reeves disputes SMF No. 15. Reeves testified that he attended more than twenty WCW television tapings. (Reeves Dep. at 34-35).

16.  Reeves disputes SMF No. 16. Reeves testified that he would wait for someone to ask him to wrestle and that he would

also repeatedly ask Ole Anderson if he would be wrestling that day.  Mr. Anderson would reply that he should just "hang in there."  (Reeves Dep. at 39).  Reeves also attended these wrestling events, per Gene Anderson's instructions so that Reeves could watch and learn to become a better wrestler when he got his chance. (Reeves Aff. At ¶ 7).

17.  Reeves disputes SMF No. 17.  Although Reeves was not given the opportunity to wrestle, he was instructed by Gene Anderson to sit and watch matches, which Reeves did.  (Reeves Aff. at ¶ 7).

18.  Reeves disputes SMF No. 18.  Reeves did send video tapes of himself wrestling to WCW and J.J. Dillon, but he never testified that he did so because he was not asked to wrestle at the tapings he attended.  (Reeves Dep. at 45-46).

19.  Reeves disputes SMF No. 19.  Reeves testified that he may have sent these seven or eight video tapes sometime before 1995 through 1996 and that the tapes contained two or three wrestling matches per tape.  (Reeves Dep. at 45-47).

20.  Reeves disputes SMF No. 20.  Reeves testified that he sent the video tapes to "the talent guy" at WCW but could not remember the exact name.  (Reeves Dep. at 45-46).  Later in his deposition, he clarified that he sent the tapes to J.J. Dillon.  (Reeves Dep. at 47).  In any event, the "talent guy" was J.J. Dillon.  (Reeves Aff. at ¶ 10).

- 6 -

21.   Reeves disputes SMF No. 21 because his tapes were provided to WCW.   (Reeves Aff. at ¶ 8).

22.   Reeves disputes SMF No. 22.   Reeves testified that he sent video tapes, letters, and made phone calls to WCW - not that he called and left message with WCW employees after he did not receive a response from WCW regarding the video tapes. (Reeves Dep. at 46).

23.   Reeves does not dispute SMF No. 23.

24.   Reeves disputes SMF No. 24.   Reeves testified that he spoke to J.J. Dillon in person at the training center on Howell Mill Road.   (Reeves Dep. at 48).   Reeves does admit that Mr. Dillon never took his call or made an appointment.   (Reeves Dep. at 51).

25.   Reeves disputes SMF No. 25.   (Reeves Aff. at ¶ 10).

26.   Reeves disputes SMF No. 26.   Reeves testified that he called Terry Taylor "quite a bit" and that he met him several times at the Ramada Hotel.   (Reeves Dep. at 55).

27.   Reeves disputes SMF No. 27.   Reeves testified that he spoke with Mr. Taylor at the Ramada Hotel and had a conversation with him about getting a job.   (Reeves Dep. at 55-56).   Also, Reeves left several phone messages on Taylor's voice-mail. (Reeves at 62-66).   Also, Reeves did not happen to "see" Mr. Taylor at the Ramada Inn; Reeves purposefully went there many

times before and after November, 1999.  (Reeves Aff. at ¶¶
11,12).

28.  Reeves disputes SMF No. 28.  When Reeves asked for a
job, Mr. Taylor responded that they "got enough of y'all boys
already."  (Reeves Dep. at 55-56).

29.  Reeves does not dispute SMF No. 29.

30.  Reeves disputes SMF No. 30.  Reeves testified that he
asked Jody Hamilton about how to get a job.  (Reeves Dep. at
59).

31.  Reeves disputes SMF No. 31.  When Reeves asked for a
job, Mr. Hamilton replied, "We got enough of your kind down
here."  (Reeves Dep. at 59).

32.  Reeves disputes SMF No. 32.  Reeves did not testify
that Mr. Hamilton has never heard of Reeves.  (Reeves Aff. at ¶
17).

33.  Reeves disputes SMF No. 33.  Reeves testified that he
asked Jody Hamilton for an opportunity to train at the Power
Plant and that Mr. Hamilton stated, "We got enough of your kind
down here."  (Reeves at 59-60).

34.  Reeves disputes SMF No. 34.  He testified that he
could not say "exactly."  (Reeves at 53).

35.  Reeves disputes SMF No. 35.  Reeves testified that WCW
Bookers would instruct wrestlers on the outcomes and how to "put
this guy over."  (Reeves at 105).

This 30th day of January, 2003.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Telephone:   (404) 261-6020
Telecopy:    (404) 261-3656

- 9 -



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

To: ALL WCW TALENT

From: J.J. DILLON

Date: APRIL 30, 1999

CC: Eric Bischoff
      Bill Busch
      Diana Myers
      Alan Sharp

Subject: TALENT SCHEDULES, INCLUDING PERSONAL APPEARANCES

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

We have had several recent situations where talent were needed on short notice for WCW business ("house show" substitution, personal appearance, etc.) only to be informed by the individual talent that they had made a previous commitment not approved by WCW (movie project, charity appearance, autograph session, etc.) that caused a conflict.     In order to avoid a reoccurrence of these situations from this point forward, please be advised that all requests for days "OFF" must be requested in advance and approved by J.J. Dillon.     If you are planning a vacation, wanting to attend the wedding of a friend or planning to attend a school reunion, etc., you must request the time off in advance. THIS INCLUDES ANY AND ALL PERSONAL APPEARANCES (INCLUDING AUTOGRAPH SESSIONS), WHETHER FOR CHARITY OR INVOLVING AN APPEARANCE FEE.

Talent Relations has been given approval on a trial basis to authorize personal appearances for talent that involve payment to talent of a fee payable from a source outside our company.     These personal appearances will only be considered "Authorized Appearances" if they are scheduled through WCW.     The talent involved and WCW will share any fee involved, with the majority of any appearance fee going to the talent that makes the appearance.     All of these non WCW related personal appearances will be voluntary (therefore not regarded as a workday if there are limitations in the WCW talent contract) and subject to the approval of the talent. Appearance fees are usually determined by the fair market value, and if approached, WCW will attempt to get a fair appearance fee, which is subject to the approval of the talent.     If you are approached concerning an appearance, please have the party contact J.J. Dillon to comply with our appearance approval process.     This usually involves a contract for the appearance, which assures the validity of the request.     All appearance fees are received in advance by WCW, which assures the talent will be paid in accordance with the agreement.     ALL APPEARANCES NOT CLEARED BY WCW WILL BE REGARDED AS "UNAUTHORIZED" AND YOUR PARTICIPATION IN AN "UNAUTHORIZED APPEARANCE" COULD BE INTERPRETED AS A BREACH OF YOUR CONTRACT.

This represents a great opportunity for an added revenue stream for WCW talent.     This should continue beyond a trial basis, if we all work within the system.     If you have any questions or comments, please call J.J. Dillon at (404) 603-3832.     Thank you.



49

WCW 010262
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## 2

(To be scanned in place of tab)

**WCW**
WORLD
CHAMPIONSHIP
WRESTLING™

A Time Warner Company

# MEMO

TO:         Dr. Harvey Schiller

CC:         Eric Bischoff
            David Payne
            Matt Stroer
            Bill Busch

FROM:       Diana Myers

RE:         Talent Budget Summary

DATE:       March 31, 1999

---

The following is a synopsis of the Talent Contract Changes for March 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added two (2) new talent:                              $895,000
(David Abbott, Brian Yandrisovitz)

We negotiated increased contracts for two (2) talent:    $115,000
(Glenn Gilbertti, Ron Reis)

Impact to WCW Total Talent Commitment (increase):   $1,010,000

With this increase and our variables, we are currently $1,858,000 under budget for 1999.



PLAINTIFF'S
EXHIBIT
75

WCW 019229
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

3

(To be scanned in place of tab)



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 28, 1999

---

The following is a synopsis of the Talent Contract Changes for May 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added thirteen (13) new talent:                          $457,600
(David Fliehr, Emory Hail, and eleven trainees)

We negotiated increased contracts for three (3) talent:     $51,714
(Jacobus Strauss, and two(2) former non-contract
talent Scott James and Steve James)

We terminated two (2) contracts:                            $450,000
(Steve McMichael, Kevin Wacholz)

With this increase and our variables, we are currently $100,000 under budget for 1999.

**PLAINTIFF'S EXHIBIT**
76
PENGAD-Bayonne, N.J.

A Time Warner Company

WCW 019227
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

TO:         Eric Bischoff
            Bill Busch

FROM:       Diana Myers

DATE:       June 9, 1999

RE:         New ICAs and Trainees

| Name | Salary (1st year) |
|---|---|
| **Cornell, Richard** (trainee-referred by Kanyon) | **$ 26,000** |
| **Davis, Marcial** (trainee) | **$ 31,200** |
| **Durham, Michael** (Public Enemy) | **$170,000** |
| **Fliehr, David** (David Flair) | **$ 45,000** |
| **Forrester, Ryan** (trainee-referred by Kanyon) | **$ 20,800** |
| **Funk, Allen Eric** (trainee) | **$ 31,200** |
| **Gruner, Pete** (Billy Kidman) | **$300,000** (increase from $125,000) |
| **Hail, Emory** (Emory Hale) | **$ 85,000** |
| **Helms, Gregory Shane** (referred by Kanyon) | **$ 45,000** |
| **Hugger, Jon** (trainee) | **$ 15,600** |
| **James, Scott** (Scott Armstrong) | **$ 52,143** (increase from $31,286) |
| **James, Steve** (Steve Armstrong) | **$ 52,143** (increase from $31,286) |
| **Jindrak, Mark Robert** (trainee) | **$ 39,000** |
| **Jones, Allen** (trainee-referred by Kanyon) | **$ 20,800** |
| **Massengale, Jason** (trainee-referred by Kanyon) | **$ 20,800** |
| **Moore, Shannon** (referred by Kanyon) | **$ 45,000** |
| **Norris, Harrison** (trainee) | **$ 39,000** |
| **Palumbo, Charles** (trainee) | **$ 39,000** |
| **Petty, Ted** (Public Enemy) | **$170,000** |
| **Rodman, Dennis** | **$1,000,000** |
| **Roman, Sammy Lee** (trainee) | **$ 26,000** |
| **Sanders, Michael** (trainee) | **$ 31,200** |
| **Siaki, Sonny Uaita** (trainee) | **$ 31,200** |
| **Skipper, Elix** (trainee) | **$ 39,000** |
| **Strauss, Jacobus** (Jakes) | **$ 75,000** |
| **Thornton, Randy** (Swoll) | **$350,000** ($50k signing bonus) |
| **Tilton, Kevin** (trainee) | **$ 15,600** |
| **Wilson, Luther** (referred by Kanyon) | **$ 45,000** |
| **Yokley, Jay Brett** (trainee) | **$ 15,600** |
| **Yun, James** (trainee-referred by Kanyon) | **$ 20,800** |

PLAINTIFF'S EXHIBIT

A Time Warner Company

WCW 018865
CONFIDENTIAL

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiff's Response to Defendants' Statement of Undisputed Material Facts** by hand delivery addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This __30th__ day of January, 2003.

Charles Gernazian